## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ABRAHAM LEIFER, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, | Case No. _____ |
| | **CLASS ACTION COMPLAINT** |
| *Plaintiff*, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C., | |
| *Defendants*. | |

Plaintiff Abraham Leifer ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following class action complaint (the "Action") against the above-captioned Defendants, Live Nation Entertainment, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster," and, with Live Nation, the "Defendants"), upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of his counsel, as follows:

## I.      PRELIMINARY STATEMENT

1.      One of the most culturally significant ways to experience music is through seeing an artist perform live.  In the United States, live music is extremely popular – so much so that an entire industry has been built around the profits that live music concerts generate.

2.      Naturally, the artists are the draw for a live music event and drive demand for the services of every other participant in the live music industry.  An artist's manager serves as the strategic executive for an artist's business activities, advising in some or all phases of the artist's professional life.  The manager often hires booking agents to assist in arranging a concert event or tour.  The manager or booking agent contracts with promoters, such as Live Nation, to secure payment terms for artists as compensation for their live performances.

3.      The promoter is responsible for promoting the concert to the public, which requires several different types of work.  The promoter hires the artist for the performance, generally contracts with the venue (or uses its own venues), pays the concert venue a fee to host the concert at the venue, arranges for local production services, and advertises and markets the concert.  Artists planning to conduct a tour at major concert venues will often use a single company to provide and/or coordinate promotions for the entirety of the tour.  Concert venue operators provide access to and maintain the facilities where concerts are held and oversee the venues' associated services, such as concessions, parking and security.

4.      In terms of ticket sales, concert venue operators have two options: either to manage the sale of ticket inventory themselves or contract with a third party to handle the sale process for them.  Managing and selling concert venue tickets is technologically and operationally complex, so most concert venue operators choose the latter option and contract with ticketing service providers for comprehensive ticketing solutions on the primary market (*i.e.*, the market for initial sales of tickets, prior to any reselling on the secondary market).

5.      Next, primary ticketing service providers contract with venues to manage and sell primary ticket inventory for events at a specific venue.  The primary ticketing service providers (like Ticketmaster) provide primary ticketing services to primary ticket purchasers by acting as a distributor, selling the primary ticket inventory made available to them through means such as the internet, call centers, retail outlets and/or helping the venue sell tickets at its box office.

6.      Finally, primary level consumers purchase tickets from that ticketing agent for the artist's concert, and the primary consumer can then turn around and resell that ticket on the secondary market.  Generally, this is how the distribution chain looks for major concerts and events, which are the subject of this Action.

7.      Over the past three decades, Live Nation and Ticketmaster collectively built empires in several key markets within the live concert and event economy.  Live Nation grew into a concert and event promotion behemoth, and Ticketmaster captured the primary and secondary markets for concert and event ticket sales in the United States.  To make matters worse, Defendants

consummated an all-stock merger in 2010, combining their two forces into a vertically integrated monopoly and juggernaut trust.

8.      As a result of this merger, the new entity now dominates three major economic markets in the United States: (1) concert promotion for major concert venues, (2) primary ticketing services for major concert venues[1] and (3) secondary ticketing services for major concert venues.[2] Live Nation and Ticketmaster have continued to grow their already dominant market shares in each of the three markets by leveraging their monopoly power in each market against smaller competitors in the other two markets, as detailed herein.  Live Nation, as a major concert promoter, acts as the promoting agent for at least 80 of the top 100 largest concert and event venues in the United States.  Across the board, Live Nation's market share in the promotion of major concert venues exceeds 60%.  To protect its dominance in this market, Live Nation often requires that the venues with which it contracts sign anticompetitive exclusive agreements that entrench Live Nation as the venues' sole concert and event promoting agent.  Live Nation, as discussed below, also controls hundreds of venues either through leaseholds, ownership, or equity interests.  This means that, to access to the majority of significant concert and event tours in the United States, a consumer must interact, directly or indirectly, with Live Nation.  Live Nation additionally requires that the venues for which it acts as promoter use Ticketmaster as the sole agent for primary ticketing for all Live Nation-promoted concerts and events.  This exclusive, anticompetitive and unlawful tying eliminates significant competition, as it boxes all other primary ticketing agents out from servicing any concerts or events where Live Nation is the promoter, *i.e.*, most major concerts and events in the United States.  This tying also swells the Defendants' profits, as they collect both upstream revenue from the promotion of concerts and events, as well as downstream revenue from the sale of tickets for those events.

---

[1] "Primary" ticketing refers to the initial distribution of tickets for a show.  This is as compared to "secondary" ticketing, which refers to the resale of previously purchased tickets.

[2] Although all three markets are at issue in this Action, the third market, secondary ticketing services for major concert venues in the United States, is defined as the "Relevant Market."

9.      With respect to Ticketmaster's dominance over the downstream distribution of tickets, Ticketmaster controls the sale of over 70-80% of all primary tickets for major concert venues in the United States.  This monopoly power is reinforced by Live Nation's chokehold over the market for concert promotion for major concert venues, because Live Nation forces the venues it services to use Ticketmaster as their sole primary ticketing agent.  Thus, on the primary ticket market, Ticketmaster acts as the sole ticket broker between the venue and the end consumer.  Ticketmaster, because of this exclusivity, is able to charge supracompetitive fees for each ticket sold through its platform.  Additionally, the face-value of each ticket sold in the primary market is supracompetitively priced.  This is because Live Nation and Ticketmaster work in tandem to eliminate competition in the primary ticketing market.  As a result of Live Nation's requirement that Ticketmaster be the sole primary ticketing agent for any venues Live Nation services, would-be competitors in the primary ticketing market, such as SeatGeek and StubHub, are shut out from competing in the market.  Without any threat of downward pricing pressure from competitor ticketing agents, Ticketmaster is able to maintain the face-value of the tickets it sells for major concert and event venues at supracompetitive levels. Ticketmaster's margins, because of its supracompetitive fees and supracompetitive face-value prices, are as high as 80% on each ticket sold.

10.     Subsidized by the supracompetitive profits that Ticketmaster's business generates through its domination of the primary and (as addressed below) secondary ticketing market for major concert venues, Live Nation can keep a stranglehold on the concert promotion market by engaging in predatory pricing for its promotion services.  As a result of its predatory pricing, which often involves paying rebates to its venue clients, Live Nation is able to eliminate significant competition in the promotion market, wiping out would-be competitors who are not similarly subsidized by profits from unlawful tying arrangements with ticketing affiliates.  Accordingly, despite Live Nation's promotion business losing tens of millions of dollars in some years due to its predatory pricing, its promotion business is able to stay afloat by functioning as a loss leader that helps maintain the market dominance of Live Nation's subsidiary and affiliate, Ticketmaster.

Venue operators must consider the very real possibility that Live Nation will not route tours through their venues if they do not select Ticketmaster as their exclusive ticketing service provider, and so these venue operators engage Ticketmaster, further entrenching its ticketing monopoly.

11.     Similarly, in the market for secondary ticketing services for major concert venues, the Relevant Market, Ticketmaster uses its vise grip over the primary market to control the secondary market for ticket sales for major concerts and events.  Using anticompetitive technological restraints as further detailed herein, Ticketmaster squelches competition in the Relevant Market by making it very difficult to resell tickets initially purchased from Ticketmaster on any platform other than Ticketmaster's secondary market platform.  These anticompetitive technological restraints include, among others, exploiting consumers' mobile phone technology in order to block the ability to transfer tickets instantly to secondary market purchasers not using Ticketmaster's platform, as well as misusing supposed copyright protections to purport to invalidate tickets transferred outside of Ticketmaster's secondary market platform.  Through these unlawful and anticompetitive restraints, Ticketmaster is able both to deter most secondary ticketing agents from transacting with primary purchasers who bought from Ticketmaster, and to deter many would-be secondary ticketing agents from entering the market at all, in each case shrinking the number of secondary ticketing agents on the Relevant Market dramatically.  This paucity of ticketing agents on the secondary market, in turn, enables these few secondary ticketing agents to resell tickets at supracompetitive prices, resulting in harm to end-use consumers who purchase tickets for major concerts and events in the United States on the secondary market.  In short, Ticketmaster's primary market platform works in tandem with its secondary market platform to distort, corrupt and restrain competition in the Relevant Market.

12.     The result is devastating for consumers within the Relevant Market, all end-user purchasers in the United States who purchase secondary tickets on Secondary Ticket Exchanges[3]

---

[3] These exchanges are defined as all platforms that facilitate sales in the Relevant Market, and include but are not limited to the following: StubHub, Vivid Seats, SeekGeek, ViaGoGo, and TickPick.

from a Secondary Seller[4] who, in turn, purchased a primary ticket or a secondary ticket for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation at any point since the 2010 merger (the "Class").

13.     Plaintiff and Class members are forced to pay supracompetitive prices for tickets to concerts and events in the Relevant Market.  Plaintiff and Class members pay supracompetitive prices because Ticketmaster levies excessively high fees in the primary market on tickets that it sells, which are then passed down to consumers in the secondary market.  Additionally, consumers pay higher prices for tickets in the Relevant Market that originated from Ticketmaster because Ticketmaster inflates the face-values of tickets, as described herein.   Here too, these supracompetitive prices are passed down to consumers each time a ticket resells in the Relevant Market.  Further, because Ticketmaster interferes with Secondary Ticket Exchanges' ability to transact in tickets originally purchased from Ticketmaster, there are few Secondary Ticket Exchanges operating in the Relevant Market, enabling those that are doing so to impose supracompetitive prices when tickets are resold.  Absent Ticketmaster's anticompetitive conduct, Plaintiff and Class members would have paid significantly lower prices in the Relevant Market.

14.     At the time of the filing of this Action, Live Nation and Ticketmaster were facing multiple government investigations and/or lawsuits, including (but not limited to) by the Senate Judiciary Subcommittee on Antitrust, the Senate Investigative Subcommittee, and the United States Department of Justice's Antitrust Division.

15.     Against this backdrop, Plaintiff brings this lawsuit against Defendants on behalf of himself and all other similarly situated indirect purchasers under Sections 1 and 2 of the Sherman Antitrust Act and various state antitrust laws seeking actual damages, treble damages, declaratory relief, injunctive relief, pre- and post- judgment interest, as well as reasonable costs and attorney's fees associated with the prosecution of this Action.

---

[4] A purchaser of a major concert or event ticket that primarily originated from Ticketmaster who then resells said ticket to a secondary market purchaser.

## II.     JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as well as Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

17.     This Court has personal jurisdiction over both of the Defendants because Defendants transact business in this District and caused injury in this District through their anticompetitive conduct.

18.     Venue is proper in this District pursuant to the Clayton Act because Defendants are licensed to do business in this District, and a substantial portion of the affected interstate commerce described herein was carried out in this District.

## III.     PARTIES

### *Plaintiff*

19.     Plaintiff Abraham Leifer is a resident of Kings County, New York.

20.     In January 2024, Plaintiff purchased one or more tickets for a March 2024 concert held at the Barclays Center in Brooklyn, New York, for which concert Ticketmaster was the exclusive primary ticketing service.  Plaintiff purchased at supracompetitive prices one or more secondary market tickets from a Secondary Ticket Exchange other than Ticketmaster's secondary ticketing platform.

### *Defendant Live Nation Entertainment, Inc.*

21.     Defendant Live Nation Entertainment, Inc. (formerly known as Live Nation, Inc.) is a Delaware corporation with its principal place of business in Beverly Hills, California, and with an office at 430 W. 15th Street, New York, NY 10011.

22.     Live Nation is the largest live entertainment company in the world, connecting over half a billion fans across all of its platforms in 29 countries.  In its advertising, Live Nation states that it "annually issues over 500 million tickets, promotes more than 35,000 events, partners with over 1,000 sponsors and manages the careers of 500+ artists."  Live Nation also wholly owns Ticketmaster.  Live Nation's 2021 revenue was approximately $6.268 billion.

23.     As of December 31, 2023, Live Nation owns, operates or leases 197 entertainment venues throughout North America and 105 entertainment venues internationally.  Venue leases for Live Nation range between five and 25 years.

### Defendant Ticketmaster L.L.C.

24.     Defendant Ticketmaster L.L.C. is a wholly owned subsidiary of Live Nation Entertainment, Inc.  Ticketmaster L.L.C. is a Virginia limited liability company with its principal place of business in Hollywood, California, and with an office at 430 W. 15th Street, New York, NY 10011.  Ticketmaster L.L.C. is the successor in interest to Ticketmaster Entertainment, Inc.

25.     Ticketmaster is the largest ticketing company in the United States, distributing over 620 million tickets through the Ticketmaster systems in 2023.  As discussed herein, Ticketmaster's business includes two main arms: its legacy primary ticketing services business and its newer but increasingly dominant secondary ticketing services business.

26.     Live Nation and Ticketmaster merged in an all-stock transaction in 2010.  Since then, the resulting conglomerate has reorganized into the following three segments:

a. **Concerts.**  In the Concerts segment, Live Nation acts as a promoter.  It and one other competitor are the only promoters that operate on a national and global scale. Live Nation often serves as the exclusive promoter for artists on national tours, and uses cross-collateralization across concerts and its deep pockets, including operating profits from Ticketmaster and its sponsorship division, to routinely offer artists higher guaranteed compensation than any other competitor.  Revenue streams within this segment are numerous and significant, but margins are below cost or, at most, very thin.  Live Nation's promoted artists obtain most of this segment's revenue.  In 2023, the Concerts business generated $18.8 billion, or 82%, of Live Nation's revenue.  The breakdown of Live Nation's stake in concert or event venues is as follows:

| Venue Type | Capacity | Owned | Leased | Operated | Exclusive Booking Rights | Equity Interest | Total |
|---|---|---|---|---|---|---|---|
| Stadium | More than 30,000 | — | 1 | 1 | — | — | 2 |
| Amphitheater | 5,000 - 30,000 | 10 | 40 | 1 | 16 | — | 67 |
| Arena | 5,000 - 20,000 | 3 | 13 | 2 | 6 | — | 24 |
| Theater | 1,000 - 6,500 | 10 | 70 | 10 | 30 | 2 | 122 |
| Club | Less than 1,000 | 5 | 51 | 2 | 13 | — | 71 |
| Restaurants & Music Halls | 1,000 - 2,000 | 2 | 15 | — | — | — | 17 |
| Festival Sites (1) | Varies | 2 | — | 51 | — | — | 53 |
| Other Venues | Varies | — | 13 | — | 1 | 3 | 17 |
| Total venues in operation | | 32 | 203 | 67 | 66 | 5 | 373 |
| | | | | | | | |
| Venues currently under construction | | — | 6 | — | — | — | 6 |
| Venues not currently in operation | | 3 | — | — | 6 | 6 | 15 |
| | | | | | | | |
| Total venues in operation by location: | | | | | | | |
| North America | | 22 | 152 | 23 | 65 | 5 | 267 |
| International | | 10 | 51 | 44 | 1 | — | 106 |

b. **Ticketing.** The Ticketing segment, by contrast, is highly profitable. This segment has gross profit margins that exceed 80%. This division primarily consists of the legacy Ticketmaster business, which focuses on primary ticket sales, as well as a newer business focusing on secondary ticket sales (*i.e.*, ticket resales). Ticketmaster sells tickets to the public under contracts with the venues, and earns service and other ancillary fees on the sale of each ticket. Ticketmaster also maintains a database of over 130 million customers, a valuable resource that allows it to recapture the same existing customers that it has served previously. In 2023, the Ticketing business generated $3 billion, or 13% of Live Nation's revenue.

c. **Sponsorship & Advertising.** The Sponsorship & Advertising segment leverages the 93 million or so fans Live Nation draws to its shows, the 130 million names in the Ticketmaster database, their stable of managed and promoted artists, and the venues they control to sell targeted advertising to major companies. In 2023, the Sponsorship & Advertising business generated $1.1 billion, or 5% of Live Nation's revenue.

27.    In performing the anticompetitive acts alleged herein, Ticketmaster acted under the control and direction of, and in coordination with, Live Nation and its most senior executives.

IV.    **FACTUAL ALLEGATIONS**

### *General Background on the Music Industry*

28.    At a high level, the components of the live music entertainment industry include the following: artists, managers/agents, promoters, venue operators, ticketing/marketing, and the end consumer.

29.    Artists are the principal draw for a live music event and drive demand for the services of every subsequent link and participant in the live music industry chain.

30.    An artist's manager serves as the lead strategic advisor for an artist's business activities, advising in some or all phases of the artist's professional life (tours, appearances, recording deals, publicity, endorsements, etc.).  Managers often are compensated based on a share of the artist's revenues or profit streams.  Defendant Live Nation is currently the largest manager of artists in the music industry.

31.    The artist manager often hires booking agents to assist in arranging a concert event or tour.  The manager or booking agent contracts with promoters, such as Live Nation Entertainment, to secure payment terms for artists as compensation for their live performances.  Agents are typically paid a portion of an artist's receipts from live performances.

32.    The promoter is responsible for promoting the concert to the public, which requires several different types of work.  The promoter typically receives the proceeds from gross ticket receipts for each concert it promotes and is responsible for paying the artist, venue, and other expenses associated with the event.  For example, the promoter hires the artist for the performance (often guaranteeing more popular artists millions of dollars for that performance or tour), generally contracts with the venue (or uses its own venues), pays the concert venue a fixed fee (called a "rental payment") to host the concert at the venue, arranges for local production services, and advertises and markets the concert.  The promoter bears the risk of an event if tickets sell poorly

and reaps the upside benefit with the artist(s) if tickets sell well.  Put simply, the more tickets a promoter is able to sell for a show, the more money the promoter (and the artist(s)) should make.

33.     Today, artists planning to conduct a tour at major concert venue levels will often use a single company to provide and/or coordinate promotions for the entirety of the tour.  Live Nation is the largest promoter of these types of tours in the United States, promoting over 60% of the shows at major concert venues in the nation.

34.     Concert venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services, such as concessions, parking and security.  Along with the rental fee received from the promoter, venues generally take a share of proceeds from concessions, parking, and merchandise sales.  Concert venues that contract with Ticketmaster have also, in recent years, begun to take a portion of the fees added to the face-value of the tickets for events at the venue.  Thus, similar to the promoter, the more tickets sold (and the more patrons that attend), the more money a concert venue operator makes.

35.     In terms of ticket sales, concert venue operators have two options: either to manage the sale of primary ticket inventory themselves or contract with a third party to handle the sale process for them.  Managing and selling concert venue tickets is technologically and operationally complex, so most concert venue operators choose the latter option and contract with primary ticketing service providers (generally, Ticketmaster) for comprehensive ticketing solutions on the primary market.  On information and belief, Live Nation, as well as the other members of the Live Nation conglomerate, is the second-largest concert venue operator/owner in the United States and exclusively utilizes Ticketmaster for these services.

36.     Primary ticketing service providers contract with venues to manage and sell primary ticket inventory for events at a specific venue.  Primary ticketing service providers create "back-end" inventory management systems and provide "front-end" support, including customer service, shipping, fulfillment services, as well as the technology (and staff) to allow concert venue operators to sell tickets through their box offices.  The primary ticketing service providers (like Ticketmaster) provide primary ticketing services to primary ticket purchasers and sellers by acting

as a distributor, selling the primary ticket inventory made available to them through means such as the internet, call centers, retail outlets, and/or box offices.

37.     Primary ticketing service providers generate profits by applying additional charges to the price of tickets sold to primary purchasers.  The overall price a consumer pays on a primary market ticket purchase therefore includes the face-value of the ticket, as well as a variety of fees on top of/in addition to the face-value of a ticket.  Typically, these are described as "convenience," processing," "service," "facility" and/or "delivery" fees, which can constitute a substantial portion of the overall cost of the ticket to the consumer.

38.     Substantially all of the United States' major concert venues have entered into long-term exclusive agreements with primary ticketing service providers – over 70-80% with Ticketmaster and growing each year – whereby the ticketing service provider contracts for the exclusive rights to the majority of all ticket sales for all concerts held at that particular venue.  By Defendants' own count, Ticketmaster provides primary ticketing services to over 10,000 venues and has a renewal rate "exceeding 100%," because there is no effective competition to Ticketmaster when these long-term, exclusive dealing contracts expire.

39.     According to Ticketmaster, its agreements with concert venues have terms that may exceed ten or more years in length.  In order to induce concert venues to enter into such exclusive dealing arrangements, Ticketmaster offers up-front payments and subsidies that can run into millions of dollars that are conditioned on such exclusivity.  Those up-front payments act as a barrier to entry for smaller competitors and act as an additional mechanism to maintain Ticketmaster's dominance.

40.     With respect to the Relevant Market, secondary ticket sales take place after there has been a primary ticket sale.  Typically, a primary ticket purchaser can choose to resell their ticket, as can a secondary ticket purchaser who also wishes to resell the same ticket.  Historically, such "secondary" ticket sales were challenging because it was difficult to find a purchaser.  Ticket holders wanting to sell their tickets were therefore typically relegated to either asking around, selling to local ticket brokers on commission, or utilizing scalping.  In recent years, however, a

market for secondary ticketing service providers arose.  Such providers typically offer online platforms connecting resellers to purchasers and providing services by acting as a distributor agent.  This substantially reduces the logistical difficulties of reselling tickets.  Today, selling a ticket is often as easy as posting the ticket on a secondary ticketing platform and waiting for a purchaser to locate and buy the ticket(s).

41.    Like primary ticketing service providers, secondary ticketing service providers generate revenues by levying fees on the sale of each transaction.

42.    Due to the conduct alleged herein, Ticketmaster's branded platform, as well as its TicketExchange, TicketsNow, TM+ and Verified Tickets secondary platforms have obtained a market share exceeding 60% of the secondary ticketing services for major concert venues.

### *The Relevant Market Is a Separate Market*

43.     There are three relevant service markets applicable to this Action.  They are: (1) concert and event promotion services for major venues within the United States, (2) primary ticketing services for major venues in the United States, and (3) secondary ticketing services for major United States venues.  Defendants have a dominant market share and monopoly power in each of these three markets.

44.    This Action focuses on the third of the relevant service markets, the Relevant Market, which is the secondary ticketing services market for major concert and event venues within the United States.

45.    Secondary Ticket Exchanges help facilitate the resale of tickets, and they provide a distinct role in the music and event industry.  Similar to online auction websites, a Secondary Ticket Exchange creates an online platform that allows ticketholders to post their ticket(s) for sale.  The price set for a ticket on a Secondary Ticket Exchange is a function, in significant part, of the prices posted for similar tickets on other Secondary Ticket Exchanges.  The Secondary Ticket Exchange provides potential purchasers with search capabilities to locate tickets for events they want to attend.  If a purchaser decides they want to buy one or more tickets for sale on that platform, they fill in their purchase information, and the platform completes the sale.  Typically, the

Secondary Ticket Exchange charges both the seller and the purchaser fees, usually based on the sales price of the ticket(s).  In other words, the higher the price paid for a ticket sold on a Secondary Ticket Exchange, the higher the fees charged by the exchange in that transaction.

46.     Within the live music industry, and among concertgoers nationwide, there is broad recognition that primary and secondary ticketing services are distinct.  Live Nation's CEO, for example, has been repeatedly quoted discussing the differences between the two service markets, including noting that Ticketmaster has grown its secondary ticketing services substantially over the past several years.  Industry sources also regularly recognize the clear difference between such services, and secondary ticketing service providers are listed and grouped in industry materials as a distinct category of provider.

47.     Several other factors also demonstrate the unique and separate nature of secondary ticketing services (as opposed to primary ticketing services) for major concert venues:

a.   Critically, the customers for secondary ticketing services for events at major concert venues are distinct from the customers of primary ticketing services for events at major concert venues.  For primary ticketing services, major concert venue operators are ticket sellers who retain primary ticketing service providers to act as their distributor agent and provide a number of back-end and front-end services to sell tickets directly to fans wishing to attend an event.  For secondary ticketing services, the ticket sellers are purchasers who bought a ticket on either the primary or secondary market and now wish to resell that ticket.  The ticket buyers who utilize the two types of ticketing services are also distinct, in that the secondary ticket buyers are purchasers who were unable to buy tickets they wanted from the primary provider, and therefore need to look for resale options as an alternative.

b.   These customers for secondary ticketing services (both sellers and purchasers) recognize the difference between the secondary and primary ticket services markets.  In fact, primary ticketing service providers (including Ticketmaster) all view secondary ticketing services as separate and distinct from primary ticketing

services.  Defendants make this distinction multiple times, including in SEC filings.
For example, in Live Nation's 2020 SEC Form 10-K disclosure statement, Live
Nation repeatedly distinguishes between "ticketing services" and "ticketing resale
services," noting that the former is for venues and the latter for resellers, and that
the services provided through each are different.  Additionally, that same disclosure
distinguishes between "primary ticketing companies" and "secondary ticketing
companies."

c.  All entities in the live music industry (including the Defendants themselves)
recognize that secondary ticketing services have unique purposes as compared to
primary ticketing services: the latter are meant to facilitate and run the original sale
of tickets on a venue's behalf, and the former are meant to facilitate ticket
purchasers' resale of their ticket(s) at a later date.

d.  There are distinct pricing models between the two service markets.  Primary
ticketing service providers generate profits by levying fees on top of a ticket's face-
value.  The venue operator does not pay services fees – primary ticket purchasers
do – and due to recent changes in Ticketmaster's business model, now often shares
in a portion of the levied fees.  Secondary ticketing service providers also generate
profits by levying fees on secondary ticket sales, but that is where the similarity
ends.  Unlike in the primary market, a secondary ticketing service provider typically
charges the *ticket seller* a fee, often a percentage of the sale price of the ticket.
However, secondary ticketing service providers *also* charge the purchaser one or
more fees on the sale, thus obtaining profits from both sides of the transaction.

e.  Demand for secondary ticketing services is not sensitive to changes in prices for
primary ticketing services because such changes do not cause secondary purchasers
to choose a different set of services.  Put differently, it is irrelevant to secondary
ticket sellers and purchasers whether the prices paid by primary purchasers to a
venue's primary ticketing service provider changes in any real way.  What matters

for the secondary market purchaser is that they have a service available to find and purchase a resale ticket.  This leaves consumers in the secondary market to be vulnerable to high prices emerging from the primary market, because they have no choice: they can either pay prices on the secondary market that often include supracompetitive mark ups and fees or miss the event or concert.

f.   There are specialized vendors that are largely distinct between the primary and secondary ticketing service markets, and the platforms they provide are substantially different themselves.  For primary ticketing service providers, the platform is venue specific, and the services provided are aimed at facilitating a sale of primary tickets (often including the high-volume rush of tickets at the initial opening of sales) as well as on-the-ground ticketing services at the actual event.  For secondary ticketing service providers, the vendor must instead provide a platform with very different services and functionality.  A secondary platform focuses more on connecting sellers and purchasers, and also providing the necessary capabilities to complete their ticket transaction.  The secondary ticketing service provider takes a fee for its services.

### *Ticketmaster Distorts the Relevant Market*

48.   In the Relevant Market, which as described above is a distinct market, Ticketmaster has few competitors.  Ticketmaster's anticompetitive acts in each of the three applicable markets insulate Ticketmaster from meaningful competition in the Relevant Market, as well as the other two applicable markets.  This has created a concentration of power in Defendants' control which cannot be penetrated by any potential competitor.  For example, using a widely-recognized measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), the post-Live Nation and Ticketmaster HHI for primary ticketing services increased by over 2,190 points, resulting in a post-merger HHI of more than 6,900.  The United States Department of Justice's Antitrust Division considers any market with more than an HHI of more than 2,500 to be highly

concentrated.  Ticketmaster leverages its control over this concentrated primary ticketing services market to choke off access to already supracompetitively-priced tickets in the Relevant Market.

49.     In the Relevant Market, Ticketmaster uses its grip over the primary market to control the secondary market for ticket sales to major concerts and events.  Using anticompetitive technological restraints as detailed below, Ticketmaster suppresses competition in the Relevant Market by making it more difficult to resell Ticketmaster's primary market tickets on any platform other than Ticketmaster's secondary market platform.  Ticketmaster's secondary market platform thrives because Ticketmaster's primary market platform works in tandem with Ticketmaster's secondary market platform to distort, corrupt and restrain competition in the Relevant Market.

50.     The rise of the internet ultimately helped create, for the first time, a truly viable and robust secondary market for concert tickets in the U.S.  This is because the internet's ability to connect individuals from all walks of life allowed secondary ticketing service providers to create platforms where secondary ticket sellers and purchasers could more easily connect and consummate secondary ticket sales.  Whereas, pre-internet, a secondary ticket purchaser needed to affirmatively seek out ticket brokers or find scalpers near the entrance of a show, now they could locate secondary tickets with just the click of a button.  Similarly, ticket resellers suddenly had a far broader reach via an easy-to-access electronic platform that initially dramatically lowered the transaction costs for ticket resales.  These mutual conveniences allowed the market to flourish, which created substantial benefits for ticket resellers and purchasers.

51.     The proliferation of the secondary market for concert tickets, however, was not without negative effects.  Because a ticket reseller may charge more for secondary tickets than their face-value, opportunistic individuals and companies built business models around buying up large amounts of primary tickets at the beginning of a general sale and then selling those tickets at a markup on the secondary market.  They could do so because they and other similar opportunists locked up the supply of the tickets for a show, thereby driving up prices for fans that wanted to attend the concert.  These resellers (often, ticket brokers, but also just as often run-of-the-mill scalpers) developed a number of different techniques to quickly purchase primary tickets,

including operating multiple accounts simultaneously, employing small armies of ticket purchasers at the beginning of general sales, and using "bots" (programs that automatically purchase tickets online faster than any human could).

52.    Ticketmaster benefited from the growth of secondary concert sales because a robust secondary market maximizes primary ticket sales. Given high demand and limited quantity on the primary market, ticket brokers and scalpers are incentivized to quickly purchase as many primary tickets as possible; the rest are then purchased by real fans. All of this frenzied purchasing during the general sale benefits the primary ticketing service provider because, as discussed above, it allows them to generate revenues by levying fees on primary ticket sales.

53.    Over the years, Ticketmaster has walked a narrow line by publicly decrying ticket broker practices while privately encouraging them. Defendants began a concerted effort to grow their secondary ticketing services in addition to their dominant primary ticketing services platform so that Ticketmaster could make money off the initial sales as well as resales of the very same concert tickets. Resultingly, the anticompetitive conduct that Ticketmaster has thus employed in the Relevant Market has allowed it to recapture the revenues of the sale and resale of the same tickets. As addressed in detail below, Ticketmaster's anticompetitive conduct in the Relevant Market includes acquiring horizontal competitors and would-be competitors in the Relevant Market in order to eliminate competition, using conditional licensing to stifle the free flow of tickets from Ticketmaster's primary market platform onto alternative, non-Ticketmaster secondary market platforms, and using technological restraints to curtail the ability of consumers to easily transfer tickets purchased initially from Ticketmaster's primary market platform onto alternative, non-Ticketmaster secondary market platforms.

54.    **Acquiring Secondary Ticket Services Providers.** Ticketmaster first entered the secondary ticketing services market by acquiring preexisting secondary ticket service providers. It then initially kept the platforms separate from Ticketmaster's primary ticket site for several years. More recently, however, Defendants integrated those secondary ticketing service providers into Ticketmaster's broader platform, such that consumers can now purchase primary *or* secondary

tickets on Ticketmaster.com or the Ticketmaster mobile application, and may not even know if they are purchasing a primary or secondary ticket at the time of sale.

55.     By acquiring horizontal nascent competitors, Ticketmaster removed competitors from the Relevant Market to Ticketmaster's own benefit.  This, in turn, had the following effects: (1) reduced choice for consumers, as consumers no longer had as many options to choose from in the Relevant Market; (2) reduced price competition, as less competitors in the Relevant Market means Ticketmaster faces less downward pressure on ticket sales in the Relevant Market due to horizontal competition; and (3) reduced incentives to innovate, as less competitors in the Relevant Market means Ticketmaster faces less of a need to innovate and improve the quality of its products for its consumers due to a lack of competition.

56.     **Conditional Licensing.**  Ticketmaster grants a conditional license to the use of its tickets and its ancillary services to users of its website and/or mobile application.  The conditional license allows users to view Ticketmaster's site and access its contents only if they agree to a bevy of restrictions that prevent brokers from purchasing tickets from Ticketmaster and then reselling them on rival secondary ticketing platforms.

57.     As one example, the conditional license prevents users from refreshing Ticketmaster's ticketing pages "more than once during any three second interval."  The conditional license also restricts the use of "ticket bot technology," which makes it more difficult for brokers to engage in bulk purchases of tickets.  The conditional license contains many similar terms as well, and Ticketmaster claims that it will put brokers to the back of the electronic line if it spots them in the queue.

58.     While Defendants claim the conditional license is pro-consumer, the truth is that it is simply one more tool for Defendants to use to effectuate their broader anticompetitive scheme. Ticketmaster, as directed by Live Nation, regularly sets aside primary tickets for ticket brokers so that those brokers can then resell those tickets.  Defendants accomplish this through "ticket banks," which are ostensibly for presale tickets, and through ticket "holds" (the allotment of total tickets "held" aside from the general sale for industry insiders).  The ticket banks have neutral names so

as not to trigger fan suspicion, but the ticket banks (and the tickets placed into them) are really for the brokers.  In this way, Ticketmaster is able to bolster its relationship with ticket brokers and maximize primary ticket sales while also growing its secondary ticketing service business.

59.     Ticketmaster's conditional license plays into this scheme by acting as the sword Ticketmaster wields against ticket brokers if they do not agree to Ticketmaster's anticompetitive demands.  Put simply, Ticketmaster will allocate primary tickets for a broker to a ticket bank *only* if that broker agrees that it will resell those tickets only through Ticketmaster's secondary ticket platform.  If the broker does not agree, then Ticketmaster will use the conditional license to force the broker off its platform.  Ticketmaster is able to do this with impunity because of the power it holds over the supply of primary tickets at major concert venues, and because Live Nation, as the dominant concert promoter in the nation, controls the vast bulk of major concert tours.  Faced with this potent combination, ticket brokers seeking to resell major concert venue seats have no other choice but to use Ticketmaster's secondary ticketing services, even though Ticketmaster is not a competitively attractive platform for secondary sellers as compared to Ticketmaster's competitors.  Specifically, Ticketmaster's competitors charge lower fees for access to their platforms as compared to Ticketmaster – however, brokers cannot reap these benefits because they must appease Ticketmaster's demands or risk losing access to primary market tickets.

60.     This, in turn, had the following effects: (1) reducing competition in the Relevant Market, giving consumers less choice with respect to purchasing options and (2) creating a supply restraint that keeps primary market tickets and other secondary market tickets from being resold in the Relevant Market on a secondary ticketing services platform other than Ticketmaster's secondary ticketing services platform.  Reduced competition and restrained supply have the effect of distorting the Relevant Market, leading to higher prices, including both higher fees and high resale values for tickets.

61.     **Technological Limits on Transferability.**   Ticketmaster also limits primary purchasers on their platform from transferring their tickets through any means other than Ticketmaster's secondary ticketing services platform.  Defendants do so most prominently through

a combination of mobile ticket and Ticketmaster's branded "SafeTix" technology, although Defendants regularly attempt to limit ticket transferability through other means as well.

62.    The overall goal of these efforts is to prevent primary ticket purchasers from using competing secondary ticketing platforms, to competitors' detriment and Defendants' benefit. This part of Defendants' scheme relies on utilizing their dominance over the primary ticketing services market, their control over most concert tours in the U.S., and their ability to employ technological trickery for anticompetitive purposes.

63.    Similar to the conditional license, Defendants use mobile technology and SafeTix technology for anticompetitive, rather than procompetitive purposes. Primary ticket resellers typically purchase their tickets with the understanding that they can resell their tickets wherever and however they wish. Using typical practices, they can transfer their tickets electronically after selling through a different secondary ticketing services platform. But SafeTix primary purchasers often find out only after the fact that they cannot transfer tickets in this manner. As Defendants themselves admit, the only way a primary buyer can transfer tickets outside of Ticketmaster's secondary platform is if Ticketmaster says so. Ticketmaster does this by notifying users whether their tickets are transferrable – though many users report they did not receive any advanced notice when purchasing on the Ticketmaster primary market website that they could not then resell their tickets anywhere but through Ticketmaster.

64.    This, in turn, had the following effects: (1) reducing competition in the Relevant Market, giving consumers less choice with respect to purchasing options and (2) creating a supply restraint that keeps primary market tickets and other secondary market tickets from being resold in the Relevant Market on a secondary ticketing services platform other than Ticketmaster's secondary ticketing services platform. Reduced competition and restrained supply have the effect of distorting the Relevant Market, leading to higher prices.

65.    The starkest example of the effect of Ticketmaster's anticompetitive conduct is illuminated when comparing Ticketmaster's dominance to performances where they are not the exclusive primary ticketing service provider. Put differently, when Ticketmaster is not the

exclusive primary ticketing service provider for events in the very same arenas where they hold concerts, ticket prices are markedly lower.

66.     For example, in the Kaseya Center in Miami, there are both Live Nation exclusive major concerts and events (where Ticketmaster is the exclusive primary ticketing service provider) and non-Live Nation sporting events as the home court for the NBA's Miami Heat in the very same arena (where Ticketmaster is not the exclusive primary ticketing service provider).  As is clear from the chart below, the fees on live music events in the same arena were significantly higher:



Source: Ticketmaster, "Licensed User Agreement," Oct. 28, 2014, 8–10 (TM00000362 at -369–371, -373).

67.     Similar examples can be seen at other arenas around the United States that host both Live Nation major concerts and events as well as non-Live Nation (and, therefore, unexclusively Ticketmaster) sporting events.

### ***Antitrust Injury***

68.     As a result of Defendants' anticompetitive conduct, Plaintiff has paid supracompetitive prices for secondary ticket purchases.  Additionally, Ticketmaster has reduced

competition in the Relevant Market and therefore has largely immunized itself from price competition.

69.     **Harm to Competition.**  Competing secondary ticketing service providers, as well as the secondary ticketing marketplace, require a free-flowing supply of primary tickets.  Without a supply of primary tickets to list on their platforms, such secondary ticketing service providers cannot compete.  Furthermore, competing secondary ticketing service providers have no ability to circumvent the technological limits Defendants have increasingly placed on primary ticket transferability.

70.     Additionally, Defendants' use of the conditional license to force secondary resellers to use Ticketmaster's platform, as well as their limitations on primary ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services markets.  Among other effects, one effect is to grow Ticketmaster's secondary ticketing service business at the expense of its rivals.

71.     This conduct, in the aggregate, suppresses the already limited supply of tickets that secondary market platforms other than Ticketmaster can sell.  Because of this, those secondary market platforms other than Ticketmaster are routinely shut out of the Relevant Market by Ticketmaster by virtue of Ticketmaster's control over the secondary market sale of tickets emanating originally from Ticketmaster.  By choking off access to the free flow of tickets, Ticketmaster is eliminating competition and, therefore, throttling price competition for downstream purchasers of tickets from Ticketmaster.  Because of this, the Relevant Market and purchasers of tickets in the Relevant Market from secondary platforms other than Ticketmaster are impacted because the upstream elimination of price competition leads to artificially higher prices being passed down to those secondary market, non-Ticketmaster purchasers.

72.     These higher prices also harm competition in the Relevant Market, because secondary ticketing platforms other than Ticketmaster are unable to sell tickets at market price, driving away consumers seeking to avoid paying supracompetitive prices.  The secondary ticketing agent other than Ticketmaster is then left with a choice: transact sales of overpriced tickets and

face losing ticket sales in voluminous numbers or incur a loss on tickets to sell at market price. Either way, Ticketmaster's competitors cannot operate in this anticompetitive environment.

73.     **Harm to Consumers.**  Plaintiff and Class members are forced to pay higher prices for tickets purchased on platforms other than Ticketmaster to concerts and events in the Relevant Market.  This is due to artificially higher prices for concert tickets being sold by Ticketmaster on the primary market as the result of extremely high fees on the sale of each ticket as well as the inflated face-value of the ticket itself.

74.     Plaintiff and Class members pay supracompetitive prices because Ticketmaster levies excessively high fees in the primary market on tickets that it sells which are then passed down to consumers in the secondary market.  The way this occurs is as follows: Live Nation's exclusive agreements and ownership over venues allows it to choose Ticketmaster as the sole primary market ticketing agent for a particular concert or event.  Then, when a ticket is sold through Ticketmaster to a primary market purchaser, that purchaser pays excessively high fees on top of the face-value of the ticket itself (which is also inflated, as discussed).  Rationally, the primary market purchaser who chooses to resell a ticket on the secondary market will do so inclusive of whatever fees and price were paid initially to Ticketmaster on the primary market. The same holds true for any ticket that is then resold thereafter – each time, the purchaser pays an inflated price due to Ticketmaster's conduct on the primary market and Live Nation's conduct above it.

75.     Additionally, the face-value of each ticket sold in the primary market is supracompetitively priced as well.  This is because Live Nation and Ticketmaster work in tandem to eliminate competition in the primary market for the sale of each ticket sold.  The way this is done is through Live Nation's exclusive agreements with venues higher up the distribution chain for tickets to live concerts and events.  These restraints cause competition in the primary market for tickets to live concerts and events, like SeatGeek and StubHub, to be shut out from competing in that market – which would cause downward pricing pressure and would push prices to competitive (and, therefore, lower) levels at face-value.

76.     These supracompetitive prices are then passed down to consumers each time a ticket resells in the Relevant Market.  Absent Ticketmaster's anticompetitive conduct, Plaintiff and Class members would have paid lower prices in the Relevant Market.

77.     Ticketmaster's growth has come at the expense of consumers because, despite the fact that Ticketmaster's secondary ticketing service competitors for major concert venues charge lower fees, Defendants have used anticompetitive practices described herein in order to keep consumers from accessing those less expensive platforms.

### *Government Investigations and Litigation*

78.     Additionally, at the time of the initiation of this Action, Live Nation and Ticketmaster were under investigation by numerous governmental agencies for antitrust violations.

79.     In the summer of 2022, as the Senate Judiciary Committee held hearings about Live Nation and the lack of competition in the event ticketing primary and secondary markets, Senator Amy Klobuchar of Minnesota stated, "I just want to dispel this notion that this is not a monopoly, and then we can go from there about solutions."

80.     In January 2023, the United States Department of Justice (the "DOJ") announced that they opened an antitrust investigation into Live Nation and Ticketmaster regarding abusive practices in the live music industry, and the DOJ commenced suit against Live Nation and Ticketmaster on May 23, 2024.  However, when it comes to consumers, including the Plaintiff and Class members, the harm has already been done – they have been economically harmed in the form of higher ticket prices and supracompetitive fees passed down into and charged in the Relevant Market.

81.     In November 2023, a United States Senate investigative subcommittee revealed that it had issued subpoenas for Live Nation and Ticketmaster following a previously unannounced months-long probe into ticket pricing and fees.  The subpoena "seeks records related to Live Nation/Ticketmaster's failure to combat artificially inflated demand . . . which resulted in consumers being charged exorbitant ticket prices."  According to Senator Richard Blumenthal of

Connecticut, "Live Nation has egregiously stonewalled [the] inquiry into its abusive consumer practices, making the subpoena necessary."

## V.     CLASS ALLEGATIONS

82.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representative of the Class (hereinafter defined collectively as the "Class"), which is defined as follows:

> **Nationwide Class.**  All end-user purchasers in the United States who purchased secondary tickets on Secondary Ticket Exchanges from a Secondary Seller who, in turn, purchased a primary ticket or a secondary ticket for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation at any point since the 2010 merger (the "Class").

> **State Indirect Purchaser Class.**  All end-user purchasers in Arizona, California, Connecticut, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin who purchased secondary tickets on Secondary Ticket Exchanges from a Secondary Seller who, in turn, purchased a primary ticket or a secondary ticket for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation at any point since the 2010 merger (the "Class").

83.     Excluded from the Class are Defendants and Defendants' subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; and all judicial officers assigned to hear any aspect of this litigation.

84.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

85.     **Numerosity**.  Members of the Class are so numerous that joinder would be impracticable, as millions of Class members exist.

86.     **Commonality.**  Questions of law and fact common to the Class include:

(a) Whether Defendants in fact engaged in anticompetitive acts aimed at unreasonably restraining competition in the Relevant Market;

(b) Whether such conduct violates the Sherman Act and state antitrust statutes;

(c) Whether such conduct injured the Class members; and

(d) Whether monetary damages and injunctive relief should be provided to Class members as a result of Defendants' wrongful conduct.

87.     **Typicality.**  Plaintiff's claims are typical of those of other Class members because Plaintiff, like every other Class member, was harmed by way of the conduct as alleged herein. Plaintiff, like all other Class members, was injured by Defendants' uniform conduct.  Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, such that there are no defenses unique to Plaintiff.  The claims of Plaintiff and those of the other Class members arise from the same operative facts and are based on the same legal theories.

88.     **Adequacy of Representation.**  Plaintiff will fairly and adequately represent and protect the interests of the Class members in that he has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class.  The damages and infringement of rights that Plaintiff suffered are typical of other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class.  Plaintiff has retained counsel experienced in antitrust class action litigation, and Plaintiff intends to prosecute this action vigorously.

89.     **Superiority of Class Action.**  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts.  In addition, without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

90.     The litigation of the claims brought herein is manageable.  Defendants' uniform

conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

91.     Adequate notice can be given to Class members directly using information maintained in the parties' records.

92.     **Predominance.**  The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

93.     This proposed class action does not present any unique management difficulties. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## **FIRST CAUSE OF ACTION**

### **VIOLATION OF THE SHERMAN ANTITRUST ACT**

### **SECTION 2 – MONOPOLIZATION**

### **(AGAINST BOTH DEFENDANTS – ON BEHALF OF THE NATIONWIDE CLASS)**

94.     Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

95.     Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the Relevant Market.

96.     Ticketmaster possesses monopoly power in the Relevant Market and Ticketmaster has the power to control prices or exclude competition in the Relevant Market.

97.     Ticketmaster has market share of at least 60% of the relevant market for secondary ticketing services for major concert venues.

98.     Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the relevant markets, by means of predatory, exclusionary, and anticompetitive conduct, including but not limited to: long-term exclusive dealing arrangements (entering into long-term exclusive arrangements with venues); coercion of disloyal customers, ticket brokers, and others (through the technological restraints as discussed); and vertically-arranged boycotts (by other ticket resellers to boycott Ticketmaster's competitors for the provision of secondary ticketing services), as alleged herein.

99.     Defendants' conduct has foreclosed access to the relevant market for secondary ticketing services for major concert venues, which is necessary to enable Ticketmaster's secondary ticketing service competitors to compete.

100.    Ticketmaster possesses a dominant position in the Relevant Market.

101.    Defendants' conduct is not justified, because their conduct is not intended to enhance overall efficiency and to make the Relevant Market more efficient.

102.    Defendants' conduct has a substantial effect on interstate commerce.

103.    Live Nation promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.  Live Nation also independently participated in the anticompetitive scheme as alleged herein.

104.    Plaintiff has been injured as a result of Defendants' conduct.

105.    Plaintiff has suffered and will suffer the type of injury that the antitrust laws were intended to prevent.  Plaintiff has been injured by the harm to competition as a result of Defendants' conduct.

106.    Plaintiff seeks declaratory and injunctive relief with respect to this cause of action.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE SHERMAN ANTITRUST ACT

## SECTION 1 – RESTRAINTS OF TRADE

## (AGAINST BOTH DEFENDANTS – ON BEHALF OF THE NATIONWIDE CLASS)

107. Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

108. As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the Relevant Market.

109. As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the Relevant Market.

110. As alleged above, Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of competing primary ticketing service providers for major concert venues and the use of Ticketmaster's secondary ticketing services for major concert venues.

111. These contracts, combinations, or conspiracies include but are not limited to long-term exclusive dealing arrangements and vertically arranged boycotts.

112. Defendants' conduct has had an anticompetitive effect in the Relevant Market.

113. Defendants' conduct has no legitimate business purpose or procompetitive effect.

114. There are less restrictive alternatives to the restraints Defendants imposed on the relevant markets for primary and secondary ticketing services for major concert venues.

115. Defendants' conduct has had a substantial effect on interstate commerce.

116. Live Nation Entertainment promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above. Live Nation Entertainment also independently participated in the anticompetitive scheme as alleged herein.

117.    Plaintiff has been or will be injured as a result of Defendants' conduct.

118.    Plaintiff has suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiff has been and will be injured by the harm to competition as a result of Defendants' conduct.

119.    Plaintiff seeks declaratory and injunctive relief with respect to this cause of action.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE STATE ANTITRUST LAWS

### (AGAINST BOTH DEFENDANTS – ON BEHALF OF THE STATE INDIRECT PURCHASER CLASS)

120.    Plaintiff realleges and repeats each and every allegation as if fully set forth herein.

121.    By reason of the conduct alleged herein, Defendants have violated the following state antitrust statutes:

*Arizona's Uniform State Antitrust Act (Ariz. Rev. Stat. § 44-1401)*

122.    **Arizona.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Arizona state law.

123.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Arizona; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Arizona.  During the Class Period, Defendants' illegal conduct substantially impacted Arizona's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*California's Cartwright Act (Cal. Bus. & Prof. Code § 16700)*

124.    **California.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of California state law.

125.    The violations of California state law consisted, without limitation, of continuing an unlawful trust in the Relevant Market, the objective of which was to raise prices for secondary market tickets to major concerts and events.  This has deprived Californians of free and open competition in the Relevant Market.

126.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in California; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout this California.  During the Class Period, Defendants' illegal conduct substantially impacted California's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute including treble damages and reasonable attorneys' fees.

*Connecticut's Antitrust Act (Conn. Gen. Stat. § 35-24)*

127.    **Connecticut.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Connecticut state law.

128.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Connecticut; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Connecticut.  During the Class Period, Defendants' illegal conduct substantially impacted Connecticut's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The District of Columbia Antitrust Act (D.C. Code § 28-4501)*

129.    **District of Columbia.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of District of Columbia law.

130.    Due to monopolization and restraints of trade, the citizens of the District of Columbia have paid supracompetitive, artificially inflated prices in the Relevant Market.

131.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in

the Relevant Market in this District; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout this District.  During the Class Period, Defendants' illegal conduct substantially impacted District of Columbia's commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201(2))*

132.    **Florida.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Florida state law.

133.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Florida; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Florida.  During the Class Period, Defendants' illegal conduct substantially impacted Florida's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Illinois Antitrust Act (740 Ill. Comp. Stat. Ann. 10/3(1))*

134.    **Illinois.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Illinois state law.

135.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Illinois; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Illinois.  During the Class Period, Defendants' illegal conduct substantially impacted Illinois's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Iowa Competition Law (Iowa Code § 553.1)*

136.    **Iowa.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Iowa state law.

137.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in

the Relevant Market in Iowa; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Iowa.  During the Class Period, Defendants' illegal conduct substantially impacted Iowa's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Kansas Restraint of Trade Act (Kan. Stat. Ann. § 50-101)*

138.  **Kansas.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Kansas state law.

139.  Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Kansas; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Kansas.  During the Class Period, Defendants' illegal conduct substantially impacted Kansas's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*Maine's Antitrust Statute (Me. Rev. Stat. Ann. Title 10 § 1101)*

140.  **Maine.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Maine state law.

141.  Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Maine; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially impacted Maine's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*Maryland's Antitrust Statute (Md. Code Ann. § 11-204(a))*

142.  **Maryland.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Maryland state law.

143.  Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in

the Relevant Market in Maryland; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Maryland.  During the Class Period, Defendants' illegal conduct substantially impacted Maryland's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Michigan Antitrust Reform Act (Mich. Comp. Laws § 445.771)*

144.   **Michigan.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Michigan state law.

145.   Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Michigan; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Michigan.  During the Class Period, Defendants' illegal conduct substantially impacted Michigan's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Minnesota Antitrust Law (Minn. Stat. § 325D.49, et seq. & 325D.57)*

146.   **Minnesota.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Minnesota state law.

147.   Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Minnesota; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Minnesota.  During the Class Period, Defendants' illegal conduct substantially impacted Minnesota's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*Mississippi's Antitrust Statute (Miss. Code Ann. § 75-21-1)*

148.   **Mississippi.**   Defendants have monopolized trade and entered into an unlawful agreement in violation of Mississippi state law.

149.   Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in

the Relevant Market in Mississippi; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Mississippi.  During the Class Period, Defendants' illegal conduct substantially impacted Mississippi's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Nebraska Junkin Act (Neb. Rev. Stat. § 59-801)*

150.    **Nebraska.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Nebraska state law.

151.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Nebraska; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Nebraska.  During the Class Period, Defendants' illegal conduct substantially impacted Nebraska's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Nevada Unfair Trade Practices Act (Nev. Rev. Stat. § 598A.010)*

152.    **Nevada.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Nevada state law.

153.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Nevada; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Nevada.  During the Class Period, Defendants' illegal conduct substantially impacted Nevada's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*New Hampshire's Antitrust Statute (N.H. Rev. Stat. Ann. Title XXXI § 356)*

154.    **New Hampshire.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of New Hampshire state law.

155.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in

the Relevant Market in New Hampshire; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially impacted New Hampshire's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The New Mexico Antitrust Act (N.M. Stat. Ann. § 57-1-1)*

156.    **New Mexico.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of New Mexico state law.

157.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in New Mexico; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Mexico.  During the Class Period, Defendants' illegal conduct substantially impacted New Mexico's commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*Section 340 of New York's General Business Law (N.Y. Gen. Bus. Law § 340)*

158.    **New York.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of New York state law.

159.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in New York; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New York.  During the Class Period, Defendants' illegal conduct substantially impacted New York's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The North Carolina General Statutes (N.C. Gen. Stat. § 75-1)*

160.    **North Carolina.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of North Carolina state law.

161.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in North Carolina; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout North Carolina.  During the Class Period, Defendants' illegal conduct substantially impacted North Carolina's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The North Dakota Uniform State Antitrust Act (N.D. Cent. Code § 51-08.1-01)*

162.    **North Dakota.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of North Dakota state law.

163.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in North Dakota; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct substantially impacted North Dakota's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*Oregon's Antitrust Law (Or. Rev. Stat. § 646.705)*

164.    **Oregon.**    Defendants have monopolized trade and entered into an unlawful agreement in violation of Oregon state law.

165.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Oregon; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Oregon.  During the Class Period, Defendants' illegal conduct substantially impacted Oregon's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Puerto Rican Anti-Monopoly Act (P.R. Laws Title 10 § 260)*

166.    **Puerto Rico.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Puerto Rico law.

167.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Puerto Rico; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Puerto Rico.  During the Class Period, Defendants' illegal conduct substantially impacted Puerto Rico's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Rhode Island Antitrust Act (6 R.I. Gen. Laws § 6-36-1)*

168.    **Rhode Island.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Rhode Island state law.

169.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Rhode Island; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Rhode Island.  During the Class Period, Defendants' illegal conduct substantially impacted Rhode Island's commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*South Dakota's Antitrust Statute (S.D. Codified Laws § 37-1-3.1)*

170.    **South Dakota.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of South Dakota state law.

171.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in South Dakota; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout South Dakota.  During the Class Period, Defendants' illegal conduct substantially impacted South Dakota's commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Tennessee Trade Practices Act (Tenn. Code § 47-25-101)*

172.    **Tennessee.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Tennessee state law.

173.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Tennessee; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Tennessee.  During the Class Period, Defendants' illegal conduct substantially impacted Tennessee's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Utah Antitrust Act (Utah Code Ann. § 76-10-3101)*

174.    **Utah.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Utah state law.

175.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Utah; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Utah.  During the Class Period, Defendants' illegal conduct substantially impacted Utah's commerce.  Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*West Virginia's Antitrust Statute (W. Va. Code § 47-18-1)*

176.    **West Virginia.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of West Virginia state law.

177.    Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in West Virginia; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout West Virginia.  During the Class Period, Defendants' illegal conduct substantially impacted West Virginia's commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

*The Wisconsin Antitrust Act (Wis. Stat. § 133.01)*

178.    **Wisconsin.**  Defendants have monopolized trade and entered into an unlawful agreement in violation of Wisconsin state law.

179. Defendant's conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Wisconsin; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct substantially impacted Wisconsin's commerce. Accordingly, Plaintiff and members of the Class seek all forms of relief available under this statute.

180. Under the laws of each of these states, indirect purchasers have standing under the aforementioned antitrust and consumer protection statutes to maintain an action based on the facts alleged in this Complaint.

181. Defendants monopolized the Relevant Market with the intention of injuring or destroying competition therein; additionally, Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market with the intention of injuring or destroying competition therein. Members of the Class were injured with respect to purchases of tickets to a Live Nation event or concert in the Relevant Market from secondary ticketing services platforms other than Ticketmaster.

182. There are no procompetitive benefits that outweigh the anticompetitive effects of Defendants' monopolization and restraint of trade in the Relevant Market.

183. Accordingly, members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## VI.    PRAYER FOR RELIEF

184. To remedy these illegal acts, Plaintiff requests that the Court:

    a.   Certify the Class and appoint Plaintiff as the Class's representative;

    b.   Find that Defendants' conduct was unlawful, as alleged herein;

    c.   Award such injunctive relief and other equitable relief as the Court deems just and proper;

    d.   Award Plaintiff and Class members statutory, actual, compensatory, consequential, treble, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

    e.   Award Plaintiff and Class members pre-judgment and post-judgment interest;

    f.   Award Plaintiff and Class members reasonable attorneys' fees, costs and expenses; and

    g.   Grant such other relief as this Court deems just and proper.

## VII.   DEMAND FOR JURY TRIAL

185.   Plaintiff demands a trial by jury so triable on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED:  May 23, 2024               Respectfully Submitted,

                        */s Adam M. Harris*
                        Israel David
                        Adam M. Harris
                        **ISRAEL DAVID LLC**
                        17 State Street, Suite 4010
                        New York, New York 10004
                        Tel.:   212-739-0622
                        Email:  israel.david@davidllc.com
                                    adam.harris@davidllc.com

                        Mark A. Cianci
                        **ISRAEL DAVID LLC**
                        399 Boylston Street, Floor 6, Suite 23
                        Boston, MA 02116
                        Tel.:   617-295-7770
                        Email:  mark.cianci@davidllc.com

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
DAVID W. MITCHELL
ALEXANDRA S. BERNAY
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
xanb@rgrdlaw.com
ashingler@rgrdlaw.com


**ROBBINS GELLER RUDMAN
  & DOWD LLP**
STUART A. DAVIDSON
MARK J. DEARMAN
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com


*Attorneys for Plaintiff and
the Proposed Class*