UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

In re LIVE NATION ENTERTAINMENT, :   Lead Case No. 1:24-cv-03994-AS
INC. and TICKETMASTER L.L.C. :
ANTITRUST LITIGATION :   (Consolidated with Case No. 1:24:cv-04106-AS)
———————————————————— :
  :   <u>CLASS ACTION</u>
This Document Relates To: :
  :   CONSOLIDATED CLASS ACTION
    ALL ACTIONS. :   COMPLAINT
  :
———————————————————— x:   **<u>JURY TRIAL DEMANDED</u>**

Plaintiffs Abraham Leifer and Tamara Stevens (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, bring the following class action complaint (the "Action") against Defendants Live Nation Entertainment, Inc., f/k/a Live Nation, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster") (collectively, the "Defendants"), upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## PRELIMINARY STATEMENT

1.      One of the most culturally significant ways to experience music is through seeing an artist perform live.  In the United States, live music is extremely popular – so much so that an entire industry has been built around the profits that live music concerts generate.

2.      Naturally, the artists are the draw for a live music event and drive demand for the services of every other participant in the live music industry.  An artist's manager serves as the strategic executive for an artist's business activities, advising in some or all phases of the artist's professional life.  The manager often hires booking agents to assist in arranging a concert event or tour.  The manager or booking agent contracts with promoters, such as Live Nation, to secure payment terms for artists as compensation for their live performances.

3.      The promoter is responsible for promoting the concert to the public, which requires several different types of work.  The promoter hires the artist for the performance, generally contracts with the venue (or uses its own venues), pays the concert venue a fee to host the concert at the venue, arranges for local production services, advertises, and markets the concert.  Artists planning to conduct a tour at major concert venues will often use a single company to provide and coordinate promotions for the entirety of the tour.  Concert venue operators provide access to and

maintain the facilities where concerts are held and oversee the venues' associated services, such as concessions, parking, and security.

4.     In terms of ticket sales, concert venue operators have two options: either to manage the sale of ticket inventory themselves or contract with a third party to handle the sale process for the tickets.  Because managing and selling concert venue tickets is technologically and operationally complex, most concert venue operators choose the latter option and contract with ticketing service providers for comprehensive ticketing solutions on the primary market (*i.e.*, the market for initial sales of tickets, prior to any reselling on the secondary market).[1]

5.     Next, primary ticketing service providers contract with venues to manage and sell primary ticket inventory for events at a specific venue.  The primary ticketing service providers (like Ticketmaster) provide primary ticketing services to primary ticket purchasers by acting as a distributor, selling the primary ticket inventory made available to them through means such as the internet (including through mobile devices), call centers, retail outlets and/or helping the venue sell tickets at its box office.

6.     Finally, primary level consumers purchase tickets from that ticketing agent for the artist's concert, and the primary consumer can then turn around and resell that ticket on the secondary market.  Of course, in order for a ticket to be available for resale on a secondary ticketing marketplace, the ticket must have already been purchased through a primary ticket offering. Accordingly, the fees and face-value ticket prices associated with resale marketplaces generally exceed those associated with primary ticket offerings, because the primary ticketing fees and primary face-value ticket prices are embedded into the price of tickets being resold on these

---

[1]    "Primary" ticketing refers to the initial distribution of tickets for a show.  This is as compared to "secondary" ticketing, which refers to the resale of previously purchased tickets.

4873-9954-1219.v1

marketplaces, and the reseller is also attempting to achieve a profit over and above its cost in purchasing the ticket on the primary market.  Generally, this is how the distribution chain looks for major concerts and events, which are the subject of this Action.

7.     Over the past three decades, Live Nation and Ticketmaster collectively built empires in several key markets within the live concert and event ecosystem.  Live Nation grew into a concert and event promotion behemoth, and Ticketmaster captured the primary and secondary markets for concert and event ticket sales in the United States.  Defendants consummated an all-stock merger in 2010, combining forces into a vertically integrated monopoly and juggernaut trust.

8.     As a result of this merger, the new entity now dominates three major economic markets in the United States: (1) concert promotion for major concert venues; (2) primary ticketing services for major concert venues; and (3) secondary ticketing services for major concert venues.[2] Live Nation and Ticketmaster have continued to grow their already dominant market shares in each of the three markets by leveraging their monopoly power in each market against smaller competitors in the other two markets, as detailed herein.  Live Nation, as a major concert promoter, acts as the promoting agent for at least 80 of the top 100 largest concert and event venues in the United States. Across the board, Live Nation's market share in the promotion of major concert venues exceeds 60%.  Moreover, Ticketmaster accounts for at least 80% of the total face-value associated with all concert tickets sold at major concert venues.  To protect its dominance in this market, Live Nation often requires that the venues with which it contracts sign anticompetitive exclusive agreements that entrench Live Nation as the venues' sole concert and event promoting agent.  Live Nation, as discussed below, also controls hundreds of venues either through leaseholds, ownership, or equity

---

[2]     Although all three markets are at issue in this Action, the third market, secondary ticketing services for major concert venues in the United States, is defined as the "Relevant Market."

interests. This means that, to access to the majority of significant concert and event tours in the United States, a consumer must interact, directly or indirectly, with Live Nation. Live Nation additionally requires that the venues for which it acts as promoter use Ticketmaster as the sole agent for primary ticketing for all Live Nation-promoted concerts and events. This exclusive, anticompetitive and unlawful tying arrangement eliminates significant competition, as it boxes all other primary ticketing agents out from servicing any concerts or events where Live Nation is the promoter, *i.e.*, most major concerts and events in the United States. This tying also swells Defendants' profits, as they collect both upstream revenue from the promotion of concerts and events, as well as downstream revenue from the sale of tickets for those events.

9.    With respect to Ticketmaster's dominance over the downstream distribution of tickets, Ticketmaster controls the sale of at least 80% of all primary tickets for major concert venues in the United States. This monopoly power is reinforced by Live Nation's chokehold over the market for concert promotion for major concert venues, because Live Nation forces the venues it services to use Ticketmaster as their sole primary ticketing agent. Thus, on the primary ticket market, Ticketmaster acts as the sole ticket broker between the venue and the end consumer. Ticketmaster, because of this exclusivity, is able to charge supracompetitive fees for each ticket sold through its platform. This is because Live Nation and Ticketmaster work in tandem to eliminate competition in the primary ticketing market. As a result of Live Nation's requirement that Ticketmaster be the sole primary ticketing agent for any venues Live Nation services, would-be competitors in the primary ticketing market, such as SeatGeek and StubHub, are shut out from competing in the market. Without any threat of downward pricing pressure from competitor ticketing agents, Ticketmaster is able to maintain the face-value of the tickets it sells for major concert and event venues at supracompetitive levels. Ticketmaster's margins, because of its

- 4 -

supracompetitive fees and supracompetitive face-value prices, are as high as 80% on each ticket sold.

10.    Subsidized by the supracompetitive profits that Ticketmaster's business generates through its domination of the primary and (as addressed below) secondary ticketing market for major concert venues, Live Nation can keep a stranglehold on the concert promotion market by engaging in predatory pricing for its promotion services.  As a result of its predatory pricing, which often involves paying rebates to its venue clients, Live Nation is able to eliminate significant competition in the promotion market, wiping out would-be competitors who are not similarly subsidized by profits from unlawful tying arrangements with ticketing affiliates.  Accordingly, despite Live Nation's promotion business losing tens of millions of dollars in some years due to its predatory pricing, its promotion business is able to stay afloat by functioning as a loss leader that helps maintain the market dominance of Live Nation's subsidiary and affiliate, Ticketmaster.  Venue operators must consider the very real possibility that Live Nation will not route tours through their venues if they do not select Ticketmaster as their exclusive ticketing service provider, and so these venue operators engage Ticketmaster, further entrenching its ticketing monopoly.

11.    Similarly, in the market for secondary ticketing services for major concert venues, the Relevant Market, Ticketmaster uses its grip over the primary market to control the secondary market for ticket sales for major concerts and events.  Using anticompetitive technological restraints as further detailed herein, Ticketmaster suppresses competition in the Relevant Market by making it very difficult to resell tickets initially purchased from Ticketmaster on any platform other than Ticketmaster's secondary market platform.  These anticompetitive technological restraints include, among others, exploiting consumers' mobile phone technology in order to block the ability to transfer tickets instantly to secondary market purchasers ***not*** using Ticketmaster's platform, as well

- 5 -

as misusing supposed copyright protections to purport to invalidate tickets transferred outside of Ticketmaster's secondary market platform. Through these unlawful and anticompetitive restraints, Ticketmaster is able both to deter most secondary ticketing agents from transacting with primary purchasers who bought from Ticketmaster, and to deter many would-be secondary ticketing agents from entering the market at all, in each case shrinking the number of secondary ticketing agents on the Relevant Market dramatically. This paucity of ticketing agents on the secondary market, in turn, enables these few secondary ticketing agents to resell tickets at supracompetitive prices, resulting in harm to end-use consumers who purchase tickets for major concerts and events in the United States on the secondary market. In short, Ticketmaster's primary market platform works in tandem with its secondary market platform to distort, corrupt, and restrain competition in the Relevant Market.

12. The result is costly for consumers within the Relevant Market. The Classes (defined below), consist of all end-user purchasers in the United States who purchased secondary tickets on Secondary Ticket Exchanges[3] from a Secondary Seller[4] who, in turn, purchased a primary ticket or a secondary ticket for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation at any point since the 2010 merger.

13. Plaintiffs and Class members are forced to pay supracompetitive prices for tickets to concerts and events in the Relevant Market. Plaintiffs and Class members pay supracompetitive prices because Ticketmaster inflates the face-values of tickets, as described herein. Additionally,

---

[3]    "Secondary Ticket Exchanges" refer to all platforms that facilitate sales in the Relevant Market, and include, but are not limited to, the following: StubHub, Vivid Seats, SeatGeek, ViaGoGo, and TickPick.

[4]    "Secondary Seller" refers to a purchaser of a major concert or event ticket that primarily originated from Ticketmaster who then resells the ticket to a secondary market purchaser.

4873-9954-1219.v1

consumers pay higher prices for tickets in the Relevant Market that originated from Ticketmaster because Ticketmaster levies excessively high fees in the primary market on tickets that it sells, which are then passed down to consumers in the secondary market.  Here too, these supracompetitive prices are passed down to consumers each time a ticket resells in the Relevant Market.  Further, because Ticketmaster interferes with a Secondary Ticket Exchange's ability to transact in tickets originally purchased from Ticketmaster, there are few Secondary Ticket Exchanges operating in the Relevant Market than would exist in a competitive market.  Absent Ticketmaster's anticompetitive conduct, Plaintiffs and Class members would have paid significantly lower prices in the Relevant Market.

14.    At the time of the filing of this Action, Live Nation and Ticketmaster were facing multiple government investigations and/or lawsuits, including (but not limited to) by the Senate Judiciary Subcommittee on Antitrust, the Senate Investigative Subcommittee, and the U.S. Department of Justice ("DOJ") Antitrust Division.

15.    Against this backdrop, Plaintiffs bring this lawsuit against Defendants on behalf of themselves and all other similarly situated indirect purchasers under §§1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§1, 2) and various state antitrust and consumer protection laws seeking actual damages, treble damages, declaratory relief, injunctive relief, pre- and post- judgment interest, as well as reasonable costs and attorney's fees associated with the prosecution of this Action.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1331, as well as §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

17.    This Court has personal jurisdiction over Defendants because Defendants transact business in this District and caused injury in this District through their anticompetitive conduct.

- 7 -

18.     Venue is proper in this District pursuant to the Clayton Act because Defendants are licensed to do business in this District, and a substantial portion of the affected interstate commerce described herein was carried out in this District.

## PARTIES

**Plaintiffs**

19.     Plaintiff Abraham Leifer ("Leifer") is a resident of Kings County, New York.

20.     In January 2024, Leifer purchased one or more tickets for a March 2024 concert held at the Barclays Center in Brooklyn, New York, for which concert Ticketmaster was the exclusive primary ticketing service.  Leifer purchased at supracompetitive prices one or more secondary market tickets from StubHub, a Secondary Ticket Exchange unaffiliated with Ticketmaster or Live Nation.

21.     Plaintiff Tamara Stevens ("Stevens") is a resident of Alpharetta, Georgia.

22.     Stevens purchased tickets at supracompetitive prices through Secondary Seller StubHub for concerts on March 24, 2022, May 6, 2022, October 22, 2022, December 17, 2022, and January 6, 2023.

**Defendants**

23.     Defendant Live Nation is a Delaware corporation with its principal place of business in Beverly Hills, California, and with an office at 430 W. 15th Street, New York, NY 10011.

24.     Live Nation is the largest live entertainment company in the world, connecting over half a billion fans across all of its platforms in 29 countries.  In fact, by its own account, Live Nation is the "largest live entertainment company in the world," the "largest producer of live music concerts in the world," and "the world's leading live entertainment ticketing sales and marketing company." In its advertising, Live Nation states that it "annually issues over 500 million tickets, promotes more

than 35,000 events, partners with over 1,000 sponsors and manages the careers of 500+ artists." Live Nation also wholly owns Ticketmaster. Live Nation's 2021 revenue was approximately $6.268 billion.

25.     As of December 31, 2023, Live Nation owns, operates, or leases 197 entertainment venues throughout North America and 105 entertainment venues internationally. This includes more than 60 of the top 100 amphitheaters in the United States that Live Nation owns or controls through long-term leases, or for which it has the exclusive right to control performances at the venue. Venue leases for Live Nation range between 5 and 25 years.

26.     Defendant Ticketmaster is a wholly owned subsidiary of Live Nation. Ticketmaster is a Virginia limited liability company with its principal place of business in Hollywood, California, and with an office at 430 W. 15th Street, New York, NY 10011. Ticketmaster is the successor in interest to Ticketmaster Entertainment, Inc.

27.     Ticketmaster is the largest ticketing company in the United States, distributing over 620 million tickets through the Ticketmaster systems in 2023. As discussed herein, Ticketmaster's business includes two main arms: its legacy primary ticketing services business and its newer but increasingly dominant secondary ticketing services business.

28.     Live Nation and Ticketmaster merged in an all-stock transaction in 2010. Since then, the resulting conglomerate has reorganized into the following three segments:

(a)     **Concerts**. In the Concerts segment, Live Nation acts as a promoter. It and one other competitor are the only promoters that operate on a national and global scale. Live Nation often serves as the exclusive promoter for artists on national tours, and uses cross-collateralization across concerts and its deep pockets, including operating profits from Ticketmaster and its sponsorship division, to routinely offer artists higher guaranteed compensation than any other

- 9 -

competitor. Live Nation's promoted artists obtain most of the Concert segment's revenue. However, Live Nation, as a promoter, often signs separate agreements with venues that come in a variety of forms such as "rebate deals," "co-promotion deals," or "drawbacks." These revenues are not shared with artists. In fact, some of these payments functionally remit back to Live Nation amounts that Live Nation initially paid to venues on behalf of its artists (*e.g.*, facility rental fee rebates). These agreements – through which Live Nation can effectively claw back a show's expenditures – highlight Live Nation's dominance over venues, derived from its influence over artists' decisions over which venues to play at and when. Over the past few years, Live Nation has continued to increase its concert promotional fees imposed on venues, all at the expense of ticket purchasers in the primary and secondary markets. Revenue streams within the concert promotion segment are numerous and significant. For example, in 2023, the Concerts business generated $18.8 billion, or 82%, of Live Nation's revenue. But margins in the Concerts division are below cost or, at most, very thin. Live Nation's strategy is to use its concert promotion business – the core of its revenue and profits "flywheel" – to feed its other more profitable businesses, including Ticketmaster's ticketing business, Live Nation's network of venues, and Live Nation's sponsorship and advertising business. In fact, in an October 10, 2013 Liberty's Investor Meeting, Live Nation's Chief Executive Officer ("CEO") explicitly stated:

> At the core is our flywheel. It's the concert business . . . It's the lower margin part of our business. But in order to get into these three high margin businesses and be competitive, we have to have that scale [in concerts] . . . . [Our] leadership position [in concerts] drives the three high margin businesses that are driving our true cash flow and EBITDA.

The breakdown of Live Nation's stake in concert or event venues, as identified in Live Nation's 2023 Form 10-K, filed with the U.S. Securities and Exchange Commission ("SEC"), is as follows:

| Venue Type | Capacity | Owned | Leased | Operated | Exclusive Booking Rights | Equity Interest | Total |
|---|---|---|---|---|---|---|---|
| Stadium | More than 30,000 | — | 1 | 1 | — | — | 2 |
| Amphitheater | 5,000 - 30,000 | 10 | 40 | 1 | 16 | — | 67 |
| Arena | 5,000 - 20,000 | 3 | 13 | 2 | 6 | — | 24 |
| Theater | 1,000 - 6,500 | 10 | 70 | 10 | 30 | 2 | 122 |
| Club | Less than 1,000 | 5 | 51 | 2 | 13 | — | 71 |
| Restaurants & Music Halls | 1,000 - 2,000 | 2 | 15 | — | — | — | 17 |
| Festival Sites [1] | Varies | 2 | — | 51 | — | — | 53 |
| Other Venues | Varies | — | 13 | — | 1 | 3 | 17 |
| Total venues in operation | | 32 | 203 | 67 | 66 | 5 | 373 |
| | | | | | | | |
| Venues currently under construction | | — | 6 | — | — | — | 6 |
| Venues not currently in operation | | 3 | — | — | 6 | 6 | 15 |
| | | | | | | | |
| Total venues in operation by location: | | | | | | | |
| North America | | 22 | 152 | 23 | 65 | 5 | 267 |
| International | | 10 | 51 | 44 | 1 | — | 106 |

(b)    **Ticketing**.  The Ticketing segment, by contrast, is highly profitable.  This segment has gross profit margins that exceed 80%.  This division primarily consists of the legacy Ticketmaster business, which focuses on primary ticket sales, as well as a newer business focusing on secondary ticket sales (*i.e.*, ticket resales).  Ticketmaster sells tickets to the public under contracts with the venues, and earns service and other ancillary fees on the sale of each ticket.  Further, the numerous fees that are added on top of each other – often with little visibility or notice offered to the consumer buying the ticket – massively contributed to Live Nation's nearly 40% adjusted operating margin in 2023 for its Ticketmaster global ticketing business.  Ticketmaster also maintains a database of over 130 million customers, a valuable resource that allows it to recapture the same existing customers that it has served previously.  In 2023, the Ticketing business generated $3 billion, or 13% of Live Nation's revenue.

(c)    **Sponsorship & Advertising**.  The Sponsorship & Advertising segment leverages the 93 million or so fans Live Nation draws to its shows, the 130 million names in the Ticketmaster database, their stable of managed and promoted artists, and the venues they control to sell targeted advertising to major companies.  This type of leveraging is especially concerning in light of Live Nation CEO's comment at the October 10, 2013 Liberty's Investor Meeting:

Ticketmaster "now not only know[s] the person that bought the ticket, but [also] those three people that you are taking to the show, which we [Live Nation] had not known historically."  In other words, Live Nation's data supremacy over rivals has only accelerated.  In 2023, the Sponsorship & Advertising business generated $1.1 billion, or 5% of Live Nation's revenue.

29.    In performing the anticompetitive acts alleged herein, Ticketmaster acted under the control and direction of, and in coordination with, Live Nation and its most senior executives.

## FACTUAL ALLEGATIONS

### General Background on the Music Industry

29.    The components of the live music entertainment industry include the following: artists, managers/agents, promoters, venue operators, ticketing/marketing, and the end consumer.

30.    Artists are the principal draw for a live music event and drive demand for the services of every subsequent link and participant in the live music industry chain.

31.    An artist's manager serves as the lead strategic advisor for an artist's business activities, advising in some or all phases of the artist's professional life (tours, appearances, recording deals, publicity, endorsements, etc.).  Managers often are compensated based on a share of the artist's revenues or profit streams.  Defendant Live Nation is currently the largest manager of artists in the music industry.

32.    The artist's manager often hires booking agents to assist in arranging a concert event or tour.  The manager or booking agent contracts with promoters, such as Live Nation Entertainment, to secure payment terms for artists as compensation for their live performances. Agents are typically paid a portion of an artist's receipts from live performances.

33.    The promoter is responsible for promoting the concert to the public, which requires several different types of work.  The promoter typically receives the proceeds from gross ticket

receipts for each concert it promotes and is responsible for paying the artist, venue, and other expenses associated with the event.  For example, the promoter hires the artist for the performance (often guaranteeing more popular artists millions of dollars for that performance or tour), generally contracts with the venue (or uses its own venues), pays the concert venue a fixed fee (called a "rental payment") to host the concert at the venue, arranges for local production services, and advertises and markets the concert.  The promoter bears the risk of an event if tickets sell poorly and reaps the upside benefit with the artist(s) if tickets sell well.  Put simply, the more tickets a promoter is able to sell for a show, the more money the promoter (and the artist(s)) should make.

34.    Artists planning to conduct a tour at major concert venue levels often use a single company to provide and/or coordinate promotions for the entirety of the tour.  Live Nation is the largest promoter of these types of tours in the United States, promoting over 60% of the shows at major concert venues in the nation.

35.    Concert venue operators provide access to and maintain the facilities where concerts are held and oversee the venue's associated services, such as concessions, parking, and security. Along with the rental fee received from the promoter, venues generally take a share of proceeds from concessions, parking, and merchandise sales.  Concert venues that contract with Ticketmaster have also, in recent years, begun to take a portion of the fees added to the face-value of the tickets for events at the venue.  Thus, similar to the promoter, the more tickets sold (and the more patrons that attend), the more money a concert venue operator makes.

36.    Large amphitheaters are particularly attractive venues for certain popular artists. Amphitheaters are large outdoor venues, which allow artists to take advantage of warm weather in the summer months, when many artists prefer to tour.  Many touring artists favor amphitheaters because they generally offer more seating than clubs and theaters, a more curated and intimate

- 13 -

artistic experience than arenas or large festivals, and a generally more lucrative venue platform because of the significant scale they facilitate. Large amphitheaters are especially attractive to artists who have graduated from clubs and theaters but are not yet able to fill higher-capacity arenas on a more consistent basis. They also may be attractive to artists who once played in arenas or stadiums but are no longer able to attract the same audience size. Live Nation controls more than 60% of the large amphitheaters in the United States. In fact, it owns, operates, or exclusively books at least 40 of the top 50 (as well as 60 of the top 100) amphitheaters in the United States. No other company can compete with this staggering and outsized number of venues, even those with an otherwise large portfolio of arenas.

37.     In terms of ticket sales, concert venue operators have two options: either to manage the sale of primary ticket inventory themselves or contract with a third party to handle the sale process for them. Managing and selling concert venue tickets is technologically and operationally complex, so most concert venue operators choose the latter option and contract with primary ticketing service providers (generally, Ticketmaster) for comprehensive ticketing solutions on the primary market.

38.     Primary ticketing service providers contract with venues to manage and sell primary ticket inventory for events at a specific venue. Primary ticketing service providers create "back-end" inventory management systems and provide "front-end" support, including customer service, shipping, fulfillment services, as well as the technology (and staff) to allow concert venue operators to sell tickets through their box offices. The primary ticketing service providers (like Ticketmaster) provide primary ticketing services to primary ticket purchasers and sellers by acting as a distributor, selling the primary ticket inventory made available to them through means such as the internet, call centers, retail outlets, and/or box offices.

39.     Primary ticketing service providers generate profits by, among other things, applying additional charges to the price of tickets sold to primary purchasers.  The overall price a consumer pays on a primary market ticket purchase therefore includes the face-value of the ticket, as well as a variety of fees in addition to the face-value of a ticket.  Typically, these are described as "convenience," processing," "service," "facility," and/or "delivery" fees, which can constitute a substantial portion of the overall cost of the ticket to the consumer.  Today, consumers pay more in fees associated with live music concert tickets in the United States than anywhere else in the world. The fees can include, for example:

- **"*Service*" or "*Convenience*" *Fees***.  Service Fees, sometimes called convenience fees, are negotiated between the venue and the ticketer and can be set in a variety of methods.  One method involves the ticketer receiving an agreed-upon dollar amount and/or an agreed-upon percentage of the service fee.  Another method involves the venue and ticketer agreeing in advance as to the actual fee that the fan will pay for any event and how to split that fee.  Lastly, a ticketer may receive a fee based on the face-value of the ticket.  Under any of those models, the ultimate fee that the consumer pays results from the negotiation between the ticketer and the venue. Generally, under these methods, the higher the ticket price, the higher the ticketing fee.  As a result, the fee has no meaningful relationship to the actual cost of providing the ticketing service, which would generally not vary ticket by ticket or show by show.

- **"*Platinum*" and "*Pricemaster*" *Fees***.  Not all primary tickets, however, are subject to the typical "service" fees.  Ticketmaster has two dynamic pricing tools, Platinum and Pricemaster.  For tickets that Ticketmaster dynamically prices, consumers often pay higher ticketing fees.  Ticketmaster additionally receives an "inside fee" from the promoter, allowing Ticketmaster to financially benefit on both sides of the transaction.

- **"*Per Order*" (or "*Handling*") *Fees***.  Per Order or Handling Fees, which are additional ticketing service fees charged on top of each order, separate and apart from the ticketing fees embedded in the service charge.  These are often split between the ticketer and the venue.

- **"*Payment Processing*" *Fees***.  Payment Processing Fees, which are additional fees charged on certain transactions for processing the electronic payment inherently necessary to purchase any electronically delivered ticket.

- **"*Facility*" *Fees***.  Facility Fees, which some venues charge and are typically remitted in full to the venue.

Although venues retain some proportion of the ticketing fees described above, a significant proportion of the venue's share is often passed onto promoters, like Live Nation, to incentivize them to steer content to their venue.

40.    With respect to the Relevant Market, secondary ticket sales take place after there has been a primary ticket sale.  Typically, a primary ticket purchaser can choose to resell their ticket, as can a secondary ticket purchaser who also wishes to resell the same ticket.  Historically, such "secondary" ticket sales were challenging because it was difficult to find a purchaser.  Ticket holders wanting to sell their tickets were therefore typically relegated to either asking around, selling to local ticket brokers on commission, or utilizing scalping.  In recent years, however, a market for secondary ticketing service providers arose.  Such providers typically offer online platforms connecting resellers to purchasers and providing services by acting as a distributor agent.  This substantially reduces the logistical difficulties of reselling tickets.  Today, selling a ticket is often as easy as posting the ticket on a secondary ticketing platform and waiting for a purchaser to locate and buy the ticket(s).  Like primary ticketing service providers, secondary ticketing service providers generate revenues by levying fees on the sale of each transaction.

**Live Nation and Ticketmaster Have Distorted Various Markets
in the Live Music Industry, Causing the Cost of Tickets on the
Primary and Secondary Ticketing Markets To Skyrocket**

41.    Substantially all of the United States' major concert venues have entered into long-term exclusive agreements with primary ticketing service providers – at least 80% with Ticketmaster and growing each year – whereby the ticketing service provider contracts for the exclusive rights to all (or in some instances the majority of) ticket sales for all concerts held at that particular venue.  By Defendants' own count, Ticketmaster provides primary ticketing services to over 10,000 venues and

- 16 -

has a renewal rate "exceeding 100%," because there is no effective competition to Ticketmaster when these long-term, exclusive dealing contracts expire. Ticketmaster is, by far, the largest primary ticketer in the United States, so much so that its next closest competitor in the primary ticketing space, AXS (operated by Anschutz Entertainment Group ("AEG")), is less than a fifth of the size of Ticketmaster, which results in Ticketmaster's disproportionate dominance. By way of example, in 2022, Ticketmaster's share of primary ticketing for major concerts at NBA and NHL arenas exceeded 70%, with AXS and SeatGeek lagging far behind. And in the past ten years, AXS has not moved a single arena away from Ticketmaster.

42.    Indeed, in light of existing market dynamics and Defendants' conduct, it has been and remains rare for venues in the United States to be "open," which would mean that the dynamism of competition would decide what primary ticketer wins the contract for a particular concert at a particular venue. Instead, primary ticketers, notably Ticketmaster, typically contract to be the exclusive ticketer for a major concert venue for a period of many years, offering venues up-front payments in the form of signing bonuses and sponsorships. Ticketmaster's exclusive contracts cover more than 60% of ticket sales to major concert venues and more than 75% of concert ticket sales to major concert venues. These exclusive agreements contractually bar any option of having more than one ticketing company offering differentiated services to fans at such venues for a single show or even across shows, with very limited exceptions. This model, which locks in the certainty of exclusivity over the dynamism of open competition, is an intentional business strategy found in the Ticketmaster-dominated primary ticketing market in the United States, but does not burden competition for such services in many other parts of the world not dominated by Ticketmaster.

43.    Unfortunately, any attempted negotiations with Live Nation by venues that want to be more independent with respect to their selection of a primary ticketing agent are dead on arrival.

- 17 -

Live Nation essentially gives venues an ultimatum: use Ticketmaster and potentially receive a significant payment for long-term exclusivity, or use another ticketer and risk losing access to the vast array of Live Nation assets, including lucrative concerts. This ultimatum often comes in the form of direct threats from Live Nation. Other times, the ultimatum is delivered implicitly, but the substance is the same. In fact, in some circumstances, Live Nation deploys its extensive network of intermediaries to communicate this ultimatum to venues on Live Nation's behalf. As only one example, Live Nation and a key would-be competitor, Oak View Group, have conspired and colluded to establish a partnership in order to allocate business lines, avoid competing with each other, and chart a mutually beneficial plan to cement Live Nation's dominance. Oak View Group is a leading American venue development and management company uniquely positioned to compete against Live Nation. Despite Oak View Group's clear capacity to compete against Live Nation due to its experience and business relations with artists and venues, Oak View Group instead decided to be a self-described "hammer" for Live Nation. In this role, Oak View Group has made threats and ultimatums to at least one venue and, on information and belief, numerous others.

44.    Similarly, at least one other venue was warned by a rival venue CEO that Live Nation would move shows away from the venue if it selected another ticketing platform other than Ticketmaster for primary ticketing services.

45.    It is well understood across the live concert industry that, as a consequence of Defendants' egregious conduct and overt intent to retain their dominance, choosing ticketers other than Ticketmaster carries enormous risk and financial hardship for venues. Live Nation's reputation and history of retaliation by directly threatening venue operators are infamous. These threats have included: (a) pulling or moving concerts completely away from venues that do not agree to Live Nation's terms, including use of Ticketmaster; (b) moving shows at such venues to less desirable

and/or less lucrative dates; (c) curtailing promotional efforts for concerts at such venues; and (d) forcing such venues to disable secondary ticketing on non-Ticketmaster platforms (dissuading wary consumers from purchasing tickets in the first place and frustrating consumers who buy tickets but change their plans).

46.      In 2021, for example, Live Nation audaciously threatened retaliation against Barclays Center, which had decided to switch from Ticketmaster to SeatGeek for primary ticketing because SeatGeek offered to share with the venue a greater percentage of the fees associated with secondary ticketing.  In response, a Live Nation senior executive sent a very candid warning text to the venue's CEO: "Apparently seatgeek are telling [nearby venue] and others that they have a contract deal with you guys already??  Anyways should think about bigger relationship with [Live Nation] not just who is writing a bigger sponsorship check ☺."  A few days later, Live Nation's CEO emailed Barclays Center's owner that Live Nation "will be very concerned that seatgeek a secondary provider will be selling our [Live Nation] artist tickets when not authorized by the artist."

47.      Once Barclays Center switched to SeatGeek, Live Nation made good on its threats – re-routing concerts to other venues and demanding that the venue disable secondary ticketing on SeatGeek's platform for all Live Nation-promoted concerts, depriving the venue and SeatGeek of secondary fee revenue.  Thereafter, Live Nation conditioned re-enabling secondary ticketing on: (1) Barclays Center agreeing to split its share of secondary fee revenue (sourced through SeatGeek) with Live Nation; and (2) SeatGeek agreeing to change its ticket-buying interface to make it conform more closely to Ticketmaster's, without regard to consumer or venue preferences.  But Live Nation maintained other aspects of its retaliation, ultimately causing Barclays Center to terminate its primary ticketing deal with SeatGeek and to return to Ticketmaster within about a year.  In 2024, Barclays Center was the venue for which Plaintiff Leifer purchased at supracompetitive prices one or

- 19 -

more secondary market concert tickets, after those tickets were initially sold by Ticketmaster as the venue's exclusive primary ticketing service.

48.    Moreover, direct threats are not the only tool in Live Nation's arsenal to retain its dominance in the industry.  Due to Live Nation's historical reputation, Live Nation can simply imply that it fully intends to retain its hold over the industry by any means it deems necessary.  For example, in 2019 Live Nation's CEO publicly announced that it will steer the concerts it promotes to the venues "where we make the most economics," which typically means venues where Ticketmaster holds the primary ticketing contract.  He stated:

> We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, "If you do that, we won't put shows in your building." . . .  [However] ***we have to put the show where we make the most economics, and maybe that venue [that wants to use a different ticketing platform] won't be the best economic place anymore because we don't hold the revenue***.

Venues considering primary ticketing options fully understand and take heed of Live Nation's obvious warnings.  The threat of taking shows away from venues allows Live Nation to exercise its monopoly power to get better promotion deals and impose Ticketmaster on venues, all to the financial detriment of consumers.

49.    Even Live Nation's biggest competitors fear losing concerts if they do not use Ticketmaster.  Live Nation's principal competitor, AEG, owns approximately 30% of Anschutz Spectacor Management ("ASM Global"), a venue management company that manages more than 30 arenas in the United States.  ASM Global resulted from a 2019 merger between AEG Facilities and Spectator Management Group ("SMG").  Before the merger, SMG's legacy venues had used Ticketmaster as their exclusive primary ticketer, and AEG Facilities' legacy venues had used AXS as their exclusive primary ticketer.  Through its minority interest in ASM Global, AEG advocated for AXS to serve as the exclusive primary ticketer for the ASM Global venues that AEG now

- 20 -

partially owned.  But ASM Global's majority shareholder Onex worried that Live Nation would retaliate by withholding shows from ASM Global venues if ASM Global switched away from using Ticketmaster.

50.     To avoid losing access to concerts at ASM Global venues by "alienating" Live Nation, AEG was forced to accept that Ticketmaster would remain the dominant provider at ASM Global venues despite AEG's partial ownership of ASM Global and AEG's ability to provide an alternative primary ticketer, AXS.  AEG agreed Ticketmaster would remain the default primary ticketer for most ASM Global venues, with AEG reserving a limited right to use AXS for events promoted by AEG.

51.     Relatedly, when venues have proposed non-exclusive ticketing contracts, Ticketmaster has almost invariably rejected such requests.  And even though Live Nation agreed to limited non-exclusivity for AEG-promoted shows at certain ASM Global venues as part of its recent contract negotiation – in order to dislodge its largest ticketing rival (AEG's AXS) from the very venues that its largest promotions rival (AEG) partially owns – Ticketmaster has refused to even consider this for other venues.  If even AEG must acquiesce to Live Nation's demands that Ticketmaster exclusively ticket every show at AEG's own affiliated venues, no other concert venue owner realistically stands a chance to challenge Live Nation.

52.     According to Ticketmaster, its agreements with concert venues have terms that may exceed ten or more years in length.  To induce concert venues to enter into such exclusive dealing arrangements (which can amount to over 75% of concert ticket sales at major concert venues), Ticketmaster offers up-front payments and subsidies that can run into millions of dollars that are conditioned on such exclusivity.  These arrangements offer two direct financial benefits to Live Nation at the cost of fair competition and to the financial detriment of consumers: (1) lock venues

out from choosing a rival ticketer even if that ticketer offers a better price, a better product, or simply a better experience because, as Ticketmaster puts it, the "[venue] is under contract for longer and not able to leave [Ticketmaster] or price the competition's offer into our new deal for an extended time"; and (2) the up-front payments Ticketmaster provides act as a barrier to entry for smaller competitors and act as an additional mechanism to maintain Ticketmaster's dominance.

53.    Even more, Live Nation, with and through Oak View Group, exploits these long-term relationships to flip venues to Ticketmaster, cementing Ticketmaster's dominance in the industry. For example, in 2022, Live Nation and Oak View Group entered into a long-term agreement.  Since then, Oak View Group has recognized it has a significant financial interest in maintaining existing Ticketmaster contracts at its venues and converting its other venues to Ticketmaster.  Oak View Group has pushed through these new contracts with Ticketmaster, subverting the very ticketer selection process that Oak View Group purportedly runs on behalf of its venue clients.  As a venue manager, Oak View Group can control which non-incumbent ticketing services are invited to submit bids for ticketing service proposals, and it often invites only Ticketmaster, eliminating some of the very limited opportunities that rival ticketers would otherwise have to compete against Ticketmaster. As Oak View Group's CEO explained to Live Nation's CEO, the deal that Oak View Group has with Live Nation

> allows us to tie up all owned and operated facilities to 10 year deals, develop a standard A and B market deal for all future projects and to convert all OVG 360 deals to [Ticketmaster] now or as they expire after 10 years. . . .  Appreciate the consideration and partnership and all of us will work diligently on this so we are always aligned with [Ticketmaster].

Oak View Group had projected that it would flip at least twenty-two venues to Ticketmaster over four years, and it has already converted at least six venues, if not several more.

54.     Before its long-term exclusive agreements expire, Ticketmaster also works defensively to deny rivals the opportunity to compete at all.  Ticketmaster often renews or extends these ticketing arrangements before they expire, thus preventing rivals like SeatGeek and AXS from being able to bid at all.  This not only eliminates Ticketmaster's need to be competitive vis-à-vis other ticketing platforms as these arrangements protect Ticketmaster's dominance, but it also effectively eliminates any chance of Ticketmaster losing a bidding process at all, again to the financial detriment of live concertgoers.

55.     Moreover, in order to ensure that its existing locked-in venues agreed to early renewals, thereby blocking competition from any rivals, Ticketmaster egregiously used COVID-19 as an opportunity to extend the terms of its existing long-term venue ticketing arrangements for one more year.  After one venue resisted this effort, telling Ticketmaster that it intended to sign with one of Ticketmaster's competitors after their contract expired by its own terms, Ticketmaster's counsel wrote as follows: "Any effort by [the venue] to switch ticketing service providers before [the extension date] would be a breach of contract, and any announced intention to do so would be an anticipatory breach."  In a conversation between this venue's CEO and Live Nation's executives, Live Nation's Chief Financial Officer indicated that Live Nation would "drop" the contractual dispute if the venue agreed to enter into a new ticketing contract with Ticketmaster, but not if the venue went with a rival.

56.     Live Nation also wields its power to keep rivals from expanding in the concert promotions market in the United States.  Live Nation had categorized Oak View Group as one of its "Biggest Competitor Threats" shortly after Oak View Group was founded because Live Nation immediately recognized Oak View Group's concert promotion capabilities.  However, over time, Oak View Group and Live Nation morphed from competitors into partners who found it easier and

more financially advantageous to work together rather than compete, and Live Nation and Oak View Group have agreed to a competitive détente in concert promotions. Oak View Group now operates as an agent and a self-described "pimp" and "hammer" for Live Nation, often influencing venues and artists for the financial benefit of Live Nation at the cost of the consumer. This collusive relationship designed to financially squeeze consumers was on full display in a recent comment from the CEO of Oak View Group to Live Nation's CEO: "Just like I tell our folks we 100% always protect you and LN on your lanes," and "I always protect you on rebates, promoter position, ticketing." Likewise, in 2022, after Live Nation's CEO challenged the CEO of Oak View Group upon learning that Oak View Group made a promotion offer to an artist ("who would be so stupid to do this and play into [the artist's] arms?"), Oak View Group's CEO responded apologetically: "We have never promoted without you. Won't." Oak View Group's CEO later added that he was "[m]ore than happy to do these deals through LN as I have always been aligned," and that "I never want to be competitors." Consistent with that sentiment, a Senior Vice President at Oak View Group stated to their colleagues in 2019: "It has been our policy to stay on the sidelines when it comes to buying and specifically promoting tour dates as we are cognizant not to compete with our partner Live Nation in this side of the business."

57.    To take just one more example, in 2021, Live Nation threatened commercial retaliation against private equity firm Silver Lake, unless one of its portfolio companies, TEG, stopped competing with Live Nation for artist promotion contracts. These threats succeeded, and Silver Lake has tried to sell TEG altogether.

58.    Prior to this TEG incident, Live Nation and Silver Lake had a relationship through Silver Lake's ownership of Oak View Group, which as noted became a functionary for key aspects of Live Nation's anticompetitive scheme. Live Nation's campaign to squash competition from TEG

- 24 -

took place at the highest levels.  In 2021, Live Nation's CEO complained to Oak View Group's co-founder that TEG was acting as a "[f]ull on competitor[]" to Live Nation.  Live Nation's CEO then escalated his complaints to Silver Lake directly: "I am all in on [Oak View Group] where the big play lies with venues – why insult me with this investment in ticketing/promotions etc."

59.     Later in 2021, Live Nation learned that TEG made promotion offers to prominent artists in the United States and succeeded in securing a big-name artist for a concert at the Los Angeles Coliseum.  In response, Live Nation used its power derived from its exclusive ticketing arrangements with the venue to frustrate TEG's concert.  For this concert, TEG reached an agreement with StubHub where TEG would sell a certain number of tickets on StubHub's platform. But Live Nation, through Ticketmaster, threatened to deny entry to any person using a StubHub-issued ticket.  Ultimately, StubHub stopped selling tickets and attempted to work with Ticketmaster to fulfill the tickets that it had already sold.  But Ticketmaster failed to fulfill many of those tickets for StubHub's customers, and hundreds of StubHub's customers were refused entry to the event.

60.     After learning about the TEG-promoted concert in Los Angeles, Live Nation's CEO again threatened Silver Lake, TEG, and Oak View Group.  He said that he "fail[ed] to understand" why Silver Lake "continue[d] to invest in a business that competed with [Live Nation]/OVG."  Live Nation then threatened to pull its support from Oak View Group and instead back an Oak View Group competitor unless TEG stopped competing with Live Nation for promotion deals:

> I can assure you the OVG investment is a much bigger win then T[E]G . . . .  [Live Nation] declared to back OVG vs other developers or going solo and it's been a huge win for both sides – we have over 20 global arenas in development that neither could do without the other . . . do you really want [Live Nation] backing [AEG's venue development and management company] . . . ?  Seems like a dumb trade off??

61.     The co-founder of Oak View Group then refused to allow TEG to promote any of his large roster of artist clients (serviced through his separate company, Full Stop Management).  He

- 25 -

also informed Live Nation that he was going to demand that Silver Lake sell TEG.  In reply, Live Nation's CEO, said "[l]ove ya."  TEG soon stopped competing with Live Nation for concert promotions.  And Silver Lake responded by trying to "dump" TEG and asking Live Nation, through the founder of Oak View Group, whether it would be interested in purchasing TEG.

62.    The foregoing strategies and conduct were part of a deliberate series of actions and decisions designed to lock up venues, lock out competitors, and hold the live concert industry hostage from innovation and evolution.

**The Relevant Market Is a Separate Market**

63.    There are the three relevant service markets applicable to this Action: (1) concert and event promotion services for major venues within the United States; (2) primary ticketing services for major venues in the United States; and (3) secondary ticketing services for major United States venues.  Defendants have dominant market share and monopoly power in the three markets.

64.    This Action focuses on the third of the relevant service markets, the Relevant Market, which is the secondary ticketing services market for major concert and event venues within the United States.

65.    Due to the conduct alleged herein, Ticketmaster's branded platform, as well as its TicketExchange, TicketsNow, TM+ and Verified Tickets secondary platforms have obtained a market share exceeding 60% of the secondary ticketing services for major concert venues.

66.    Secondary Ticket Exchanges help facilitate the resale of tickets, and they provide a distinct role in the music and event industry.  Similar to online auction websites, a Secondary Ticket Exchange creates an online platform that allows ticketholders to post their ticket(s) for sale.  The price set for a ticket on a Secondary Ticket Exchange is a function, in significant part, of the prices posted for similar tickets on other Secondary Ticket Exchanges.  The Secondary Ticket Exchange

- 26 -

provides potential purchasers with search capabilities to locate tickets for events they want to attend. If a purchaser decides they want to buy one or more tickets for sale on that platform, they fill in their purchase information, and the platform completes the sale. Typically, the Secondary Ticket Exchange charges both the seller and the purchaser fees, usually based on the sales price of the ticket(s). In other words, the higher the price paid for a ticket sold on a Secondary Ticket Exchange, the higher the fees charged by the exchange in that transaction.

67. Within the live music industry, and among concertgoers nationwide, there is broad recognition that primary and secondary ticketing services are distinct. Live Nation's CEO, for example, has been repeatedly quoted discussing the differences between the two service markets, including noting that Ticketmaster has grown its secondary ticketing services substantially over the past several years. Industry sources also regularly recognize the clear difference between such services, and secondary ticketing service providers are listed and grouped in industry materials as a distinct category of provider.

68. Several other factors also demonstrate the unique and separate nature of secondary ticketing services (as opposed to primary ticketing services) for major concert venues:

(a) Critically, the customers for secondary ticketing services for events at major concert venues are distinct from the customers of primary ticketing services for events at major concert venues. For primary ticketing services, major concert venue operators are ticket sellers who retain primary ticketing service providers to act as their distributor agent and provide a number of back-end and front-end services to sell tickets directly to fans wishing to attend an event. For secondary ticketing services, the ticket sellers are purchasers who bought a ticket on either the primary *or* secondary market and now wish to resell that ticket. The ticket buyers who utilize the two types of ticketing services are also distinct, in that the secondary ticket buyers are purchasers

- 27 -

who were unable to buy tickets they wanted from the primary provider, and therefore need to look for resale options as an alternative.

(b)     These customers for secondary ticketing services (both sellers and purchasers) recognize the difference between the secondary and primary ticket services markets.  In fact, primary ticketing service providers (including Ticketmaster) all view secondary ticketing services as separate and distinct from primary ticketing services.  Defendants make this distinction multiple times, including in SEC filings.  For example, in Live Nation's 2020 Form 10-K disclosure statement, filed with the SEC, Live Nation repeatedly distinguishes between "ticketing services" and "ticketing resale services," noting that the former is for venues and the latter for resellers, and that the services provided through each are different.  Additionally, that same disclosure distinguishes between "primary ticketing companies" and "secondary ticketing companies."

(c)     All entities in the live music industry (including Defendants themselves) recognize that secondary ticketing services have unique purposes as compared to primary ticketing services: the latter are meant to facilitate and run the original sale of tickets on a venue's behalf, and the former are meant to facilitate ticket purchasers' resale of their ticket(s) at a later date.

(d)     There are distinct pricing models between the two service markets.  Primary ticketing service providers generate profits by levying fees on top of a ticket's face-value.  The venue operator does not pay services fees – primary ticket purchasers do – and due to recent changes in Ticketmaster's business model, now often shares in a portion of the levied fees.  Secondary ticketing service providers also generate profits by levying fees on secondary ticket sales, but that is where the similarity ends.  Unlike in the primary market, a secondary ticketing service provider typically charges the ***ticket seller*** a fee, often a percentage of the sale price of the ticket.  However,

- 28 -

secondary ticketing service providers *also* charge the purchaser one or more fees on the sale, thus obtaining profits from both sides of the transaction.

(e)    Demand for secondary ticketing services is not sensitive to changes in prices for primary ticketing services because such changes do not cause secondary purchasers to choose a different set of services.  Put differently, it is irrelevant to secondary ticket sellers and purchasers whether the prices paid by primary purchasers to a venue's primary ticketing service provider changes in any real way.  What matters for the secondary market purchaser is that they have a service available to find and purchase a resale ticket.  This leaves consumers in the secondary market vulnerable to high prices emerging from the primary market, because they have no choice: they can either pay prices on the secondary market that include supracompetitive mark ups and fees or miss the event or concert.

(f)    There are specialized vendors that are largely distinct between the primary and secondary ticketing service markets, and the platforms they provide are substantially different themselves.  For primary ticketing service providers, the platform is venue specific, and the services provided are aimed at facilitating a sale of primary tickets (often including the high-volume rush of tickets at the initial opening of sales) as well as on-the-ground ticketing services at the actual event.  For secondary ticketing service providers, the vendor must instead provide a platform with very different services and functionality.  A secondary platform focuses more on connecting sellers and purchasers, and also providing the necessary capabilities to complete their ticket transaction.  The secondary ticketing service provider takes a fee for its services.

**Ticketmaster Distorts the Relevant Market**

69.    In the Relevant Market, which is described above as a distinct market, Ticketmaster has few competitors.  Ticketmaster's anticompetitive acts in each of the three applicable markets

insulate Ticketmaster from meaningful competition in the Relevant Market, as well as the other two applicable markets. This has created a concentration of power in Defendants' control which cannot be penetrated by any potential competitor. For example, using a widely-recognized measure of market concentration called the Herfindahl-Hirschman Index ("HHI"), the post-Live Nation and Ticketmaster HHI for primary ticketing services increased by over 2,190 points, resulting in a post-merger HHI of more than 6,900. The DOJ's Antitrust Division considers any market with more than an HHI of more than 2,500 to be highly concentrated. Ticketmaster leverages its control over this concentrated primary ticketing services market to choke off access to already supracompetitively-priced tickets in the Relevant Market.

70.     In the Relevant Market, Ticketmaster uses its grip over the primary market to control the secondary market for ticket sales to major concerts and events. Using anticompetitive technological restraints as detailed below, Ticketmaster suppresses competition in the Relevant Market by making it more difficult to resell Ticketmaster's primary market tickets on any platform other than Ticketmaster's secondary market platform. Ticketmaster's secondary market platform thrives because Ticketmaster's primary market platform works in tandem with Ticketmaster's secondary market platform to distort, corrupt, and restrain competition in the Relevant Market.

71.     The rise of the internet ultimately helped create, for the first time, a truly viable and robust secondary market for concert tickets in the United States. This is because the internet's ability to connect individuals from all walks of life allowed secondary ticketing service providers to create platforms where secondary ticket sellers and purchasers could more easily connect and consummate secondary ticket sales. Whereas, pre-internet, a secondary ticket purchaser needed to affirmatively seek out ticket brokers or find scalpers near the entrance of a show, now they could locate secondary tickets with just the click of a button. Similarly, ticket resellers suddenly had a far

broader reach via an easy-to-access electronic platform that initially dramatically lowered the transaction costs for ticket resales. These mutual conveniences allowed the market to flourish, which created substantial benefits for ticket resellers and purchasers.

72.     The proliferation of the secondary market for concert tickets, however, was not without negative effects. Because a ticket reseller may charge more for secondary tickets than their face-value, opportunistic individuals and companies built business models around buying up large amounts of primary tickets at the beginning of a general sale and then selling those tickets at a markup on the secondary market. They could do so because they and other similar opportunists locked up the supply of the tickets for a show, thereby driving up prices for fans that wanted to attend the concert. These resellers (often, ticket brokers, but also just as often run-of-the-mill scalpers) developed a number of different techniques to quickly purchase primary tickets, including operating multiple accounts simultaneously, employing small armies of ticket purchasers at the beginning of general sales, and using "ticket bot technology" (programs that automatically purchase tickets online faster than any human could).

73.     Ticketmaster benefited from the growth of secondary concert sales because a robust secondary market maximizes primary ticket sales. Given high demand and limited quantity on the primary market, ticket brokers and scalpers are incentivized to quickly purchase as many primary tickets as possible; the rest are then purchased by real fans. All of this frenzied purchasing during the general sale benefits the primary ticketing service provider because, as discussed above, it allows them to generate revenues by levying fees on primary ticket sales.

74.     Over the years, Ticketmaster has walked a narrow line by publicly decrying ticket broker practices while privately encouraging them. Defendants began a concerted effort to grow their secondary ticketing services in addition to their dominant primary ticketing services platform so

- 31 -

that Ticketmaster could make money off the initial sales as well as resales of the very same concert tickets.  As a result, the anticompetitive conduct that Ticketmaster has thus employed in the Relevant Market has allowed it to recapture the revenues of the sale and resale of the same tickets.  As addressed in detail below, Ticketmaster's anticompetitive conduct in the Relevant Market includes acquiring horizontal competitors and would-be competitors in the Relevant Market in order to eliminate competition, using conditional licensing to stifle the free flow of tickets from Ticketmaster's primary market platform onto alternative, non-Ticketmaster secondary market platforms, and using technological restraints to curtail the ability of consumers to easily transfer tickets purchased initially from Ticketmaster's primary market platform onto alternative, non-Ticketmaster secondary market platforms.

75.    **Acquiring Secondary Ticket Services Providers**.  Ticketmaster first entered the secondary ticketing services market by acquiring preexisting secondary ticket service providers.  It then initially kept the platforms separate from Ticketmaster's primary ticket site for several years.  More recently, however, Defendants integrated those secondary ticketing service providers into Ticketmaster's broader platform, such that consumers can now purchase primary or secondary tickets on Ticketmaster.com or the Ticketmaster mobile application, and may not even know if they are purchasing a primary or secondary ticket at the time of sale.

76.    By acquiring nascent horizontal competitors, Ticketmaster removed competitors from the Relevant Market to Ticketmaster's own benefit.  This, in turn, had the following effects: (1) reduced choice for consumers, as consumers no longer had as many options to choose from in the Relevant Market; (2) reduced price competition, as less competitors in the Relevant Market means Ticketmaster faces less downward pressure on ticket sales in the Relevant Market due to horizontal competition; and (3) reduced incentives to innovate, as less competitors in the Relevant Market

means Ticketmaster faces less of a need to innovate and improve the quality of its products for its consumers due to a lack of competition.

77.    **Conditional Licensing**.  Ticketmaster grants a conditional license to the use of its tickets and its ancillary services to users of its website and/or mobile application.  The conditional license allows users to view Ticketmaster's site and access its contents only if they agree to a bevy of restrictions that prevent brokers from purchasing tickets from Ticketmaster and then reselling them on rival secondary ticketing platforms.

78.    As one example, the conditional license prevents users from refreshing Ticketmaster's ticketing pages "more than once during any three second interval."  The conditional license also restricts the use of "ticket bot technology," which makes it more difficult for brokers to engage in bulk purchases of tickets.  The conditional license contains many similar terms as well, and Ticketmaster claims that it will put brokers to the back of the electronic line if it spots them in the queue.

79.    While Defendants claim the conditional license is pro-consumer, the truth is that it is simply one more tool for Defendants to use to effectuate their broader anticompetitive scheme. Ticketmaster, as directed by Live Nation, regularly sets aside primary tickets for ticket brokers so that those brokers can then resell those tickets.  Defendants accomplish this through "ticket banks," which are ostensibly for presale tickets, and through ticket "holds" (the allotment of total tickets "held" aside from the general sale for industry insiders).  The ticket banks have neutral names so as not to trigger fan suspicion, but the ticket banks (and the tickets placed into them) are really for the brokers.  In this way, Ticketmaster is able to bolster its relationship with ticket brokers and maximize primary ticket sales while also growing its secondary ticketing service business.

4873-9954-1219.v1

80.     Ticketmaster's conditional license plays into this scheme by acting as the sword Ticketmaster wields against ticket brokers if they do not agree to Ticketmaster's anticompetitive demands.  Put simply, Ticketmaster will allocate primary tickets for a broker to a ticket bank **_only_** if that broker agrees that it will resell those tickets only through Ticketmaster's secondary ticket platform.  If the broker does not agree, then Ticketmaster will use the conditional license to force the broker off its platform.  Ticketmaster is able to do this with impunity because of the power it holds over the supply of primary tickets at major concert venues, and because Live Nation, as the dominant concert promoter in the nation, controls the vast bulk of major concert tours.

81.     Faced with this potent combination, ticket brokers seeking to resell major concert venue seats have no other choice but to use Ticketmaster's secondary ticketing services, even though Ticketmaster is not a competitively attractive platform for secondary sellers as compared to Ticketmaster's competitors.  Specifically, Ticketmaster's competitors charge lower fees for access to their platforms as compared to Ticketmaster – however, brokers cannot reap these benefits because they must appease Ticketmaster's demands or risk losing access to primary market tickets.

82.     This, in turn, had the following effects: (1) reducing competition in the Relevant Market, giving consumers less choice with respect to purchasing options; and (2) creating a supply restraint that keeps primary market tickets and other secondary market tickets from being resold in the Relevant Market on a secondary ticketing services platform other than Ticketmaster's secondary ticketing services platform.  Reduced competition and restrained supply have the effect of distorting the Relevant Market, leading to higher prices, including both higher fees and high resale values for tickets.

83.     **Technological Limits on Transferability**.  Ticketmaster also limits primary purchasers on their platform from transferring their tickets through any means other than

Ticketmaster's secondary ticketing services platform.  Defendants do so most prominently through a combination of mobile ticketing and Ticketmaster's branded "SafeTix" technology, although Defendants regularly attempt to limit ticket transferability through other means as well.  SafeTix is an encrypted mobile ticket program that Ticketmaster added to its suite of products and services in order to protect its hegemony in primary ticketing, expand its already dominant position in secondary ticketing, and undercut the ability of rival ticketers to compete in either aspect of ticketing.  Via SafeTix, Ticketmaster replaced the static barcodes on PDF tickets—or other types of electronic tickets—with a constantly refreshing and encrypted barcode.  Ticketmaster marketed this change as reducing the risk of ticket fraud from stolen or illegal counterfeit tickets.  But the transfer restrictions implemented as part of this change had the much more significant—and intended—effect of making it far more difficult for a consumer who wishes to buy or sell a SafeTix-encrypted ticket through a secondary platform to use a rival secondary platform like StubHub or SeatGeek.  Further, SafeTix introduces uncertainty as to when, or even whether, that ticket can even be transferred.  If a ticketholder wants to sell or otherwise transfer a SafeTix-encrypted ticket, both the ticketholder and the purchaser must create Ticketmaster accounts (thereby providing Ticketmaster with their personal data and information), download the Ticketmaster app, and wait for Ticketmaster to determine when or whether the transfer can be completed.  Ticketmaster also, thereby, while not a party to such transactions, seeks to unilaterally and surreptitiously impose its own unfair and one-sided terms and conditions on secondary platform purchasers.  By reducing the incentives to enter secondary ticketing altogether, SafeTix not only reduces competition from existing rivals, but also disincentivizes prospective innovators from considering secondary ticketing as a viable foothold to enter primary ticketing.

84.     In addition to cementing Ticketmaster's restrictions on secondary ticket transfers and transactions, SafeTix has also secured Live Nation's data advantages against its rivals.  For example, according to internal documents, SafeTix was expected to grow the "size/value of the [Ticketmaster] database," already the largest of any ticketer, by as much as 30-40%.  As Live Nation will "now not only know the person that bought the ticket, but [also] th[e] three people that you are taking to the show, which we have not known historically."  Live Nation can now monetize this enormous new trove of user data to further entrench its hegemonic position within the live entertainment industry.

85.     The overall goal of these efforts is to prevent primary ticket purchasers from using competing secondary ticketing platforms, to competitors' detriment and Defendants' benefit.  This part of Defendants' scheme relies on utilizing their dominance over the primary ticketing services market, their control over most concert tours in the United States, and their ability to employ technological trickery for anticompetitive purposes.  Ticketmaster went so far as to evaluate the risk of a more open, non-exclusive ticketing system – in essence, ending its preferred exclusive primary ticketing relationship – and recognized that it could lead to more competition and threats to its dominance.

86.     Similar to the conditional license, Defendants use mobile technology and SafeTix technology for anticompetitive, rather than procompetitive purposes.  Primary ticket resellers typically purchase their tickets with the understanding that they can resell their tickets wherever and however they wish.  Using typical practices, they can transfer their tickets electronically after selling through a different secondary ticketing services platform.  But SafeTix primary purchasers often find out only after the fact that they cannot transfer tickets in this manner.  As Defendants themselves admit, the only way a primary buyer can transfer tickets outside of Ticketmaster's secondary platform is if Ticketmaster says so.  Ticketmaster does this by notifying users whether their tickets

are transferrable – though many users report they did not receive any advanced notice when purchasing on the Ticketmaster primary market website that they could not then resell their tickets anywhere but through Ticketmaster.  In fact, Ticketmaster has focused on adding new restrictions to its ticketing systems to force fans to interact with Ticketmaster and thereby facilitate Ticketmaster's ability to increase the amount of data it collects from fans.

87.    This, in turn, had the following effects: (1) reducing competition in the Relevant Market, giving consumers less choice with respect to purchasing options; and (2) creating a supply restraint that keeps primary market tickets and other secondary market tickets from being resold in the Relevant Market on a secondary ticketing services platform other than Ticketmaster's secondary ticketing services platform.  Reduced competition and restrained supply have the effect of distorting the Relevant Market, leading to higher prices.

88.    The starkest example of the effect of Ticketmaster's anticompetitive conduct is illuminated when comparing Ticketmaster's dominance to performances where they are not the exclusive primary ticketing service provider.  Put differently, when Ticketmaster is not the exclusive primary ticketing service provider for events in the very same arenas where they hold concerts, ticket prices are markedly lower.

89.    For example, in the Kaseya Center in Miami, there are both Live Nation exclusive major concerts and events (where Ticketmaster is the exclusive primary ticketing service provider) and non-Live Nation sporting events as the home court for the NBA's Miami Heat in the very same arena (where Ticketmaster is not the exclusive primary ticketing service provider).  As is clear from the chart below, the fees on live music events in the same arena were significantly higher:



Source: Ticketmaster, "Licensed User Agreement," Oct. 28, 2014, 8–10 (TM00000362 at -369–371, -373).

90.    Similar examples can be seen at other arenas around the United States that host both Live Nation major concerts and events as well as non-Live Nation (and, therefore, unexclusively Ticketmaster) sporting events.

**Antitrust Injury**

91.    As a result of Defendants' anticompetitive conduct, Plaintiffs paid supracompetitive prices for secondary ticket purchases. Additionally, Ticketmaster has reduced competition in the Relevant Market and therefore has largely immunized itself from price competition.

92.    **Harm to Competition**. Competing secondary ticketing service providers, as well as the secondary ticketing marketplace, require a free-flowing supply of primary tickets. Without a supply of primary tickets to list on their platforms, such secondary ticketing service providers cannot compete. Furthermore, competing secondary ticketing service providers have no ability to circumvent the technological limits Defendants have increasingly placed on primary ticket transferability.

93.     Additionally, Defendants' use of the conditional license to force secondary resellers to use Ticketmaster's platform, as well as their limitations on primary ticket transferability, have had anticompetitive effects for both primary and secondary ticketing services markets. Among other effects, one effect is to grow Ticketmaster's secondary ticketing service business at the expense of its rivals.

94.     This conduct, in the aggregate, suppresses the already limited supply of tickets that secondary market platforms other than Ticketmaster can sell. Because of this, those secondary market platforms other than Ticketmaster are routinely shut out of the Relevant Market by Ticketmaster by virtue of Ticketmaster's control over the secondary market sale of tickets emanating originally from Ticketmaster. By choking off access to the free flow of tickets, Ticketmaster is eliminating competition and, therefore, throttling price competition for downstream purchasers of tickets from Ticketmaster. Because of this, the Relevant Market and purchasers of tickets in the Relevant Market from secondary platforms other than Ticketmaster are impacted because the upstream elimination of price competition leads to artificially higher prices being passed down to those secondary market, non-Ticketmaster purchasers.

95.     These higher prices also harm competition in the Relevant Market, because secondary ticketing platforms other than Ticketmaster are unable to sell tickets at market price, driving away consumers seeking to avoid paying supracompetitive prices. The secondary ticketing agent other than Ticketmaster is then left with a choice: transact sales of overpriced tickets and face losing ticket sales in voluminous numbers or incur a loss on tickets to sell at market price. Either way, Ticketmaster's competitors cannot operate in this anticompetitive environment.

96.     **Harm to Consumers**. Plaintiffs and Class members are forced to pay higher prices for tickets purchased on platforms other than Ticketmaster to concerts and events in the Relevant

Market.  This is due to artificially higher prices for concert tickets that Ticketmaster sold on the primary market as the result of extremely high fees on the sale of each ticket as well as the inflated face-value of the ticket itself.  Live Nation also lies to the public and claims that the venue decides the amount of the service fees to be charged.  In reality, service fees are set based on the portion of those fees that Live Nation (via Ticketmaster) will retain in the first instance – an amount Live Nation demands in its negotiations with each venue.  This arrangement is consistent with the many other fees extracted at various stages; though other participants may play a small role in setting those fees, Live Nation through Ticketmaster has a controlling hand in setting nearly all these fees and often benefits financially from a significant portion of these fees.  Live Nation's different arrangements work in tandem with each other to drive up the overall number and size of the fees that consumers pay.  For example, under many Ticketmaster contracts, when venues increase their own fees to offset Live Nation's concert promotion charges, Ticketmaster is entitled to receive a "ticketing" fee.  Here, Live Nation financially benefitting twice from a single transaction (*i.e.*, one time as a promoter via Live Nation and the other as ticketer via Ticketmaster) means venues must raise consumer-paid fees just to attempt to break even after accounting for Live Nation's charges. For example, a venue forced to pay Live Nation a $5 promotions rebate and Ticketmaster a portion of any increased fees would need to increase the overall ticket price that consumers pay by more than $5 just to break even, all due to Live Nation's and Ticketmaster's mutually reinforcing – and mutually detrimental for consumers – arrangements and fees.

97.    Plaintiffs and Class members pay supracompetitive prices because Ticketmaster levies excessively high fees in the primary market on tickets that it sells which are then passed down to consumers in the secondary market.  The way this occurs is as follows: Live Nation's exclusive agreements and ownership over venues allows it to choose Ticketmaster as the sole primary market

ticketing agent for a particular concert or event.  Then, when a ticket is sold through Ticketmaster to

a primary market purchaser, that purchaser pays excessively high fees on top of the face-value of the

ticket itself (which is also inflated, as discussed).  Rationally, the primary market purchaser who

chooses to resell a ticket on the secondary market will do so inclusive of whatever fees and price

were paid initially to Ticketmaster on the primary market.  The same holds true for any ticket that is

then resold thereafter – each time, the purchaser pays an inflated price due to Ticketmaster's conduct

on the primary market and Live Nation's conduct above it.

98.     Additionally, the face-value of each ticket sold in the primary market is

supracompetitively priced as well.  This is because Live Nation and Ticketmaster work in tandem to

eliminate competition in the primary market for the sale of each ticket sold.  The way this is done is

through Live Nation's exclusive agreements with venues higher up the distribution chain for tickets

to live concerts and events.  These restraints cause competition in the primary market for tickets to

live concerts and events, like SeatGeek and StubHub, to be shut out from competing in that market –

which would cause downward pricing pressure and would push prices to competitive (and, therefore,

lower) levels at face-value.

99.     These supracompetitive prices are then passed down to consumers each time a ticket

resells in the Relevant Market.  Absent Ticketmaster's anticompetitive conduct, Plaintiffs and Class

members would have paid lower prices in the Relevant Market.

100.     Ticketmaster's growth has come at the expense of consumers because, despite the fact

that Ticketmaster's secondary ticketing service competitors for major concert venues charge lower

fees, Defendants have used anticompetitive practices described herein in order to keep consumers

from accessing those less expensive platforms.

**Government Investigations and Litigation**

101.    Additionally, at the time of the initiation of this Action, Live Nation and Ticketmaster were under investigation by numerous governmental agencies for antitrust violations.

102.    In January 2023, as the Senate Judiciary Committee held hearings about Live Nation and the lack of competition in the event ticketing primary and secondary markets, Senator Amy Klobuchar of Minnesota stated: "I just want to dispel this notion . . . that this is not a monopoly, and then we can go from there about solutions."

103.    Also in January 2023, the DOJ announced that they opened an antitrust investigation into Live Nation and Ticketmaster regarding abusive practices in the live music industry.  Plaintiffs and Class members, the harm has already been done – they have been economically harmed in the form of higher ticket prices and supracompetitive fees passed down into and charged in the Relevant Market.

104.    In November 2023, a United States Senate investigative subcommittee revealed that it had issued subpoenas for Live Nation and Ticketmaster following a previously unannounced months-long probe into ticket pricing and fees.  The subpoena "seeks records related to Live Nation/Ticketmaster's failure to combat artificially inflated demand . . . which resulted in consumers being charged exorbitant ticket prices."  According to Senator Richard Blumenthal of Connecticut, "Live Nation has egregiously stonewalled [the] inquiry into its abusive consumer practices, making the subpoena necessary."

105.    On May 23, 2024, the DOJ – together with 29 states and the District of Columbia – filed a civil action in this District against Defendants for violations of §§1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§1 and 2) and various state laws.  The complaint in that action details at great length Defendants' sprawling (and successful) efforts at unlawfully monopolizing, among

other things, the market for ticketing services for events held at major concert venues in the United

States.

## CLASS ALLEGATIONS

106.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Classes

(collectively, the "Classes"), which are defined as follows:

> **Nationwide Class**.  All end-user purchasers in the United States who purchased
> secondary tickets on Secondary Ticket Exchanges from a Secondary Seller who, in
> turn, purchased a primary ticket or a secondary ticket for an event at a major concert
> venue in the United States from Ticketmaster or one of its affiliated entities owned,
> directly or indirectly, by Live Nation at any point since the 2010 merger (the "Class
> Period").

> **State Indirect Purchaser Class**.  All end-user purchasers in Alaska, Arizona,
> Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Hawaii,
> Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi,
> Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York,
> North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota,
> Tennessee, Utah, Vermont, West Virginia, Wisconsin, and territory of Puerto Rico
> who purchased secondary tickets on Secondary Ticket Exchanges from a Secondary
> Seller who, in turn, purchased a primary ticket or a secondary ticket for an event at a
> major concert venue in the United States from Ticketmaster or one of its affiliated
> entities owned, directly or indirectly, by Live Nation at any point since the 2010
> merger (the "Class Period").

107.    Excluded from the Classes are Defendants and Defendants' subsidiaries, affiliates,

officers and directors, and any entity in which Defendants have a controlling interest; and all judicial

officers assigned to hear any aspect of this litigation.

108.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes

before the Court determines whether certification is appropriate.

109.    **Numerosity**.  Members of the Classes are so numerous that joinder would be

impracticable, as millions of Class members exist.

110.    **Commonality**.  Questions of law and fact common to the Classes include:

- 43 -

(a)    Whether Defendants in fact engaged in anticompetitive acts aimed at unreasonably restraining competition in the Relevant Market;

(b)    Whether such conduct violates the Sherman Antitrust Act and state antitrust statutes;

(c)    Whether such conduct injured Class members; and

(d)    Whether monetary damages and injunctive relief should be provided to Class members as a result of Defendants' wrongful conduct.

111.    **Typicality**.  Plaintiffs' claims are typical of those of other Class members because Plaintiffs, like all other Class members, were harmed by way of the conduct as alleged herein. Plaintiffs, like all other Class members, were injured by Defendants' uniform conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class members, such that there are no defenses unique to Plaintiffs.  Plaintiffs' claims and those of the other Class members arise from the same operative facts and are based on the same legal theories.

112.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent and protect the interests of Class members in that they have no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Classes.  The damages and infringement of rights that Plaintiffs suffered are typical of other Class members, and Plaintiffs seek no relief that is antagonistic or adverse to the members of the Classes.  Plaintiffs have retained counsel experienced in antitrust class action litigation, and Plaintiffs intend to prosecute this action vigorously.

113.    **Superiority of Class Action**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a

class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based on an identical set of facts. In addition, without a class action, it is likely that many members of the Classes will remain unaware of the claims they may possess.

114.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

115.    Adequate notice can be given to Class members directly using information maintained in the parties' records.

116.    **Predominance**. The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

117.    This proposed class action does not present any unique management difficulties. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## FIRST CAUSE OF ACTION

### Violation of the Sherman Antitrust Act (15 U.S.C. §2)
### Section 2 – Monopolization
### (Against Both Defendants – on Behalf of the Nationwide Class)

118.    Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

119.    Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the Relevant Market.

120.    Ticketmaster possesses monopoly power in the Relevant Market and Ticketmaster has the power to control prices or exclude competition in the Relevant Market.

121.    Ticketmaster has a market share of at least 60% of the Relevant Market for secondary ticketing services for major concert venues.

122.    Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the Relevant Market, by means of predatory, exclusionary, and anticompetitive conduct, including, but not limited to: long-term exclusive dealing arrangements (entering into long-term exclusive arrangements with venues); coercion of disloyal customers, ticket brokers, and others (through the technological restraints as discussed); and vertically-arranged boycotts (by other ticket resellers to boycott Ticketmaster's competitors for the provision of secondary ticketing services), as alleged herein.

123.    Defendants' conduct has foreclosed access to the Relevant Market for secondary ticketing services for major concert venues, which is necessary to enable Ticketmaster's secondary ticketing service competitors to compete.

124.    Ticketmaster possesses a dominant position in the Relevant Market.

125.    Defendants' conduct is not justified, because their conduct is not intended to enhance overall efficiency and to make the Relevant Market more efficient.

- 46 -

126.    Defendants' conduct has a substantial effect on interstate commerce.

127.    Live Nation promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.  Live Nation also independently participated in the anticompetitive scheme as alleged herein.

128.    Plaintiffs have been injured as a result of Defendants' conduct.

129.    Plaintiffs have suffered and will suffer the type of injury that the antitrust laws were intended to prevent.  Plaintiffs have been injured by the harm to competition as a result of Defendants' conduct.

130.    Plaintiffs seek declaratory and injunctive relief with respect to this cause of action.

## SECOND CAUSE OF ACTION

**Violation of the Sherman Antitrust Act (15 U.S.C. §1)**
**Section 1 – Restraints of Trade**
**(Against Both Defendants – on Behalf of the Nationwide Class)**

131.    Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

132.    As alleged above, Defendants and various venues, ticket brokers, artists, and others have entered into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the Relevant Market.

133.    As alleged above, Defendants have induced or coerced various major concert venues, ticket brokers, artists, and others to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the Relevant Market.

134.    As alleged above, Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of competing primary ticketing

- 47 -

service providers for major concert venues and the use of Ticketmaster's secondary ticketing services for major concert venues.

135.    These contracts, combinations, or conspiracies include, but are not limited to, long-term exclusive dealing arrangements and vertically arranged boycotts.

136.    Defendants' conduct has had an anticompetitive effect in the Relevant Market.

137.    Defendants' conduct has no legitimate business purpose or procompetitive effect.

138.    There are less restrictive alternatives to the restraints Defendants imposed on the relevant markets for primary and secondary ticketing services for major concert venues.

139.    Defendants' conduct has had a substantial effect on interstate commerce.

140.    Live Nation promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above.  Live Nation also independently participated in the anticompetitive scheme as alleged herein.

141.    Plaintiffs have been or will be injured as a result of Defendants' conduct.

142.    Plaintiffs have suffered and will suffer injury of the type that the antitrust laws were intended to prevent.  Plaintiffs have been and will be injured by the harm to competition as a result of Defendants' conduct.

143.    Plaintiffs seek declaratory and injunctive relief with respect to this cause of action.

### THIRD CAUSE OF ACTION

### Violations of the State Antitrust Laws
### (Against Both Defendants – on Behalf of the State Indirect Purchaser Class)

144.    Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

145.    By reason of the conduct alleged herein, Defendants have violated the following state antitrust statutes:

**The Arizona Uniform State Antitrust Act (Ariz. Rev. Stat. §§44-1401,** *et seq.***)**[5]

146.    **Arizona**.    Defendants have monopolized trade and entered into an unlawful agreement in violation of Arizona state law.

147.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Arizona; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Arizona.  During the Class Period, Defendants' illegal conduct substantially impacted Arizona's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The California Cartwright Act (Cal. Bus. & Prof. Code §§16700,** *et seq.***)**

148.    **California**.    Defendants have monopolized trade and entered into an unlawful agreement in violation of California state law.

149.    The violations of California state law consisted, without limitation, of continuing an unlawful trust in the Relevant Market, the objective of which was to raise prices for secondary market tickets to major concerts and events.  This has deprived Californians of free and open competition in the Relevant Market.

150.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in California; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout California.  During the Class Period, Defendants' illegal conduct substantially impacted California's commerce.  Accordingly,

---

[5]    *See also Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003) (holding *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) decision is not binding on Arizona courts).

Plaintiffs and members of the Classes seek all forms of relief available under this statute including treble damages and reasonable attorneys' fees.

**The Colorado State Antitrust Act of 2023 (Colo. Rev. Stat. §6-4-114, *et seq*.)**

151.    **Colorado**.    Defendants have monopolized trade and entered into an unlawful agreement in violation of Colorado state law.

152.    The violations of Colorado state law consisted, without limitation, of continuing an unlawful trust in the Relevant Market, the objective of which was to raise prices for secondary market tickets to major concerts and events.    This has deprived Coloradans of free and open competition in the Relevant Market.

153.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Colorado; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Colorado.    During the Class Period, Defendants' illegal conduct substantially impacted Colorado's commerce.    Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute including treble damages and reasonable attorneys' fees.

**The Connecticut Antitrust Act (Conn. Gen. Stat. Ann. §§35-24, *et seq*.)**

154.    **Connecticut**.    Defendants have monopolized trade and entered into an unlawful agreement in violation of Connecticut state law.

155.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Connecticut; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Connecticut.    During the Class

- 50 -

Period, Defendants' illegal conduct substantially impacted Connecticut's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The District of Columbia Antitrust Act (D.C. Code Ann. §§28-4501, *et seq*.)**

156.     **District of Columbia**. Defendants have monopolized trade and entered into an unlawful agreement in violation of District of Columbia law.

157.     Due to monopolization and restraints of trade, the citizens of the District of Columbia have paid supracompetitive, artificially inflated prices in the Relevant Market.

158.     Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in the District of Columbia; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout the District of Columbia. During the Class Period, Defendants' illegal conduct substantially impacted the District of Columbia's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Hawaii Antitrust Provisions (Haw. Rev. Stat Ann. §§480-13(a)(1), *et seq*.)**

159.     **Hawaii**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Hawaii state law.

160.     Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Hawaii; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Hawaii. During the Class Period, Defendants' illegal conduct substantially impacted Hawaii's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

- 51 -

**The Iowa Competition Law (Iowa Code Ann. §§553.1, *et seq*.)**

161.    **Iowa**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Iowa state law.

162.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Iowa; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Iowa. During the Class Period, Defendants' illegal conduct substantially impacted Iowa's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Kansas Restraint of Trade Act (Kan. Stat. Ann. §§50-101, *et seq*.)**

163.    **Kansas**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Kansas state law.

164.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Kansas; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially impacted Kansas's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Maine Antitrust Statute (Me. Rev. Stat. Ann. tit. 10, §§1101, *et seq*.)**

165.    **Maine**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Maine state law.

166.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the

Relevant Market in Maine; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Maine.  During the Class Period, Defendants' illegal conduct substantially impacted Maine's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Maryland Antitrust Statute (Md. Code Ann. §§11-2041, *et seq*.)**

167.    **Maryland**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Maryland state law.

168.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Maryland; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Maryland.  During the Class Period, Defendants' illegal conduct substantially impacted Maryland's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Michigan Antitrust Reform Act (Mich. Comp. Laws Ann. §§445.771, *et seq*.)**

169.    **Michigan**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Michigan state law.

170.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Michigan; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Michigan.  During the Class Period, Defendants' illegal conduct substantially impacted Michigan's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Minnesota Antitrust Law (Minn. Stat. Ann. §§325D.49, *et seq*.)**

171.    **Minnesota**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Minnesota state law.

172.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Minnesota; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Minnesota.  During the Class Period, Defendants' illegal conduct substantially impacted Minnesota's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Mississippi Antitrust Statute (Miss. Code Ann. §§75-21-1, *et seq*.)**

173.    **Mississippi**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Mississippi state law.

174.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Mississippi; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Mississippi.  During the Class Period, Defendants' illegal conduct substantially impacted Mississippi's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Nebraska Junkin Act (Neb. Rev. Stat. Ann. §§59-801, *et seq*.)**

175.    **Nebraska**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Nebraska state law.

176.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the

- 54 -

Relevant Market in Nebraska; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Nebraska.  During the Class Period, Defendants' illegal conduct substantially impacted Nebraska's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Nevada Unfair Trade Practices Act (Nev. Rev. Stat. §§598A.010, *et seq*.)**

177.    **Nevada**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Nevada state law.

178.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Nevada; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Nevada.  During the Class Period, Defendants' illegal conduct substantially impacted Nevada's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The New Hampshire Antitrust Statute (N.H. Rev. Stat. Ann. §§356:1, *et seq*.)**

179.    **New Hampshire**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of New Hampshire state law.

180.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in New Hampshire; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Hampshire.  During the Class Period, Defendants' illegal conduct substantially impacted New Hampshire's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

4873-9954-1219.v1

**The New Jersey Antitrust Act (N.J. Stat. Ann. §§56:9-1, *et seq*.)**

181.   **New Jersey**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of New Jersey state law.

182.   Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in New Jersey; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Jersey.  During the Class Period, Defendants' illegal conduct substantially impacted New Jersey's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The New Mexico Antitrust Act (N.M. Stat. Ann. §§57-1-1, *et seq*.)**

183.   **New Mexico**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of New Mexico state law.

184.   Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in New Mexico; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New Mexico.  During the Class Period, Defendants' illegal conduct substantially impacted New Mexico's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The New York Donnelly Act (N.Y. Gen. Bus. Law §§340, *et seq*.)**

185.   **New York**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of New York state law.

186.   Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the

4873-9954-1219.v1

Relevant Market in New York; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout New York.  During the Class Period, Defendants' illegal conduct substantially impacted New York's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The North Carolina General Statutes (N.C. Gen. Stat. Ann. §§75-1, *et seq.*)**

187. **North Carolina**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of North Carolina state law.

188. Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in North Carolina; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout North Carolina.  During the Class Period, Defendants' illegal conduct substantially impacted North Carolina's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The North Dakota Uniform State Antitrust Act (N.D. Cent. Code §§51-08.1-01, *et seq.*)**

189. **North Dakota**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of North Dakota state law.

190. Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in North Dakota; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout North Dakota.  During the Class Period, Defendants' illegal conduct substantially impacted North Dakota's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

4873-9954-1219.v1

**The Oregon Antitrust Law (Or. Rev. Stat. Ann. §§646.705, *et seq*.)**

191.    **Oregon**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Oregon state law.

192.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Oregon; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Oregon.  During the Class Period, Defendants' illegal conduct substantially impacted Oregon's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Puerto Rican Anti-Monopoly Act (P.R. Laws Ann. tit. 10, §§260, *et seq*.)**

193.    **Puerto Rico**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Puerto Rico law.

194.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Puerto Rico; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Puerto Rico.  During the Class Period, Defendants' illegal conduct substantially impacted Puerto Rico's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Rhode Island Antitrust Act (R.I. Gen. Laws §§6-36-1, *et seq*.)**

195.    **Rhode Island**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Rhode Island state law.

196.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the

Relevant Market in Rhode Island; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Rhode Island.  During the Class Period, Defendants' illegal conduct substantially impacted Rhode Island's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The South Dakota Antitrust Statute (S.D. Codified Laws §§37-1-3.1, *et seq*.)**

197.    **South Dakota**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of South Dakota state law.

198.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in South Dakota; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout South Dakota.  During the Class Period, Defendants' illegal conduct substantially impacted South Dakota's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Tennessee Trade Practices Act (Tenn. Code §§47-25-101, *et seq*.)**

199.    **Tennessee**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Tennessee state law.

200.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Tennessee; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Tennessee.  During the Class Period, Defendants' illegal conduct substantially impacted Tennessee's commerce.  Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Utah Antitrust Act (Utah Code Ann. §§76-10-3101, *et seq*.)**

201.    **Utah**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Utah state law.

202.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Utah; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Utah. During the Class Period, Defendants' illegal conduct substantially impacted Utah's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Vermont State Antitrust laws Law (Vt. Stat. Ann. tit. 9, §§2465, *et seq*.)**

203.    **Vermont**. Defendants have monopolized trade and entered into an unlawful agreement in violation of Vermont state law.

204.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Vermont; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Vermont. During the Class Period, Defendants' illegal conduct substantially impacted Vermont's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The West Virginia Antitrust Statute (W. Va. Code §§47-18-1, *et seq*.)**

205.    **West Virginia**. Defendants have monopolized trade and entered into an unlawful agreement in violation of West Virginia state law.

206.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the

Relevant Market in West Virginia; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout West Virginia. During the Class Period, Defendants' illegal conduct substantially impacted West Virginia's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

**The Wisconsin Antitrust Act (Wis. Stat. Ann. §§133.01, *et seq*.)**

207.    **Wisconsin**.  Defendants have monopolized trade and entered into an unlawful agreement in violation of Wisconsin state law.

208.    Defendants' conduct had the following effects: (1) price competition for tickets sold in the Relevant Market was restrained, suppressed, and eliminated for purchasers of tickets in the Relevant Market in Wisconsin; and (2) ticket prices in the Relevant Market were raised, fixed, maintained, and/or stabilized at artificially higher levels throughout Wisconsin. During the Class Period, Defendants' illegal conduct substantially impacted Wisconsin's commerce. Accordingly, Plaintiffs and members of the Classes seek all forms of relief available under this statute.

209.    Under the laws of each of these states, indirect purchasers have standing under the aforementioned antitrust and consumer protection statutes to maintain an action based on the facts alleged in this Complaint.

210.    Defendants monopolized the Relevant Market with the intention of injuring or destroying competition therein; additionally, Defendants contracted, combined or conspired in restraint of trade or commerce in the Relevant Market with the intention of injuring or destroying competition therein. Members of the Classes were injured with respect to purchases of tickets to a Live Nation event or concert in the Relevant Market from secondary ticketing services platforms other than Ticketmaster.

4873-9954-1219.v1

211.    There are no procompetitive benefits that outweigh the anticompetitive effects of Defendants' monopolization and restraint of trade in the Relevant Market.

212.    Accordingly, members of the Classes are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

### FOURTH CAUSE OF ACTION

**Violations of the State Consumer Protection Laws**
**(Against Both Defendants – on Behalf of the State Indirect Purchaser Class)**

213.    Plaintiffs reallege and repeat each and every allegation as if fully set forth herein.

214.    By reason of the conduct alleged herein, Defendants have violated the following state consumer protection and unfair competition statues, and Plaintiffs and members of the Classes are entitled to relief thereunder.  Specifically, at all relevant times, each Plaintiff and member of the Classes is a person or entity subject to these statutes, based on their respective residency.  As alleged herein, Defendants' conduct constitutes unfair and deceptive acts and practices, as well as unfair and/or illegal business practices.  At all relevant times, Defendants' wrongdoing occurred in the conduct of trade and commerce.  Defendants' conduct was misleading and/or fraudulent and, to the extent required by law, in fact, did mislead Plaintiffs and members of the Classes.  Defendants willfully engaged in the unfair and deceptive acts and practices described herein, and knew or should have known that those acts and practices were unfair, deceptive and/or unlawful in violation of the following statutes.  Defendants' conduct offends public policy and is immoral, unethical, oppressive, or unscrupulous, and caused injury to consumers, competitors, or other business. As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Classes have been damaged. Defendants are therefore liable to Plaintiffs and members of the Classes for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law:

- 62 -

(a)    Alaska, Alaska Stat. Ann. §§45.50.471, *et seq*.;

(b)    Arizona, Ariz. Rev. Stat. Ann. §§44-1521, *et seq*.;

(c)    Arkansas, Ark. Code Ann. §§4-88-101, *et seq*.;

(d)    California, California Bus & Prof. Code §§17200, *et seq*.;

(e)    District of Columbia, D.C. Code Ann. §§28-3901, *et seq*.;

(f)    Florida, Fla. Stat. Ann. §§501.201, *et seq*.;

(g)    Hawaii, Hawaii Rev. Stat. Ann. §§480-2, *et seq*.;

(h)    Kansas, Kan. Stat. Ann. §§50-623, *et seq*.;

(i)    Massachusetts, Mass. Gen. Laws Ann., ch. 93A §§1, *et seq*.;

(j)    Michigan, Mich. Comp. Laws Ann. §§445.901, *et seq*.;

(k)    Minnesota, Minn. Stat. Ann. §§325F.68, *et seq*.;

(l)    Mississippi, Miss. Code Ann. §§75-24-1, *et seq*.;

(m)    Missouri, Mo. Rev. Stat. Ann. §§407.005, *et seq*.;

(n)    Nebraska, Neb. Rev. Stat. Ann. §§59-1601, *et seq*.;

(o)    Nevada, Nev. Rev. Stat. Ann. §§598.0903, *et seq*.;

(p)    New Hampshire, N.H. Rev. Stat. Ann. §§358-A:1, *et seq*.;

(q)    New Jersey, N.J. Stat. Ann. §§56-8-1, *et seq*.;

(r)    New Mexico, N.M. Stat. Ann. §§57-12-1, *et seq*.;

(s)    New York, N.Y. Gen. Bus. Law §§349, *et seq*.;

(t)    North Carolina, N.C. Gen. Stat. Ann. §§75-1.1, *et seq*.;

(u)    Rhode Island, R.I. Gen. Laws Ann. §§6-13.1-1, *et seq*.;

(v)    South Carolina, S.C. Code Ann., §§39-5-10, *et seq*.; and

(w)    Vermont, Vt .Stat. Ann. tit. 9, §§2453a, *et seq*.

- 63 -

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment Claim)

215.    Plaintiffs repeat and reassert each of the preceding allegations as if fully set forth herein.

216.    Defendants financially benefited from their unlawful acts at the expense of Plaintiffs and the members of the Classes who paid supracompetitive prices for tickets to a Live Nation event or concert in the Relevant Market from secondary ticketing services platforms other than Ticketmaster.

217.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiffs and members of the Classes, and the circumstances are such that equity and good conscience require Defendants to make restitution to Plaintiffs and members of the Classes.

218.    Defendants should be made to disgorge their ill-gotten gains to a constructive trust created for the benefit of Plaintiffs and members of the Classes, from which Plaintiffs and the members of the Classes may obtain restitution.

219.    By reason of the foregoing, Plaintiffs and members of the Classes are entitled to relief under the laws of the 50 states, the District of Columbia, and the territory of Puerto Rico.

4873-9954-1219.v1

## PRAYER FOR RELIEF

To remedy these illegal acts, Plaintiffs request that the Court:

A.     Certify the Classes and appoint Plaintiffs as the Class's representatives;

B.     Find that Defendants' conduct was unlawful, as alleged herein;

C.     Award such injunctive relief and other equitable relief as the Court deems just and proper;

D.     Award Plaintiffs and Class members statutory, actual, compensatory, consequential, treble, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

E.     Award Plaintiffs and Class members pre-judgment and post-judgment interest;

F.     Award Plaintiffs and Class members reasonable attorneys' fees, costs and expenses; and

G.     Grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury so triable on all claims so triable under Federal Rule of Civil Procedure 38(b).

DATED:  September 16, 2024              ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                    DAVID W. MITCHELL (admitted *pro hac vice*)
                                    ALEXANDRA S. BERNAY (admitted *pro hac vice*)
                                    ARTHUR L. SHINGLER III (admitted *pro hac vice*)

                                                  s/ David W. Mitchell
                                                  DAVID W. MITCHELL

- 65 -

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
davidm@rgrdlaw.com
xanb@rgrdlaw.com
ashingler@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
STUART A. DAVIDSON (admitted *pro hac vice*)
MARK J. DEARMAN (admitted *pro hac vice*)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
sdavidson@rgrdlaw.com
mdearman@rgrdlaw.com

Interim Class Counsel for Plaintiffs and the
Proposed Class

ISRAEL DAVID LLC
ISRAEL DAVID
ADAM M. HARRIS
17 State Street, Suite 4010
New York, NY  10004
Telephone:  212/739-0622
israel.david@davidllc.com
adam.harris@davidllc.com

ISRAEL DAVID LLC
MARK A. CIANCI
399 Boylston Street, Floor 6, Suite 23
Boston, MA  02116
Telephone:  617/295-7770
mark.cianci@davidllc.com

HERMAN JONES LLP
SERINA M. VASH
153 Central Avenue #131
Westfield, NJ 07090
svash@hermanjones.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone: 404/504-6500
404/504-6501 (fax)
jherman@hermanjones.com

Additional Plaintiffs' Counsel

4873-9954-1219.v1