**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C. ANTITRUST LITIGATION | Lead Case No. 1:24-cv-03994-AS-SLC |
| | [Consolidated with Case No. 1:24:cv-04106-AS] |
| | <u>CLASS ACTION</u> |
| This Document Relates To: | |
| ALL ACTIONS. | **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................1

II.   FACTUAL BACKGROUND ........................................................................2

    A.    Plaintiffs' Claims ...............................................................................2

    B.    The Terms ...........................................................................................3

    C.    Plaintiffs' Agreement to the Terms....................................................5

        1.    Plaintiffs' Agreement to the Current Terms at Sign-In ............7

        2.    Plaintiffs' Agreement to the Current Terms at Ticket Transfer.................8

        3.    Plaintiffs' Agreement to the Current Terms at Purchase ...........................9

III.  LEGAL FRAMEWORK ...............................................................................10

IV.   ARGUMENT ................................................................................................11

    A.    Plaintiffs Assented to the Terms on Multiple Occasions......................11

    B.    The Parties Clearly and Unmistakably Delegated Arbitrability to the
        Arbitrator............................................................................................14

    C.    The Amended New Era Rules Address the Concerns in *Heckman* ......16

    D.    The Court Must Stay Proceedings ......................................................18

V.    CONCLUSION..............................................................................................18

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ajzenman v. Off. of Comm'r of Baseball*,
  2020 WL 6031899 (C.D. Cal. Sept. 14, 2020) ........................................................13

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013).................................................................................................10

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).................................................................................................10

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) .......................................................................13

*Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*,
  203 F.R.D. 677 (S.D. Fla. 2001) .............................................................................18

*Brooks v. WarnerMedia Direct, LLC*,
  2024 WL 3330305 (S.D.N.Y. July 8, 2024) ............................................................12

*CMS Inv. Holdings, LLC v. Castle*,
  2016 WL 4557115 (S.D.N.Y. Aug. 31, 2016)..........................................................17

*Coe v. Coca-Cola Co.*,
  702 F. Supp. 3d 140 (W.D.N.Y. 2023).....................................................................11

*Commonwealth Edison Co. v. Gulf Oil Corp.*,
  541 F.2d 1263 (7th Cir. 1976) .................................................................................18

*Daly v. Citigroup Inc.*,
  939 F.3d 415 (2d Cir. 2019).....................................................................................15

*Dickey v. Ticketmaster LLC*,
  2019 WL 9096443 (C.D. Cal. Mar. 12, 2019)..................................................13, 14

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) ...............................................................................11, 12

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018)........................................................................................10, 18

*Eyewonder, Inc. v. Abraham*,
  2010 WL 3528882 (S.D.N.Y. Sept. 3, 2010)...........................................................16

*Gingras v. Think Fin., Inc.*,
  922 F.3d 112 (2d Cir. 2019)..............................................................................10

*Hansen v. Ticketmaster Ent., Inc.*,
  2020 WL 7319358 (N.D. Cal. Dec. 11, 2020) .........................................................13

*Harrington v. Atl. Sounding Co.*,
  602 F.3d 113 (2d Cir. 2010)..............................................................................16

*Heckman v. Live Nation Ent., Inc.*,
  686 F. Supp. 3d 939 (C.D. Cal. 2023), *aff'd*, 2024 WL 4586971 (9th Cir. Oct.
  28, 2024) ....................................................................................................17

*Heckman v. Live Nation Entertainment, Inc.*,
  2024 WL 4586971 (9th Cir. Oct. 28, 2024)...............................................1, 2, 16

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019)............................................................................11, 14, 15

*Himber v. Live Nation Worldwide*,
  2018 WL 2304770 (E.D.N.Y. May 21, 2018) ......................................................13, 15

*Hines v. Overstock.com, Inc.*,
  380 F. App'x 22 (2d Cir. 2010) .........................................................................16

*In re Am. Express Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011)..............................................................................10

*JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*,
  167 F. App'x 266 (2d Cir. 2006) ........................................................................17

*Katz v. Cellco P'ship*,
  794 F.3d 341 (2d Cir. 2015)..............................................................................18

*Lee v. Ticketmaster L.L.C.*,
  817 F. App'x 393 (9th Cir. 2020) ...................................................................13, 14

*Lloyd v. J.P. Morgan Chase & Co.*,
  791 F.3d 265 (2d Cir. 2015)...........................................................................2, 17

*Maldonado v. Nat'l Football League*,
  2023 WL 4580417 (S.D.N.Y. July 18, 2023) .........................................................12

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017)..........................................................................11, 12, 13

*Nevarez v. Forty Niners Football Co., LLC*,
  2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) .........................................................14

*Oberstein v. Live Nation Ent., Inc.*,
   2021 WL 4772885 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir.
   2023) .............................................................................................................................14, 15

*Oberstein v. Live Nation Ent., Inc.*,
   60 F.4th 505 (9th Cir. 2023) .....................................................................................................13

*Rent-A-Ctr. West, Inc. v. Jackson*,
   561 U.S. 63 (2010)......................................................................................................................10

*Starke v. SquareTrade, Inc.*,
   913 F.3d 279 (2d Cir. 2019).......................................................................................................12

## STATUTES

9 U.S.C. § 2......................................................................................................................................10

9 U.S.C. § 3......................................................................................................................................18

## I.    INTRODUCTION

Plaintiffs Abraham Leifer and Tamara Stevens ("Plaintiffs") brought these consolidated putative class actions against Defendants Ticketmaster L.L.C. ("Ticketmaster") and Live Nation Entertainment, Inc. ("Live Nation") (together, "Defendants") for alleged damages related to tickets issued by Ticketmaster that Plaintiffs purchased on "secondary ticket exchanges."  Consolidated Complaint, ECF No. 49 ("Compl.") ¶¶ 8-15.  However, Plaintiffs agreed on numerous occasions to arbitrate any disputes related to products issued by Defendants, including the claims in this case. For instance, Plaintiffs affirmatively agreed to be bound by Ticketmaster and Live Nation's Terms of Use ("Terms") each time they accepted the transfer of tickets issued by Ticketmaster, each time they signed in to their Ticketmaster accounts (including in connection with ticket transfers), and each time they purchased tickets on Defendants' websites.  Those Terms contain a mandatory arbitration provision that broadly applies to "any dispute . . . relating in any way to . . . products or services sold, distributed, issued, or serviced by or through" Defendants.  Decl. of K. Tobias in Support of Defs.' Mot. ("Tobias Decl.") ¶¶ 3-4, 22-23 & Ex. 16.  And the Terms clearly and unmistakably delegate all questions relating to the interpretation, applicability, and enforceability of the Terms to the arbitrator.  As courts around the country—including in this Circuit, interpreting the same delegation clause—have held many times over, the Court's analysis stops there: the Court should compel arbitration and stay this litigation until any arbitration concludes.

Defendants expect Plaintiffs to argue that compelling arbitration is improper in light of the Ninth Circuit's recent decision in *Heckman v. Live Nation Entertainment, Inc.*, 2024 WL 4586971 (9th Cir. Oct. 28, 2024) ("*Heckman*"), where the panel declined to enforce Defendants' arbitration agreement with the plaintiffs in that case because the agreement at issue switched Defendants' designated arbitration provider from JAMS to New Era ADR ("New Era"), a new provider that has developed procedures for handling mass arbitration filings.  The court found that New Era's

rules—principally, its "mass arbitration protocol," including the application of precedent to bellwethers, and certain "procedural limitations" applicable to both parties, such as limitations on discovery—were substantively unconscionable under California law. *See id.* at *8-10. The *Heckman* opinion is deeply flawed, and Defendants have filed a petition for panel rehearing and rehearing *en banc*. But regardless, the *Heckman* decision is irrelevant to this case. After the district court issued its ruling denying Defendants' motion to compel arbitration in *Heckman*, New Era amended its rules to directly and fully address the issues animating the decision. This Circuit's case law is clear that the version of the arbitration provider's rules in place *at the time the case is filed* is the version that governs. *See Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 273 (2d Cir. 2015). Here, that is the May 1, 2024 version of New Era's rules, which resolve the alleged problems identified in the *Heckman* ruling. *Heckman* is therefore irrelevant, and the Court should compel arbitration of Plaintiffs' claims.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs' Claims

Plaintiffs allege that Defendants have engaged in various anticompetitive conduct that inflated the prices they paid for tickets issued by Ticketmaster and purchased by Plaintiffs on a secondary ticket exchange run by one of Ticketmaster's competitors (e.g., StubHub, SeatGeek).[1]

---

[1]    Plaintiffs allege that Ticketmaster acts as both a "primary ticketing service provider" and "secondary ticketing service provider." Compl. ¶¶ 28, 37, 40. "Primary ticketing service providers contract with venues to manage and sell primary ticket inventory" and provide both "'back-end' inventory management systems and . . . 'front-end' support, including customer service, shipping, [and] fulfillment services." *Id.* ¶ 38. Secondary ticketing service providers offer marketplace services to third parties looking to resell tickets, including "online platforms connecting resellers to purchasers and providing services by acting as a distributor agent." *Id.* ¶ 40. Plaintiffs allege that they used the secondary ticketing services of one of Ticketmaster's competitors (e.g., "StubHub, Vivid Seats, SeatGeek, ViaGoGo, and TickPick," *id.* at 6 n.3) to purchase tickets issued through Ticketmaster's primary ticketing service.

Specifically, Plaintiffs allege monopolization and attempted monopolization of an alleged market for secondary ticketing services in violation of Section 2 of the Sherman Act; unlawful agreements between Ticketmaster and venues, ticket brokers, and artists in violation of Section 1 of the Sherman Act; and various state-law claims.  *See* Compl. ¶¶ 118-30, 131-43, 144-214, 215-19. Plaintiffs claim that this alleged conduct caused them to pay "supracompetitive prices" for tickets that were issued by Ticketmaster and later resold on secondary ticket exchanges.  *Id.* ¶ 91.

Plaintiff Leifer, a resident of New York, alleges that, in January 2024, he purchased "tickets for a March 2024 concert held at the Barclays Center in Brooklyn, New York, for which concert Ticketmaster was the exclusive primary ticketing service."  *Id.* ¶ 20.  Plaintiff Stevens, a resident of Georgia, alleges that she purchased tickets "through Secondary Seller StubHub for concerts on March 24, 2022, May 6, 2022, October 22, 2022, December 17, 2022, and January 6, 2023."  *Id.* ¶ 22.  Plaintiffs seek to represent two purported classes—one nationwide, and one limited to the residents of 34 states, D.C., and Puerto Rico—composed of "end-user purchasers . . . who purchased secondary tickets on Secondary Ticket Exchanges from a Secondary Seller who, in turn, purchased a primary ticket or a secondary ticket for an event at a major concert venue in the United States from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation at any point since the 2010 merger."  *Id.* ¶ 106.

### B.    The Terms

Since 2011, Defendants' Terms have contained a provision whereby users expressly agree to submit claims against Defendants to binding arbitration.  Tobias Decl. ¶¶ 22-23 & Exs. 16-20. The current Terms, which have been operative since July 2, 2021, provide that:

> **YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY DISPUTE, CLAIM, OR CONTROVERSY RELATING IN ANY WAY TO THE TERMS, YOUR USE OF THE SITE, OR PRODUCTS OR SERVICES SOLD, DISTRIBUTED, ISSUED, OR SERVICED BY OR THROUGH US—IRRESPECTIVE OF WHEN THAT DISPUTE, CLAIM,**

**OR CONTROVERSY AROSE—WILL BE RESOLVED SOLELY BY BINDING, INDIVIDUAL ARBITRATION AS SET FORTH IN THE TERMS, RATHER THAN IN COURT. YOU AND WE THEREBY EACH AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL, AND AGREE THAT YOU AND WE MAY BRING CLAIMS AGAINST EACH OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** . . .

**Governing Law; Interpretation and Enforcement**. The arbitration agreement in the Terms is governed by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA"), including its procedural provisions, in all respects. This means that the FAA governs, among other things, the interpretation and enforcement of this arbitration agreement and all of its provisions, including, without limitation, the class action waiver. State arbitration laws do not govern in any respect. Further, you and we each agree that the Terms evidence a transaction involving interstate commerce, and will be governed by and construed in accordance with federal law to the fullest extent possible. . . .

**Delegation; Interpretation**. The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable; however, in the event of a dispute about which particular version of this Agreement you agreed to, a court will decide that specific question. This arbitration agreement is intended to be broadly interpreted and will survive termination of the Terms.

*Id.* Ex. 16.

The Terms further specify that "[a]ny arbitration will be administered by New Era ADR in accordance with their Virtual Expedited Arbitration Rules and Procedures, as well as any applicable General Rules and Procedures, except as modified by the Terms," and provide a link to those Rules and Procedures (the "Rules"). *Id.* The linked Rules make clear that, like other arbitration providers, "New Era ADR reserves the right to make changes and amendments" to the Rules, and "[i]f the Parties have entered into an arbitration or mediation agreement, the version of the Rules in effect at the time a claim is filed with New Era ADR will govern the arbitration or mediation, unless the Parties mutually agree to another version." Decl. of T. O'Mara in Support

of Defs.' Mot. ("O'Mara Decl.") Ex. 1, Rule 2(dd)(i-ii).  New Era revised its Rules most recently before the initiation of this case on May 1, 2024.[2]  *Id.* ¶ 5.

The Terms also provide that, if "New Era ADR is unable to conduct the arbitration for any reason, the arbitration will be conducted by FairClaims pursuant to its FastTrack Rules & Procedures, and/or any applicable rules for consumer arbitrations."   Tobias Decl. Ex. 16.  And if "FairClaims is unable to conduct the arbitration for any reason," then the parties "will mutually select an alternative arbitration provider" and arbitrate "pursuant to that provider's applicable rules."  *Id.*  The Terms also contain a general severability clause: "if any part of the Terms is determined to be illegal, invalid, or unenforceable," then "(a) that part shall nevertheless be enforced to the extent permissible in order to effect the intent of the Terms, and (b) the remaining parts shall be deemed valid and enforceable."  *Id.*

## C.    Plaintiffs' Agreement to the Terms

To make purchases and accept ticket transfers on Defendants' websites and applications, users must agree to the Terms at numerous, distinct times—including at account creation, acceptance of a ticket transfer, account sign-in, and ticket purchase.  *Id.* ¶¶ 4-17.  Particularly relevant here—and as Plaintiffs acknowledge in their Complaint—users must agree to the Terms when they accept the transfer of a ticket issued by Ticketmaster that the user purchased on a secondary ticket exchange.  *Id.* ¶¶ 18-21; Compl. ¶ 83 ("If a ticketholder wants to sell or otherwise transfer a SafeTix-encrypted ticket, both the ticketholder and the purchaser must create Ticketmaster accounts.").   When tickets are transferred, Ticketmaster's systems create and maintain a record to ensure the accurate handover of tickets and prevent fraud.  Tobias Decl. ¶ 18.

---

[2]    New Era updated its Rules once more since the first filings in this suit, on August 22, 2024, but the changes are immaterial for purposes of this Motion.  Defendants therefore reference the May 1, 2024 Rules throughout this Motion.

Defendants' records confirm that Plaintiffs agreed to the Terms on many occasions, including when they accepted transfers of the tickets issued by Ticketmaster that they allege to have purchased on secondary ticket exchanges. Pursuant to stipulation, Plaintiffs agreed to "provide a complete list of the email address(es) associated with any and all Ticketmaster account(s) used by [Plaintiffs] during the alleged Class Period." O'Mara Decl. ¶¶ 2-3. Defendants used these email addresses to locate Plaintiffs' account histories, which demonstrate:

- Plaintiff Leifer accepted a transfer of tickets on March 22, 2024, as alleged (Decl. of S. Moon in Support of Defs.' Mot. ("Moon Decl.") ¶ 5);[3]

- In addition, Plaintiff Leifer created an account on March 30, 2021 (Decl. of T. Cook in Support of Defs.' Mot. ("Cook Decl.") ¶ 5); signed in to his account at least ten times before filing this lawsuit, most recently on May 7, 2024 (Decl. of G. Yue in Support of Defs.' Mot. ("Yue Decl.") ¶ 5); and purchased primary tickets directly from Ticketmaster on at least three occasions, most recently on March 28, 2024 (Moon Decl. ¶ 6);

- Plaintiff Stevens accepted a transfer of tickets on both May 6, 2022 and October 21, 2022, as alleged (Moon Decl. ¶ 8);

- In addition, Plaintiff Stevens created three different Ticketmaster accounts on August 30, 2017, August 9, 2017, and May 16, 2015 (Cook Decl. ¶¶ 7-9); signed in to her accounts at least 81 times before filing this lawsuit, most recently on May 25, 2024 (Yue Decl. ¶ 7-9); purchased primary tickets directly from Ticketmaster on at least 30

---

[3]     Plaintiff Leifer alleges that he "purchased one or more tickets for a March 2024 concert held at the Barclays Center in Brooklyn, New York." Compl. ¶ 20. Defendants' records demonstrate that he actually accepted the transfer of two tickets to a concert on March 22, 2024 at UBS Arena in Elmont, New York, for which Ticketmaster provided primary ticketing services. Moon Decl. ¶ 5.

occasions, most recently on May 3, 2024 (Moon Decl. ¶ 9); and accepted the transfer of secondary tickets issued by Ticketmaster (beyond those alleged in the Complaint) on at least 12 occasions, most recently on April 29, 2023 (*id.* ¶ 8).

To streamline this Motion, the factual discussion will focus on Plaintiffs' recent acceptances of the current Terms—including their acceptance of the Terms in connection with secondary ticket purchases that form the basis of their Complaint.

### 1.   *Plaintiffs' Agreement to the Current Terms at Sign-In*

In order to take various actions on Ticketmaster and Live Nation's websites and apps (including accept the transfer of secondary tickets), users must sign in to their accounts and assent to the Terms.  Defendants' records demonstrate that each Plaintiff signed in multiple times and saw the current version of the sign-in flow, which has been in place since at least the time of Defendants' last update to the Terms on July 2, 2021.  Yue Decl. ¶¶ 5, 7-9.  Each time Plaintiffs signed in, they were notified on the sign-in page that: "By continuing past this page, you agree to the **Terms of Use** and understand that information will be used as described in our **Privacy Policy**."  The words "**Terms of Use**" appeared in bold, bright blue, color-contrasting text, immediately above the "**Sign in**" button, and hyperlinked directly to the full text of the Terms:

*See* Tobias Decl. ¶¶ 10-12 & Exs. 7-8.  Plaintiff Leifer would have seen this screen when he signed in on May 5, 2024 and March 22, 2024, for instance, and Plaintiff Stevens would have seen this screen when she signed in on May 25, 2024, October 21, 2022, and May 6, 2022, for instance.  *Id.* ¶ 12; Yue Decl. ¶¶ 5, 7-9.

### 2.    *Plaintiffs' Agreement to the Current Terms at Ticket Transfer*

Accepting the transfer of a secondary ticket requires assenting to the Terms.  After Plaintiffs purchased their tickets on secondary exchanges, Ticketmaster facilitated the transfer of those tickets to Plaintiffs via email.  *See* Tobias Decl. ¶ 18.  Specifically, when the transfers were initiated by the resellers, Plaintiffs received emails notifying them of the pending transfer.  *See id.* ¶¶ 19-21 & Ex. 15.  Those emails included an "ACCEPT TICKETS" button which Plaintiffs needed to click in order to access the tickets.  *Id.*  Immediately below the "ACCEPT TICKETS" button, Plaintiffs were notified that: "By clicking "ACCEPT TICKETS", you agree to our Terms of Use and any applicable ticket back terms."  *Id.*  The words "Terms of Use" appeared in color-contrasting, bright blue text, and, as always, hyperlinked directly to the full text of the Terms:

*Id.*  Plaintiff Leifer would have seen this screen when he accepted a transfer of tickets on March 22, 2024, and Plaintiffs Stevens would have seen this screen when she accepted transfers of tickets on May 6, 2022 and October 21, 2022, for example.  Tobias Decl. ¶ 21; Moon Decl. ¶¶ 5, 8.

In addition, when Plaintiffs clicked the "ACCEPT TICKETS" button and agreed to the Terms, they were auto-directed to Ticketmaster's sign-in page, which opened in a new window.  Tobias Decl. ¶ 20.  In order to complete the transfer and access the tickets, they then needed to

sign in to their account and assent to the Terms, exactly as described in Section II.C.1, above.

### 3.    *Plaintiffs' Agreement to the Current Terms at Purchase*

In order to complete the purchase of a ticket using Defendants' services, users must assent to the Terms again, and this time <u>check a box</u> to confirm their agreement. Defendants' records demonstrate that each Plaintiff completed multiple purchases using the current purchase flow, which has been active since at least the time of Defendants' last update to the Terms on July 2, 2021. Tobias Decl. ¶ 16; Moon Decl. ¶¶ 6, 9. Each time they did so, depending on whether the particular event had special protocols related to COVID-19, Plaintiffs would have seen either: (a) "**I have read and agree to the current Terms of Use**," or (b) "**I have read and agree to the current Terms of Use**," plus the event's COVID disclosure, as show in the two excerpts below. Tobias Decl. ¶¶ 13-16. Either way, the notice required Plaintiffs to check a box affirming their agreement to the Terms to make their purchases. The notices appeared in bold font, with the words "**Terms of Use**" in color-contrasting text (hyperlinked to the full text of the Terms), adjacent to the check box and immediately above the "Place Order" button:



*Id.* ¶¶ 13-16 & Exs. 9-12. Plaintiff Leifer would have seen one of these screens when he purchased tickets from Ticketmaster on March 28, 2024, for instance, and Plaintiff Stevens would have seen one of these screens when she purchased tickets from Ticketmaster on April 29, 2023, for instance. *Id.* ¶ 15; Moon Decl. ¶¶ 6, 9.

### III.    LEGAL FRAMEWORK

Pursuant to the Terms, the Federal Arbitration Act ("FAA") governs the arbitration agreement.  *See* Tobias Decl. Ex. 16.  Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Congress enacted the FAA to replace "widespread judicial hostility to arbitration agreements" with a "liberal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "Not only did Congress require courts to respect and enforce agreements to arbitrate, it also specifically directed them to respect and enforce the parties' chosen arbitration procedures."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).  By "affording parties discretion in designing arbitration processes," the FAA promotes "efficient, streamlined procedures tailored to the type of dispute."  *Concepcion*, 563 U.S. at 344. Accordingly, courts must "rigorously enforce arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.,* 570 U.S. 228, 233 (2013) (citation omitted).  This includes delegation clauses, pursuant to which parties may agree to have an arbitrator decide "'gateway' questions of 'arbitrability'" in addition to the merits of the underlying dispute.  *Rent-A-Ctr. West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010) (citation omitted).

When assessing a motion to compel arbitration, courts consider two questions: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."  *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).  If the answer to the first question is yes, however, the court's role is limited to deciding "whether the issue of arbitrability is for the court or for the arbitrator" by undertaking a limited inquiry into whether the agreement "'clearly and unmistakably' delegates the issue of arbitrability to the arbitrator."  *Gingras v. Think Fin., Inc*., 922 F.3d 112, 125-26 (2d Cir. 2019) (internal citations omitted).  And if so, the "court may not

decide the arbitrability issue" and must grant the motion to compel arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019).

## IV.    ARGUMENT

This Court should compel arbitration and stay this case. *First*, Plaintiffs had clear and repeated notice of the Terms and manifested their assent many times, including in connection with the ticket transfers alleged in the Complaint. *Second*, the Terms clearly and unmistakably delegate to the arbitrator the power to decide all threshold issues, including the scope of the arbitration clause—but even if they did not, the Terms plainly encompassed this dispute. And *third*, the version of the New Era Rules relevant here resolves any potential question about their enforceability.

### A.    Plaintiffs Assented to the Terms on Multiple Occasions

To assess whether Plaintiffs agreed to arbitrate, this Court asks whether "(1) a 'reasonably prudent' person would be on inquiry notice of the [T]erms . . . and (2) [Plaintiffs] unambiguously manifest[ed] assent through conduct that a reasonable person would understand to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (internal citations and emphasis omitted). To analyze these questions, courts apply state-law principles of contract formation. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017).[4] In analyzing "web-based contract[s]," courts consider "the design and content of the relevant interface to determine

---

[4]    The Court need not engage in a detailed choice-of-law analysis with respect to contract formation. "A district court sitting in diversity is required to apply the choice-of-law rules of the forum state," and "New York's rules first require a determination as to whether there is an actual conflict." *Coe v. Coca-Cola Co.*, 702 F. Supp. 3d 140, 154 (W.D.N.Y. 2023). On the question of contract formation, there is no conflict: "traditional contract formation law does not vary meaningfully from state to state," and therefore "precedents determining the enforceability of arbitration provisions according to the contract-law principles of other states may also be relevant." *Edmundson*, 85 F.4th at 702-03.

if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Maldonado v. Nat'l Football League*, 2023 WL 4580417, at *2 (S.D.N.Y. July 18, 2023) (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019), brackets in original). "[M]ultiple factors" are relevant, including whether "the screen is cluttered; the text and hyperlinks to the [Terms] are positioned directly below the relevant assent button; and the hyperlinks are contrasted with the background." *Id.* at *2 (citation omitted). "'Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract [if] the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement.'" *Meyer*, 868 F.3d at 75 (citation omitted).

There is no question that Plaintiffs had inquiry notice of and unambiguously assented to the current Terms—including when they accepted the ticket transfers alleged in the Complaint. The notices that Plaintiffs saw, and the buttons they clicked, in both the "ACCEPT TICKETS" email and the sign-in page to which they were subsequently directed are dispositive. Those screens clearly "notify the user of the existence of the website's terms of use and . . . advise the user that he or she is agreeing to the terms of service" by accepting the tickets and by signing in. *Id.* at 75-76. The screens are "uncluttered" with a simple, legible message conveying that, by clicking the relevant action button, the user agrees to the Terms. *Id.* at 78. On each page, the words "**Terms of Use**" are presented in color-contrasting font directly below the action button, with a hyperlink to the full Terms. The notice is both spatially and temporally coupled with the mechanism for manifesting assent (i.e., the action button), and therefore provides inquiry notice to a reasonably prudent Internet user "as a matter of law." *Edmundson*, 85 F.4th at 704. Courts in this Circuit and others have repeatedly held that similar interfaces are sufficient to form an agreement. *See, e.g.*, *Meyer*, 868 F.3d at 78; *Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *14 (S.D.N.Y.

July 8, 2024) (where users were notified that "[b]y clicking 'Start Streaming,' you agree to the [terms]," "clicking the 'Start Streaming' button *does* constitute unambiguous assent"); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 515-17 (9th Cir. 2023) (holding that Defendants' sign-in screen provided sufficient notice and assent to form an agreement to arbitrate).

If there were any doubt about notice or assent, each Plaintiff also *checked a box* agreeing to the current Terms when completing ticket purchases on Defendants' websites.  This means Plaintiffs formed a "clickwrap" agreement, where users "click an 'I agree' box after being presented with a list of terms and conditions of use."  *Meyer*, 868 F.3d at 75.  "Courts routinely uphold clickwrap agreements for the principal reason that the user has affirmatively assented to the terms of agreement by clicking 'I agree.'"  *Id.*; *see also, e.g.*, *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394 (E.D.N.Y. 2015) ("[A]lmost '[e]very [lower] court to consider the issue has found 'clickwrap' licenses, in which an online user clicks 'I agree' to standard form terms, enforceable.'") (citation omitted).

Any one of these points of assent—the "Accept Tickets" email, the sign-in page, or the purchase page with the checkbox—would be independently valid and binding.  *See, e.g.*, *Himber v. Live Nation Worldwide*, 2018 WL 2304770, at *4-5 (E.D.N.Y. May 21, 2018) (Live Nation account creation, sign-in, and purchase pages sufficient to form contract); *Oberstein*, 60 F.4th at 516-17 (Ticketmaster account creation, sign-in, and purchase pages sufficient to form contract); *Hansen v. Ticketmaster Ent., Inc.*, 2020 WL 7319358, at *3-5 (N.D. Cal. Dec. 11, 2020) (Ticketmaster sign-in page sufficient to form contract); *Ajzenman v. Off. of Comm'r of Baseball*, 2020 WL 6031899, at *2, *4 (C.D. Cal. Sept. 14, 2020) (Ticketmaster sign-in and purchase pages sufficient to form contract); *Dickey v. Ticketmaster LLC*, 2019 WL 9096443, at *5-7 (C.D. Cal. Mar. 12, 2019) (Ticketmaster account creation page sufficient to form contract); *Lee v.*

*Ticketmaster L.L.C.*, 817 F. App'x 393, 394-95 (9th Cir. 2020) (Ticketmaster sign-in and purchase pages sufficient to form contract); *Nevarez v. Forty Niners Football Co., LLC*, 2017 WL 3492110, at *7-10 (N.D. Cal. Aug. 15, 2017) (Ticketmaster account creation, sign-in, and purchase pages sufficient to form contract).   Taken together, they reinforce the clear notice and unambiguous assent for each Plaintiff on multiple occasions.  *See Lee*, 817 F. App'x at 395 ("The fact that Lee indicated his assent to Ticketmaster's [Terms] roughly twenty times during the relevant period only reinforces" notice).

**B.    The Parties Clearly and Unmistakably Delegated Arbitrability to the Arbitrator**

Once the Court finds that Plaintiffs agreed to be bound by the Terms, the Court's inquiry ends.  To the extent Plaintiffs intend to challenge whether their claims fall within the scope of the arbitration agreement, that agreement "clearly and unmistakably" provides that those issues must be decided by an arbitrator and not the Court.  *See Henry Schein*, 139 S. Ct. at 529, 531 (holding that where there is "clear and unmistakable evidence" that the "contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract," "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless").

Multiple courts have held that the Terms are "clear and unmistakable" in delegating issues of arbitrability to the arbitrator, not the Court.  *See, e.g.*, *Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *7 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023); *Dickey*, 2019 WL 9096443, at *8.  The current Terms specify that:

> The arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve <u>all</u> disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to any claim that all or any part of this Agreement is void or voidable.

*See* Tobias Decl. Ex. 16 (emphasis added). This language is clear and unmistakable on its face, and "[m]ultiple other courts . . . have looked at the exact same language and . . . confirmed that it satisfies the 'clear and unmistakable' standard." *Oberstein*, 2021 WL 4772885, at *7. Indeed, a court in the Eastern District of New York found that this exact language in the Terms "clearly and unmistakably demonstrates the parties' intent to delegate the question of arbitrability to the arbitrator." *Himber*, 2018 WL 2304770, at *5. The Court's analysis can and should stop there. *See Henry Schein*, 139 S. Ct. at 530.

Even if the delegation clause were not clear and unmistakable (it is), the Court should still enforce the parties' arbitration agreement because that agreement plainly encompasses Plaintiffs' claims. Consistent with the "strong federal policy favoring arbitration," courts must compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (citation omitted). Plaintiffs' claims are covered by the arbitration provision, which broadly states:

> any dispute, claim, or controversy relating in any way to the Terms, your use of the site, or products or services sold, distributed, issued, or serviced by or through us . . . will be resolved solely by binding, individual arbitration as set forth in the Terms.

Tobias Decl. Ex. 16 (emphases added). Plaintiffs' claims "relat[e]" to "products . . . issued . . . by or through" Ticketmaster (*id.*) because they claim to have paid inflated prices *for tickets issued by Ticketmaster* that they purchased on secondary ticket exchanges. *See, e.g.*, Compl. ¶ 20 (alleging the purchase of tickets for which "Ticketmaster was the exclusive primary ticketing service"). Likewise, Plaintiffs allege their harm is derived in part from the "excessively high fees" that Plaintiffs claim Ticketmaster levies on primary tickets. *Id.* ¶ 13. Plaintiffs' claims are anchored

in the "products or services sold, distributed, issued, or serviced by or through" Ticketmaster, and are therefore plainly encompassed by the arbitration agreement in the Terms.

### C.    The Amended New Era Rules Address the Concerns in *Heckman*

After a defendant demonstrates that the plaintiff entered into an agreement to arbitrate, the burden is on the plaintiff to attempt to demonstrate the invalidity of that agreement. *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (under the FAA, the movant "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue'"; the movant is not required "to show initially that the agreement would be *enforceable*, merely that one existed"); *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) ("A party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid.").  Nonetheless, to avoid an unnecessary dispute over an outdated version of the New Era Rules, Defendants briefly address a recent Ninth Circuit decision finding flaws with the March 2, 2022 version of the New Era Rules under California unconscionability law and declining to enforce Defendants' arbitration agreement on that basis. *See Heckman*, 2024 WL 4586971, at *8-11.[5]  Defendants disagree with the decision and have filed a petition for panel rehearing and rehearing *en banc*, but the decision is irrelevant here in any event.

---

[5]    Unlike contract formation law, unconscionability law *does* vary significantly from state to state, so an out-of-Circuit unconscionability decision applying California law has no direct bearing here. *See Eyewonder, Inc. v. Abraham*, 2010 WL 3528882, at *3 n.10 (S.D.N.Y. Sept. 3, 2010) ("Since this Court finds that New York law applies, Defendant's arguments that the arbitration provision is unconscionable under California law is unavailing, and need not be addressed.").  If Plaintiffs intend to argue that California law applies to their suit—which was filed in New York and involves tickets for a concert in New York purchased by a New York resident and concerts in Georgia purchased by a Georgia resident—Defendants will address that argument on reply, including whether different states' unconscionability laws govern the claims of each Plaintiff.

*Heckman* addressed the March 2, 2022 version of the New Era Rules. *Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 959 n.14 (C.D. Cal. 2023), *aff'd*, 2024 WL 4586971 (9th Cir. Oct. 28, 2024). After the district court decision in *Heckman* on August 10, 2023, New Era updated its Rules to address the issues raised in that case, first on August 21, 2023 and then again on May 1, 2024. O'Mara Decl. ¶¶ 6-7 & Exs. 1-2. New Era meticulously addressed and resolved each one.[6] *See id.* It is the amended New Era Rules, not the version at issue in *Heckman*, that apply in this dispute. Those Rules—which are conspicuously hyperlinked in the Terms—provide that the version "in effect at the time a claim is filed with New Era ADR will govern the arbitration or mediation, unless the Parties mutually agree to another version." O'Mara Decl. Ex. 1, Rule 2(dd)(i)-(ii); *see also* O'Mara Decl. Ex. 2, Rule 2(dd)(i)-(ii). As the Second Circuit has made clear, "[a] party that agrees to arbitrate before a particular forum according to the rules of that forum assumes the risk that the forum's rules might change." *Lloyd*, 791 F.3d at 273 (applying rules amended after arbitration agreement was made because "the parties must have intended the [arbitrator's] Rules (as they may be amended) to govern"); *see also JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 167 F. App'x 266, 268 (2d Cir. 2006) (applying version of arbitrator's rules not yet in effect when agreement was formed because those rules provided "that the 'rules and any amendment of them shall apply in the form obtaining at the time the demand for arbitration or submission agreement is received by the [arbitrator].'"); *CMS Inv. Holdings, LLC v.*

---

[6]      As just one example, while the *Heckman* decision faulted the March 2, 2022 version of the New Era Rules for not explicitly providing for adequate discovery, the May 1, 2024 New Era Rules set forth a detailed process for discovery and make clear that the discovery process applies to all types of arbitration. *See* O'Mara Decl. Ex. 1, Rules 6(a)(viii)(2), 2(o)(iii).

*Castle*, 2016 WL 4557115, at *2 n.1 (S.D.N.Y. Aug. 31, 2016) (applying current version of JAMS Rules, not those in effect when agreement was signed).[7]

### D.    The Court Must Stay Proceedings

Under the FAA, a court must grant a motion to stay judicial proceedings once it has determined that the dispute is subject to a valid arbitration agreement.  9 U.S.C. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[The] text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").  Because Defendants have demonstrated that the parties formed valid agreements to arbitrate, and because those agreements clearly and unmistakably delegate to the arbitrator the power to decide threshold issues including scope, the Court should compel arbitration and grant the mandatory stay until any arbitration concludes.

## V.    CONCLUSION

The FAA directs courts to "respect and enforce the parties' chosen arbitration procedures" and "rigorously . . . enforce arbitration agreements according to their terms."  *Epic*, 138 S. Ct. at 1621 (internal citation omitted).  The parties here agreed, again and again, to arbitrate the claims at issue, including threshold questions of arbitrability.  Defendants therefore respectfully request that the Court grant Defendants' Motion.

---

[7]    *See also, e.g.*, *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1273 (7th Cir. 1976) ("This amendment [to the arbitrator's rules] . . . was in effect at the time Edison initiated arbitration and thus is binding on the parties according to the terms of the contract."); *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 684 (S.D. Fla. 2001) ("MedPartners' only response is to argue that the 1999 version of Rule 8 does not apply here because the Agreement was forged in 1996 and not 1999.  This argument is without merit.  As quoted above, Rule 1 of the AAA, which was operative in 1996 at the time of the Agreement, states '[t]hese rules *and any amendment of them* shall apply in the form obtaining *at the time the demand for arbitration or submission agreement is received by the AAA.*'").

Dated: November 15, 2024

Respectfully submitted,

**LATHAM & WATKINS LLP**

_/s/ Timothy L. O'Mara_
Timothy L. O'Mara (admitted _pro hac vice_)
   _Lead Trial Counsel_
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
tim.o'mara@lw.com

Anna M. Rathbun (admitted _pro hac vice_)
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200
Facsimile: +1.202.637.2201
anna.rathbun@lw.com

_Attorneys for Defendants Ticketmaster_
_L.L.C. and Live Nation Entertainment, Inc._

19