UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

x

In re LIVE NATION ENTERTAINMENT, INC. and TICKETMASTER L.L.C. ANTITRUST LITIGATION

---

This Document Relates To:

    ALL ACTIONS.

---

: Lead Case No. 1:24-cv-03994-AS
:
: (Consolidated with Case No. 1:24:cv-04106-AS)
:
: __CLASS ACTION__
:
: PLAINTIFFS' MEMORANDUM OF LAW IN
: OPPOSITION TO DEFENDANTS' MOTION
x: TO COMPEL ARBITRATION AND STAY
  PROCEEDINGS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   FACTS ................................................................................................................2

    A.    Plaintiffs and Class Members Had No Interaction with Ticketmaster When Purchasing Tickets on Secondary Ticket Exchanges.................................................2

    B.    To the Extent Relevant at All, the Arbitration Provision is More than Adhesive; It Is Coercive.................................................................................4

    C.    Not All Purchasers on Secondary Ticket Exchanges "Accept" Their Already-Purchased Tickets Through Ticketmaster; Critically, Leifer Never Did, and Neither Did Stevens for Several Relevant Transactions .........................6

III.  ARGUMENT ......................................................................................................9

    A.    Basic Contractual Principles Demonstrate Defendants' Motion to Compel Arbitration Fails ...........................................................................................10

    B.    The Recent Ninth Circuit Decision Regarding the Same Arbitration Agreement Is Highly Relevant.............................................................................13

    C.    Defendants' Arguments Regarding Which Version of the New Era ADR Rules Control Are Meaningless .......................................................................17

    D.    The Delegation Provision Is Unconscionable and Unenforceable .......................18

IV.   NO STAY SHOULD ISSUE ..............................................................................20

# TABLE OF AUTHORITIES

Page

## CASES

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)......................................................................................10

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003)...........................................................................1

*Bielski v. Coinbase, Inc.*,
   87 F.4th 1003 (9th Cir. 2023) ......................................................................18

*Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A.*
   *v. MedPartners, Inc.*, 203 F.R.D. 677 (S.D. Fla. 2001),
   *aff'd in part*, 312 F.3d 1349 (11th Cir. 2002) ..........................................18

*CMS Inv. Holdings, LLC v. Castle*,
   2016 WL 4557115 (S.D.N.Y. Aug. 31, 2016).........................................17

*Coe v. Coca-Cola Co.*
   702 F. Supp. 3d 140 (W.D.N.Y. 2023)...................................................10

*Commonwealth Edison Co. v. Gulf Oil Corp.*,
   541 F.2d 1263 (7th Cir. 1976) ...................................................................18

*Eyewonder, Inc. v. Abraham*,
   2010 WL 3528882 (S.D.N.Y. Sept. 3, 2010)..........................................15

*FCI Grp. Inc. v. City of New York*,
   862 N.Y.S. 2d 352 (N.Y. App. Div. 2008) ..............................................13

*Fieger v. Pitney Bowes Credit Corp.*,
   251 F.3d 386 (2d Cir. 2001)........................................................................10

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995)..................................................................................3, 9

*Haft v. Haier US Appliance Sols., Inc.*,
   578 F. Supp. 3d 436 (S.D.N.Y. 2022).......................................................16

*Heckman v. Live Nation Ent., Inc.*,
   120 F.4th 670 (9th Cir. 2024) ............................................................ *passim*

*Heckman v. Live Nation Ent., Inc.*,
   2024 U.S. App. LEXIS 30935 (9th Cir. Dec. 6, 2024)............................14

- ii -

Page

*Heckman v. Live Nation Ent., Inc.*,
   686 F. Supp. 3d 939 (C.D. Cal. 2023) ....................................................................19

*Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*,
   249 F. Supp. 526 (S.D.N.Y. 1966),
   *aff'd*, 372 F.2d 753 (2d Cir. 1967) .......................................................................12

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019) .................................................................................................10

*JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*,
   167 F. App'x 266 (2d Cir. 2006) ...........................................................................17

*Los Angeles Fed. Credit Union v. Madatyan*,
   147 Cal. Rptr. 3d 768 (Cal. Ct. App. 2012) ...........................................................11

*NEC Techs., Inc. v. Nelson*,
   478 S.E.2d 769 (Ga. 1996) .....................................................................................16

*OTO, L.L.C. v. Kho*,
   447 P.3d 680 (Cal. 2019) ........................................................................................16

*Pandolfi v. AviaGames, Inc.*,
   2024 WL 4051754 (N.D. Cal. Sept. 24, 2024) .....................................................16

*Ramirez v. Charter Commc'ns., Inc.*,
   551 P.3d 520 (Cal. 2024) ........................................................................................16

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*,
   157 Cal. App. 3d 1154 (Cal. Ct. App. 1984) .........................................................12

*Sheehan v. Atlanta Int'l Ins. Co.*,
   812 F.2d 465 (9th Cir. 1987) ..................................................................................13

*Smith v. Allstate Power Vac, Inc.*,
   482 F. Supp. 3d 40 (E.D.N.Y. 2020) ......................................................................20

*Specht v. Netscape Commc'ns Corp.*,
   150 F. Supp. 2d 585 (S.D.N.Y. 2001),
   *aff'd*, 306 F.3d 17 (2d Cir. 2002) .........................................................................10

*Specht v. Netscape Commc'ns. Corp.*,
   306 F.3d 17 (2d Cir. 2002).......................................................................................20

- iii -

Page

**STATUTES, RULES, AND REGULATIONS**

9 U.S.C.
  §2....................................................................................................................9, 10, 13

Federal Rule of Civil Procedure
  Rule 23 ....................................................................................................................13

California Civil Code
  §1565....................................................................................................................12
  §1567....................................................................................................................12
  §1670.5....................................................................................................................17

**SECONDARY AUTHORITIES**

17A C.J.S. Contracts
  §254 (2024)....................................................................................................................12
  §255 (2024)....................................................................................................................12

Restatement (Second) of Contracts (Am. L. Inst. 1981)
  §176....................................................................................................................11

Restatement (Third) of Restitution and Unjust Enrichment (Am. L. Inst. 2011)
  §14....................................................................................................................11

## I.    INTRODUCTION

Defendants Live Nation Entertainment, Inc., f/k/a Live Nation, Inc. ("Live Nation") and Ticketmaster L.L.C. ("Ticketmaster") (collectively, "Defendants") present their motion as a standard motion to compel arbitration.  But the facts here afford them no support.  Instead, Defendants seek to hold Plaintiffs to a contract purportedly entered into with Defendants ***after*** contract formation with a third party (through ticket resale markets like StubHub and SeatGeek).  At the time of purchase, when Plaintiffs Abraham Leifer ("Leifer") and Tamara Stevens ("Stevens") (collectively, "Plaintiffs") were overcharged due to Defendants' monopolization of the live music market, Plaintiffs did not agree to be bound by Live Nation's arbitration agreement.  At that time, there is no indication at all that agreement to be bound by Live Nation's arbitration provision is part of the bargain struck.  It is only when someone goes to collect the tickets they already paid for that they ever (if at all) see the terms of use ("Terms") that Defendants claim bar Plaintiffs' claims in this court.

Even if Defendants' version of the facts was credited, the agreement at issue is procedurally and substantively unconscionable.  Efforts by Defendants to obscure the relevance of the Ninth Circuit's lengthy opinion – finding Defendants' same arbitration agreement to be unconscionable – fail.  Moreover, Defendants' numerous declarations are flawed and misstate or omit critical facts. The standard here is "similar to that applicable for a motion for summary judgment."  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).[1]  And Defendants' efforts fall well below that standard. No stay should issue and the case should proceed.

---

[1]    Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Consolidated Class Action Complaint ("CCAC") (ECF 49).  References to "Mitchell Decl." are to the concurrently filed Declaration of David W. Mitchell.  Unless otherwise noted, all emphasis is added and citations are omitted.

- 1 -

## II.    FACTS

This case concerns end-user purchasers in the United States (and a separate proposed state indirect-purchaser class) who purchased tickets on Secondary Ticket Exchanges from a Secondary Seller who originally purchased a primary or secondary ticket for an event at a major U.S. concert venue from Ticketmaster or one of its affiliated entities owned, directly or indirectly, by Live Nation at any point since the 2010 merger (the "Class Period").  *See* ECF 49, ¶106.

### A.    Plaintiffs and Class Members Had No Interaction with Ticketmaster When Purchasing Tickets on Secondary Ticket Exchanges

Leifer purchased two tickets on the Secondary Ticket Exchange, StubHub, for a March 1, 2024 concert featuring Subtronics at the Barclays Center in Brooklyn, New York, for which concert Ticketmaster was the exclusive primary ticketing service.  *Id.*, ¶20; Mitchell Decl., Ex. 1 (Declaration of Abraham Leifer in Support of Plaintiffs' Opposition to Motion to Compel Arbitration and Stay Proceedings ("Leifer Decl.")), ¶3.  Stevens purchased tickets on StubHub for concerts on March 24, 2022; May 6, 2022; October 22, 2022; December 17, 2022; and January 6, 2023; Ticketmaster was the original seller of each of these tickets on the primary market, prior to Stevens' ultimate secondary market purchases on StubHub.  ECF 49, ¶22; Mitchell Decl., Ex. 2 (Declaration of Tamara Stevens in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Compel Arbitration and Stay Proceedings ("Stevens Decl.")), ¶5.

Defendants argue that Plaintiffs agreed to Defendants' arbitration clause in an after-the-fact process of "[a]ccepting" a ticket from the Secondary Seller who sold each Plaintiff (and each Class member) a ticket on a Secondary Ticket Exchange.  ECF 54 at 7-9.  Defendants' proposition glosses over the proverbial elephant in the room.  Namely, throughout the entire process of selecting, purchasing, and paying for secondary tickets on Secondary Ticket Exchanges (including when a purchase is made from a Secondary Seller who, in turn, purchased the ticket on a primary or

secondary ticket exchange from Ticketmaster), Plaintiffs and Class members do not purchase from or in any way interact with Defendants, and certainly do not agree to Defendants' arbitration clause. This is true for several reasons.

*First*, the process of selecting, purchasing, and paying for tickets on a Secondary Ticket Exchange (such as StubHub or SeatGeek) occurs ***entirely*** on the Secondary Ticket Exchange's platform, and not on the Ticketmaster platform. Ticketmaster has zero involvement or visibility in that process, as the experience of each Plaintiff confirms. Leifer Decl., ¶7; Stevens Decl., ¶6.

*Second*, at no time during that process is the purchaser told that they are interacting with Ticketmaster. Leifer Decl., ¶7; Stevens Decl., ¶¶6-7, 12-13. In fact, Ticketmaster is not involved in the Secondary Ticket Exchanges' businesses and has no role whatsoever in those businesses, which are actually competitors of Ticketmaster. ECF 49, ¶9.

*Third*, at no point prior to making a purchase (and paying for a ticket) on a Secondary Ticket Exchange is the purchaser told by the Secondary Ticket Exchange (or anyone else) that – when the purchaser downloads the ticket ***after*** making the purchase on the Secondary Ticket Exchange – Ticketmaster will purportedly require the purchaser to relinquish the purchaser's ability to sue Ticketmaster in court and instead arbitrate those claims. Leifer Decl., ¶7; Stevens Decl., ¶¶7, 12.

In sum, Ticketmaster is completely absent from the onset of the ticket selection and purchase process through and including the purchaser's binding non-refundable payment. *See* Mitchell Decl., Ex. 3 (screenshot from sample StubHub transaction involving an upcoming Live Nation-promoted concert to be held at Madison Square Garden).

Tellingly, Defendants offer no evidence suggesting a purchaser on any Secondary Ticket Exchange is ***ever*** notified, prior to purchase, that Ticketmaster will be involved or will attempt to require the purchaser to agree to Ticketmaster's Terms in order to access their tickets.

- 3 -

**B.    To the Extent Relevant at All, the Arbitration Provision is More than Adhesive; It Is Coercive**

As detailed in the CCAC, some (but not all) purchasers on Secondary Ticket Exchanges cannot receive – or as Defendants put it, "accept" – the tickets they already purchased unless they log on to Ticketmaster and, as Defendants contend, purportedly agree to the Ticketmaster arbitration clause. ECF 49, ¶83. Specifically, in order to receive tickets (***that they already purchased and paid for***) on a Secondary Ticket Exchange, Defendants' heavy-handed tactics require some purchasers to either sign up for or log in to a pre-existing Ticketmaster account in order to obtain their tickets, and purportedly click on a link regarding Ticketmaster's Terms, including Ticketmaster's arbitration clause.

As an initial matter, Defendants do not attempt to establish that either Plaintiff clicked on Ticketmaster's Terms in connection with the tickets and concerts alleged in the CCAC. Despite receiving Plaintiffs' email addresses and having the ability to trace all activity by Plaintiffs across the Ticketmaster platform, Defendants have submitted nothing amidst the hundreds of pages of their supporting materials demonstrating that either Plaintiff ever actually assented to Ticketmaster's Terms. ECFs 53-59. Instead, Defendants claim that Plaintiffs created and/or logged into Ticketmaster accounts at various points in their lifetimes. ECF 54 at 6. Based on that unremarkable observation, Defendants then leap to the unsupported conclusion that Plaintiffs must have encountered 1 or more out of 15 potential Ticketmaster interface screens (Defendants do not say which). *Id.* at 8-9. Then, based on Defendants' hand-selected interface screen examples, which are entirely unconnected to Plaintiffs or the transactions at issue here, Defendants speculate that Plaintiffs "would have" seen these screens when they used Ticketmaster for unrelated purposes at unknown times. And as a result, Plaintiffs supposedly somehow agreed to Ticketmaster's Terms,

including to arbitrate all claims and waive class action litigation.  *Id.*  But Defendants offer no actual evidence of such agreement by Plaintiffs here.[2]  ECFs 53-59.

On the motion's telling, the theoretical purchaser is presented with a Hobson's choice: either agree to Ticketmaster's onerous Terms, or lose the tickets they already paid for.  ECF 54 at 8-9; ECF 55, ¶19.  Stated differently, Ticketmaster holds hostage the ticket that was already purchased from a third-party on a third party (non-Ticketmaster) platform, and will prevent the purchaser from obtaining their ticket unless the purchaser agrees to Ticketmaster's unilateral Terms, despite the fact that the purchaser was not in privity with Ticketmaster at the time of purchase.  *Id.*  This is not merely a contract of adhesion.  It is a coercive contract, if indeed it can be deemed a contract at all.  No reasonable purchaser can conceivably be expected to forego tickets they already own.  *See* Leifer Decl., ¶¶2-6; Stevens Decl., ¶¶3-4.  Rather, it is understood that nearly all purchasers will click on any button that Ticketmaster places between the purchaser and the tickets that the purchaser already purchased on a third-party website.  Defendants assert this is assent to whatever terms Ticketmaster heavy-handedly demands.  *See* ECF 54 at 8-9.

In addition to being coercive, Ticketmaster's Terms – to the extent a theoretical Class member (but not either Plaintiff) can be said to have truly accepted them under the circumstances presented here – are riddled with procedurally oppressive features.  For example, they provide that Ticketmaster can unilaterally modify such terms at any time, without notice, and that such modifications automatically and retroactively supersede any "prior version" to which a user may have previously agreed.  ECF 55, Ex. 16.  Likewise, Defendants attempt to distract by devoting three

---

[2]  As to just two of the five transactions alleged by Stevens (and none of those alleged by Leifer), Defendants claim that Stevens logged in to her Ticketmaster application to access the tickets, ECF 54 at 6, but again Defendants submit no evidence regarding what specifically Stevens saw or purportedly agreed to in connection with accessing those tickets.

pages of their memorandum to the aesthetics of their "Sign-In," "Accept Ticket," and "Purchase" pages (ECF 54 at 7-9), whereas, in reality, Ticketmaster's Terms  purport to bind anyone even browsing the Ticketmaster website.  ECF 55, Ex. 16 ("By visiting or using the Site, you expressly agree to these Terms . . . .").  Further, the arbitration provision at issue applies both prospectively and retroactively to any user's claims or disputes with Ticketmaster.  *Id.*, §17 (emphasis removed) ("You . . . agree . . . any dispute, claim, or controversy . . . irrespective of when that dispute, claim or controversy arose – will be resolved solely by binding, individual arbitration.").  Finally, the Terms are hopelessly misleading when read in conjunction with the New Era ADR Rules they purport to incorporate.   Specifically, Ticketmaster's Terms deceptively state "any dispute, claim, or controversy . . . will be resolved solely by binding, individual arbitration."  *Id.*  However, the New Era ADR Rules contemplate and permit mass arbitration, whereby claims by "five (5) or more . . . against common respondent(s)" that are brought by "the same law firm or group of law firms" and that "arise out of Common Issues of Law and Fact" will be heard together.  *Id.* (citing New Era ADR, Rules and Procedures (Aug. 22, 2024) www.neweraadr.com/rules-and-procedures/ (last visited Dec. 13, 2024)).

   **C.    Not All Purchasers on Secondary Ticket Exchanges "Accept" Their Already-Purchased Tickets Through Ticketmaster; Critically, Leifer Never Did, and Neither Did Stevens for Several Relevant Transactions**

   The motion's central premise – that all Plaintiffs and Class members who purchased the tickets at issue agreed to Ticketmaster's Terms upon "accepting" their tickets – is flat out wrong.  This is confirmed by each Plaintiff's experience.

   *Leifer*.  On January 3, 2024, Leifer browsed StubHub for available tickets to a Subtronics concert to be held on March 1, 2024 at the Barclays Center in Brooklyn, New York.  Leifer then selected two tickets, and purchased and paid for those tickets, all on January 3, 2024.  As confirmed

by the January 3, 2024 email from StubHub to Leifer, that activity took place entirely on the StubHub platform, not on any Ticketmaster platform. *See* Leifer Decl., ¶¶3-7, 10 & Ex. A.

Notably, the confirmation email from StubHub illustrates the lack of any notices or warnings that purchasers would need to engage with Ticketmaster (or agree to Ticketmaster's arbitration provision). To begin with, the email states that the purchase is subject to the current StubHub user agreement. It says nothing at all about any Ticketmaster user agreement or Terms.[3] Likewise, the confirmation email merely has a notice stating: "When your tickets are ready, you'll receive an email from the original ticket provider with instructions on how to accept the ticket transfer. Please make sure to carefully read the details." Leifer Decl., Ex. A. Of course, those details – whatever they may eventually be – are not provided in that StubHub email confirming the purchase **and payment**. Further illustrating the absence of any mention of Ticketmaster, the confirmation email advises that an email with the tickets will "com[e] from a third-party not from StubHub. It may have the seller's name in the subject line (ex. 'Seller name' sent your tickets)." *See id*.

Subsequently, as the concert drew closer, Leifer downloaded to his mobile phone the tickets in electronic form from the StubHub platform (not Ticketmaster). *See id.*, Ex. B. Leifer and a guest attended the concert using the electronic tickets Leifer had purchased and downloaded from the StubHub platform, as confirmed by the screenshot at Exhibit B. *See id.*, Ex. B & ¶¶8-9, 11.

At no point was Leifer ever asked, much less required, to engage with the Ticketmaster platform in order to "accept" these tickets. *See id.*, ¶9. And at no point in this process did Leifer ever agree to any of Ticketmaster's Terms, much less any of Ticketmaster's arbitration agreements.

---

[3]    StubHub's user agreement does not appear to reference Ticketmaster or its Terms. Mitchell Decl., Ex. 4.

*See id.* Indeed, throughout this process, nothing on either the StubHub, or the linked Secure Tickets websites, signaled any Ticketmaster involvement. *Id.*, ¶¶7-9.

Defendants' motion readily admits all of this. Specifically, the motion states: "When tickets are transferred, Ticketmaster's systems create and maintain a record to ensure the accurate handover of tickets and prevent fraud." ECF 54 at 5. The motion then asserts that, notwithstanding the CCAC's allegation that Leifer purchased tickets to a March 2024 concert held at the Barclays Center, Defendants "records ***demonstrate*** that he ***actually*** accepted the transfer of two tickets to a concert on March 22, 2024 at UBS Arena in Elmont, New York." ECF 54 at 6 n.3. In other words, so sure are Defendants that Leifer never "accepted" any tickets to the March 1, 2024 concert at the Barclays Center that Defendants audaciously – and inaccurately – suggest that the CCAC refers to the wrong concert. Most importantly, in pressing their non-existent "gotcha" moment, Defendants unwittingly (but expressly) admit that their supposedly vaunted records "demonstrate" that Leifer did not accept his tickets to the March 1, 2024 Subtronics concert at the Barclays Center through Ticketmaster, and thus Leifer never agreed to Ticketmaster's Terms or arbitration agreement in connection therewith.

***Stevens***. On April 19, 2024, Stevens browsed StubHub for available tickets to an Orville Peck concert to be held on June 1, 2024 at the Cadence Bank Amphitheatre at Chastain Park in Atlanta, Georgia. Stevens selected two tickets, and purchased and paid for those tickets, all on April 19, 2024. As confirmed by the April 19, 2024 email from StubHub to Stevens, (*see* Stevens Decl., Ex. A), that activity took place solely on the StubHub platform, not on any Ticketmaster platform. *See id.*, ¶¶11-13.

Nowhere in the confirmation email from StubHub is there anything suggesting that purchasers would need to engage with Ticketmaster (or agree to Ticketmaster's arbitration

- 8 -

provision). The email states that the purchase is subject to the current StubHub user agreement and makes no reference to Ticketmaster or Ticketmaster's user agreement or Terms. Stevens's confirmation email merely has a notice stating: "[w]hen your tickets are ready, you'll receive an email from the original ticket provider with all the info you'll need." Stevens Decl., Ex. A. The confirmation email further advises that an email with the tickets will be "coming from a third-party not from StubHub" and "may have the seller's name in the subject line." *Id.* Nothing regarding the "original ticket provider" or Ticketmaster is contained in the StubHub email confirming the purchase, payment and other instructions. *Id.* It was not until **after** purchasing the **nonrefundable** Orville Peck tickets that Stevens received an email from StubHub that her tickets would be made available on Ticketmaster's platform. *See id.*, ¶13.

## III.   ARGUMENT

Section 2 of the Federal Arbitration Act ("FAA") provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. §2.

To determine whether a valid arbitration agreement exists, federal courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Section 2 of the FAA "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.' This saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that

apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  Thus, it is well-settled that "arbitration is a matter of contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 67 (2019).

## A.    Basic Contractual Principles Demonstrate Defendants' Motion to Compel Arbitration Fails

Here – either because there is no valid agreement under the plain language of the FAA in the first place or because there is no such language in Ticketmaster's Terms – there is no agreement between Defendants and Class members as to which state's law governs.  In the Second Circuit, where there is no choice-of-law agreement between the parties, courts evaluate the "'center of gravity'" or "'grouping of contacts'" in order to determine the state that has "'the most significant relationship to the transaction and the parties.'"  *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001).  In this action, the source of Defendants' alleged anticompetitive conduct and attendant decisions, as well as the hub which connects all Class members to the two Defendants, is the principal place of business and headquarters of Ticketmaster and Live Nation – both of which are in California.  Thus, the laws of the State of California determine the validity of Defendants' asserted arbitration agreement with Class members.  *See, e.g.*, *Specht v. Netscape Commc'ns Corp.*, 150 F. Supp. 2d 585, 590-91 (S.D.N.Y. 2001) (California has the "most significant connection" to challenged conduct of California-based defendant where class-action plaintiffs reside in multiple states), *aff'd*, 306 F.3d 17 (2d Cir. 2002).[4]

---

[4]    Defendants' claim at 11 n.4 of their memorandum that the Court need not undertake a choice-of-law analysis here suggests the Court ignore decades of established Second Circuit authority to the opposite effect in the absence of a choice-of-law agreement.  Defendants' cite to *Coe v. Coca-Cola Co.* is misleading.  702 F. Supp. 3d 140 (W.D.N.Y. 2023).  The *Coe* parties' agreement ***did*** contain a choice-of-law provision (Georgia), though the parties later assented in the trial court to the application of New York law.  *Id.* at 150, 154.

4905-6730-2405.v2

While many Class members procure and use their secondary-market ticket purchases without having to obtain their tickets from Ticketmaster, a portion of Class members' tickets – *i.e.*, their property – are unknowingly in Ticketmaster's control until Class members download their tickets. Indeed, Class members' **only** contact with Ticketmaster concerning these tickets is simply to access what is already theirs and perform the clerical task of downloading them. Under threat of complete loss of their tickets, however, Ticketmaster holds hostage Class members' property – valuable tickets to one time unique live events previously bought and paid for on the secondary market **without** Ticketmaster involvement – unless Class members click the Accept Tickets button and, according to Defendants, agree thereby to Ticketmaster's Terms.

In short, Ticketmaster coerces Class member's agreement under a threat to convert Class members' property.[5] "'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages . . . .'" *Los Angeles Fed. Credit Union v. Madatyan*, 147 Cal. Rptr. 3d 768, 771 (Cal. Ct. App. 2012). "'Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant." *Id.* at 771; *see also* Restatement (Third) of Restitution and Unjust Enrichment §14 (Am. L. Inst. 2011) ("Because the tort of conversion is one of strict liability, the unauthorized detention of another's property constitutes duress even when the party who refuses to release the property acts in good faith.").

---

[5]    *See* Restatement (Second) of Contracts §176 (Am. L. Inst. 1981) ("A threat is improper if . . . what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property. . . .").

According to Ticketmaster, Class members have no choice but to "agree" to its Terms or Ticketmaster will not release the tickets – *i.e.*, Ticketmaster simply unilaterally retains possession of the Class members' property until the property is useless and the experience paid for is gone.

This is classic economic duress, also called business compulsion. *See* 17A C.J.S. Contracts §255 (2024) ("Economic duress or business compulsion vitiates a contract induced thereby."). Under California law, while consent to a contract must be freely given (Cal. Civ. Code §1565), consent is not free when obtained through duress, menace, fraud, undue influence, or mistake. Cal. Civ. Code §1567. California recognizes economic duress where there is "a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158(Cal. Ct. App. 1984).[6]  It is a long-standing equitable principle of contract law that coercion voids any such "agreement" in this context.  A finding of economic duress or business compulsion is supported even upon "the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value." *Id.* at 1159.  As particularly prescient here, "threats of destruction of property or duress of goods under oppressive circumstances will avoid a contract on the grounds of duress."  17A C.J.S. Contracts §254 (2024).  Indeed, where one party is in a position to dictate terms, "courts will treat agreements which are influenced by threats of injury to, or withholding of, property as made under duress." *Id*.

Here, Ticketmaster dictates terms, leaving Class members with no alternative – ***click the download link or lose the ticket***.  This is by Defendants' own design, whose system blocks Class

---

[6]   *Accord Hellenic Lines, Ltd. v. Louis Dreyfus Corp.*, 249 F. Supp. 526, 529 (S.D.N.Y. 1966) ("[W]here one party has control or possession of the goods of another and refuses to surrender such goods to the owner thereof except upon the latter's compliance with an unlawful demand, a contract made by the owner to emancipate his property is considered as one made under duress and thus avoidable."), *aff'd*, 372 F.2d 753 (2d Cir. 1967).

member access to tickets they ***already own*** unless Class members click the Accept Tickets button and thereby, Defendants assert, agree to Ticketmaster's Terms, giving up valuable rights.  But the doctrine of economic duress is "designed to 'preclude the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value.'"  *Sheehan v. Atlanta Int'l Ins. Co.*, 812 F.2d 465, 469 (9th Cir. 1987).  If a Class member refuses to click Ticketmaster's download button, the threat is that they will lose their property and access to the event they purchased the right to experience.  Ticketmaster, on the other hand, gains nothing by way of the concert or ticket, but does specifically use the power it possesses to evade any meaningful accountability for the alleged anticompetitive Sherman Antitrust Act violations both by forcing Class member victims to forgo their Constitutional rights to a jury trial and judicial resolution of any and all disputes with Defendants, as well as right to pursue class remedies in that regard under Federal Rule of Civil Procedure 23.  *See FCI Grp. Inc. v. City of New York*, 862 N.Y.S. 2d 352, 355 (N.Y. App. Div. 2008) ("The constitutional right to seek redress before courts cannot be waived by implication but must be relinquished in a clear and unequivocal manner.").  There is simply no "contract evidencing a transaction" as contemplated by §2 of the FAA as between Plaintiffs and Ticketmaster.  9 U.S.C. §2.

Class members who could not otherwise access tickets they have already purchased on the secondary market "agreed to" Defendants' Terms without any choice and under threat.  Any "agreement" to Defendants' Terms under these circumstances is unlawfully coerced and, therefore, invalid.

**B.  The Recent Ninth Circuit Decision Regarding the Same Arbitration Agreement Is Highly Relevant**

Defendants brush aside the relevance of the recent Ninth Circuit decision in *Heckman v. Live Nation Ent., Inc*., 120 F.4th 670 (9th Cir. 2024) ("*Heckman II*"), claiming first that the Circuit

Court's decision is "deeply flawed" and then arguing changes to New Era's Rules after the conduct at issue here fixed all the problems identified in the *Heckman II* ruling. ECF 54 at 2. Neither of those arguments has merit. The decision is highly relevant, and Defendants' half-hearted efforts to demonstrate any after-the-fact fixes fail. Notably, on December 6, 2024 the Ninth Circuit unanimously voted to deny Defendants' petition for panel rehearing. *See Heckman v. Live Nation Ent., Inc.*, 2024 U.S. App. LEXIS 30935, at *1 (9th Cir. Dec. 6, 2024).

Defendants' arguments to compel arbitration presuppose those that downloaded tickets from Ticketmaster's website are bound by Ticketmaster's Terms. As discussed above, any such "agreement" is coerced by Defendants and is, therefore, invalid and unenforceable in the first instance. But, Defendants persist, and simply dismiss as irrelevant the well-considered and careful analyses of both the Central District of California court and the reviewing Ninth Circuit panel, both of which found the arbitration and class-action-waiver provisions of Defendants' Terms are unconscionable and, therefore, unenforceable. ECF 54 at 1-2, 16. *Heckman*, is not only relevant, it is highly persuasive in the present dispute.

In *Heckman*, consumers who bought tickets directly from Ticketmaster brought similar claims to those alleged here, challenging certain anticompetitive conduct of Live Nation and Ticketmaster as violating the Sherman Antitrust Act. Defendants sought to enforce the arbitration provision of their Terms, including arbitration rules of a "newly created entity, New Era ADR ('New Era'), using "novel and unusual procedures." 120 F.4th at 676. New Era, working with both the law firm of Latham & Watkins LLP and Defendants here, was designed to partner with corporations in an effort to limit class exposure. *See id.* at 677. The Ninth Circuit, however, held Ticketmaster's Terms, including its arbitration clause and New Era's Rules, to be procedurally and substantively unconscionable and therefore, unenforceable under California law. *Id.* at 680-89. Specifically, the

- 14 -

Ninth Circuit upheld the district court's conclusion that the agreement was "'procedurally unconscionable to an extreme degree.'" *Id*. at 681. The Ninth Circuit held that "the Terms on Ticketmaster's website, and the manner in which Ticketmaster bound users to those Terms, 'evince[] an extreme amount of procedural unconscionability far above and beyond a run-of-the-mill contract-of-adhesion case.'" *Id*. at 683.

The Ninth Circuit also found Defendants' Terms substantively unconscionable "to a substantial degree" on the bases that, among others: New Era's mass arbitration protocol violates consumers' due process rights; discovery limitations were "inadequate procedures as are necessary to vindicate th[e] claim"; in circumstances where the arbitrator has discretion, the "'[New Era] Rules provide no guidance as to how the neutral is to exercise the discretion"; and any right to appeal is unequal and favors Defendants. *Id*. at 683-87.

Moreover, as an alternate and independent ground invalidating Defendants' Terms, the Ninth Circuit held that Ticketmaster's Terms and New Era's Rules were independently unconscionable because, under California law, "class waivers are unenforceable when contained in a 'consumer contract of adhesion,' when small damage disputes could predictably arise between the parties, and when the 'party with the superior bargaining power' is alleged to have 'carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money.'" *Id*. at 690. Indeed, the Court found these criteria easily met in the context of Defendants' Terms. Defendants claim that while contract formation law is substantially identical in California, Georgia, and New York, unconscionability law varies. ECF 54 at 16 n.5. In support Defendants cite a single case, which did not even reach this issue. *See id.* (citing *Eyewonder, Inc. v. Abraham*, 2010 WL 3528882, at *3 (S.D.N.Y. Sept. 3, 2010) (arguments regarding California law "need not be addressed," because there was "an express choice-of-law provision")).

- 15 -

In reality, just as with contract formation, there are no substantive differences between the unconscionability laws of these three jurisdictions. *See OTO, L.L.C. v. Kho*, 447 P.3d 680, 689-90 (Cal. 2019) (requiring both procedural and substantive unconscionability under California law and looking at the totality of the circumstances to determine unconscionability); *NEC Techs., Inc. v. Nelson*, 478 S.E.2d 769, 773 n.6 (Ga. 1996) (same under Georgia law); *Haft v. Haier US Appliance Sols., Inc.*, 578 F. Supp. 3d 436, 451-52 (S.D.N.Y. 2022) (same under New York law). Here, however, the consistency of various state laws is not an issue – as discussed above, California contract law governs the formation and enforceability of Defendants' Terms.

Defendants suggest that the New Era Rules have been revised recently to remedy the procedures the Ninth Circuit found overwhelmingly unconscionable. As an initial matter, Defendants cavalierly point to "just one example" of an issue raised in *Heckman II* that they supposedly remedied, notwithstanding that (as noted below) *Heckman II* found numerous problems with the New Era Rules. ECF 54 at 17 n.6. More fundamentally, no purported alterations Defendants have made to their Terms remedies the Ninth Circuit ruling that the class action waiver renders the Terms unconscionable as a matter of law. Thus, regardless of any changes, Class members here cannot be held to any alleged arbitration clause. Further, setting aside that the revised rules remain unconscionable under *Heckman II*, as discussed more fully below, the *Heckman II* ruling directly invalidates any such Class member agreements that are prior to Defendants' touted revisions to their Terms or the New Era Rules.

For Class members with pre-revision "agreements," under California law, challenged arbitration provisions "should be assessed at the time of formation only, and not at the time of enforcement." *Pandolfi v. AviaGames, Inc*., 2024 WL 4051754, at *5 (N.D. Cal. Sept. 24, 2024) (finding internet gaming adhesion terms of use arbitration provision unconscionable); *Ramirez*

- 16 -

*v. Charter Commc'ns., Inc.*, 551 P.3d 520, 539 (Cal. 2024) (unconscionability of arbitration clauses should be examined "without relying on subsequent developments"); Cal. Civ. Code §1670.5 (unconscionability should be assessed at the time of contract formation). Thus, the Terms and arbitration rules that Defendants attempt to thrust on Class members have already been found to be "permeate[d]" with unconscionability and adjudged unenforceable. *Heckman II*, 120 F.4th at 680. That judgement is the law of California and directly invalidates Defendants' pre-revision Terms and arbitration rules. As a matter of law, therefore, Class members are not bound to arbitrate.

### C. Defendants' Arguments Regarding Which Version of the New Era ADR Rules Control Are Meaningless

While missing the point entirely, Defendants seek to have the Court believe that a much later in time version of the New Era Rules control. They point to a statement in those rules that "the Rules in effect at the time a claim is filed with New Era ADR will govern the arbitration or mediation." ECF 54 at 4, 17. But no claim has ever been filed with New Era ADR in this case.

Defendants' description of *CMS Inv. Holdings, LLC v. Castle*, 2016 WL 4557115, at *2 n.1 (S.D.N.Y. Aug. 31, 2016), is extremely misleading. The parenthetical provided claims the case "appl[ies] current version of JAMS Rules, not those in effect when agreement was signed." ECF 54 at 18. What the case actually states is: "The parties do not address which version of the JAMS Rules governs the SPA. Although the Court cites to the current version, the version that was in effect when the parties signed the SPA in 2007 does not differ in any material respect." *Castle*, 2016 WL 4557115, at *2 n.1. That's a far cry from Defendants' "spin."

Defendants' other cases on this point similarly don't stand up to scrutiny. The other cases cited by Defendants in their footnote (ECF 54 at 18 n.7) suffer from another significant flaw: they all hold that courts should look to the arbitration rules that were in effect "at the time [the parties] initiated arbitration" (*id.*), and here, arbitration has not been initiated in the first place. *See JSC*

- 17 -

*Surgutneftegaz v. President & Fellows of Harvard Coll.*, 167 F. App'x 266, 268 (2d Cir. 2006) (applying rules in place "at the time the demand for arbitration or submission agreement is received" by the arbitrator because that was what the parties agreed to in the contract); *Commonwealth Edison Co. v. Gulf Oil Corp.*, 541 F.2d 1263, 1273 (7th Cir. 1976) (looking to the rules "in effect at the time Edison initiated arbitration" because that was what the contract said); *see also Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v. MedPartners, Inc.*, 203 F.R.D. 677, 684 (S.D. Fla. 2001) (applying rules in place "at the time the demand for arbitration or submission is received by the AAA," because that was what the agreement said), *aff'd in part*, 312 F.3d 1349 (11th Cir. 2002).

### D.     The Delegation Provision Is Unconscionable and Unenforceable

The delegation provision in Defendants' Terms is unconscionable and unenforceable.  As held by the Ninth Circuit in *Heckman II*, "the delegation clause is procedurally unconscionable to an extreme degree and substantively unconscionable to a substantial degree.  Taken in combination, this procedural and substantive unconscionability is fatal to the delegation clause contained in Ticketmaster's Terms." *Heckman II*, 120 F.4th at 687; *see also id.* at 680-87.  In deciding whether a delegation clause is unenforceable, the court's analysis is not limited to the "bare text" of the clause. Under California law, a court must be able to interpret the delegation provision "in the context of the agreement as a whole," and the court may consider "the parts of the agreement that impact[] the delegation provision to decide its enforceability." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1011-12 (9th Cir. 2023); *see also Heckman II*, 120 F.4th at 681.  Each of the arguments set forth above render the delegation clause substantively and procedurally unconscionable.

The delegation clause is further procedurally unconscionable because, whether the arbitration provision at issue relates to the New Era Rules found unenforceable by the Ninth Circuit in *Heckman* or New Era's revised New Rules, the delegation clause still imposes a novel dispute resolution

- 18 -

process, without notice, but with surprising features, in Live Nation's coercive and oppressive contract of adhesion. *Heckman II*, 120 F.4th at 682-83; *see also Heckman v. Live Nation Ent., Inc.*, 686 F. Supp. 3d 939, 953 (C.D. Cal. 2023) ("*Heckman I*"), *aff'd*, *Heckman II*. The unconscionability of each of New Era's Rules renders Live Nation's delegation clause unenforceable, independent of the features and consequences of the delegation clause itself. The Terms falsely state that disputes will be resolved by "individual arbitration." This is contrary to New Era's Rules, which require mass arbitration. *See* ECF 56, Ex. 1 (New Era Rules 6(b)(ii)(4)) (May 1, 2024) ("Updated Rules")). The arbitration provision also states that it applies to any and all claims, regardless of when such claims accrued. Even more troubling is that Defendants may alter the delegation clause, at any time, unilaterally, rendering it one-sided and procedurally unconscionable.

The delegation cause is also substantively unconscionable. A claimant cannot opt out of New Era's mass arbitration process. Rather, she must petition to be removed ***after*** being placed in a mass arbitration, and a New Era arbitrator decides whether the claimant can exit the same. *See id.* (Updated Rules 6(b)(ii)(4), 6(b)(iii)(5)(d)). Issues, including those regarding arbitrability and unconscionability, can be resolved by an arbitrator applying a "Lead Decision," or a handful of anonymized decisions in prior cases – to which confidential proceedings the claimant was not a party and lacks access to underlying briefing and evidence, and in which she had no opportunity to be heard – and the particulars of which Live Nation has full knowledge. *See id.* (Updated Rules 6(b)(iii)(5)(a)). There is no requirement that the arbitrator alert a claimant whether he intends to use Lead Decision or how he will do so. Further, there is no requirement that such Precedent set forth detailed findings of law or fact. According to New Era, such "reasoned decision" provides only "***limited*** explanation or elaboration for the decision along with a summary of the same."

*Id.* (Updated Rules 1(d)(i)(2)). Additionally, a challenge to the use of such Lead Decision is limited to a mere 1,000 words. *See id.* (Updated Rules 6(b)(iii)(5)(d)).

Per the New Era Rules, threshold issues still may be commonly decided without discovery or briefing. Further, even if they are not decided through the use of Precedent, threshold issues regarding arbitrability and unconscionability still may be decided with merits issues rather than before. This all is solely within the arbitrator's discretion. *Id.* (Updated Rules 2(r)(iii)(1)).

Defendants delegation clause is further substantively unconscionable as it maintains a one-sided appeals process, including for threshold issues. While a grant of equitable relief (*e.g.*, an injunction which enjoins the application of an unconscionable arbitration clause in Live Nation's Terms) can be appealed, the denial of the same in Live Nation's favor cannot. In this manner, as well, the New Era arbitration process improperly tips the scales in Live Nation's favor.

## IV.   NO STAY SHOULD ISSUE

Should the Court be inclined to grant Defendants' motion, Plaintiffs respectfully request an opportunity to conduct limited discovery into the matters raised herein prior to the Court's issuance of a ruling on arbitration. *See, e.g.*, *Smith v. Allstate Power Vac, Inc*., 482 F. Supp. 3d 40, 44 (E.D.N.Y. 2020) (granting leave to conduct limited discovery in connection with defendant's anticipated motion to compel arbitration). The Second Circuit makes clear that disputed motions to compel arbitrations often depend on a "well developed record." *Specht v. Netscape Commc'ns. Corp*., 306 F.3d 17, 28 (2d Cir. 2002).

DATED:  December 13, 2024                Respectfully submitted,

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         DAVID W. MITCHELL (admitted *pro hac vice*)
                                         ALEXANDRA S. BERNAY (admitted *pro hac vice*)
                                         ARTHUR L. SHINGLER III (admitted *pro hac vice*)


                                                   s/ David W. Mitchell
                                         ────────────────────────────────
                                                 DAVID W. MITCHELL
                                                  *Lead Trial Counsel*

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         davidm@rgrdlaw.com
                                         xanb@rgrdlaw.com
                                         ashingler@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                         STUART A. DAVIDSON (admitted *pro hac vice*)
                                         MARK J. DEARMAN (admitted *pro hac vice*)
                                         225 NE Mizner Boulevard, Suite 720
                                         Boca Raton, FL  33432
                                         Telephone:  561/750-3000
                                         sdavidson@rgrdlaw.com
                                         mdearman@rgrdlaw.com

                                         Interim Class Counsel for Plaintiffs and the
                                         Proposed Class

                                         ISRAEL DAVID LLC
                                         ISRAEL DAVID
                                         ADAM M. HARRIS
                                         17 State Street, Suite 4010
                                         New York, NY  10004
                                         Telephone:  212/739-0622
                                         israel.david@davidllc.com
                                         adam.harris@davidllc.com

- 21 -

4905-6730-2405.v2

ISRAEL DAVID LLC
MARK A. CIANCI
399 Boylston Street, Floor 6, Suite 23
Boston, MA  02116
Telephone:  617/295-7770
mark.cianci@davidllc.com

HERMAN JONES LLP
SERINA M. VASH
153 Central Avenue, #131
Westfield, NJ  07090
Telephone:  862/250-3930
svash@hermanjones.com

HERMAN JONES LLP
JOHN C. HERMAN
3424 Peachtree Road NE, Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6500
jherman@hermanjones.com

Additional Plaintiffs' Counsel

4905-6730-2405.v2