UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

James R. Jacobson; Abraham Leifer; Tamara Stevens, individually and on behalf of all others similarly situated,

                                          Plaintiffs,

                    -against-

Live Nation Entertainment, Inc.; Ticketmaster, LLC,

                                          Defendants.

24-CV-3994 (AS)
24-CV-6538 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Three people who bought or sold concert tickets second-hand sued Live Nation and its subsidiary Ticketmaster for antitrust violations. Ticketmaster, the story goes, is a monopolist that drives up the prices of tickets and fees on the secondary market. But this case can't proceed in federal court. The three customers agreed to arbitrate their claims against defendants when they agreed to Ticketmaster's terms of use. That agreement delegates the question of arbitrability to the arbitrator. And none of the customers has shown that the delegation clause is unenforceable. So the Court grants defendants' motions to compel arbitration and to stay this litigation pending the outcome of those proceedings.

## BACKGROUND

James Jacobson, Abraham Leifer, and Tamara Stevens sued defendants under federal and state antitrust laws. The theory is that Ticketmaster is a monopolist. 24-CV-3994 Dkt. 49 ¶¶ 7–15; 24-CV-6538, Dkt. 2 ¶¶ 3–21. But unlike as in the case brought by the federal government and the states, these plaintiffs don't directly challenge Ticketmaster's conduct in the primary market for tickets. *Compare* 24-CV-6538, Dkt. 2 *and* 24-CV-3994, Dkt. 49 *with* 24-CV-3973, Dkt. 257 at 85–139. Their claims focus on the impact of Ticketmaster's conduct in the secondary market, in which tickets are resold.

Leifer, Stevens, and Jacobson all bought or sold tickets second-hand. 24-CV-3994, Dkt. 49 ¶¶ 20–22; 24-CV-6538, Dkt. 2 ¶¶ 24–30. Leifer and Stevens used StubHub to buy tickets that were originally sold on Ticketmaster; Jacobson bought a ticket and then resold it, all on Ticketmaster. *Id.* Leifer and Stevens argue that Ticketmaster's upstream anticompetitive practices inflated the prices they ultimately paid downstream on StubHub. 24-CV-3994, Dkt. 49 ¶ 13. And Jacobson argues that Ticketmaster charged him "supracompetitive handling charge[s]" to digitally redeliver the tickets that he resold. 24-CV-6538, Dkt. 2 ¶ 41.

None of that is directly at issue in this opinion. What's at issue is Ticketmaster's mandatory arbitration provision, contained in its terms of use. 24-CV-6538, Dkt. 44 ¶ 15. The provision sends any covered disputes to arbitration with a company called New Era—and if New Era can't handle the dispute for whatever reason, then it goes to another company called Fair Claims. *Id.*, Dkt. 44-10 at 18. Fair Claims has since shut its doors permanently, which means that if New Era can't handle the arbitration, then the parties will select an arbitration provider that's mutually acceptable. *Id.* The provision also has a delegation clause that assigns questions of arbitrability to the arbitrator. *Id.* at 19.

Defendants moved to compel arbitration in both cases under the Federal Arbitration Act (FAA). 24-CV-3994, Dkt. 53; 24-CV-6538, Dkt. 42; *see also* 9 U.S.C. § 4. They argue that plaintiffs accepted the terms of use, which include an agreement to send threshold questions of interpretation and enforceability to the arbitrator. On that view, this Court has no authority to decide those issues. Plaintiffs disagree. In their view, the entire arbitration agreement—the delegation clause included—is unenforceable, and for that reason it's the Court's job to invalidate it.

Because Leifer, Stevens, and Jacobson agreed to arbitrate and don't carry their burden of showing that the agreement is unenforceable, the motions to compel arbitration are granted.

## LEGAL STANDARDS

In deciding motions to compel, courts "apply a standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quotation marks omitted). That requires the Court to "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (cleaned up).

The party moving to compel arbitration "bears an initial burden of demonstrating that an agreement to arbitrate was made." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (quotation omitted). Once that burden is carried, it shifts to the party resisting arbitration to show that the agreement is unenforceable. *See id.* When the agreement contains a clause that delegates questions of enforceability to the arbitrator, the Court looks to whether there's "clear and unmistakable evidence" that the parties delegated enforceability to the arbitrator. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 72 (2019) (quoting *First Options, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

## DISCUSSION

A dispute is arbitrable if: (1) the parties agreed to arbitrate, and (2) the scope of that agreement covers the claims at issue. *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015). But even if those conditions are met, not all disputes go to arbitration. The agreement must also be enforceable, and "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996); 9 U.S.C. § 2. Like the initial question of contract formation, these

defenses are evaluated under state law. *First Options*, 514 U.S. at 944; *In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 250 (S.D.N.Y. 2005).

Under California law, the parties agreed to arbitrate whether these disputes are arbitrable. And plaintiffs fail to show that any part of the delegation clause is unconscionable.

## I.    The contract is governed by California law

"A federal court sitting in diversity or adjudicating state law … must apply the choice of law rules of the forum state." *Licci ex rel. Licci v. Lebanese Canadian Bank*, 672 F.3d 155, 157 (2d Cir. 2012) (quotation omitted). New York's choice-of-law rules have two steps. First, a court must "determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993). If there's a conflict, then the court considers "which State has the most significant relationship to the transaction and the parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994) (quotation omitted).

Plaintiffs argue that there's a conflict between the laws of the relevant jurisdictions. 24-CV-6538, Dkt. 50 at 7. They say that New York and California treat class action waivers and unconscionability differently. *Id.* at 7–8. Defendants appear to agree with the latter point at least. *Id.*, Dkt. 43 at 15 n.3 ("[U]nconscionability law *does* vary from state to state.").

Then, plaintiffs' argument goes, California is this suit's "center of gravity." *Zurich Ins. Co.*, 642 N.E.2d at 1068. The four relevant factors are: (1) where the contract was negotiated, (2) where it was performed; (3) where the subject matter is located; and (4) the place of business or domicile of the parties. *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (applying New York law). Plaintiffs' arguments all stem from the core fact that Live Nation and Ticketmaster are headquartered in California. That, they say, means that California is "where the consumer adhesion contract at issue was ostensibly drafted, modified, and administered, making it the effective place of both contracting and negotiation." 24-CV-6538, Dkt. 50 at 8. Then, the subject matter and performance of the contract gravitate toward California as well because the transactions happened through Ticketmaster's website, which is allegedly "maintained or overseen from" its California headquarters. *Id.* at 8

Defendants don't contest these factual assertions. Nor do they provide an alternative legal argument. Though in their opening brief on Jacobson's motion they promised to "address [whether California law applies] on reply," 24-CV-6538, Dkt. 43 at 15 n.3, their argument on reply is cabined to a single sentence. That sentence reads: "Defendants disagree that California law should apply to a single Ohio resident's dispute over the purchase and resale of tickets for events in Ohio and Pennsylvania." *Id.*, Dkt. 57 at 1 n.1. Read generously, defendants argue that either Ohio or Pennsylvania law should instead govern. But they then proceed to rely only on California law "because Plaintiff loses under California law too." *Id.*

That means defendants have forfeited choice of law. True, they nominally contested the issue. But when an "issue is adverted to only in a perfunctory manner, unaccompanied by any effort at

developed argumentation, it must be deemed waived—or, more precisely, forfeited." *In re Demetriades*, 58 F.4th 37, 54 (2d Cir. 2023) (cleaned up and quotation omitted); *see also Chau v. Lewis*, 771 F.3d 118, 126 (2d Cir. 2014) (When "the parties' briefs assume that [a state's] law controls, … such implied consent is sufficient to establish choice of law." (cleaned up and quotation omitted)). So the Court will apply California law.

## II.    Leifer, Stevens, and Jacobson agreed to arbitrate this dispute

Defendants bear the initial burden of "demonstrating that an agreement to arbitrate was made." *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). "This burden does not require the moving party to show initially that the agreement would be *enforceable*, merely that one existed." *Id.* As stated earlier, that requires defendants to show that (1) the parties agreed to arbitrate, and (2) the agreement covers the relevant dispute. *Holick*, 802 F.3d at 394. Defendants satisfy that initial burden.

### A.  Plaintiffs agreed to arbitrate at least some disputes

Each plaintiff agreed to the terms of service multiple times. To buy, sell, or claim tickets originally sold by Ticketmaster, a user must sign into the website or mobile app. 24-CV-6538, Dkt. 44 ¶ 5. To create an account or to sign in, a user must accept Ticketmaster's terms of use. *Id.* ¶¶ 6, 8. The terms are agreed to in clickwrap and "sign-in-wrap" agreements that require the user to affirmatively click or to sign in to manifest assent. *Id.* ¶¶ 6–11. The terms have included a mandatory arbitration provision since 2011. *Id.* ¶ 15.

The problem with these kinds of agreements is that a user might not know about many of the underlying terms. And agreeing to hidden terms, by itself, isn't enough to bind a customer; under California law, "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 101 Cal. Rptr. 347, 351 (Ct. App. 1972)). Leifer, Stevens, and Jacobson all suggest that they didn't know about the arbitration clause or its details. But even if a website user doesn't have actual knowledge, she can still be bound "if a reasonably prudent user would be on inquiry notice of the terms." *Meyer*, 868 F.3d at 74–75 (applying California law). Inquiry notice "turns on the clarity and conspicuousness of arbitration terms," which in turn "are a function of the design and content of the relevant interface." *Id.* at 75 (cleaned up and quotation omitted).

Here, the relevant interfaces make the terms of use sufficiently clear and conspicuous.

Start with what's enough to provide inquiry notice. In *Meyer*, the Second Circuit applied California law to hold that a user interface provided sufficient inquiry notice of an arbitration agreement. *Id.* at 80. Relevant were the uncluttered screens, the fact that the terms were visible without scrolling, the proximity of the hyperlinked terms to the button to press to manifest assent, and hyperlinked text that was visually distinct from the rest of the text. *Id.* at 77–78. And in *Davitashvili v. Grubhub*, 131 F.4th 109 (2d Cir. 2025), the Second Circuit reiterated the importance of the

proximity of the terms of use to the relevant button (there, a checkout button). *Id.* at 116–17. *Davitashvili* applied New York law but relied on *Meyer* and noted that "New York and California apply substantially similar rules for determining whether parties have mutually assented to a contract term." *Id.* at 116 n.25 (quotation omitted).

That contrasts with when courts have found inquiry notice lacking. For example, when the terms of use were presented with "between fifteen and twenty-five links" in "text … [that was] in at least four font sizes and six colors," with "multiple buttons and promotional advertisements." *Nicosia v. Amazon.com*, 834 F.3d 220, 236–37 (2d Cir. 2017); *see also Meyer*, 868 F.3d at 78 (applying California law and distinguishing the facts of *Nicosia*). Or when the seller suggested that an email *was* the customer's "service agreement," but then sent a lengthy and cluttered email that buried the hyperlink to the *actual* terms and conditions. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 292–93 & n.8 (2d Cir. 2019) (applying New York law but noting that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term").

The interfaces in this case don't resemble those at all. They instead look like those in *Meyer* and are clearer even than those in *Davitashvili*. So they're sufficient for inquiry notice. Here are just a few examples of many.

When creating a new account, users are alerted that "[b]y continuing past this page, you agree to the Terms of Use." 24-CV-6538, Dkt. 44-1 at 2 (desktop); 24-CV-3994, Dkt. 55-2 at 2 (mobile). The phrase "Terms of Use" is bolded and appears in a different color from the rest of the text. *Id.* If a user clicks on it, it links to the full terms. 24-CV-6538, Dkt. 44 ¶ 8; 24-CV-3994, Dkt. 55 ¶ 6.

Here's how it looks:



Then a similar screen appears each time a user signs in, as shown below. 24-CV-3944, Dkt. 55-7 at 2 (desktop); 55-8 (mobile).



To purchase tickets, users must check a box certifying that they have read and agree to the terms of use. 24-CV-3994, Dkt. 55-9 at 2. The screen below is part of a larger interface with payment and insurance information; but the checkbox with the terms is located directly above the button to place an order. *See Davitashvili*, 131 F.4th at 116–17 (approving of a similar setup).



A similar screen pops up when users claim tickets from Ticketmaster that they bought second-hand. *Id.*, Dkt. 55 ¶¶ 19–21. The button to accept the tickets is directly above the terms of use, which are shown in a contrasting color.



The plaintiffs were all on inquiry notice of these terms. And, as described below, they each manifested their assent multiple times.

### 1. *Leifer and Stevens*

Leifer created a Ticketmaster account on March 30, 2021. 24-CV-3994, Dkt. 57 ¶ 5. He signed into that account many times, most recently (before filing this lawsuit) on May 7, 2024. *Id.*, Dkt. 58 ¶ 5. He bought tickets directly from Ticketmaster at least three times. *Id.*, Dkt. 59 ¶ 6. Most recently, he bought tickets on March 28, 2024 for the "Wakaan Expansion Tour With Liquid Stranger" at The Fillmore Philadelphia. *Id.*

Stevens created three Ticketmaster accounts between 2015 and 2017. *Id.*, Dkt. 57 ¶¶ 7–9. She accepted at least 12 ticket transfers and bought tickets at least 30 times. *Id.*, Dkt. 59 ¶¶ 8–9. Most recently (before filing this suit), she bought tickets on May 3, 2024 for "Chelsea Handler: Little Big Bitch" at the Cobb Energy Performing Arts Center. *Id.*

Leifer and Stevens agreed to the terms of use each time they created an account, logged in, or bought tickets.

Though Leifer and Stevens argue that this is mere "speculat[ion]" about what they "would have seen," they offer no explanation of how they could have accessed Ticketmaster without going through these screens and agreeing to the terms of use. 24-CV-3994, Dkt. 60 at 4 (quotation marks omitted). And elsewhere, they implicitly concede that they went through these screens—at least to access tickets purchased on the secondary market. *See, e.g., id.* at 11 ("Under threat of complete loss of their tickets … Ticketmaster holds hostage Class members' property … unless Class members click the Accept Tickets Button.").

The only evidence offered against assent is that Leifer once claimed tickets purchased on the secondary market without first agreeing to Ticketmaster's terms. *Id.* at 7–8. He was able to do so by going through a secondary seller that did not observe Ticketmaster's terms of service. *Id.*, Dkt. 62 ¶ 3. Plaintiffs don't allege that this is a common practice or that it applies to any other transactions but this one. But it doesn't matter. Leifer agreed to the terms many other times, and so they apply to this transaction as well, as will be explained shortly.

### 2. *Jacobson*

Jacobson signed into his Ticketmaster account at least 46 times between July 2, 2021 and August 19, 2024. 24-CV-6538, Dkt. 46 ¶ 4. He bought tickets at least 16 times, most recently on May 9, 2024, for the "Chicago and Earth, Wind & Fire: Heart & Soul Tour 2024" at the Blossom Music Center. *Id.*, Dkt. 47 ¶¶ 4–5.

Jacobson doesn't contest that he accepted the terms of use. He instead argues that he wasn't on notice of New Era's rules because, even though the terms suggested that arbitration would be individualized, the rules include a mass-arbitration protocol. 24-CV-6538, Dkt. 50 at 19. For the reasons discussed further below, this argument ultimately isn't relevant because the mass-arbitration protocol will not apply to any arbitration.

## B. The parties' arbitration agreement covers these disputes

Leifer and Stevens argue that they didn't agree to arbitrate *this* dispute, even if they might have agreed to arbitrate other ones. They say that they didn't know that Ticketmaster was involved when they bought their tickets on the secondary market, and that they didn't agree to the terms until they tried to claim their tickets and it was already too late. 24-CV-3994, Dkt. 60 at 8. This argument fails because Leifer and Stevens agreed on other occasions to arbitrate virtually any dispute with defendants concerning any Ticketmaster tickets. The arbitration provision is worded expansively. It applies to:

> "[a]ny dispute, claim, or controversy relating in any way to the terms, your use of the site, or products or services sold, distributed, issued, or serviced by or though us—irrespective of when that dispute, claim or controversy arose." *Id.*, Dkt. 55-16 at 16.

The plain language of the contract sweeps broadly enough to cover the transactions at issue here, which were made on the secondary market. Plaintiffs don't dispute this argument, cite no authority to the contrary, and so forfeit any response. *See Piuggi v. Good For You Prods. LLC*, 739 F. Supp. 3d 143, 168 (S.D.N.Y. 2024).

Though it isn't raised in the briefing, the Court notes that the Second Circuit's decision in *Davitashvili v. Grubhub* doesn't change the outcome of this analysis. In *Davitashvili*, the Second Circuit held that an antitrust claim wasn't arbitrable because it didn't "arise out of" a transaction between the plaintiff and Grubhub, the defendant. *Davitashvili*, 131 F.3d at 119–20; *see also* 9 U.S.C. § 2 (requiring arbitration for "a controversy … arising out of such contract or transaction" that features the arbitration clause). That was because the plaintiff didn't allege that Grubhub was directly involved with any sale tainted by anticompetitive conduct. *Id.* at 119. Instead, the plaintiff's theory was that Grubhub's anticompetitive behavior caused restaurants to overcharge for meals that were sold *outside* of the Grubhub platform. *Id.* By that logic, the claim didn't "arise out of" any transaction between Grubhub and the plaintiff but instead from one between *a competitor* and the plaintiff.

That differs from this situation. Ticketmaster's covered activities are at the heart of this lawsuit. It sells tickets, and this is a dispute about the prices of those tickets. Each plaintiff used Ticketmaster to buy tickets at some point, be it from Ticketmaster itself or from a secondary market seller that originally bought the tickets from Ticketmaster. And on top of that, Ticketmaster delivers the tickets to its ultimate destination—the secondary market buyer. The use of Ticketmaster is intertwined with plaintiffs' claims. That differs starkly from Grubhub's dealings with a restaurant selling food to somebody who has never used Grubhub. *See id.* at 120. ("Plaintiffs who never used Grubhub are just as much class members as those who have.").

All that means that plaintiffs agreed to arbitrate all relevant claims here against defendants.

### III.    An arbitrator must decide whether the contract is enforceable

An agreement to arbitrate a dispute doesn't end the inquiry. The agreement might not be enforceable. An agreement may be found unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Potential reasons include "fraud, duress, or unconscionability." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation omitted). As the parties seeking to avoid arbitration, Leifer, Stevens, and Jacobson bear the burden of showing that the agreement is unenforceable. *Harrington*, 602 F.3d at 124. They all argue for unconscionability and Leifer and Stevens argue also for duress.

But there's a wrinkle. The contract's delegation clause gives the arbitrator "exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of this Agreement." 24-CV-3994, Dkt. 55-16 at 19. This is "clear and unmistakable evidence" that the parties delegated enforceability to the arbitrator, so the delegation clause is valid. *Henry Schein*, 586 U.S. at 72 (quoting *First Options*, 514 U.S. at 944); *see also Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *7 (C.D. Cal. Sept. 20, 2021) (examining the same language), *aff'd*, 60 F.4th 505 (9th Cir. 2023).

When "a contract contains a valid delegation to the arbitrator of the power to determine arbitrability, such a clause will be enforced *absent a specific challenge to the delegation clause by the party resisting arbitration.*" *Long v. Amway Corp.*, 306 F. Supp. 3d 601, 608 (S.D.N.Y. 2018) (quotation omitted); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71–72 (2010).

Only some of plaintiffs' arguments specifically challenge the delegation clause, and those arguments lack merit. So the arbitrator, not a court, should decide whether the dispute is arbitrable.

#### A. The Ninth Circuit's decision in *Heckman v. Live Nation*

Before proceeding, the Court notes that it isn't the first to address whether Ticketmaster's arbitration clause is enforceable under California law. In 2023, a customer brought a putative class action against Live Nation and Ticketmaster in California. The district court held that the arbitration agreement was unconscionable, *Heckman v. Live Nation*, 686 F. Supp. 3d 939 (C.D. Cal. 2023), and the Ninth Circuit affirmed. *Heckman v. Live Nation*, 120 F.4th 670 (9th Cir. 2024). The Ninth Circuit's decision rested on two bases. First, it held that the arbitration agreement was un-

9

conscionable under California law. *Id*. at 689. Second, it held that the agreement was independently unconscionable under California's *Discover Bank* rule against class action waivers in consumer contracts of adhesion. *Id.* at 689–90.

There are several important differences between the issues presented in *Heckman* and those here. First, New Era changed its rules shortly after the Ninth Circuit's decision. So while the decision is instructive in some respects, its persuasive effect carries only as far as the newer rules resemble the older ones. And second, the rules now before the Court have been narrowed in this litigation. Defendants have stipulated that two of the more controversial provisions in the rules will not apply in arbitration (the mass arbitration protocols and the asymmetric appeal provision). 24-CV-3994, Dkt. 92 at 3; 24-CV-6538, Dkt. 110 at 3.

The Court thus begins a fresh analysis, starting with the specific challenges made to the contract's delegation clause.

### B.  Only some of plaintiffs' arguments specifically challenge the delegation clause

#### 1.  *The Second Circuit's interpretation of* Rent-A-Center

In *Rent-A-Center*, the Supreme Court held that a plaintiff challenging a delegation clause must do so specifically. *Rent-A-Center*, 586 U.S. at 72. Challenging the arbitration agreement in its entirety isn't enough. *Id.* But the Court left open just how specific a plaintiff must be. *Id.* at 74 ("It may be that had [plaintiff] challenged the delegation provision by arguing that these common procedures as applied to the delegation provision rendered that provision unconscionable, the challenge should have been considered by the court."). In the intervening decade and a half, the Second Circuit has provided two bookends that clarify how much specificity is needed.

At one end, *Davitashvili* stands for what's not enough. It isn't sufficient to argue that "arbitration *in general* would be unconscionable," and pair that with a footnote stating that "[f]or the avoidance of doubt, [plaintiffs] challenge the validity of the delegation clause itself." *Davitashvili*, 131 F.4th at 118. That counsels against any reading of *Rent-A-Center* that would cabin its holding to the formality of whether plaintiffs uttered the right magic words. "Our precedents require something more: Plaintiffs must show why allowing an arbitrator—as opposed to a court—to decide the question of arbitrability would be unconscionable." *Id.*

The other bookend is *Gingras v. Think Finance, Inc.*, 922 F.3d 112 (2d Cir. 2019). There, the court encountered a payday-lending partnership typical of many "transparent attempts to deploy tribal sovereign immunity to skirt state and federal consumer protection laws." *Id.* at 126. As part of that scheme, the defendants "craft[ed] arbitration agreements … in which borrowers [were] forced to disclaim the application of federal and state law in favor of tribal law." *Id.* That was the theme of the plaintiffs' opposition to the motion to compel arbitration. They argued that the delegation clause was "the key to keeping the entire scheme from federal review." Opposition to Motion to Dismiss, Dkt. 85, *Gingras v. Rosette*, No. 15-CV-101 at 60 (D. Vt. Nov. 13, 2015). Once the case entered arbitration, the system was rigged. The arbitration was governed only by tribal law and decisions could be appealed only to tribal courts, which had "unfettered discretion" to

interpret tribal law however they wished.[1] *Gingras*, 992 F.3d at 128; *accord* Opposition to Motion to Dismiss, *Gingras v. Rosette*, No. 15-CV-101 at 60–61.

These cases yield a few principles. The first is formal. In *Davitashvili*, the plaintiffs offered only a single footnote that clarified that the general unconscionability analysis in the opinion applied also to the delegation clause. 131 F.4th at 118. Doing nothing more than incorporating analysis about the rest of the agreement isn't sufficient. The second principle is more functional. Arguments about the rest of the arbitration agreement may be relevant to the delegation clause if a plaintiff can explain how the clause's interaction with the rest of the agreement renders it unenforceable. But the plaintiff must actually do so.

With these principles in mind, the Court proceeds to analyze each of Leifer's, Stevens's, and Jacobson's arguments.

> 2. *Few of plaintiffs' arguments meet the requirements of* Rent-A-Center *and* Davitashvili

Leifer and Stevens don't argue that the delegation clause, specifically, is unconscionable. Yes, they name the delegation clause as the subject of their challenge. 24-CV-3994, Dkt. 60 at 18–19. But they don't advance any arguments unique to that clause; they instead reiterate the same arguments they make against the rest of the arbitration agreement. *Id.* Though the two pages that Leifer and Stevens devote to the delegation clause far exceed the footnote in *Davitashvili*, the arguments are not tethered to the delegation clause and instead restate grievances with the agreement as a whole. And, unlike the *Gingras* plaintiffs, Leifer and Stevens don't explain how the delegation clause interacts with the rest of the agreement. In fact, they take the opposite approach, arguing that "[t]he unconscionability of [the arbitration rules] renders Live Nation's delegation clause unenforceable, independent of the features and consequences of the delegation clause itself." *Id.* at 19. So Leifer and Stevens share a fate with the *Davitashvili* plaintiffs.

One of these insufficiently specific challenges merits further discussion, if only because of its potential consequences. The arbitration agreement has a class-action waiver. 24-CV-3994, Dkt. 55-16 at 15–16. Leifer and Stevens argue that the waiver makes the agreement unconscionable under California's *Discover Bank* rule. *See Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005). Under that rule, class-action waivers in arbitration agreements in consumer contracts of adhesion are unconscionable when they bar many low-dollar individual claims. *Id.* at 160–61. But Leifer and Stevens provide no explanation for why this is a problem specific to the delegation clause, rather than one that applies to the rest of the agreement. Unless the arbitrator is otherwise compromised in some way, she will be able to decide if the *Discover Bank* rule applies and if the

---

[1] Some language in *Gingras* might be read to endorse the broader principle that a plaintiff need but say "I challenge the delegation clause" in her complaint to satisfy *Rent-A-Center*. The Court declines to read it that way given *Davitashvili*, which clarifies that the bar must be higher than that. That's further supported by the underlying record in *Gingras,* which reflects that the plaintiffs made arguments far more specific to the delegation clause than those made in *Davitashvili*. *See, e.g.*, Opposition to Motion to Dismiss, Dkt. 85, *Gingras v. Rosette*, No. 15-CV-101 at 59–63 (D. Vt. Nov. 13, 2015).

dispute is arbitrable—just as the delegation clause ponders. (But, as described further below, the *Discover Bank* rule is preempted anyway by federal law in *this* case.)

Jacobson fares a bit better. Like Leifer and Stevens, he incorporates the arguments against the entire arbitration agreement; those are insufficiently specific to the delegation clause for the same reasons. But unlike Leifer and Stevens, Jacobson offers two arguments that are plausibly tailored to the delegation clause. Both turn on New Era, the alternative-dispute-resolution company that the contract picks out as the preferred arbitrator. 24-CV-6538, Dkt. 50 at 17–18.

*First*, Jacobson says that a New Era arbitrator faces a conflict of interest when adjudicating the arbitrability of the agreement. *Id.* at 17. If an arbitrator struck down the delegation clause, "he wouldn't just be dismissing the case before him. He would literally be ruling against his employer's … entire business model. He would be destroying New Era, and of course his own job along with it." *Id.* (quoting *Heckman*, 120 F.4th at 694 (VanDyke, J. concurring)). On top of that, he alleges that there isn't a process for revealing any conflicts, and, if any are found, New Era neutrals don't have to recuse. Oral Arg. Tr., 24-CV-3994, Dkt. 96, at 26:7–27:10. This is a specific challenge to the delegation clause.

*Second*, Jacobson mounts an argument in the style of *Gingras*. Relying on the record in *Heckman*, he points to a district court finding that New Era was financially dependent on defendants during its first year of business. 24-CV-3994, Dkt. 50 at 18. That, he says, coupled with coordination between defendants' lawyers and New Era, adds up to a serious conflict of interest. This argument mirrors the general shape of the Hotel-California scheme alleged in *Gingras*—once a plaintiff checks into arbitration she may never leave. True, Jacobson is not quite so explicit as the *Gingras* plaintiffs. *Compare id.* at 17–18 *with* Opposition to Motion to Dismiss, *Gingras v. Rosette*, No. 15-CV-101 at 60–61. But *Gingras* does not purport to create a floor. So this argument counts as a specific challenge to the delegation clause.

Although at oral argument plaintiffs pointed also to the mass-arbitration protocol and the lopsided appeal provision, those challenges weren't made with sufficient specificity either in the briefing or at argument. Even so, defendants have stipulated that neither provision would apply in arbitration and has consented to them being severed, per the contract's severability clause. 24-CV-3994, Dkt. 55-17 at 13–14 ("[I]f any part of these Terms is determined to be illegal, invalid, or unenforceable, you agree that: (a) that part shall nevertheless be enforced to the extent permissible in order to effect the intent of these Terms, and (b) the remaining parts shall be deemed valid and enforceable.").

In any event, Jacobson has gotten in the door to challenge the delegation clause on his arguments about conflict of interest and financial dependence. The next question is whether his arguments have merit.

### C. On the record in *this* case, Jacobson fails to show that the delegation clause is unconscionable

Under California law, the party challenging a contract must show both procedural and substantive unconscionability. *Baltazar v. Forever 21, Inc.*, 367 P.3d 6, 11 (Cal. 2016). Though both are needed, "they need not be present in the same degree." *Id.* Instead, there's a "sliding scale": "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required … and vice versa." *Id.*

Even assuming that he could demonstrate procedural unconscionability, Jacobson's arguments for substantive unconscionability are unpersuasive. Start with his conflict-of-interest argument. The basic theory is that New Era arbitrators would be hesitant to find that a dispute isn't arbitrable because it would hurt their employer, and so themselves. But as defendants point out, New Era's arbitrators aren't full-time employees but instead are contractors. Oral Arg. Tr., 24-CV-3994, Dkt. 96, at 5:21–25; 24-CV-6538, Dkt. 58-1 at 4 ("New Era ADR's Neutrals are non-exclusive, independent contractors of New Era ADR who all maintain their own independent arbitration, mediation, and/or legal business."). To be sure, discovery also revealed that some of New Era's arbitrators have ownership interests in New Era. 24-CV-6538, Dkt. 85 at 7. But the neutral having an ownership stake in the forum itself shouldn't present any conflict, *Pacelli v. Vane Line Bunkering, Inc.*, 549 F. Supp. 3d 306, 316–17 (S.D.N.Y. 2021), as long as the interest is "disclosed." *Monster Energy Company v. City Beverages, LLC*, 940 F.3d 1130, 1136 & n.2 (9th Cir. 2019) (noting also that "one-third of JAMS neutrals are owner-shareholders"). And the documents that Jacobson relies on indicate that this is exactly what New Era intended: to disclose any ownership interests, consistent with the Ninth Circuit's *Monster Energy* decision. 24-CV-6538, Dkt. 87-11 at 1. But that point ultimately matters little. Defendants have similarly agreed that no neutral with an ownership stake in New Era will be appointed to any of these cases. 24-CV-3994, Dkt. 92 at 3; 24-CV-6538, Dkt. 110 at 3. So the Court "decline[s] to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious, and impartial arbitrators." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 634 (1985).

Next, Jacobson's allegations of a corrupt scheme also fall flat. In broad strokes, the theory is that defendants, through their counsel (Latham & Watkins), is in cahoots with New Era. 24-CV-6538, Dkt. 50 at 4, 17–18. Jacobson suggests that Latham helped write New Era's rules. *Id.* at 4. And he points out that a large portion of New Era's revenue in its first year came from defendants. *Id.* at 18. Putting that together, Jacobson implies that defendants functionally control New Era by employing Latham, their law firm. But to support that, Jacobson cites only the district court in California that decided this issue along with the Ninth Circuit's opinion on appeal. That district court, after discovery, concluded that "while Plaintiffs allege Latham was involved in shaping New Era's Rules, they have not made any concrete showing to that effect." *Heckman*, 686 F. Supp. 3d at 958. And the Ninth Circuit didn't address this question on appeal. *Heckman*, 120 F.4th at 684 n.1.

13

This Court ordered limited discovery to determine whether there was anything to Jacobson's theory. After discovery, it's become clear that defendants are now but two of many New Era clients, and they account for a much smaller portion of New Era's revenue than they previously had. Even so, Jacobson now presses three additional "themes" that illustrate the closeness of the relationship between defendants, Latham, and New Era. These are: (1) that New Era has a "[c]orporate defendant-oriented business model," (2) that Ticketmaster was a "[k]ey start-up client," and (3) that the arbitration rules are "[c]ustom tailored" for defendants. 24-CV-6538, Dkt. 85, Schedule A, at i–iii. None of these documents points to anything untoward.

*First*, most of the documents that allegedly show a "defendant-oriented business model" are marketing materials that tout the efficiency of New Era compared with the court system. *Id.*, Dkts. 86-4 at 2, 5; 86-7; 86-8. In fact, they emphasize that "the goal should be that both parties have an opportunity to be heard and to get a fair, speedy and equitable result based on the merits of the case(s)." *Id.*, Dkt. 86-8. The only other document is an email from 2020 (a year before New Era launched) describing some type of arbitration system that could be a "means to counter the legal aid crisis, a means for low-income folks to have access to resolution of legal disputes even if they cannot afford an attorney." *Id.*, Dkt. 87-12 at 1–2. Jacobson's argument appears to be that New Era pivoted away from that vision, and instead toward corporate clients. But a business catering to business clients suggests nothing about the kind of corruption scheme Jacobson alleges.

*Second*, the documents purporting to show that Ticketmaster was a "key start-up client" don't show much beyond New Era trying to court clients. Some of these are emails to defendants that express exactly that sentiment. *Id.*, Dkt. 87-2 at 1, 3. Others are emails to Latham asking whether the law firm had other clients who might be interested in New Era's services and passing along its general terms and procedures. *Id.*, Dkts. 87-3; 87-4 at 1–2; 87-5. Nothing about any of these emails suggests that Latham was involved in authoring the rules, much less at defendants' behest. And at argument, Latham explicitly disclaimed that either Latham or defendants had any role in drafting the updated rules; plaintiffs didn't dispute that. Oral Arg. Tr., 24-cv-3994, Dkt. 96, at 8:19–23.

*Third*, the documents purporting to show that defendants influenced the rules also fall flat. One of these is a marketing document that describes subscription models with "highly customized pricing and protections tailored to the specific risk of each organization." 24-CV-6538, Dkt. 86-4. Another is an email to Latham pitching New Era's services and emphasizing that New Era is "nimble and … enjoy[s] crafting client-specific solutions for different needs." *Id.*, Dkt. 87-4 at 1. But there's no explanation of what those needs might be, nor anything to connect the dots between this somewhat generic outreach email and the specific allegation that Latham or defendants influenced the arbitration rules.

The rest of the documents are communications between New Era and Latham as they negotiated the contract between defendants and New Era. *Id.*, Dkts. 87-6; 87-7; 87-8; 87-9; 87-10. Each of these documents concerns the terms of the agreement between defendants and New Era, but none of them remotely suggests that Latham or defendants had input over New Era's arbitration *procedures*. The best document for Jacobson is an email exchange between New Era and Latham in which a draft version of New Era's rules was sent to Latham. *Id.*, Dkt. 87-6. This document shows

that while negotiating defendants' contract Latham saw a draft version of the rules. But it has no indicia that Latham *influenced* them in any way. In fact, an attorney from Latham replied asking when New Era expected "to send [them] the complete written rules." *Id.* at 1. What plaintiffs *don't* rely on is the contract itself between defendants and New Era. That's for good reason—it's a subscription agreement under which defendants pay a recurring fee and a per-case fee, but it has nothing that indicates any undue financial interest of defendants in New Era. 24-CV-3994, Dkt. 92-1.

Jacobson originally raised a serious concern that New Era's rules were tainted by Latham's involvement in drafting them. But now that there has been discovery, it's clear that this is but a phantom concern. So the Court concludes that there's no evidence of anything untoward.

### D. Leifer's and Stevens's duress arguments also fail

Leifer and Stevens argue that they shouldn't be bound by the contract because they signed it under duress. By their lights, their tickets were held hostage: They couldn't claim them after already paying for them unless they agreed to Ticketmaster's terms of service. The Court considers this argument at this stage because it's plausibly related to the delegation clause, as it taints contract formation to begin with. But the argument fails for two reasons.

*First*, plaintiffs agreed to the terms of use many times besides when they claimed their resold tickets. They did so when they logged into Ticketmaster or bought other tickets. And, as discussed earlier, the arbitration agreement is broad enough to cover this dispute. Whether plaintiffs properly agreed to arbitrate at the time that they claimed a specific ticket doesn't matter. They had already agreed many times over to arbitrate this case. So the duress argument just isn't relevant.

*Second*, losing out on a concert ticket isn't sufficient to show duress. Under California law, duress requires a "wrongful act" like the "assertion of a false claim, a bad faith threat to breach a contract, [or] a threat to withhold payment of an acknowledged debt." *Martinez-Gonzalez v. Elkhorn Packing Co.*, 25 F.4th 613, 621 (9th Cir. 2021) (applying California law). The bar is high. A "wrongful act" typically involves the withholding of some lawfully due payment or a threat of some sort. *See* 1 Corbin on California Contracts § 28.02[1]. And it must be "sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to agree to an unfavorable contract." *Martinez-Gonzalez*, 25 F.4th at 621. Not having a reasonable alternative means your other option is, for example, being "forced into bankruptcy, [suffering] financial ruin, or selling one's home." *Id.*

This case presents neither the requisite "wrongful act" nor the lack of any reasonable alternative. Start with the wrongful act. StubHub, not Ticketmaster, brokered the sale of Leifer's and Stevens's tickets. Yes, Ticketmaster requires users to accept its terms of use to access its platform and tickets. But in this case, *Ticketmaster* didn't withhold that fact during the initial sale, only to ambush plaintiffs afterward when they went to claim their tickets. The sale was instead brokered by *a third party* (StubHub), on that third party's terms. That differs from the typical duress setup, in which one party tries to change the terms of the deal on the other party by leveraging some threat—canonical examples of which include "[t]he assertion of a claim known to be false or a bad

15

faith threat to breach a contract or to withhold a payment." *Philippine Exp. & Foreign Loan Guarantee Corp. v. Chuidian*, 267 Cal. Rptr. 457, 466 (Ct. App. 1990). To be sure, "[a]ctionable duress may be found even when the duress is the result of actions of a third party." 1 Corbin on California Contracts § 28.02[6]. But in those cases, the cause of action is against the original contracting party (i.e. StubHub), not against the alleged source of duress (i.e. Ticketmaster).

And plaintiffs haven't shown that there was no reasonable alternative either. Losing out on a concert ticket falls far short of the examples provided in the caselaw. At argument, plaintiffs identified *Rich & Whillock, Inc. v. Ashton Dev., Inc.* as their best case on duress. 204 Cal. Rptr. 86 (Ct. App. 1984). But tellingly, that case involved a company on the brink of bankruptcy agreeing to give up tens of thousands of dollars that it desperately needed. *Id.* at 88. Again, losing out on a concert ticket falls far short of that, and plaintiffs do not point to any case in which a court applying California law found duress with stakes this low. To be clear, that doesn't necessarily leave plaintiffs without any recourse—if StubHub didn't properly warn them that they might have to comply with the terms of use of the primary ticket seller, they might have some legal recourse against StubHub. But having to agree to the terms of use of a primary ticket provider after you purchased tickets on the secondary market doesn't yield a duress defense against the primary ticket provider.

**IV.  Even if they clear *Rent-A-Center*, the rest of the arguments don't add up to unconscionability**

The above analysis is sufficient to grant the motions against Leifer, Stevens, and Jacobson to compel arbitration. But even if the plaintiffs' other arguments were sufficiently specific as to the delegation clause under *Rent-A-Center*, all roads lead to the same destination. These challenges mirror those that the Ninth Circuit heard in *Heckman*. But recall that New Era changed its rules after the *Heckman* decision "to address the issues" that it raised. 24-CV-3994, Dkt. 54 at 17; Dkt. 56 ¶¶ 6–7. The changes address the major problems identified by the Ninth Circuit and bring the terms within the realm of conscionability.

### A.  The relevant set of New Era rules is from 2024

Leifer and Stevens don't argue that the new rules are unconscionable. They instead argue that the older rules analyzed in *Heckman* apply instead. 24-CV-3994, Dkt. 60 at 17–18. That's because the rules specify that the version that's "in effect at the time a claim is filed with New Era ADR will govern" and no claim for arbitration has yet been filed. *Id.*, Dkt. 56-1 at 23. Their proposal is that the rules in place "at formation" should govern. 24-CV-3994, Dkt. 60 at 16 (citing *Pandolfi v. AviaGames, Inc.*, 2024 WL 4051754, at *5 (N.D. Cal. Sept. 24, 2024)). But that's puzzling when Leifer and Stevens both agreed to the terms of use in May 2024, *after* the old rules were nixed and replaced with the new ones. 24-CV-3994, Dkt. 58 ¶ 5 (Leifer), ¶¶ 7–9 (Stevens); Dkt. 56 ¶ 5 (date that rules took effect). So even under their theory, the Court would consider the updated rules.

Though the rules at issue in *Heckman* certainly don't apply, it's less obvious which set of newer rules is the right one. There are two options. The first is the version of New Era's rules from May 2024, when the record supports that Leifer, Stevens, and Jacobson all agreed to the terms of use.

16

The second is a newer set from August 2024 that defendants suggest applies. 24-CV-6538, Dkt. 45 ¶ 6 ("Attached … [is] the August 22, 2024 version of the Rules (at issue in this case)."). In any event, this distinction makes no difference. The relevant clauses of two versions of the rules are virtually identical, as defendants conceded at oral argument. Oral Arg. Tr., 24-CV-3994, Dkt. 96, at 19:6–8.

### B.  The new rules address many of the issues that motivated *Heckman*

The new rules differ meaningfully from the old ones. And faced with a different record and different arguments, this Court reaches a different conclusion from that in *Heckman.* Here, the Court addresses plaintiffs' remaining arguments as the Ninth Circuit did in *Heckman*—by assuming that they suffice as specific challenges to the delegation clause. Under this lens, the Court analyzes *all* of plaintiffs' arguments for unconscionability as applied to the delegation clause, even if they weren't made in a sufficiently specific manner under *Rent-A-Center.*

#### 1.  The mass arbitration protocol and appeal provisions will not apply in arbitration

Defendants have stipulated that two of the more controversial provisions in the new rules will not apply in any arbitration among the parties. 24-CV-3994, Dkt. 92 at 3; 24-CV-6538, Dkt. 110 at 3. These are the mass arbitration protocol and the asymmetric appeal provision. As such, if these cases go to arbitration, they won't apply and can be severed from the agreement.[2]

#### 2.  The remaining procedures aren't procedurally unconscionable

Procedural unconscionability turns on "the circumstances of contract negotiation and formation." *OTO, LLC v. Kho*, 447 P.3d 680, 690 (Cal. 2019) (citation omitted). The two relevant factors are "oppression and surprise." *Patterson v. ITT Consumer Fin. Corp.*, 18 Cal. Rptr. 4th 563, 565 (Ct. App. 1993). Oppression involves "no real negotiation of contract terms because of unequal bargaining power." *Id.* "Surprise involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (quotation marks omitted).

The features that the Ninth Circuit relied on to find procedural unconscionability haven't changed much with the newer rules. There were four problems that supported its holding: (1) the agreement is a contract of adhesion and Ticketmaster has enormous bargaining leverage (supporting oppression); (2) the agreement can be changed with retroactive effect (surprise); (3) the

---

[2] Of course, to some degree the concession on the mass arbitration protocol makes little difference in this case. Putting aside the *Rent-A-Center* specificity issue, the protocol is triggered only when *five or more* cases are brought together. 24-CV-3994, Dkt. 56-1 at 5. At argument, plaintiffs' counsel could represent only that these three plaintiffs would be involved with any arbitration. Oral Arg. Tr., 24-CV-3994, Dkt. 96, at 40:10–19. So, even if the mass arbitration protocol were not severed, it is not clear that it would be relevant.

changes can be made unilaterally (surprise); and (4) the agreement misleadingly suggests that arbitration will be individual, but instead mass-arbitration protocols might apply (surprise). *Heckman*, 120 F.4th at 681–83.

Of these, the first, second, and third all continue to apply—defendants don't contest that.[3] Each supports some procedural unconscionability. *Id.* at 682 ("[G]iven Defendants' market dominance in the ticket services industries," a contract of adhesion almost amounts to saying "accept [the] terms or … be entirely foreclosed from purchasing tickets on the primary market."). However, the Court puts less weight on defendants' ability to unilaterally change the contract with retroactive effect than did the Ninth Circuit. That's because any changes to the terms themselves aren't unilateral; a customer still must click or sign in again to accept them. And even though changes to New Era's rules are possible without further assent, plaintiffs fail to show that defendants control or influence those changes. And plaintiffs don't provide any reason to think that retroactivity is especially problematic for the delegation clause (as opposed to for the rest of the agreement to arbitrate). As to the fourth feature, mass arbitration wouldn't apply, so it isn't relevant.

That means there's some amount of procedural unconscionability involved in this arrangement, but less than the Ninth Circuit found in *Heckman*. *See* 120 F.4th at 683.

### 3. The substance of the new rules is very different than the rules examined in Heckman

The changes have more bite for the substantive unconscionability analysis. The Ninth Circuit found four problems with New Era's rules that rendered them substantively unconscionable. These were: (1) the "mass arbitration protocol" that bundled claims together, (2) the limited procedural rights afforded to litigants, (3) a right of appeal that functioned asymmetrically, and (4) arbitrator-selection provisions that favored defendants. *Heckman*, 120 F.4th at 683–87. Separately, the court found that the class-action waiver was independently unconscionable, which was an alternate ground for affirmance. *Id.* at 689–90. Putting the mass arbitration protocol and appeal provision aside for the reasons discussed, here's how the Ninth Circuit characterized it all:

- *Limited procedural rights*: The rules provided "no right to discovery" and limited complaints to 10 pages. *Id.* at 685. The "evidentiary record and initial briefing [was] limited to 10 documents, subject to limited exceptions." *Id.* And closing briefs were limited to around five pages. *Id.* That was a problem because "'[t]he denial of adequate discovery in arbitration proceedings leads to the de facto frustration of' statutory rights." *Id.* (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 683 (Cal. 2000)).

- *Arbitrator selection*: A single neutral is chosen by both parties through a symmetrical "rank/strike process." *Heckman*, F. 4th at 678. But ultimately that mattered little because New Era could "replace a neutral at its sole discretion." *Id.*

---

[3] Jacobson argues that the rug was pulled out from under him when New Era changed its rules after *Heckman*. That illustrates the potential for unilateral change, but Jacobson fails to argue that these changes in any way prejudiced him.

- *Class-action waiver*: The terms of use have a class-action waiver. 24-CV-6538, Dkt. 44-10 at 16. Under the waiver, the parties agreed to "bring claims against each other only in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." *Id.* That, the Ninth Circuit held, was barred by California's *Discover Bank* rule when coupled with the mass-arbitration protocol. *Heckman*, 120 F.4th at 689.

The newer rules remedy many of these problems. What's left is fairly typical for arbitration of this sort, especially when uncoupled from the mass arbitration protocols or appeal provisions. For example:

- *Limited procedural rights*: The new rules get rid of the prior limitations and now include an explicit right to discovery. 24-CV-6538, Dkt. 45-2 at 14–15 (May 2024 rules); Dkt. 45-5 at 22–24 (August 2024 rules). And the prior limitations on the allowed quantity of evidence were also removed. *Id.*, Dkt. 45-2 at 16 (May 2024 rules); Dkt. 45-5 at 24–25 (August 2024 rules). In their place, the arbitrator has flexibility to "determine the appropriate limits on the amount of evidence, briefing, and argumentation based on the complexity" of the lawsuit. *Id.* (both sets of rules).

- *Arbitrator selection*: The sweeping language that granted New Era the authority to replace the arbitrator "at its sole discretion" was removed. In its place is a more restrictive procedure: If a party objects to the neutral and New Era agrees to disqualify her, then—instead of having "sole discretion" to replace the neutral—New Era will "replace the Neutral with the next-ranked Neutral" from the rank and strike process. 24-CV-6538, Dkt. 45-2 at 12 (May 2024 rules); Dkt. 45-5 at 19 (August 2024 rules).

With these changes in mind, the Court proceeds to the question whether the new rules are substantively unconscionable.

### C. Plaintiffs fail to show substantive unconscionability

Leifer, Stevens, and Jacobson don't challenge many of the new rules. Leifer and Stevens challenge only the old rules—so they have forfeited every argument but those against the asymmetric appeal system and class-action waiver, which remain the same in both versions. Jacobson mounts more of a challenge. Though he doesn't address any of the new features of the arbitrator-selection provision, he argues against the new mass-arbitration protocol. *Id.*, Dkt. 50 at 13–14 ("The same arbitrator selection procedure remains in effect and is still substantively unconscionable" (capitalization altered)); 14–17 (disputing the new mass-arbitration procedure). That whittles down how many challenges plaintiffs haven't forfeited. What's left standing is Jacobson's challenge to the mass-arbitration protocol and all plaintiffs' challenges to the appeal provision and class-action waiver. *See Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int. Ltd.*, 283 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) ("Arguments not raised in a party's brief are deemed waived").

19

The mass-arbitration and asymmetric appeal arguments are moot given that defendants have stipulated that those procedures won't apply. So that leaves only a challenge to the class-action waiver. But Jacobson's challenge to that waiver is precluded by Supreme Court precedent.

As stated earlier, the Supreme Court of California held in *Discover Bank* that class-action waivers in arbitration agreements in consumer contracts of adhesion are unconscionable when they bar many low-dollar individual claims. 113 P.3d 1100 (Cal. 2005). To get around federal preemption, it reasoned that "the FAA is silent on the matter of class actions and class action arbitration," and that "[t]he Congress that enacted the FAA … cannot be said to have contemplated" the issue. *Id.* at 1110. The U.S. Supreme Court disagreed. It held that "California's *Discover Bank* rule is preempted by the FAA." *Concepcion*, 563 U.S. at 352. The problem, it elaborated, was that the *Discover Bank* rule didn't "place arbitration agreements on an equal footing with other contracts, [or] enforce them according to their terms." *Id.* at 339 (citations omitted). It instead created a "defense[] that appl[ied] only to arbitration" as a practical matter. *Id.* at 339–43. If people agree to arbitrate individually, the Court held, the FAA protects that decision. After all, the Court's "cases place it beyond dispute that the FAA was designed to promote arbitration." *Id.* at 345.

In *Heckman*, the Ninth Circuit held that the FAA doesn't preempt the *Discover Bank* rule when a plaintiff would be subjected to mass arbitration (which the court concluded was not contemplated by the FAA when it was enacted). 120 F.4th at 689–90; *see also* 120 F.4th at 692 (VanDyke, J., concurring). That holding is of course not binding on this Court. But even if the Court were to find it persuasive, it wouldn't apply in this case, since defendants have waived the mass-arbitration protocol. And since Jacobson makes no argument why the remaining New Era procedures would fall outside of the FAA's scope, *Concepcion* says that the *Discover Bank* rule is preempted. This challenge therefore fails.

## CONCLUSION

For these reasons, defendants' motions to compel arbitration in these actions are GRANTED and the cases will be STAYED pending the conclusion of those proceedings.

The Clerk of Court is directed to terminate Dkt. 53 in 24-CV-3944 and Dkt. 42 in 24-CV-6538 and to stay these cases.

SO ORDERED.

Dated: June 29, 2026
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge

20