# Exhibit  9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| UNITED STATES OF AMERICA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>and TICKETMASTER L.L.C.,<br><br>Defendants. | Case No. 1:24-cv-03973-AS |

<u>JOINT PROPOSED JURY INSTRUCTIONS</u>

Pursuant to Rule 51(a) of the Federal Rules of Civil Procedure and the Court's Individual

Practices in Civil Cases, Paragraph D, Plaintiffs the United States of America ("United States"), the

States of Arizona, Arkansas, California, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa,

Kansas, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New

Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Rhode

Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia,

Wisconsin, and Wyoming, the Commonwealths of Massachusetts, Pennsylvania, and Virginia, and

the District of Columbia, acting by and through their respective Attorneys General (collectively,

"Plaintiff States"), together with Defendants Live Nation Entertainment, Inc., and Ticketmaster

L.L.C. (collectively, "Defendants"), respectfully request that the Court provide the following

instructions to the jury. For those instructions where the parties could not reach agreement, Plaintiffs

and Defendants have separately set forth their proposed instruction together with short arguments,

including citations to supporting authority.

1

# Contents

**Preliminary Instruction No. 1** ........................................................................ 10

**OPENING INSTRUCTIONS** ........................................................................ 10

**Preliminary Instruction No. 2** ........................................................................ 15

**PROVINCE OF JUDGE AND JURY** ........................................................ 15

**Preliminary Instruction No. 3** ........................................................................ 16

**JURY CONDUCT** ........................................................................................ 16

**Preliminary Instruction No. 4** ........................................................................ 19

**BURDEN OF PROOF** .................................................................................. 19

**Preliminary Instruction No. 5** ........................................................................ 20

**EVIDENCE IN THE CASE** .......................................................................... 20

**Preliminary Instruction No. 6** ........................................................................ 21

**DIRECT AND CIRCUMSTANTIAL EVIDENCE** ...................................... 21

**Preliminary Instruction No. 7** ........................................................................ 23

**WHAT IS NOT EVIDENCE** ........................................................................ 23

**Preliminary Instruction No. 8** ........................................................................ 25

**EVALUATING EVIDENCE** ........................................................................ 25

**Preliminary Instruction No. 9** ........................................................................ 27

**NOTES** ........................................................................................................ 27

**Preliminary Instruction No. 10** ...................................................................... 29

**SUMMARY OF CONTENTIONS** ................................................................ 29

**Preliminary Instruction No. 11** ................................................................. 35

**PURPOSE OF THE ANTITRUST LAWS** ..................................................... 35

**Preliminary Instruction No. 12** ................................................................. 37

**OVERVIEW OF APPLICABLE LAW** ......................................................... 37

**Preliminary Instruction No. 13** ................................................................. 41

**STIPULATION OF FACT** ........................................................................... 41

**Preliminary Instruction No. 14** ................................................................. 42

**OUTLINE OF TRIAL** .................................................................................. 42

**Post-Instruction No. 1** ................................................................................ 45

**GENERAL INTRODUCTION** ..................................................................... 45

**Post-Instruction No. 2** ................................................................................ 46

**THE PARTIES** ............................................................................................. 46

**Post-Instruction No. 3** ................................................................................ 49

**EVIDENCE IN THE CASE** ......................................................................... 49

**Post-Instruction No. 4** ................................................................................ 50

**WITNESS CREDIBILITY** ........................................................................... 50

**Post-Instruction No. 5** ................................................................................ 52

**USE OF DEPOSITIONS AS EVIDENCE** ................................................... 52

**Post-Instruction No. 6** ................................................................................ 53

**EXPERT TESTIMONY** ............................................................................... 53

Post-Instruction No. 6P .................................................................................. 54

IMPEACHMENT—INCONSISTENT STATEMENT OR CONDUCT ..................................... 54

Post-Instruction No. 7 .................................................................................... 55

SUMMARY OF CONTENTIONS ................................................................... 55

Post-Instruction No. 8 .................................................................................... 60

BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE ......................................... 60

Post-Instruction No. 9 .................................................................................... 61

MONOPOLIZATION ELEMENTS ................................................................ 61

Post-Instruction No. 10 .................................................................................. 64

RELEVANT MARKET—GENERAL ............................................................. 64

Post-Instruction No. 11 .................................................................................. 67

RELEVANT PRODUCT MARKET ............................................................... 67

Post-Instruction No. 12 .................................................................................. 72

RELEVANT GEOGRAPHIC MARKET ......................................................... 72

Post-Instruction No. 13 .................................................................................. 75

MONOPOLIZATION—MONOPOLY POWER ................................................ 75

Post-Instruction No. 14 .................................................................................. 76

EXISTENCE OF MONOPOLY POWER—DIRECT PROOF ............................. 76

Post-Instruction No. 15 .................................................................................. 79

EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF ......................... 79

Post-Instruction No. 16 ........................................................................................ 83

MONOPOLIZATION: MAINTAINING MONOPOLY POWER THROUGH

ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT ........................................ 83

Post-Instruction No. 16P ...................................................................................... 89

ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXAMPLES ............... 89

Post-Instruction No. 16P2 .................................................................................... 93

ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—OVG AGREEMENTS ............... 93

Post-Instruction No. 17 ........................................................................................ 94

ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING -

SHERMAN ACT SECTION 2 ............................................................................... 94

Post-Instruction No. 17P ...................................................................................... 97

PROCOMPETITIVE BENEFITS ............................................................................ 97

Post-Instruction No. 17P2 .................................................................................... 98

BALANCING THE COMPETITIVE EFFECTS ...................................................... 98

Post-Instruction No. 18 ........................................................................................ 99

EXCLUSIVE DEALING—SHERMAN ACT SECTION 1 ....................................... 99

Post-Instruction No. 19 ...................................................................................... 104

UNLAWFUL TYING .......................................................................................... 104

Post-Instruction No. 20 ...................................................................................... 107

UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS ................................ 107

Post-Instruction No. 21 ...................................................................................... 108

**UNLAWFUL TYING—PROOF OF CONDITIONING**............................................................. 108

**Post-Instruction No. 22** ...................................................................................................110

**UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT** ........................110

**Post-Instruction No. 23** ...................................................................................................112

**UNLAWFUL TYING—NO DUTY TO DEAL [PLAINTIFFS' PROPOSED ALTERNATIVE VERSION]** ...........................................................................................................................112

**Post-Instruction No. 24** ...................................................................................................116

**STATE LAW CLAIMS** .....................................................................................................116

**Post-Instruction No. 25** ...................................................................................................117

**CONGRUENT STATE CLAIMS** .....................................................................................117

**Post-Instruction No. 26** .................................................................................................. 124

**CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)** ....................................................................................................................... 124

**Post-Instruction No. 27** .................................................................................................. 129

**FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT  (FLA. STAT. § 501.204)** ........................................................................................................................... 129

**Post-Instruction No. 28** .................................................................................................. 133

**ILLINOIS ANTITRUST ACT (740 ILCS 10/1 *ET SEQ.*)** ........................................... 133

**Post-Instruction No. 29** .................................................................................................. 136

**KANSAS RESTRAINT OF TRADE ACT  (KAN. STAT. ANN. § 50-101 *ET SEQ.*)** ............... 136

**Post-Instruction No. 30** ................................................................................................ 138

**NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1602)**................. 138

**Post-Instruction No. 31** ................................................................................................ 140

**DONNELLY ACT (NEW YORK GENERAL BUSINESS LAW §§ 340 *ET SEQ.*)**................. 140

**Post-Instruction No. 32** ................................................................................................ 142

**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10 ET SEQ.)** ............................................................................................................................... 142

**Post-Instruction No. 33** ................................................................................................ 145

**TENNESSEE TRADE PRACTICES ACT (TENN. CODE ANN. §§ 47-25-101 AND 102)** ... 145

**Post-Instruction No. 33P** .............................................................................................. 147

**VERMONT CONSUMER PROTECTION ACT (9 V.S.A. § 2451 ET SEQ.)**........................ 147

**Post-Instruction No. 34** ................................................................................................ 149

**STATES DAMAGES CLAIMS AND CAUSATION** .......................................................... 149

**Post-Instruction No. 35** ................................................................................................ 152

**INJURY AND CAUSATION** ............................................................................................ 152

**Post-Instruction No. 36** ................................................................................................ 156

**DAMAGES INSTRUCTIONS—GENERAL** ..................................................................... 156

**Post-Instruction No. 37** ................................................................................................ 158

**COMPENSATORY DAMAGES—OVERCHARGE** .......................................................... 158

**Post-Instruction No. 38** ................................................................................................ 160

**TIME PERIOD FOR ANY DAMAGES: STATUTE OF LIMITATIONS** ............................... 160

**Post-Instruction No. 39** ................................................................................. 162

**BASIS FOR CALCULATING DAMAGES** ..................................................... 162

**Post-Instruction No. 39P** ............................................................................... 163

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200 ET SEQ.)** ............... 163

**Post-Instruction No. 40** ................................................................................. 166

**FINAL INSTRUCTIONS** ............................................................................... 166

*DUTY TO DELIBERATE/UNANIMOUS VERDICT* ..................................... 166

*SELECTION OF FOREPERSON* ................................................................... 167

*RETURN OF VERDICT* .................................................................................. 167

*JUROR OATH* ................................................................................................. 167

**Preliminary Instructions**

**Preliminary Instruction No. 1**

## OPENING INSTRUCTIONS

We are about to begin trial of the case you heard about during the jury selection. The case is now officially on trial. I would like to begin with some brief instructions about how the case is going to proceed.

To begin with, all of you are here to administer justice in this case according to the law and the evidence. You are to perform this task with complete fairness and impartiality and without bias or prejudice or sympathy for or against Plaintiffs or Defendants.

During the trial you will hear me use a few terms that you may not have heard before. Let me briefly explain some of the most common to you. The parties who sue are called the Plaintiffs. In this action, the Plaintiffs are the United States, 39 individual States, and the District of Columbia. The parties being sued are called the Defendants. In this action, the Defendants are Live Nation Entertainment, Inc. and Ticketmaster L.L.C. Live Nation is the parent company of Ticketmaster, its wholly-owned subsidiary.

You will sometimes hear me refer to "counsel." "Counsel" is another way of saying "lawyer" or "attorney." I will sometimes refer to myself as the "Court."

When I "sustain" an objection, I am excluding that evidence from this trial for a good reason. When you hear that I have "overruled" an objection, I am permitting that evidence to be admitted.

When I say "admitted into evidence" or "received into evidence," I mean that you may consider this particular statement or the particular exhibit in making the decisions you must make at the end of the case.

By your verdict, you will decide disputed issues of fact. I will decide all questions of law that arise during the trial. Before you begin your deliberation at the close of the case, I will instruct you in more detail on the law that you must follow and apply.

Because you will be asked to decide the facts of this case, you should give careful attention to the testimony and evidence presented. Keep in mind that I will instruct you at the end of the trial about determining the credibility or "believability" of the witnesses. During the trial you should keep an open mind and should not form or express any opinion about the case until you have heard all of the testimony and evidence, the lawyers' closing arguments, and my instructions to you on the law.

While the trial is in progress, you must not discuss the case in any manner among yourselves or with anyone else. In addition, you should not permit anyone to discuss the case in your presence. You should avoid reading any news articles that might be published about the case. You should also avoid watching or listening to any television or radio comments or reading comments on the internet about the trial.

From time-to-time, I may make rulings on objections or motions made by the lawyers. It is a lawyer's duty to object when the other side offers testimony or other evidence the lawyer believes is not admissible. You should not be biased or partial against a lawyer or the lawyer's client because the lawyer has made objections. If I sustain or uphold an objection to a question that goes unanswered by the witness, you should not draw any inferences or conclusions from the question. You should not infer or conclude from any ruling or other comment I may make that I have any opinions on the merits of the case favoring one side or the other. I do not favor one side or the other.

The lawyers are not allowed to speak with you during this case. When you see the lawyers at a recess or pass them in the halls and they do not speak to you, they are not being rude or unfriendly; they are simply following the law.

During the trial, it may be necessary for me to talk with the lawyers out of your earshot about questions of law or procedure. Sometimes, you may be excused from the courtroom during these discussions. I will try to limit these interruptions as much as possible.

11

**Plaintiffs' Authority**: Adapted Federal Jury Practice and Instructions, Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, Nadine Jean Wichern (6th ed.), (hereinafter "Fed. Jury Prac. & Instr."), § 101:01; Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 1-2, 1:23-cv-00771-AS (S.D.N.Y.).

**Plaintiffs' Position**: Plaintiffs propose the language used for preliminary jury instructions in the *Nike, Inc. v. Lululemon USA Inc.* case. The stylistic edits suggested by Defendants are not necessary for this instruction.

Plaintiffs object to Defendants' request that the Court provide the legally incorrect instruction that, as a self-described "vertically integrated" parent and wholly owned subsidiary, they should be treated—as a matter of law—as separate entities rather than as a single entity. Defendants propose similar language in Preliminary Instruction 10 and Post-Instruction 2. Plaintiffs have proposed different language in those later instructions that correctly states the law:

> Under the antitrust laws, a parent and its wholly owned subsidiary are viewed as a single entity with a complete unity of interest. For purposes of making your decision on liability in this case, you should consider Live Nation and Ticketmaster as a single company.

In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court overturned "a long-settled rule" permitting Section 1 Sherman Act antitrust liability for "intra-enterprise" coordinated conduct between a parent and its wholly owned subsidiary. *Id.* at 777, 784. In doing so, however, the Court held that "[a]ny anticompetitive activities of [such enterprises] meriting antitrust remedies may be policed adequately without resort to an intra-enterprise conspiracy doctrine" as "the enterprise is fully subject to § 2 of the Sherman Act." 467 U.S. at 776-77. The *Copperweld* Court reasoned that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary" (emphasis added). *Id.* at 771-72. Significant to the dispute here, the Court also barred the consideration of multi-factor tests to determine whether corporate entities could be considered a "single entity" "[a]s applied to a wholly owned subsidiary" because such a test is "inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct." *Id.* at 772 n. 18 (noting that "[a]t least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act" because "[t]hey cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary *must* be viewed as a single economic unit") (emphasis added).

Courts have been near uniform in applying this rule in antitrust cases. *See, e.g., Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 58 (1st Cir. 2002) (Boudin, J.) (explaining that it is settled law under *Copperweld* that a "parent and its wholly owned subsidiary . . . share[ ] a 'complete unity of interests'") (quoting *Copperweld*, 467 U.S. at 771); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (explaining that the *Copperweld* "[c]ourt saw an identity of economic interest between a parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding

12

them as one [because] [a]ny claimed instance of truly 'independent,' owner-hostile, subsidiary decisionmaking would meet with the skeptical question, 'But, if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?' Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective"); *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 978-79 (2d Cir. 1984) (post-*Copperweld*, attributing without discussion subsidiaries' activities and market shares to parent corporation for purposes of Clayton Act merger analysis).

Defendants' reliance on a smattering of non-antitrust cases and some out-of-circuit, inapposite antitrust cases do not support a deviation from *Copperweld* here. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) (discussing "general principle[s] of corporate law" in the context of CERCLA); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) (considering a franchisee's efforts to collect an arbitral breach-of-contract award against a franchisor's parent company); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (considering liability of a parent company that purchased defendant company, which was already engaging in Section 1 conspiracy with co-defendants); *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) (declining to consider a non-insurance company "as an insurance company on the same horizontal level as [co-defendant insurance companies] merely because [non-insurance] company happens to be the wholly owned subsidiary of [a parent company] which owns other subsidiaries which are insurance companies"). Other cases cited by Defendants undercut their position here. *See, e.g.*, *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018) (finding parent and subsidiary should be treated as a single entity for purposes of Sherman Act claim and chastising defendants for trying to "have the *Copperweld* doctrine both ways [by] insist[ing] both (1) that two affiliates are incapable of conspiring with each other for purposes of Section 1 of the Sherman Act because they 'always' share a 'unity of purpose,' and (2) that one affiliate may escape liability for its own conduct . . . by disavowing the anticompetitive intent of the other, even where the two acted together" because "*Copperweld* 'foreclose[d]' a result that would allow sophisticated companies to evade Section 2 liability by spreading anticompetitive schemes over multiple affiliates").

Finally, even assuming arguendo that Defendants' cited authorities were applicable to the facts and circumstances here—they are not—Plaintiffs will present evidence at trial that Live Nation is "involved" in the alleged conduct of its wholly owned subsidiary, such that they should be considered a single entity even under a more restrictive test. Notably, Defendants request a separate instruction premised on their "vertical integration," claiming that their existence as a single entity provides a defense to liability, while insisting through this instruction that they be treated as entirely separate entities as a matter of law. This charge should be denied as legally and factually baseless and likely to confuse the jury.

**Defendants' Authority:**  Federal Jury Practice and Instructions, Kevin F. O'Malley, Jay E. Grenig, Hon. William C. Lee, Nadine Jean Wichern (7th ed.) ("Fed. Jury Prac. & Instr.") § 101:01; *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 1-2, 1:23-cv-00771-AS (S.D.N.Y.); *United States v. Bestfoods*, 524 U.S. 51, 61 (1998); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993); *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) ("Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary 'even where there is no evidence that both were involved in the challenged conduct.'" (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999))); *id.*

13

("[C]ourts continue to find a parent liable only when it was directly involved in the anticompetitive conduct." (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018))); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) (dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "the claims against the corporate parent defendants" for failure to allege "facts sufficient to infer . . . direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012).

**Defendants' Argument:**

*First paragraph.*  Defendants' proposed sentence from the model federal jury instructions more accurately captures what information will be provided to the jury in the Court's preliminary instructions.  Moreover, it avoids saying "[t]he case is now officially on trial" directly after "[w]e are about to begin trial," as that may be confusing to the jury.

*Second paragraph.*  Defendants' edits to this paragraph eliminate the terms "Plaintiffs" and "Defendants," which have not yet been explained to the jury as part of these instructions.  They also eliminate the words "administer justice."  Defendants object to that phrase as it is prejudicial and confusing in a case involving the U.S. Department of Justice and related State agencies.

*Last paragraph.*  Given the length and complexity of this trial, Defendants' proposed sentence from the model federal jury instructions bears inclusion in the Court's opening instructions to ensure that the jury understands the importance of the case and that it may seem to proceed slowly at times.

**Preliminary Instruction No. 2**

## PROVINCE OF JUDGE AND JURY

After all the evidence has been heard and arguments and instructions are finished, you will meet to make your decision. You will determine the facts from all the testimony and other evidence that is presented. You are the sole and exclusive judges of the facts. I must stress that you must accept the rules of law that I give you, whether or not you agree with them.

The law permits me to comment on the evidence in the case during the trial or while instructing the jury. Such comments are only expressions of my opinion as to the facts. You may disregard these comments entirely, because you are to determine for yourself the weight of the evidence and the credibility of each of the witnesses.

**Plaintiffs' Authority**: Adapted Fed. Jury Prac. & Instr. § 101:10 (6th ed.); Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 2-3, 1:23-cv-00771-AS (S.D.N.Y.).

**Plaintiffs' Position**: Plaintiffs propose the language used for preliminary jury instructions in the *Nike, Inc. v. Lululemon USA Inc.* case. The stylistic edits to that language proposed by Defendants are not necessary for this instruction.

**Defendants' Authority**: Adapted Fed. Jury Prac. & Instr. § 101:10; Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 2-3, 1:23-cv-00771-AS (S.D.N.Y.).

**Defendants' Argument:**

Defendants' addition makes express important points that otherwise might be missed by the jury: that (1) it is not up to the jury to determine the law, and (2) the Court will determine the law and provide it to the jury.

15

**Preliminary Instruction No. 3**

## JURY CONDUCT

To ensure fairness, you must obey the following rules:

1.      Do not talk with your fellow jurors about this case or about anyone involved with this case until the end of the trial when you go to the jury room to decide on your verdict.

2.      Do not communicate with anyone else about this case or about anyone involved with this case until the trial has ended and you have been discharged as jurors. "Anyone else" includes members of your family and your friends. When I say no communicating about the case, I mean no communicating in any way, whether in writing, through e-mail, text message, blog, social media, apps, etc. Whatever it is, don't communicate about the case. Please remember that these restrictions are about all kinds of communications, even those that aren't directed at a particular person or group. A communication like a blog post or a Facebook post or a tweet can be shared to an ever-expanding circle of people, and that could have an unexpected impact on the trial. For example, a post that you may make to your social media account might be viewable by a witness who is not supposed to know what has happened in the courtroom before he or she has testified. It might be viewable by somebody else in the public who is interested in the case. For these reasons, you must inform me immediately if you learn about or share any information about the case outside of the courtroom, even if it's by accident, or if you discover that another juror has done so. You can tell your family and friends and coworkers that you are a juror in a civil case. But don't tell them anything else about it until you have been discharged by me. If you like, you can tell them that Judge Subramanian has ordered you not to discuss the case. That's because I am ordering you not to discuss the case.

3.      Outside the courtroom, do not let anyone tell you anything about the case, or about

anyone involved with it until the trial has ended. If someone should try to talk to you about the case during the trial, you must immediately report that to Mr./Ms. _____ and no one else. When I say no one else, that means other members of the jury as well. Please let Mr./Ms. _____ know, and we will handle it.

To minimize the possibility of any improper communications of any type, I am going to ask that you go straight to the jury room that Mr./Ms. _____ has already shown you when you get here in the morning. I am going to ask that you remain in the jury room to the extent that you reasonably can throughout the course of the trial day. You should use the bathrooms in the jury room rather than the bathrooms on this or any other floor. You are not supposed to use the cafeteria. Given that our morning and afternoon breaks are going to be short, it's probably just best that you remain in the jury room, if you can. That way we can move along faster because we won't have to track any one of you down.

4.      During the trial you should not talk with or speak to any of the parties, lawyers or witnesses involved in this case—you should not even pass the time of day with any of them. It is important not only that you do justice in this case, but that you also give the appearance of doing justice.

5.      Do not read any news stories or articles about the case, or about anyone involved with it, or listen to any radio or television reports about the case or about anyone involved with it.

6.      Do not do any research, such as checking dictionaries, or make any investigation about the case on your own.

7.      Do not make up your mind during the trial about what the verdict should be. Keep an open mind until after you have gone to the jury room to decide the case and you and the other jurors have discussed all the evidence.

8.    If you need to tell me something, simply give a signed note to Mr./Ms. _____ to give to me.

All of this is because, as I've told you already, your decision in this case must be made solely on the basis of the evidence that's presented in this courtroom along with the instructions on the law that I'm going to provide to you. All that you need to know is going to be presented to you in this courtroom.

Please inform me immediately if you learn of another juror's violation of any of these instructions. Also, it's possible that somebody that you know may come into the courtroom. It's unlikely, but it's a public space. If somebody that you should happen to know comes into the courtroom, again, please just let Mr./Ms. _____ know so that we can deal with it.

**Plaintiffs' Authority:** Adapted Fed Jury Prac. & Inst. §§ 101:11, 101:13 (6th ed.); Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 3-5, 1:23-cv-00771-AS (S.D.N.Y.).

**Plaintiffs' Position**: Plaintiffs propose the language used for preliminary jury instructions in the *Nike, Inc. v. Lululemon USA Inc.* case. The stylistic edits proposed by Defendants are not necessary for this instruction. Additionally, Plaintiffs do not agree with Defendants' suggested edits to numbered paragraphs 2 and 8, where Defendants deleted references to jurors informing the Court if another juror violates the Court's rules. To protect the integrity of the process, Plaintiffs believe the Court should instruct the jury here as it did in *Nike, Inc. v. Lululemon USA Inc*.

**Defendants' Authority:** Adapted Fed Jury Prac. & Instr. §§ 101:11, 101:13; Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 3-5, 1:23-cv-00771-AS (S.D.N.Y.).

**Defendants' Argument:**

Defendants moved up the rationale for the jury conduct rules from the end of this instruction to the beginning in order to (1) emphasize that the jury's decision must be based only on evidence and law presented in the courtroom, and (2) help the jury understand the importance of and reasons for the rules before they are provided.

**Preliminary Instruction No. 4**

**BURDEN OF PROOF**

There is one standard of proof that you will apply to the evidence, a preponderance of the evidence. A preponderance of the evidence means that the fact that is to be proven is more likely true than not, that is, that the evidence in favor of that fact being true is sufficient to tip the scale, even if slightly, in its favor. This standard is different from what you may have heard about in criminal proceedings where a fact must be proven beyond a reasonable doubt.

**Plaintiffs' Authority:** Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 9, 1:23-cv-00771-AS (S.D.N.Y.); Adapted Fed. Jury Prac. & Instr. §104:01; *Dukes v. Schuck*, 637 F. App'x 37, 39 (2d Cir. 2016)) ("[T]he court should instruct the jury that it is to conclude that a fact has been proven by a preponderance of the evidence if it finds that the scales tip, however slightly, in favor of the party with the burden of proof as to that fact." (quoting *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992)).

**Plaintiffs' Position**: Plaintiffs have proposed a straightforward instruction based on the cited authorities that briefly explains the preponderance standard. Defendants' proposed instruction fails to include language that even "slightly" tipping the scales is sufficient under the preponderance standard (despite similar language appearing in the source Defendants cite here). Defendants' proposal is also confusing, to the extent it can be read to suggest that Plaintiffs must prevail on every element of every claim in order to win on any one of them. Finally, Defendants' additional proposed paragraph is duplicative of subsequent instructions identifying the scope and nature of evidence.

**Defendants' Authority:**  Adapted Fed. Jury Prac. & Instr. §104.01.

**Defendants' Argument:**

Defendants object to Plaintiffs' burden of proof instruction, which does not even specify who has the burden of proof in this case.  *Nike, Inc. v. Lululemon USA Inc.*'s formulation of the burden of proof does not work here because unlike in that case, Defendants have no burden of proof in this case.  *See* Preliminary Jury Instructions at 9, 1:23-cv-00771-AS (S.D.N.Y.); Final Jury Instructions at 6, 1:23-cv-00771-AS (S.D.N.Y.).  It is thus important to make clear to the jury at the outset that Defendants are not required to prove anything.  Plaintiffs' failure to do so risks prejudicing Defendants by giving the jury the misimpression that Defendants are required to make a particular evidentiary showing.

Additionally, Defendants object to Plaintiffs' watered down description of the preponderance of the evidence standard.  Plaintiffs fail to make clear that they must prove every element of their claims by a preponderance of the evidence.  And their "tip the scale, even if slightly" language does not appear in the model instructions for any court of appeals.  *See* Notes, Fed. Jury Prac. & Instr. § 104:01. Defendants' proposal tracks verbatim the model federal jury instruction on preponderance of the evidence.

**Preliminary Instruction No. 5**

## EVIDENCE IN THE CASE

The evidence in the case will consist of the following:

1.    The sworn testimony of the witnesses, no matter who may have called a witness.

2.    All exhibits received in evidence, regardless of who may have produced the exhibits.

3.    All facts that may have been judicially noticed and that you must take as true for purposes of this case.

Depositions may also be received in evidence. Depositions contain sworn testimony, with the lawyers for each party being entitled to ask questions. In some cases, a deposition may be played for you on videotape. Deposition testimony may be accepted by you, subject to the same instructions that apply to witnesses testifying in open court.

Statements and arguments of the lawyers are not evidence in the case, unless made as an admission or stipulation of fact. A "stipulation" is an agreement between both sides that certain facts are true. When the lawyers on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence, and regard that fact as proven.

I may take judicial notice of certain facts or events. When I declare that I will take judicial notice of some fact or event, you must accept that fact as true.

If I sustain an objection to any evidence or if I order evidence stricken, you must entirely ignore that evidence, and not consider it in rendering your decision.

Some evidence is admitted for a limited purpose only. When I instruct you that an item of evidence has been admitted for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

**Authority:** Adapted Fed. Jury Prac. & Instr. § 101:40 (6th ed); Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 5-6, 1:23-cv-00771-AS (S.D.N.Y.).

**Preliminary Instruction No. 6**

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

Now, some of you probably have heard the terms "circumstantial evidence" and "direct evidence." So let me just say a couple of words about each of those things now. Direct evidence is direct proof of a fact, such as the testimony of an eyewitness.

Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. The word "infer" or the expression "to draw an inference" means to find that a fact exists from proof of another fact. An inference is only to be drawn if it is logical and reasonable to do so, not by speculation or guesswork.

In deciding whether to draw an inference, you must look at and consider all of the facts that you have seen and heard in light of reason, common sense, and your experience. Whether a given inference is or is not to be drawn is entirely a matter for you, the jury, to decide. Circumstantial evidence does not necessarily prove less than direct evidence, nor does it necessarily prove more.

Let me just give you an example to help you think about the difference between direct and circumstantial evidence. So assume that when you came into the courthouse this morning the sun was shining, and it was a nice day outdoors.

Also assume that, as they are, the courtroom blinds were drawn and you could not look outside. Assume further that as you're sitting here somebody walks into the courtroom with an umbrella that was dripping wet, and then a few minutes later somebody else walks into the courtroom with a raincoat that was also dripping wet. Now, because you could not look outside the courtroom and could not see whether it was raining, you would have no direct evidence of that fact. But on the combination of the facts that I've asked you to assume about the wet umbrella and the wet raincoat, it would be reasonable and logical for you to conclude that it was raining outside.

21

That is all that there is to circumstantial evidence. You infer on the basis of your reason, your experience, and your common sense from one established fact the existence or the nonexistence of some other fact.

I am going to give you more instructions on all of this at the end of the case, but for now just keep in mind that you are to consider all of the evidence given at this trial.

**Plaintiffs' Authority:** Adapted Fed. Jury Prac. & Instr. §§ 101:01, 101:42 (6th ed.); Adapted 9th Circuit Manual of Model Civil Jury Instruction 1.12 (2025 ed.); Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 6-7, 1:23-cv-00771-AS (S.D.N.Y.); *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).

**Plaintiffs' Position:** Plaintiffs have proposed a straightforward instruction based on the cited authorities that briefly but clearly explains the difference between direct and circumstantial evidence. Defendants' proposal largely deletes the explanation of circumstantial evidence, including the example of circumstantial evidence offered by this Court in *Nike, Inc. v. Lululemon USA Inc*. This example is helpful to illustrate this potentially foreign concept to the jury. Additionally, Defendants' proposed instruction strikes a standard reference to jurors' ability to rely upon their reason, experience, and common sense in weighing and considering the evidence, notwithstanding the cited jury practice manual, this Court's instructions in *Nike, Inc. v. Lululemon USA Inc.*, and established Second Circuit precedent. *See United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008) ("Furthermore, jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences.").

**Defendants' Authority:** Fed. Jury Prac. & Instr. § 101.42.

**Defendants' Argument:**

Defendants' proposal tracks verbatim the model federal jury instruction on direct and circumstantial evidence. Defendants object to inclusion of the example, which suggests to jurors that observations they make outside or inside this courtroom generally—including observations based on things that are not properly evidence, such as sworn testimony or admitted exhibits—may be considered as evidence in this case.

**Preliminary Instruction No. 7**

## WHAT IS NOT EVIDENCE

Now, I have just given you an overview of things that are evidence, but certain things are not evidence and must not be considered by you as evidence. The following is a list of things that are not evidence: First, statements and questions by the lawyers are not evidence. Also, statements that I may make or any questions that I may ask of a witness are not evidence. And arguments by the parties are also not evidence.

Second, if I instruct you that some piece of evidence is accepted for a limited purpose only, you must follow that instruction.

Third, testimony that I have excluded or that I may ask you to disregard is not evidence and must not be considered. Frequently, I'll do that by asking that a portion of a witness's testimony be stricken. When I do that, I'm excluding that evidence, and you are to disregard it.

Fourth, anything that you may have seen or heard outside of the courtroom is not evidence and must be disregarded. You are to decide the case based solely on the evidence that's presented here in the courtroom.

**Plaintiffs' Authority:** Adapted Fed. Jury Prac. & Instr. §101:44 (6th ed.); Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 7-8, 1:23-cv-00771-AS (S.D.N.Y.).

**Plaintiffs' Position:** Plaintiffs propose the language used for preliminary jury instructions in the *Nike, Inc. v. Lululemon USA Inc.* case. The edits suggested by Defendants are not necessary for this instruction. Additionally, Defendants' proposed insertion could be interpreted by the jury as requiring them to completely disregard their common sense and experience when evaluating the evidence in this case, which is contrary to Second Circuit precedent. *See United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008) ("Furthermore, jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences."); *Matthews v. Barr*, 927 F.3d 606, 619 (2d Cir. 2019) ("neither is a jury required to leave its common sense at the courthouse door").

**Defendants' Authority:** Adapted Fed. Jury Prac. & Instr. §101.44; Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 7-8, 1:23-cv-00771-AS (S.D.N.Y.).

**Defendants' Argument:**

23

Defendants' addition that "personal experience is not evidence" reinforces to the jury that its decision must be based only on evidence presented in this courtroom.  Inclusion of this sentence is necessary to eliminate any prejudice or bias jurors may have developed against Defendants through their personal experiences with Defendants' services.

**Preliminary Instruction No. 8**

## EVALUATING EVIDENCE

Now, how do you decide what to believe and what not to believe? There's no formula to evaluate evidence. For now, just suffice it to say that you bring into this courtroom all of the experience and background of your lives. Don't leave your common sense outside of the courtroom. The same kind of tests that each of you use in your everyday dealings are exactly the tests that you should apply in deciding how much weight, if any, to give to the evidence in this case. For example, in considering the testimony of any witness, you may take into account the witness's opportunity and ability to see or hear or know the things that the witness testified about, the quality of the witness's memory, the witness's appearance and manner while testifying, any bias or prejudice the witness may have, other evidence that may have contradicted the witness's testimony and the reasonableness of the witness's testimony in light of all of the evidence.

The weight of the evidence does not necessarily depend on the number of witnesses who testify. The law does not require you to accept all of the evidence admitted at trial. In determining what evidence you wish to accept, you must make your own evaluation of the testimony from each of the witnesses and the exhibits that I will receive into evidence.

It is essential, however, that you keep an open mind until you have heard all of the evidence in the case. That's because a case can only be presented step by step, witness by witness. And as I am sure all of you know from experience, you can have one person give his or her version of an event, and it sounds very impressive or even very compelling, and yet upon hearing another person's version of the same event or in this context maybe even the same person being cross-examined about the same event, things may seem very different. In other words, there may be another side to any witness's story.

So the thing that I would ask is that you use your common sense and your good judgment

25

to evaluate each witness's testimony based on all of the circumstances. Again, I can't emphasize too strongly how important it is that you keep an open mind until the trial is over. You should not reach any conclusions until all of the evidence is before you.

**Plaintiffs' Authority:** Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 8-9, 1:23-cv-00771-AS (S.D.N.Y.).

**Plaintiffs' Position**: Plaintiffs propose the language used for preliminary jury instructions in *Nike, Inc. v. Lululemon USA Inc.* to explain generally how evidence should be evaluated. Defendants' proposed addition of "weighing credibility" in the first paragraph incorrectly cabins this instruction to an evaluation of credibility. However, this instruction is broader than weighing credibility, addressing for example, inconsistent testimony across witnesses and the overall balance of the evidence. Defendants also propose adding an instruction related to the labelling of exhibits. Plaintiffs do not think it is necessary to provide this instruction as Preliminary Instruction No. 5 already tells jurors to consider exhibits "regardless of who may have produced the exhibits."

**Defendants' Authority:** Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 8-9, 1:23-cv-00771-AS (S.D.N.Y.).

**Defendants' Argument:**

Given that the parties have not jointly numbered the exhibits, it is important to make clear to the jury that the exhibits' numbering scheme does not indicate anything about the weight an exhibit should be given.

**Preliminary Instruction No. 9**

**NOTES**

You are permitted to take notes during the trial. Mr./Ms. _____ has given each of you a binder and pen. The binder includes pages for you to take notes in. Now, if you do take notes, please begin writing on the second blank page in each of these binders. On the first page just put your juror number. So, Juror No. 1, you would just write 1 in a circle or however you want to designate it, but put your juror number on the first page so we can make sure that only you will be making and reviewing the notes that are made in that binder. If you do take notes, do so only in these binders.

Now, we are giving you all pages to take notes, but you do not need to take notes. Notes are just an aid to your own recollection. You do not need to take them. Remember, too, that if you use any notes, they are for your use only and they are only to be used as an aid for each of your memories. It is your memory that controls.

The other thing that I would suggest is that if you decide to take notes, don't get so caught up in writing down notes that you don't focus on the testimony or other evidence that's being presented. Now, once you are in your deliberations, if there is a disagreement between one juror's notes and another juror's notes or between one juror's notes and another juror's memory, you can always ask for the court reporter to read back the transcript or for us to send back a portion of the transcript, for it's the official court transcript that controls and not any particular juror's notes.

Now, during the course of the trial, exhibits are going to be received into evidence. They will be marked by an exhibit number. If there is an exhibit that you are particularly interested in seeing, please write it down in your notes.

At the end of the trial as you begin your deliberations, if there is an exhibit that you would

like to review, we can provide it to you in the jury room.

**Authority:** Adapted *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 9-10, 1:23-cv-00771-AS (S.D.N.Y.).

**Preliminary Instruction No. 10**

## SUMMARY OF CONTENTIONS

To help you follow the evidence, I will now give you a summary of the positions of the parties.

This is a lawsuit brought by the United States of America, 39 individual States, and the District of Columbia, against Live Nation Entertainment, Inc. and its wholly-owned subsidiary Ticketmaster L.L.C. Under the antitrust laws, a parent corporation and its wholly-owned subsidiary are viewed as a single company with a complete unity of interest. For purposes of making your decision on liability in this case, you should consider Live Nation and Ticketmaster as a single company.

When I refer to the United States, the 39 States, and the District of Columbia as a group, I will use the term "Plaintiffs." When I am referring only to the individual states and the District of Columbia together, I may use the term "Plaintiff States." Many of the Plaintiff States are also suing on behalf of the residents of their States who attend live events and who have allegedly been harmed by Defendants' conduct.

When I refer to Live Nation and

Ticketmaster together, I will use the term "Defendants."

This case involves claims by the United States and the Plaintiff States that Defendants have illegally monopolized or otherwise unlawfully impeded competition in various markets related to music and comedy shows in the live entertainment industry.

The Plaintiffs allege that Defendants monopolized the following markets:

1.    Primary concert ticketing services to major concert venues (primary concert ticketing): in this market, the Defendants sell ticketing services to venues for concerts.

2.    Primary ticketing services (primary ticketing) to major concert venues: in this market Defendants sell ticketing services to venues for all different types of events.

3.    Primary concert ticketing offered to fans at major concert venues (fan ticketing): in this

market Defendants sell concert tickets and related services to fans.

    4.    Use of large amphitheaters by artists (amphitheaters): in this market Defendants sell access to large amphitheaters to artists who want to perform in amphitheaters.

    5.    Concert booking and promotion services to major concert venues (venue booking services): in this market Defendants sell services to venues to help them book and promote shows.

    6.    Promotion services to artists performing in major concert venues (artist promotion services): in this market Defendants sell promotion services to artists.

Plaintiffs allege that Defendants' conduct has harmed competition in each of these markets, and thereby harmed artists, venues, and ticket-buying fans.

Plaintiffs have also alleged that Defendants engaged in illegal exclusive dealing by entering into exclusive primary ticketing contracts with venues that foreclosed competition by other ticketing companies.

Finally, Plaintiffs have alleged that Defendants illegally tied artists' use of Defendants' promotion services to use of large amphitheaters owned or controlled by Defendants.

Defendants have denied these allegations.

Your job will be to decide whether or not the Defendants have illegally monopolized or otherwise unlawfully impeded competition or competed unfairly. If you decide that Defendants have illegally monopolized or otherwise unlawfully impeded competition, you will then need to decide whether any money damages or monetary recovery should be awarded to Plaintiff States as compensation for any unlawful conduct.

In addition to damages, Plaintiffs are seeking other remedies that will be decided by the Court at a later date, if you find Defendants liable on one or more claims. Plaintiffs may, for example, ask the Court to order Live Nation to sell Ticketmaster, open its amphitheaters to artists promoted by non-

Live Nation promoters, stop using exclusive ticketing contracts with venues, or sell some of its amphitheaters. However, you are not responsible for determining whether any of those remedies is needed or appropriate at this time.

**Plaintiffs' Authority**: Am. Compl. (ECF No. 257); Answer (ECF No. 498); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 776-77 (1984) (overturning precedent permitting intra-enterprise conspiracy claims on ground that "[a]ny anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately . . . [because] the enterprise is fully subject to Section 2 of the Sherman Act"); *id.* at 771-72 (explaining that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . [and] in reality a parent and a wholly owned subsidiary always have a 'unity of purpose or a common design.' They share a common purpose whether or not the parent keeps a tight rein over the subsidiary" (emphasis added)); *id.* at 772 n. 18 (rejecting use of a multi-factor test to determine whether a parent corporation and a wholly owned subsidiary are a single entity because, "[a]s applied to a wholly owned subsidiary, the so-called 'single entity' test is thus inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct . . . At least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act. The factors simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary *must* be viewed as a single economic unit.") (emphasis added); *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 57-58 (1st Cir. 2002) (Boudin, J.) (explaining that it is settled law under *Copperweld* that a "parent and its wholly owned subsidiary . . . share[] a 'complete unity of interests,'" (quoting *Copperweld*, 467 U.S. at 771)); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (applying *Copperweld* in the Robinson-Patman context, and explaining that the *Copperweld* "Court saw an identity of economic interest between parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one [because] [a]ny claimed instance of truly 'independent,' owner-hostile, subsidiary decisionmaking would meet with the skeptical question, 'But, if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?' Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective").

**Plaintiffs' Position:** Plaintiffs have proposed a neutral statement of the case that outlines the basic facts of the litigation, succinctly summarizes Plaintiffs' claims as set forth in the Amended Complaint, and provides a preview of Defendants' defenses. By contrast, Defendants' proposed instruction conceals basic details about the parties in the case, misstates Plaintiffs' allegations, and injects advocacy around Defendants' potential defenses. For example, in the paragraph that begins, "Plaintiffs allege," Defendants incorrectly state the allegations Plaintiffs made in the Amended Complaint, which allege that Live Nation, in conjunction with its wholly-owned subsidiary, Ticketmaster, has monopolized three primary ticketing markets. Am. Compl. at 85.

Defendants also assert that Live Nation and Ticketmaster must be treated as separate entities for purposes of liability. For the reasons set forth above for Preliminary Instruction No. 1, Plaintiffs assert that Live Nation and Ticketmaster should be treated as a single economic entity under applicable antitrust law.

Defendants' proposed instruction (both here and scattered throughout the remaining instructions) likewise impermissibly renames the markets alleged by Plaintiffs, which is likely to confuse the jury. First, the venues that fall within certain of Plaintiffs' alleged markets are not "*Plaintiffs'* 257 venues" or "*Plaintiffs'* 87 amphitheaters." Plaintiffs do not own any of the venues at issue. Second, Plaintiffs have alleged markets based on "major concert venues" and "large amphitheaters," and will put forward both industry evidence and economic analyses to support those markets. When instructing the jury on Plaintiffs' allegations, the instruction should match the terminology that Plaintiffs will use at trial. Ultimately it will be up to the jury to decide whether the plaintiffs have met their burden to establish any relevant markets. If that burden is met, the jury can decide the appropriate boundaries of those markets. *See United States v. Cont'l Can Co.*, 378 U.S. 441, 457 (1964) (finding a relevant market that was not "pressed upon the District Court" by either party).

Defendants' rewrite of Plaintiffs' exclusive dealing and tying claims incorrectly narrows those claims to individual Defendants. It also injects significant advocacy rather than providing straightforward details on Defendants' potential defenses, and is based on incorrect statements of the relevant law, as discussed in connection with Post-Instruction Nos.23 and 24. With respect to the Section 1 tying instruction in particular, also referenced in Post-Instruction No. 24, Defendants cite *Jefferson Parish* as support for incorrectly stating a heightened standard for Plaintiffs to meet. As the Supreme Court explained, "the essential characteristic of [the] invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or *might* have preferred to purchase elsewhere on different terms." 466 US. 2, 12 (1984) (emphasis added). Contrary to Defendants' proposed instruction, Plaintiffs need not show that the purchaser of the tied product would have purchased the tied product elsewhere, but rather that they might have preferred to do so.

Defendants also strike Plaintiffs' reference to certain of the Plaintiff States' pursuing claims on behalf of State residents. 24 of the 39 states are pursuing damages under 15 U.S.C. § 15c in their *parens patriae* capacities. A brief, neutral reference to this fact provides helpful context to the jury for evidence of damages they will hear at trial.

**Defendants' Authority:**   ECF No. 257 (Am. Compl.); ECF No. 498 (Answer); ECF No. 724 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the

ability to compete merely because it did not receive an invitation to bid; where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts); *Paddock Publ'ns v. Chi. Tribune*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."); *Ticketmaster v. Tickets.com*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract.").

**Defendants' Argument:**

*First*, Defendants object to Plaintiffs' use of the terms "major concert venues" and "large amphitheaters" here and throughout these instructions. This terminology is prejudicial and misleading because it gives the jury the misimpression that as a factual matter, there is industry recognition and acceptance of distinct categories of venues called "major concert venues" and "large amphitheaters" when, in fact, Plaintiffs have attached those terms to sets of venues Plaintiffs curated for this litigation. See ECF No. 724 at 16-19 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment).

A key element Plaintiffs must prove in this case is whether the sets of venues they label as "major concert venues" and "large amphitheaters" are proper antitrust markets. By implying to the jury that "major concert venues" and "large amphitheaters" constitute recognizable and accepted categories of venues outside of this litigation when those terms are creations of Plaintiffs' experts specifically for this litigation, Plaintiffs seek to improperly preference their experts and assuage their burden to prove relevant antitrust markets. Further, Plaintiffs' inclusion of these advocacy-laden terms conceals the fact that the categories denoted by these terms exclude many venues—*e.g.*, with respect to "major concert venues," amphitheaters and arenas below 8,000 capacity, amphitheaters and arenas that hosted nine or fewer concerts each year from 2017 to 2024, and stadiums.

Defendants' terminology—"Plaintiffs' 257 venues" and "Plaintiffs' 87 amphitheaters"—is accurate and properly neutral. It indicates to the jury that in Plaintiffs' view, the relevant markets are limited to 257 venues and 87 amphitheaters, without suggesting that those 257 venues or 87 amphitheaters are a recognizable and accepted category of venues as a matter of commercial reality.

*Second*, Defendants object to Plaintiffs' one-sided narrative in this instruction that details their allegations without elaborating on Defendants' positions with respect to those allegations.

*Third*, Defendants object to Plaintiffs' treatment of Live Nation and Ticketmaster "as a single company" here and throughout these instructions. It is a "deeply ingrained" principle of corporate law "that a parent corporation . . . is not liable for the acts of its subsidiaries" or vice versa. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). That is because "a parent corporation and its subsidiary are regarded as legally distinct entities," "a contract under the corporate name of one is not treated as that of both," and one cannot be held liable for the acts of the other unless the stringent requirements for "piercing the corporate veil" are satisfied. *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993). Plaintiffs have never alleged any veil piercing theory in this case. It is far too late for them to try to do so now (and doing so would be futile in any event). Plaintiffs must prove their claims against each Defendant separately.

Plaintiffs assert that *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), justifies their maneuver. That is wrong. *Copperweld* considered the "intra-enterprise conspiracy doctrine" and held only that a parent company "and its wholly owned subsidiary [] are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." 467 U.S. at 758, 777. Plaintiffs have not alleged any intra-enterprise conspiracy between Live Nation and Ticketmaster. Nor have they cited any on-point authority suggesting that *Copperweld* displaces the traditional rule of corporate separateness absent such an allegation. *Fraser v. Major League Soccer, LLC* discussed *Copperweld* only in its standard context—that of a Section 1 claim involving a "supposed conspiracy." 284 F.3d 47, 56 (1st Cir. 2002). And *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft* discussed *Copperweld* in the disparate context of the Robinson-Patman Act to determine whether a parent company and subsidiary selling the exact same product may be considered a "single seller." 19 F.3d 745, 748-49 (1st Cir. 1994). That is not relevant here.

Moreover, courts have expressly declined to follow the approach advocated by Plaintiffs here. "Courts have declined to extend *Copperweld* to allow § 1 liability for both a parent and its subsidiary '[] where there is no evidence that both were involved in the challenged conduct.'" *In re Outpatient Medical Center Employee Antitrust Litig.*, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022) (quoting *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999)). And "courts continue to find a parent liable only when it was directly involved in the anticompetitive conduct," and thus is being held liable for its own conduct, not that of its subsidiary. *Id.* (citing *Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 633 (9th Cir. 2018)); *see also In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688-89 (E.D. Pa. 2009) (dismissing claims against corporate parents); *McCray v. Fidelity Nat'l Title Ins. Co.*, 636 F. Supp. 2d 322, 334 (D. Del. 2009) (dismissing "claims against the corporate parent defendants" for failure to allege "facts sufficient to infer . . . direct involvement"), *aff'd*, 682 F.3d 229 (3d Cir. 2012).

*Fourth*, Defendants object to Plaintiffs' discussion of remedies that are not at issue in this jury trial for the same reasons explained in Defendants' motion in limine on this matter. ECF No. 1019 at 16-17 (Memorandum of Law in Support of Defendants' Motions in Limine). Those remedies have no bearing on the jury's task of determining liability and damages, and their mention is likely to confuse jurors and prejudice Defendants. *Id.*

**Preliminary Instruction No. 11**

## PURPOSE OF THE ANTITRUST LAWS

Plaintiffs allege that the Defendants violated the Sherman Act as well as various state laws.

The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace. The Sherman Act rests on the central premise that competition produces the best allocation of our economic resources, the lowest prices, the highest quality of goods and services, and the greatest material progress.

Section 1 of the Sherman Act outlaws agreements that unreasonably restrain trade or harm competition. Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." An unreasonable restraint of trade in interstate commerce exists when any contract, combination, or conspiracy unreasonably interferes with the open market's ordinary freely-competitive pricing or distribution systems.

Section 2 of the Sherman Act outlaws monopolization and states: "It is illegal to monopolize or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

**Plaintiffs' Authority**: Adapted ABA Model Jury Instructions in Civil Antitrust Cases ("ABA Model Instr.") 1.A; *Northern Pac. Ry. v. United States*, 356 U.S. 1, 4 (1958) (Sherman Act is a "comprehensive charter of economic liberty" aimed at "preserving free and unfettered competition" on the presumption that unrestrained competitive forces lead to the best allocation of economic resources); *United States v. Thomas*, No. 08-CR-063 (E.D. Ok. Aug. 13, 2009), ECF No. 108, Instructions at 21 (Section 1); *Epic Games v. Google*, 3:20-cv-05671 (N.D. Cal. Dec. 6, 2023), ECF No. 592, Instruction No. 15 "Antitrust Laws—Purpose."

**Plaintiffs' Position**: Plaintiffs proposal incorporates the ABA model instruction and substantially quotes the relevant provisions of the Sherman Act verbatim. By contrast, Defendants' proposal adds additional qualifiers to the statutory language. Furthermore, Defendants' proposed paragraph beginning with, "The Sherman Act protects," fails to accurately capture the relevant law and is likely to confuse the jury, especially at this preliminary stage, without additional clarification and explanation. Defendants assert "*as a general matter*, the Sherman Act does not restrict the long-

35

recognized right of a business to freely exercise its own judgment as to parties with whom it will deal." But Plaintiffs' claims here are not based upon Defendants' refusal to deal with competitors, and as Defendants' proposed instruction implicitly recognizes there are critical exceptions to the stated rule. *See United States v. Colgate*, 250 U.S. 300, 307 (1919) ("*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (emphasis added)); *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951) ("The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. . . . The right claimed by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985) ("The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified."); *Viamedia Inc. v. Comcast Corp.*, 951 F.3d 429, 454 (7th Cir. 2020) ("Yet there are 'limited circumstances' under which a monopolist's refusal to deal with another party will be illegal anticompetitive conduct."); *Verizon Commc's, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 408 (2004) ("Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate Section 2"); *Pac. Bell Tel. Co. v. Linkline Commc's*, 555 U.S. 438, 448 (2009) ("There are also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability.") .

**Defendants' Authority:**  ABA Model Jury Instructions in Civil Antitrust Cases ("ABA Model Instr.") 1.A, 1.B, 3.A.1; 15 U.S.C. §§ 1, 2; *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 19, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir. 1998) ("The Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market . . . ."); *id.* at 97 (Section 2 of the Sherman Act prohibits "willfully acquir[ing] or maintain[ing] [monopoly] power"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").

## Defendants' Argument:

Defendants object to quoting the Sherman Act because doing so adds unnecessary complexity at this stage of the case and might be misleading or confusing to the jury without appropriate explanation and context.  For instance, the plain text of Section 2 states that it is "illegal to monopolize," but without context, that might give the jury the misimpression that mere possession of monopoly power is unlawful.  *Contra Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.").  Defendants' description of Sections 1 and 2 accurately describes what those provisions prohibit without introducing unnecessary detail that is misleading or irrelevant to this case.

**Preliminary Instruction No. 12**

## OVERVIEW OF APPLICABLE LAW

In deciding the issues I just discussed, you will be asked to consider specific legal standards. I will give you an overview of those standards now and will review them in more detail before the case is submitted to you for your verdict.

*Monopolization:* The first issue you will be asked to decide is whether Defendants have unlawfully monopolized any of the six markets that I just described in violation of Section 2 of the Sherman Act. Monopolization will be assessed for each market separately. Defendants may be found liable for monopolization as to one market but not as to another.

There are several requirements that must be met to show that Defendants illegally monopolized a market. I will explain the elements to you in detail at the end of the case, but in general: to prove monopolization, Plaintiffs must prove that Defendants possessed monopoly power, which is the power to control prices or exclude competition, and committed anticompetitive acts. In general, an anticompetitive act is something, other than competition on the merits, that has the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the market. By contrast, competition on the merits includes developing more efficient processes, developing the ability to sell profitably at lower prices, and innovation that creates new products or improves product quality, all of which benefit consumers. Plaintiffs allege that Defendants engaged in a variety of anticompetitive conduct including, but not limited to:

- Conditioning or threatening to condition the provision of Live Nation content on a venue's use of Ticketmaster;

- Retaliating against venues that use competing ticketing companies;

- Requiring venues to agree to long-term exclusive ticketing contracts, which is called

exclusive dealing;

- Buying and acquiring control over competing promotion companies, ticketing companies, venues, and festivals;

- Requiring artists who want access to large amphitheaters to also use Live Nation as their promoter, which is called tying;

- Entering into exclusive or restrictive booking arrangements with venues;

- Inducing potential competitors such as the Oak View Group not to compete but rather to support Live Nation;

In addition to alleging that Defendants monopolized a number of markets, Plaintiffs also allege that Defendants violated Section 1 of the Sherman Act through illegal agreements in restraint of trade as part of the same course of anticompetitive conduct. For Section 1 claims, Plaintiffs must prove Defendants possessed market power—which is less than monopoly power and is the ability to influence or raise prices above a competitive level. Plaintiffs allege that Defendants engaged in anticompetitive conduct including: (a) entering exclusive contracts and (b) requiring customers to purchase one product in order to buy a separate product, which is called tying. These categories of conduct support Defendants' monopolies (as noted above), and you also need to consider them separately as specific violations of Section 1's prohibition on unreasonable restraints of trade.

*Exclusive Dealing:* Plaintiffs allege that Defendants engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with major concert venues. At the end of the case, I will provide more detail on the elements of exclusive dealing that Plaintiffs must prove. In general, however, to prove unlawful exclusive dealing Plaintiffs must prove that Defendants possessed market power and harmed competition by entering into exclusive contracts with venues.

*Tying:* You will also be asked to decide whether Defendants engaged in an unlawful tying

arrangement by requiring artists who wanted to use large amphitheaters owned or controlled by Defendants to also use and pay for Defendants' promotion services. The elements required to prove this claim will be explained to you at the end of the case.

The final issue you will be asked to decide is whether some of the Plaintiff States are entitled to damages or monetary recovery because fans attending concerts in those States overpaid for tickets due to Ticketmaster's anticompetitive conduct. I will give you additional instructions on the calculation of damages or monetary recovery at the end of the case.

**Plaintiffs' Authority**: *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (offense of monopolization requires "monopoly power in the relevant market" which is the "power to control prices or exclude competition" and  "the willful acquisition or maintenance of that power"); *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 (1985) (trial court instructed jury to "draw a distinction here between practices which tend to exclude or restrict competition on the one hand and the success of a business which reflects only a superior product, a well-run business, or luck, on the other"); *U.S. Football League v. National Football League,* 1986 WL 10620, at *12 (S.D.N.Y. July 31, 1986) (jury instructions distinguished between competition on the merits—achieved by "superior foresight and skill," "natural advantages," "economic or technological efficiency"—and anticompetitive conduct); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-12, (S.D.N.Y. 2025).

**Plaintiffs' Position**: Plaintiffs propose an instruction that provides a high-level overview of the legal standard jurors will be instructed upon at the end of the case as well as a brief, neutral summary of the conduct Plaintiffs allege to be anticompetitive. Plaintiffs' proposed instruction draws from the Supreme Court's quintessential Section 2 case, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), which Defendants also rely upon. *Grinnell* sets forth "two elements" for a Section 2 claim, which are reflected in Plaintiffs' proposed monopolization instruction: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570-71. Defendants' proposed instruction attempts to add an additional element to the Supreme Court's test: "that the relevant Defendant's anticompetitive acts harmed competition in that market." To the extent this additional language merely refers to whether the conduct at issue is anticompetitive in nature, that question is duplicative of the preceding reference to whether Defendants "committed anticompetitive acts" (Plaintiffs' proposal) or "willfully acquired or maintained monopoly power in that market by engaging in anticompetitive acts" (Defendants' proposal). Additionally, Defendants misstate the holding of *Grinnell* with the following proposed language: "instead of having superior products or business skills, or prior history." First,

the proposed language incorrectly suggests a binary world where a company with a superior product or superior business skill cannot be held liable for illegally maintaining a monopoly by also engaging in anticompetitive conduct. *See United States v. Google LLC*, 747 F. Supp. 3d 1, 144 (D.D.C. 2024). Second, "prior history" does not appear in *Grinnell* and is vague and likely confusing to the jury. Additionally, for the reasons discussed above in connection with Preliminary Instruction No. 10, Plaintiffs contend the jury can and should treat Defendants as a single economic entity, and therefore Defendants' proposed language requiring the jury to consider Defendants separately for each market and each claim is incorrect and confusing.

**Defendants' Authority:**  ABA Model Instr. 3.A.1; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of a Section 2 violation is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident"); ABA Model Instr. 2.D.5; *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008) ("It is well understood that each Plaintiff must prove her own individual claims."); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) ("Each plaintiff will be responsible for establishing the elements of her own claims."); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, No. CV 6:10-0348, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015) ("Each plaintiff must necessarily prove his or her case.").

**Defendants' Argument:**

Defendants object to Plaintiffs' characterization of the jurors' task as deciding Defendants' liability here and throughout these instructions.  Plaintiffs bear the burden of proof in this case, and the jury must decide whether Plaintiffs have carried their burden to prove Defendants' liability.  Defendants also object to Plaintiffs' recitation of their allegations regarding anticompetitive conduct as part of the Court's instruction on "applicable law."  That placement of Plaintiffs' allegations is confusing and prejudicial as it might lead the jury to believe that the allegations are part of the law, or that the Court (which determines the law) agrees with them.  Finally, Defendants object to Plaintiffs' discussion of the differences between monopoly power and market power as it is premature at this stage of the case. Defendants' remaining edits to this instruction align it with Defendants' proposed instructions on the law below.

40

**Preliminary Instruction No. 13**

## STIPULATION OF FACT

Before the trial of this case, the parties entered into certain stipulations or agreements in which they agreed that facts could be taken as true without further proof.

The stipulated facts have been provided in your binders.

Since the parties have stipulated to these facts and do not dispute them, you are to take these facts as true for purposes of this case.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 101:47 (6th ed.).

**Preliminary Instruction No. 14**

## OUTLINE OF TRIAL

We are going to begin each day no later than 9:00 A.M. We'll continue it until approximately 3:00 P.M., including breaks, and you will be gone no later than 4 P.M. Please be on time. If any of you are late even by a couple of minutes, we have to wait. That is because we can't start until all of you are here. If we lose ten or even more minutes every day, we won't be able to get the trial done on the schedule that I've told you at the outset. So please come on time.

Let me tell you the order of the trial. The first step in the trial will be opening statements. First, Plaintiffs' counsel will make an opening statement. The opening statement is simply an outline or summary to help you understand what each party expects the evidence to show. The opening statement, remember, is not evidence. Its purpose is only to help you understand what the evidence will be and what the Plaintiffs will try to prove. Then the Defendants' counsel will make an opening statement. The purpose of that will be the same.

After the opening statements, the Plaintiffs will present their evidence. I expect that the Plaintiffs' evidence will consist of the testimony of witnesses as well as exhibits. The Plaintiffs' lawyer will examine the witnesses, and where a witness is called by the Plaintiffs, the lawyers for the Defendants may then cross-examine the witness. We may then have some additional questioning by both sides, called "redirect," and a "recross."

Following the Plaintiffs' case, the Defendants may present a case. Plaintiffs' counsel has the opportunity to cross-examine any witnesses who are called by Defendants' counsel. After the presentation of the evidence is completed, the lawyers will make their closing arguments. Their closing arguments summarize and interpret the evidence that's been presented during the trial. But, as I said earlier, in the same way that opening statements are not evidence, closing arguments by the lawyers are not evidence. It's just their effort to help interpret and help you understand their

view of the evidence.

Following the closing arguments, I will instruct you on the law. Then you will retire to deliberate on your verdict, which must be a unanimous verdict, and must be based on the evidence presented at trial. Your deliberations will take place in secret. You will not have to explain your verdict to anyone.

So, again, thank you very much for all of your attention. I have described for you my plan for every day after today. For now I ask that you pay attention to the parties as they begin their opening statements.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 101:02 (6th ed.); *Nike, Inc. v. Lululemon USA Inc.*, Preliminary Jury Instructions at 13-15, 1:23-cv-00771-AS (S.D.N.Y.).

**Instructions at the Close of Evidence**

**Post-Instruction No. 1**

## GENERAL INTRODUCTION

Now that you have heard the evidence and the argument, it is my duty to instruct you about the applicable law. It is your duty to follow the law as I state it. You must apply the law to the facts as you find them from the evidence in the case. Do not single out one instruction as stating the law, but consider the instructions as a whole. Do not be concerned about the wisdom of any rule of law stated by me. You must follow and apply the law.

Nothing I say in these instructions indicates I have any opinion about the facts of the case. You, not I, have the duty to determine the facts.

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. The parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just unanimous verdict, regardless of the consequences.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 3, 1:23-cv-00771-AS (S.D.N.Y.).

45

Post-Instruction No. 2

## THE PARTIES

As I instructed you earlier, the Plaintiffs are the United States, 39 individual States, and the District of Columbia. The Defendants in this case are Live Nation Entertainment, Inc. and Ticketmaster L.L.C. Live Nation is the parent company of Ticketmaster, its wholly-owned subsidiary. At different times throughout the trial, the Court, the parties and witnesses may have referred to either Live Nation or Ticketmaster. However, under the antitrust laws, a parent and its wholly-owned subsidiary are viewed as a single company with a complete unity of interest. For purposes of making your decision on liability in this case, you should consider Live Nation and Ticketmaster as a single company.

Unless otherwise stated, these instructions apply to all parties.

**Plaintiffs' Authority**: Adapted 4 Modern F. Jury Instructions-Civil P 79.02, 79-5; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984) (overturning precedent permitting intra-enterprise conspiracy claims on ground that "[a]ny anticompetitive activities of corporations and their wholly owned subsidiaries meriting antitrust remedies may be policed adequately [because] the enterprise is fully subject to Section 2 of the Sherman Act"); *id.* at 771-72 (explaining that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise . . . [because a] parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one . . . [and] in reality a parent and a wholly owned subsidiary *always* have a unity of purpose or a common design. They share a common purpose whether or not the parent keeps a tight rein over the subsidiary") (citation omitted and emphasis in original); *id.* at 772 n. 18 (rejecting use of a multi-factor test to determine whether a parent corporation and a wholly owned subsidiary are a single entity because, "[a]s applied to a wholly owned subsidiary, the so-called 'single entity' test is thus inadequate to preserve the Sherman Act's distinction between unilateral and concerted conduct . . . At least when a subsidiary is wholly owned, however, these factors are not sufficient to describe a separate economic entity for purposes of the Sherman Act. The factors simply describe the manner in which the parent chooses to structure a subunit of itself. They cannot overcome the basic fact that the ultimate interests of the subsidiary and the parent are identical, so the parent and the subsidiary *must* be viewed as a single economic unit.") (emphasis added); *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 58 (1st Cir. 2002) (Boudin, J.) (explaining that it is settled law under *Copperweld* that a "parent and its wholly owned subsidiary . . . share[ ] a 'complete unity of interests,'") (quoting *Copperweld*, 467 U.S. at 771); *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 749-50 (1st Cir. 1994) (Breyer, C.J.) (applying *Copperweld* in the Robinson Patman context, and explaining that the *Copperweld* "Court saw an identity of economic interest between parent and wholly owned subsidiary that, considered in terms of the economically oriented antitrust laws, warrants regarding them as one [because] [a]ny claimed instance of truly 'independent,' owner-hostile, subsidiary decisionmaking would meet with the skeptical question, 'But,

if the subsidiary acts contrary to its parent's economic interest, why does the parent not replace the subsidiary's management?' Given the strength of that joint economic interest, we do not see how a case-specific judicial examination of 'actual' parental control would help achieve any significant antitrust objective").

**Plaintiffs' position:** Defendants' proposed instruction that each Plaintiff must meet its burden of proof for each of its claims, as drafted, is likely to be confusing to the jury and, in any event, is unsupported by Defendants' cited authorities. With respect to the federal antitrust claims, the United States and 39 Plaintiff states have asserted the same claims and intend to jointly present evidence in support of those claims at trial and California's claims rely on the same common nucleus of facts. There is no legal requirement for each of the 41 Plaintiffs to independently present evidence to the jury multiple times. The cases cited by Defendants are inapposite. In *Phillips v. Potter,* "each Plaintiff br[ought] separate factual allegations supporting the same claim – [a] sexually hostile environment." 2008 WL 11492752, at *30 (N.D. Ohio Mar. 31, 2008). But here, for the federal claims, all Plaintiffs base their claims on the same factual allegations.

Of course, to the extent a State Plaintiff has also brought a separate state law claim or sought damages, it will be responsible for ensuring the evidence at trial supports those claims, but each such State Plaintiff believes that the evidence will overlap significantly with evidence supporting the federal antitrust claims. Defendants' proposed instruction is not so narrow and would seem to require that each State independently put forward the necessary evidence, even though such evidence overlaps substantially both with the federal claims and across state law and state damages claims. Defendants' cherry-picked quotation from *Phillips* fairs no better. *Phillips* merely stands for the uncontroversial proposition that one plaintiff's "testimony about events that occurred in 2001 are not admissible or relevant to [other plaintiffs'] claims of harassment beginning in 2004." *Id.* at *31. There is simply no parallel to the joint claims brought by the State Plaintiffs here.

The *Radmanovich* case involved a class certification decision where the court simply highlighted as a key issue "that each plaintiff would need to come forth with proof of how the pattern or practice of discrimination impacted her." *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 436 (N.D. Ill. 2003). The court noted a finding of a commonly alleged "pattern or practice" alone would be insufficient to establish liability on any individual's claim. *See id.* at 439. But no such showing of individualized impact is required for any of the federal antitrust claims alleged here, except to the extent certain Plaintiff States seek damages or to independently prove liability under their laws, for which they each intend to offer sufficient evidence at trial within the time allotted by the Court. Indeed, in *Orchestrate,* cited by Defendants, the court did not compartmentalize evidence between Plaintiffs but rather allowed Plaintiffs to argue "that evidence of damages to one may possibly be used as evidence of damages to the other where damages overlap." *Orchestrate HR, Inc. v. Trombetta*, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) (denying in part defendants' motion in limine). And *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015), merely confirmed that when an individual plaintiff pursues monetary recovery for damages it experienced, it must prove the amount of damages incurred. No such requirement applies to the United States or the State Plaintiffs when seeking to enforce the federal antitrust laws, outside of specific damages claims.

Finally, Defendants' proposed instruction that the jury must consider each Defendant separately and in isolation also misstates the law. As explained above at Preliminary Instruction No. 1, the jury

should treat Defendants as a single economic entity for purposes of considering liability on each of Plaintiffs' claims.

**Defendants' Authority:**  *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 7, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008) ("It is well understood that each Plaintiff must prove her own individual claims."); *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 439 (N.D. Ill. 2003) ("Each plaintiff will be responsible for establishing the elements of her own claims."); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, No. CV 6:10-0348, 2015 WL 10571063, at *11 (W.D. La. Nov. 23, 2015) ("Each plaintiff must necessarily prove his or her case.").

**Defendants' Argument:**

It is well-established that each plaintiff in a case must "prove her own individual claims." *Phillips v. Potter*, No. 1:05 CV 1852, 2008 WL 11492752, at *31 (N.D. Ohio Mar. 31, 2008).  Plaintiffs entirely and opportunistically omit this point throughout their proposed instructions.  Defendants' proposal seeks to make clear to the jury at the outset that it must assess whether each Plaintiff has proven its case against each Defendant separately.

As explained above, Defendants object to Plaintiffs' characterization of Live Nation and Ticketmaster "as a single company" and have eliminated that erroneous view here and throughout these instructions. *See supra* Defendants' Argument on Preliminary Instruction No. 10 (Summary of Contentions).

**Post-Instruction No. 3**

## EVIDENCE IN THE CASE

Unless you are otherwise instructed, the evidence in the case consists of the sworn testimony of the witnesses regardless of who may have called the witness, all exhibits received in evidence regardless of who may have produced them, and all facts and events that may have been admitted, stipulated to, or taken judicial notice of.

Statements and arguments by the lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statement, closing arguments, and at other times is intended to help you understand the evidence, but it is not evidence. However, as I explained at the beginning of this trial, the lawyers on both sides have agreed on certain facts known as stipulations, and you must treat those facts as proven.

Any question to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded.

**Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 5-6, 1:23-cv-00771-AS (S.D.N.Y.).

49

**Post-Instruction No. 4**

## WITNESS CREDIBILITY

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

1.    the opportunity and ability of the witness to see or hear or know the things testified to;

2.    the witness's memory;

3.    the witness's manner while testifying;

4.    the witness's interest in the outcome of the case, if any;

5.    the witness's bias or prejudice, if any;

6.    whether other evidence contradicted the witness's testimony;

7.    the reasonableness of the witness's testimony in light of all the evidence; and

8.    any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened. People often forget things or make mistakes in what they remember. Also, two people may see the same event but remember it differently. You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said. On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of

witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.

**Plaintiffs' Authority**: Adapted 9th Circuit Manual of Model Civil Jury Instruction 1.14 (2025 ed.).

**Plaintiffs' Position**: The Parties jointly propose utilizing the 9th Cir. model instruction here, but Defendants inexplicably propose striking the concluding paragraph. Plaintiffs request the Court charge the jury using the full instruction in the model. Notably, in Preliminary Instruction No. 8, Defendants propose a substantively similar version of the language they propose striking here.

**Defendants' Authority**: Adapted 9th Cir. Manual of Model Civil Jury Instruction 1.14 (2025 ed.).

**Defendants' Argument:**

Defendants object to inclusion of Plaintiffs' final paragraph as it may give the jury the impression that the weight of the evidence as to a fact *may* depend on the number of witnesses who testify.  This impression is prejudicial where, as here, a key aspect of Defendants' case is the argument that Plaintiffs lack any evidence as to certain elements of their case, such as market definition, for instance.

**Post-Instruction No. 5**

## USE OF DEPOSITIONS AS EVIDENCE

During the trial, certain testimony has been presented by way of deposition. The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by the attorneys. The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented under oath on a videotape. Such testimony is entitled to the same consideration and is to be judged as to credibility, weighed, and otherwise considered by you in the same way as if the witness had been present and testified from the witness stand.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 105:02 (6th ed.).

**Post-Instruction No. 6**

## EXPERT TESTIMONY

You have heard testimony from a number of witnesses who were designated by the respective parties as "experts." These designated witnesses are allowed to express opinions on matters about which they may have special knowledge and training. This testimony is presented to you on the theory that someone who is experienced in a particular field may be able to assist you in understanding the evidence and in reaching your independent decision on the facts.

In weighing this type of testimony, you may consider the witness's qualifications, opinions, reasons for testifying, as well as all the other considerations that ordinarily apply when you are deciding whether to believe a witness's testimony.

The expert witness's testimony was based on particular facts, as the witness obtained knowledge of them and testified to them before you, or as the attorneys who questioned the designated witness asked them to assume. You may reject such a witness's opinion if you find the facts in the case to be different from those that formed the basis for the opinion.

You may give "expert" testimony whatever weight, if any, you find it deserves in light of all of the evidence in the case and the witness's interest in the proceeding, including any compensation for work the expert may have received. You should not, however, accept the testimony merely because it is given by a designated "expert," nor should you substitute it for your own reason, judgment, and common sense. The determination of the facts in this case rests solely with you.

**Authority**: *United States of America, et al. ex rel. Uri Bassan v. Omnicare, Inc.,* Joint Proposed Jury Instructions at 13, 1:15-cv-04179-CM-VF, ECF No. 747 (S.D.N.Y. Apr. 23, 2025).

**Post-Instruction No. 6P**

## IMPEACHMENT—INCONSISTENT STATEMENT OR CONDUCT

A witness may be discredited, or impeached, by contradictory evidence or by evidence that at some other time the witness has said or done something, or has failed to say or do something that is inconsistent with the witness's present testimony.

If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such weight, if any, you think it deserves.

If a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness's other testimony and you may reject all the testimony of that witness or give it such weight as you may think it deserves.

An act or omission is "knowingly" done, if the act is done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

**Authority**: Adapted Fed. Jury Prac. & Instr. § 105:04 (6th ed.).

**Plaintiffs' Position:** As in every case, it is likely that both sides will impeach or attempt to impeach one or more witnesses at trial. Plaintiffs believe the jury should be instructed on how to evaluate impeachment, including what effect (if any) it has on the weight assigned the witness' testimony. Accordingly, Plaintiffs propose the Court issue the standard impeachment instruction contained in the cited O'Malley treatise. Defendants have incorrectly contended this instruction is duplicative, but no other instruction addresses impeachment.

**Defendants' Argument:** Defendants object to this instruction in its entirety as it is duplicative of the instruction on witness credibility, which sufficiently explains to the jury that contradictory evidence may affect a witness's credibility, without introducing the complicated and unnecessary concept of impeachment.

**Post-Instruction No. 7**

**SUMMARY OF CONTENTIONS**

As I did at the start of the case, I will give you a summary of each side's contentions in this case. I will then provide you with detailed instructions on what Plaintiffs must prove to win on each of their claims.

*Section 2: Monopolization*

The first issue you will be asked to decide is whether Plaintiffs have proved by a preponderance of the evidence that Defendants have violated Section 2 of the Sherman Act by unlawfully monopolizing any of the six proposed relevant markets:

1.      Primary concert ticketing services to major concert venues (primary concert ticketing).

2.      Primary ticketing services to major concert venues (primary ticketing).

3.      Primary concert ticketing offered to fans at major concert venues (fan ticketing).

4.      Use of large amphitheaters by artists (amphitheaters).

5.      Concert booking and promotion services to major concert venues (venue booking services).

6.      Promotion services to artists performing in major concert venues (artist promotion services).

There are certain requirements that Plaintiffs must prove to show that Defendants illegally monopolized a market, which I will explain in more detail in a few minutes. In general, however, to prove monopolization for each of the proposed relevant markets, Plaintiffs must show by a preponderance of the evidence that Defendants committed anticompetitive acts and possessed monopoly power in each market separately. It is up to you to decide whether Plaintiffs have proven Defendants are liable for monopolization as to all markets, no markets, or only as to some markets.

Plaintiffs allege that Defendants engaged in a variety of anticompetitive conduct, including,

but not limited to:

- Conditioning or threatening to condition the provision of Live Nation content on a venue's use of Ticketmaster;

- Retaliating against venues that use rival ticketers;

- Acquiring control over rival promotion and ticketing companies as well as venues and festivals;

- Entering into exclusive or restrictive booking arrangements with venues;

- Inducing potential competitors such as the Oak View Group not to compete but rather to support Live Nation;

- Imposing long-term exclusive ticketing contracts; and

- Requiring artists to use Live Nation as their promoter if the artists want to perform in large amphitheaters controlled by Defendants.

*Section 1: Exclusive Dealing and Tying*

In addition to alleging that Defendants monopolized proposed relevant markets, Plaintiffs allege that Defendants violated Section 1 of the Sherman Act through unlawful exclusive dealing and tying. You will need to consider the exclusive dealing and tying claims under Section 1 separate from and in addition to the monopolization claims.

First, Plaintiffs allege that Defendants engaged in unlawful exclusive dealing by entering into certain primary ticketing contracts with major concert venues. There are different elements Plaintiffs must prove for you to find Defendants liable of unlawful exclusive dealing. In general, to prove unlawful exclusive dealing Plaintiffs must prove by a preponderance of the evidence that Defendants possess market power and entered exclusive contracts with venues that impeded competition.

Second, Plaintiffs allege that Defendants engaged in an unlawful tying arrangement by requiring artists who wanted to use Defendants' large amphitheaters to also use Defendants' promotion services. In general, Plaintiffs must prove by a preponderance of the evidence that Defendants illegally tied artists' use of their large amphitheaters to the use of Defendants' promotion services.

The final issue you will be asked to decide is whether some of the Plaintiff States are entitled to damages because fans attending concerts in those States overpaid for tickets due to Defendants' anticompetitive conduct. You should not assume that any of the Plaintiff States are entitled to damages merely because I am instructing you on the issue of damages.

In addition to damages, Plaintiffs are seeking other remedies that will be decided by the Court if you find Defendants liable on one or more claims. Plaintiffs may, for example, ask the Court to order Live Nation to sell Ticketmaster, open its amphitheaters to artists promoted by non-Live Nation promoters, stop using exclusive ticketing contracts with venues, or sell some of its amphitheaters. However, you are not responsible for determining whether any of those remedies is needed or appropriate. That will be decided by the Court at a later date.

**Plaintiffs' Authority**: Am. Compl. (ECF No. 257); Answer (ECF No. 498); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612 (S.D.N.Y. 2025); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

**Plaintiffs' Position**: As with Preliminary Instruction No. 10, Plaintiffs have proposed a neutral statement of the case that outlines the basic facts of the litigation, succinctly summarizes Plaintiffs' claims as set forth in the Amended Complaint, and provides a straightforward preview of Defendants' defenses as well as a high-level overview of the applicable law. As with the preliminary instruction, Defendants' proposed instruction misstates Plaintiffs' allegations, misstates the applicable legal standards, and injects significant advocacy around Defendants' potential defenses.

In the very first substantive paragraph ("Section 2 Monopolization") Defendants incorrectly state the allegations Plaintiffs made in the Amended Complaint, which allege that Live Nation, in conjunction

with its wholly-owned subsidiary, Ticketmaster, monopolized the three primary ticketing markets. Amended Compl. at 85. Defendants also incorrectly assert that Live Nation and Ticketmaster must be treated as separate entities for liability purposes, notwithstanding a long line of cases to the contrary, as explained above at Preliminary Instruction No. 1.

As in earlier instructions, Defendants' proposed exclusive dealing instruction misstates the law by requiring the jury to consider each contract individually and in isolation, as explained below at Post-Instruction No. 18. And as to tying, Defendants' proposed instruction again artificially inflates Plaintiffs' burden by contending Plaintiffs must prove artists "*would* have preferred to use a different concert promoter" rather than simply that they "might" have preferred to do so. *See Jefferson Parish*, 466 US. at 12.

The final two paragraphs regarding damages present similar issues to those raised in the preliminary instructions. Defendants' proposed instructions may potentially confuse the jury by suggesting that Plaintiffs are required to prove each element of every claim to recover on any of them, which is not accurate. Defendants' instructions also again misstate that "no money the Plaintiff States may recover in this case will be returned to any State residents or 'fans.'" But a recovery under 15 U.S.C. § 15c likely will be returned to fans. As 15 U.S.C. Sections 15c and 15e explicitly contemplate, any funds recovered by the States "shall … be distributed in such manner as the district court in its discretion may authorize" and that any "distribution procedure adopted afford each person a reasonable opportunity to secure his appropriate portion of the net monetary relief." *Id.* § 15e. While, subject to the approval of the Court, some or all of the funds recovered *may* "be deemed a civil penalty by the court and deposited with the State as general revenues," there is no basis to instruct the jury that will happen, or that the States will not try to distribute damages awards to residents. The cases cited by Defendants all contain dicta noting that in some circumstances an award in a *parens patriae* action may not be distributed to citizens, but do not suggest that distribution to residents is unusual or precluded. *See Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 849 (9th Cir. 2011) (holding that *parens patriae* actions are not class actions under CAFA despite being "representative actions" because, among other things, funds are not necessarily distributed to residents); *Broselow v. Fisher*, 319 F.3d 605, 609-10 (3d Cir. 2003) (holding that individual residents not entitled to distribution of funds where plaintiff state did not seek to recover on behalf of residents and distribution would have independently been precluded by federal law applicable to tobacco settlements); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (refusing to overturn settlement approval due to objection of individual residents where settlement would not have provided net monetary relief). Defendants' citation to New York Executive Law § 63(12) also ignores that New York is among the state seeking damages under 15 U.S.C. § 15c and any award under that statute would be subject to the provisions of 15 U.S.C. § 15e.

Further, even if some or all State Plaintiffs later sought the Court's approval to allocate a portion of funds to, *e.g.*, further antitrust enforcement efforts, Defendants' proposed instruction would be irrelevant to the jury's finding of whether Defendants are liable for violating the antitrust laws, and whether fans suffered damages. At best, Defendants have identified an argument that may ripen after a finding of liability and damages, in connection with determining the form of notice fans will receive. Speculating about any such efforts now would only serve to bias the jury against Plaintiffs. Given that the Court will be providing detailed damages instructions later, no further reference is necessary here and will instead be duplicative and waste time.

**Defendants' Authority:**  ABA Model Instr. 3.A.1, 2.D.5; *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); ECF No. 257 (Am. Compl.); ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation").

**Defendants' Argument:**

Defendants' edits to this instruction align it with Preliminary Instruction Nos. 10 and 12 (Summary of Contentions and Overview of Applicable Law) above, and the instructions on the law below.

**Post-Instruction No. 8**

## BURDEN OF PROOF—PREPONDERANCE OF THE EVIDENCE

As I instructed you earlier, in this case, Plaintiffs must prove each element of a particular

claim by a preponderance of the evidence. This means that the fact that is to be proven is more

likely true than not, as the evidence in favor of the fact being true is enough to tip the scale, even

if slightly, in its favor.

**Plaintiffs' Authority**: *Nike, Inc. v. Lululemon USA Inc.*, Final Jury Instructions at 6, 1:23-cv-00771-AS (S.D.N.Y.); Adapted 9th Cir. Manual of Model Civ. Jury Instr. 1.6 (2025 ed.); Fed. Jury Prac. & Instr. § 104:01 (6th ed.); *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 187 (2d Cir. 1992) ("[T]he court should instruct the jury that it is to conclude that a fact has been proven by a preponderance of the evidence if it 'finds that the scales tip, however slightly, in favor of the party with the burden of proof' as to that fact.").

**Plaintiffs' Position**: Plaintiffs have proposed a simplified instruction based on the cited authorities that briefly explains the preponderance standard. Defendants' proposed instruction fails to include language that even "slightly" tipping the scales is sufficient (despite that language appearing in the source Defendants cite). Defendants' proposal is also confusing to the extent it can be read to suggest that Plaintiffs must prevail on every element of every claim in order to win on any one of them. Finally, Defendants' additional proposed paragraph is duplicative of other instructions identifying the scope and nature of evidence.

**Defendants' Authority:** Fed. Jury Prac. & Instr. § 104:01.

**Defendants' Argument:**

Defendants' proposal tracks verbatim the model federal jury instruction on preponderance of the evidence. As explained above, Defendants object to Plaintiffs' watered down burden of proof instruction. Plaintiffs' "tip the scale, even if slightly" language does not appear in the model federal jury instruction or in the model instructions for any court of appeals. *See supra* Defendants' Argument on Preliminary Instruction No. 4 (Burden of Proof); Notes, Fed. Jury Prac. & Instr. § 104:01.

**Post-Instruction No. 9**

## MONOPOLIZATION ELEMENTS

Plaintiffs allege Defendants unlawfully monopolized the following markets:

(1)     primary concert ticketing services to major concert venues;

(2)     primary ticketing services to major concert venues;

(3)     primary concert ticketing offered to fans at major concert venues;

(4)     the use of large amphitheaters by artists;

(5)     concert booking and promotion services to major concert venues; and

(6)     promotion services to artists performing in major concert venues.

Plaintiffs have brought six monopolization claims in total, one for each of these markets. The alleged monopolization of any one of these six markets is a distinct claim that you are to consider separately. To prevail on a monopolization claim, Plaintiffs must prove the following elements by a preponderance of the evidence:

(1)     the alleged market is a valid antitrust market, and Defendants possessed monopoly power in that market; and

(2)     Defendants maintained that monopoly power through anticompetitive conduct.

If you find that Plaintiffs have failed to prove any of these elements for a particular claim, then you must find for Defendants and against Plaintiffs on that particular claim only. If you find that Plaintiffs have proven each of these elements by a preponderance of the evidence for a particular claim, then you must find for Plaintiffs and against Defendants on that particular claim.

I will now provide you with further instructions on these elements.

**Plaintiffs' Authority**: *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."); *see E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 441 (4th Cir. 2014);

61

Adapted ABA Model Instr. 3.A.1; Am. Compl. (ECF No. 257) ¶¶ 224-32, 249-64.

**Plaintiffs' Position**: Plaintiffs' proposal hews closely to the ABA Model Instruction, adapted to fit the circumstances of this case. Specifically, Plaintiffs identify the six alleged markets here. Plaintiffs propose a minor modification that captures the fact that Plaintiffs have alleged monopolization in six separate markets, instructing the jury that "[t]he alleged monopolization of any one of these six markets is a distinct claim that you are to consider separately."

Defendants' proposal incorrectly renames and mischaracterizes the six markets alleged in Plaintiffs' complaint which would likely confuse the jury and prejudice Plaintiffs, as Plaintiffs are entitled to have the jury be instructed to assess Plaintiff's actual claims as they are presented at trial. Defendants again incorrectly assert that Defendants should be treated as separate entities for liability, which Plaintiffs address in Preliminary Instruction No. 1.

**Defendants' Authority:**  ECF No. 257 (Am. Compl.); Adapted ABA Model Instr. 3.A.1; Adapted *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) ("[T]he exclusionary conduct must have an anti-competitive effect."); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (an element of a Section 2 violation is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident").

**Defendants' Argument:**

Defendants object to Plaintiffs' two-element structure.  The ABA model jury instruction on the elements of a Section 2 monopolization claim contains five elements.  *See* ABA Model Instr. 3.A.1. In line with that instruction, jury instructions given to juries in numerous cases contain four to five elements.  *See, e.g.*, *North Am. Soccer League, LLC v. U.S. Soccer Federation, Inc.*, Final Jury Instructions at 48, No. 1:17-cv-5495, ECF No. 531 (E.D.N.Y. Jan. 31, 2025).  Parties frequently do not dispute, and thus exclude, as here, the requirement that "defendant's conduct occurred in or affected interstate or foreign commerce."  ABA Model Instr. 3.A.1.  Defendants propose a similar four-element structure here.

There is a reason why juries are not instructed using Plaintiffs' two-element structure—it is confusing and might lead the jury to miss important parts of the analysis, such as market definition and anticompetitive effects.  Defining the relevant market is the threshold step in analyzing the antitrust claims in this case.  *Ohio v. American Express Co.*, 585 U.S. 529, 542 (2018); *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets.").  And market definition is hotly disputed in this case.  By burying market definition within the element on monopoly power, Plaintiffs improperly seek to obfuscate that element before the jury.  Plaintiffs also err in entirely omitting any element on harm even though it is well-established that a Section 2

violation requires proof of competitive harm and anticompetitive effects. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (To violate Section 2, "a monopolist's act must have an 'anticompetitive effect.' That is, it must harm the competitive *process* and thereby harm consumers."); *In re Google Digital Advertising Antitrust Litig.*, 627 F. Supp. 3d 346, 380 (S.D.N.Y. 2022) (conduct "must have an anticompetitive effect in order to form the basis of a monopolization claim"). Indeed, Plaintiffs did not dispute this element during summary judgment briefing, *see* ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment), yet they erroneously omit it here and throughout these instructions.

**Post-Instruction No. 10**

## RELEVANT MARKET—GENERAL

The purpose of defining a relevant market in an antitrust case like this one is to identify the market participants and the competitive pressures that actually restrain Defendants' ability to raise prices, restrict output, reduce quality, or exclude competition. "Relevant markets" have two dimensions: the product or service at issue, and the geographic area at issue. Several markets can exist at the same time, including submarkets alongside broader markets. For example, within the broader market for shoes, there may also be separate submarkets for men's, women's, and children's shoes. There also could be markets for shoes sold in Manhattan, shoes sold in New York City, shoes sold in the tri-state area, and shoes sold in the United States.

You can find that a relevant market exists even if you are not certain of the precise boundaries of that market; it is sufficient that a market generally contains products or services that are reasonable substitutes for each other from the perspective of actual customers. The purpose of defining a relevant market is to make sure that the identified products and geographic regions are capable of being monopolized—that is, the market is broad enough that if a single company controlled it, that company would have the ability to raise prices, restrict output, reduce quality, or exclude competition.

In assessing each monopolization claim, you are required to make a judgment about whether Plaintiffs have proven by a preponderance of the evidence that Defendants have monopoly power in a relevant market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices for the services they provide that are at issue in this case, or restrict the extent to which they provide those services.

The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes the firms and products most likely to act as the strictest restraints on Defendants' power to set prices above competitive levels because customers

would switch to them if Defendants set their own prices too high. The firms and products that exert

such primary restraining force are within what is called the relevant market.

There are two aspects you must consider in determining whether Plaintiffs have met their

burden to prove the relevant markets by a preponderance of the evidence. The first is the relevant

product market. The second is the relevant geographic market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.3; *Cf FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986) ("the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition"); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand—that is, where consumers would respond to a slight increase in the price of one product by switching to another product." (citation and quotation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (a relevant product market should "correspond to the commercial realities of the industry," and within the boundaries of a product market "well defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) (a "market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn"); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994).

**Plaintiffs' Position:** Plaintiffs' proposed instruction starts from the ABA model and adds two additional explanatory paragraphs at the beginning of the instruction. Plaintiffs added additional explanatory language so the jury would better understand the purpose and objective of defining a relevant market in antitrust cases. In *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024), the Second Circuit reiterated that a relevant market can be determined by looking at the reasonable interchangeability of use or the cross-elasticity of demand between the product at issue and potential close substitutes for it.

In addition, Plaintiffs added language related to submarkets so the jury would understand that narrower relevant markets may exist within broader relevant markets. In *Brown Shoe v. United States*, the Supreme Court held that the outer bounds of a product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. 294, 325 (1962). However, within broad markets, "well defined submarkets may exist which in themselves, constitute product markets for antitrust purposes." *Id.*; *see also Grinnell*, 384 U.S. at 570 ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act there may be submarkets that are separate economic entities."); *P&L Develop., LLC v. Gerber Prods. Co*., 715 F. Supp. 3d 435, 459 (E.D.N.Y. 2024) ("[a] product market can be limited to a particular category of buyers," with a relevant market of "sales of store-brand infant formula to [] retailers" rather than to all "end-user consumers"); *Int'l Boxing Club of N.Y., Inc. v. United States*,

358 U.S. 242, 249, 249-52 n.8 (1959) (affirming liability for Sherman Act §§1 and 2 violations based upon the relevant market of "promotion of championship boxing contests," as distinct from "all professional boxing events," even though any boxing event "includes one ring, two boxers and one referee fighting under the same rules before . . . spectators," relying "[b]y analogy" on a case involving "the Clayton Act's 'line of commerce.'") (citing *United States v. E.I. Du Pont De Nemours & Co.*, 353 U.S. 586, 593-97 (1957)).

Plaintiffs object to Defendants' proposed instruction that a relevant market "includes all firms and products or services that act or likely could act as restraints on the relevant Defendant's power to set prices as they please because customers could switch to these competing firms if the relevant Defendant set its own prices too high." This overstates the relevant standard in two ways. First, even a monopolist's power to set prices is restrained to some degree – as is noted by the "*Cellophane* fallacy." *See, e.g.*, *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1469 (W.D.N.Y. 1994) (explaining that "every monopolist faces an elastic demand at its profit-maximizing output and price" because "at a high enough price, even poor substitutes look good to the consumer") (cleaned up).  For similar reasons, contrary to Defendants proposed language, a relevant market does not consist of "all" firms or products that exert *any* restraining force — a sufficient quantum of force is required. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) ("Two products are reasonably interchangeable where there is '*sufficient* cross-elasticity of demand'—that is, 'where consumers *would* respond to a slight increase in the price of one product by switching to another product.'" (emphasis added)). Second, the relevant question is not whether customers "could" conceivably switch to products outside the relevant market—as suggested by Defendants' proposal—but whether customers in fact "would" switch in sufficient numbers to constrain a price increase or worsening of terms. *Id.*

**Defendants' Authority:**  Adapted ABA Model Instr. 3.A.3; *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 268-69 (2d Cir. 1979) ("It is, of course, a basic principle in the law of monopolization that the first step in a court's analysis must be a definition of the relevant markets."); *City of New York v. Grp. Health*, 649 F.3d 151, 155 (2d Cir. 2011) (To state an antitrust claim, "a plaintiff must allege a plausible relevant market in which competition will be impaired."); *United States v. Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995) ("Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist."); *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (before assessing "direct evidence" of "anticompetitive effects," we must "first define the relevant market").

**Defendants' Argument:**

Defendants object to Plaintiffs' discussion of "submarkets."  That concept does not appear in the ABA model jury instruction on general market definition, is irrelevant here, and is likely to confuse and mislead the jury.  *See FTC v. Meta Platforms, Inc.*, 2025 WL 3458822, at *28 (D.D.C. Dec. 2, 2025) (the concept of "submarkets" can be "misleading" because "[t]he only relevant concept is the product market").  Defendants' proposed instruction tracks the ABA model jury instruction and is sufficient to give the jury an introduction to market definition.

**Post-Instruction No. 11**

## RELEVANT PRODUCT MARKET

A relevant product market must consist of all products or services that are reasonably interchangeable in the eyes of customers of those products or services. In other words, the relevant product market includes the products or services that a customer believes are reasonably interchangeable or reasonable substitutes for each other. This is a practical test taking into account actual behavior of buyers and marketing efforts of sellers. It looks to the practical realities of substitution, not theoretical substitution. A product market does not need to include all conceivable substitutes, but only those that a buyer would view as reasonably interchangeable. Accordingly, your analysis should focus on whether or not the products or services are economic substitutes, not simply whether they appear to be functionally similar. For instance, women's shoes may not be reasonably interchangeable with men's shoes. Even if both are functionally similar, consumers may not typically substitute one for the other.

There is no single correct market because markets can overlap and within a broad relevant market, there may be smaller markets that are relevant for certain conduct. The market does not need to be defined with mathematical precision. A party may sometimes argue that a proposed market is too narrow, too broad, or drawn with arbitrary boundaries. It is okay if there is some fuzziness in the boundary, which is inherent in defining any relevant market. As a result, isolated examples of potential substitutability, for example, does not mean a proposed market is invalid. Your task is to determine whether the markets proposed by Plaintiffs are valid, notwithstanding any counter-arguments raised by Defendants and regardless of whether some different relevant markets may also be valid.

The parties disagree about the relevant product markets in this case. Plaintiffs allege that the six markets I just described to you are relevant product markets, while Defendants deny that those six markets are relevant product markets.

Different methods can be used to determine whether a market has been properly defined. One approach is to consider a variety of practical factors that can indicate whether a market is valid, such as:

- whether, as a matter of practical fact and the actual behavior of buyers, the services are reasonable substitutes for a buyer's needs;

- the relationship between the price of one service and sales of another;

- the presence or absence of specialized vendors;

- the perceptions in the industry or the public as to whether the services are in separate markets;

- the views of Defendants regarding who their respective competitors are;

- the existence or absence of different customer groups or distribution channels;

- whether the service has distinct characteristics and uses from other services;

- whether the service has distinct customers from other services;

- whether particular customers or groups of customers can be targeted for price increases or a worsening of terms; and

- any other evidence of how a service's price, quality, or total output is constrained by other services.

Another method that can be used to determine whether services are reasonable economic substitutes for each other is for you to consider the hypothetical monopolist test. This test examines whether a proposed market is sufficiently broad by asking: if all the products in the proposed market were sold by only one company, could it:

- worsen the terms of its deals with customers for products within the market—such as by raising prices a small but significant amount (e.g., 5%) above the normal competitive price or reducing quality by a small but significant amount,

- while not losing so many customers to out-of-market products as to make that price increase or quality decrease unprofitable.

If a substantial number of customers would switch from the service at issue to another type of service outside the market such that the hypothetical price increase or quality decrease would be unprofitable, then the proposed market should be expanded to include other products or services. In evaluating this hypothetical price increase or other change in terms, you should compare the effect to prices or quality in a competitive market, which may or may not be the same as prices and terms that exist in the market today. That is because if the Defendants are already charging higher prices because they have market power, some buyers today might switch to other products they would not normally consider substitutes in a competitive market.

If you find that Plaintiffs have proven a relevant product market for any claim, then you should continue to evaluate the remainder of that claim. However, if you find that Plaintiffs have failed to prove such a market for a given claim, then you must find in Defendants' favor on that claim.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.4; *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), *and aff'd*, 344 F.3d 229 (2d Cir. 2003), *and enforced*, No. 98 CIV. 7076 (BSJ), 2007 WL 1741885 (S.D.N.Y. June 15, 2007) ("A relevant product market is composed of products that have reasonable interchangeability, in the eyes of consumers, with what the defendant sells." (quotation marks and citation omitted)); *Brown Shoe v. United States*, 370 U.S. 294, 325, 336 (1962) (relevant product market should "correspond to the commercial realities of the industry" and within the boundaries of a product market "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes"); *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 204-07 (3d Cir. 2023) (affirming district court's application of *Brown Shoe* practical indicia); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956) ("[A] market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611, 612 n.31 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds" and "[f]or every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn

narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn."); *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966) ("In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act, there may be submarkets that are separate economic entities"); *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market"); *Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *see also United States v. Eastman Kodak Co.*, 63 F.3d 95, 103, 105 (2d Cir. 1995); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 160 (D.D.C. 2000); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024); *Teradata Corp. v. SAP SE*, 124 F.4th 555, 565-66, 569-70 (9th Cir. 2024); *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 249-50, 252 n.8 (1959); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) ("It is important to remember that a market is any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market." (cleaned up)).

**Plaintiffs' Position**: Plaintiffs' proposed instruction is based on the ABA model instruction with certain adjustments to clarify how reasonable interchangeability of products is properly assessed, how economic substitution is evaluated (based on examples drawn from caselaw), and how the outer boundaries of product markets are properly defined. In particular, Plaintiffs have proposed additional language to instruct the jury that the focus is on economic substitution rather than merely functional similarities in products. *See Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 340 (2d Cir. 2024) ("Rather, the applicable analysis is whether or not the products are *economic* substitutes, not whether they appear to be functionally similar. This analysis turns on economic differences, such as a lack of cross-elasticity of demand or reasonable interchangeability among products.") (holding that identical medication in vials and pre-filled syringes could be in separate product markets). Additionally, Plaintiffs' proposed instructions explain to jurors that the outer boundaries of a relevant market may be "fuzzy" and need not be defined by precise metes and bounds or mathematical precision. *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (recognizing that some "fuzziness is inherent in bounding any market") (citation omitted); *cf. United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 611 (1953) ("The 'market,' as most concepts in law or economics, cannot be measured by metes and bounds"); *id.* at 613 n.31 ("For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn").

Additionally, Plaintiffs' proposed instruction introduces the concept of submarkets, including that multiple valid relevant markets may exist for functionally similar products, which may not be intuitive to jurors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) ("Applying these considerations to the present case, we conclude that the record supports the District Court's finding that the relevant lines of commerce are men's, women's, and children's shoes."); *United States v. Apple, Inc.*, 2025 WL 1829127, at *7 (D.N.J. June 30, 2025) (recognizing product markets for both smartphones and "performance smartphones" and collecting cases); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 118 (D. Mass. 2023) (declining to decide between alternative markets because "there may be multiple relevant markets or sub-markets, any of which might appropriately be examined to assess the competitive effects of a restraint"), *aff'd*, 121 F.4th 209 (1st Cir. 2024);

*U.S. Airways, Inc. v. Sabre Holdings Corp.*, No. 11-cv-2725, 2022 WL 874945, at *7-10 (S.D.N.Y. Mar. 24, 2022) (finding that the defendant could have monopoly power in both narrower "Sabre-only product market" and broader market for "GDS services").

Plaintiffs object to Defendants' proposed example of hypothetical substitutes for flexible wrapping material as an extreme example of potential substitution not supported by economic evidence, which may confuse jurors as they consider the reasonable substitutes available to consumers in the particular markets alleged in this case.

**Defendants' Authority:** ABA Model Instr. 3.A.4.

**Defendants' Argument:**

As a general matter, Defendants object to Plaintiffs' relevant product market instruction, which fails to provide any instruction on targeted customer markets. As Defendants explained in their summary judgment briefing, five out of six alleged markets in this case are targeted customer markets. ECF No. 724 at 17-19 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 809 at 2-6 (Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment). Defining product markets based on customers "seems incongruous," *FTC v. Sysco*, 113 F. Supp. 3d 1, 37-39 (D.D.C. 2015), and requires a particular evidentiary showing, ECF No. 724 at 17-19 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 809 at 2-6 (Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment). Plaintiffs' relevant product market instruction—as well as the ABA model jury instruction on relevant product markets, ABA Model Instr. 3.A.4—does not contemplate targeted customer markets or discuss the particular evidentiary showing required to prove such markets. That instruction therefore is insufficient and would unduly confuse the jury. Defendants propose relevant product market instructions that account for the targeted customer markets as well as traditional product markets at issue here. Moreover, Defendants' proposed instructions explain the parties' disputes as to each alleged market and what the jury must find as to each alleged market separately to enable the jury to understand the unique and complex market definition analysis it must perform here.

Defendants also object to Plaintiffs' statement that the jury must determine whether Plaintiffs' alleged markets are valid "notwithstanding any counter-arguments raised by Defendants." This statement is prejudicial because it instructs the jury to effectively disregard Defendants' market definition arguments. No instruction on the law should include such prejudicial statements with respect to a party's arguments.

**Post-Instruction No. 12**

## RELEVANT GEOGRAPHIC MARKET

A relevant geographic market is the area in which Defendants face competition from other firms that compete in the relevant product market and to which customers can reasonably turn for purchases. A geographic market may be as large as global or nationwide, or as small as a single town or neighborhood.

Plaintiffs have the burden of proving a relevant geographic market by a preponderance of the evidence. In this case, the only alleged product market for which the parties dispute the geographic component is Plaintiffs' alleged fan ticketing market. Plaintiffs contend that the relevant geographic market is the United States. Defendants argue the relevant geographic market is narrower than the United States.

In determining whether Plaintiffs have met their burden and demonstrated that their proposed geographic market is proper, you may consider several factors, including:

- the geographic area in which Defendants sell and where Defendants' customers are located;

- the geographic level at which Defendants make product decisions, set prices, rates, and terms, and plan their business;

- the geographic area to which fans have turned, could turn, or have seriously considered turning, as a practical matter, for concert tickets;

- the transportation cost differences between areas;

- the geographic areas that suppliers view as potential sources of competition; and

- whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

A national geographic market can exist for services that are provided locally, even where smaller, regional geographic markets might also be valid.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.6; *United States v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966) ("We also agree with the District Court that the geographic market for the accredited central station service is national. The activities of an individual station are in a sense local as it serves, ordinarily, only that area which is within a radius of 25 miles. But the record amply supports the conclusion that the business of providing such a service is operated on a national level. There is national planning. The agreements we have discussed covered activities in many States. The inspection, certification and rate-making is largely by national insurers. . . . As the District Court found, the relevant market for determining whether the defendants have monopoly power is not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business."); *Compass, Inc. v. Zillow, Inc.*, 2026 WL 321084, at *15 (S.D.N.Y. Feb. 6, 2026).

**Plaintiffs' Position:** Plaintiffs' proposed instruction conforms closely to the ABA model instruction. Here, Plaintiffs allege markets as broad as the United States that also may include regional markets. Geographic market is a fact-based inquiry dependent on how Defendants conduct their business. *See United States v. Grinnell Corp.,* 384 U.S. 563, 575-77 (1966). Plaintiffs added one additional factor to the list of factors in the model that the jury may consider in determining the bounds of the geographic market: "the geographic level at which Defendants make product decisions, set prices, rates, and terms, and plan their business." This factor was identified by the Supreme Court in *Grinnell*, which agreed with the district court below that when evaluating whether ADT had monopoly power it was appropriate to consider "not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business." 384 U.S. at 576; *see also Compass, Inc. v. Zillow, Inc.*, 2026 WL 321084, at *15 (S.D.N.Y. Feb. 6, 2026) (applying the *Grinnell* factors in finding a national market).

Defendants, without explanation, delete several of the factors from the standard instruction and add a concluding paragraph that misstates Plaintiffs' claim and the jury's proper charge. Plaintiffs do not contend that the relevant geographic market for the fan ticketing market is the entire United States "because many fans will travel all over the United States." Rather, Plaintiffs intend to put forward a variety of evidence, consistent with the factors identified in the model instruction and *Grinnell* that collectively confirm the United States is one appropriate geographic market. *See* ECF No. 784 (Pls.' Opp. to Defs.' Mot. for Summ. J.) at 24-26. The relevant question for the jury is not how far fans will travel to see live entertainment. Rather, the jury should be instructed to consider all of the factors identified in *Grinnell* and *Compass*, including how far fans will travel to purchase tickets, which are sold electronically nationwide.

Additionally, Defendants' request to incorrectly instruct the jury that if Plaintiffs do not prevail on proving a geographic market as broad as the United States, jurors cannot find a narrower market. To the contrary, case law establishes that Plaintiffs may allege a broad market, and jurors are free to find a broader or narrower market than the alleged market. *Grinnell*, 384 U.S. at 575-76 ("the relevant [geographic] market for determining whether the defendants have monopoly power is not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business"--including that "[t]here is national

planning [and] [t]he agreements we have discussed covered activities in many States," as well as that defendant "has a national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions [and] [i]t deals with multistate businesses on the basis of nationwide contracts"); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963) ("[F]uzziness would seem inherent in any attempt to delineate the relevant geographical market."); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (a relevant geographic market is the "area in which the seller operates, and to which the purchaser can practicably turn for supplies"); *United States v. Cont'l Can Co.*, 378 U.S. 441, 457 (1964) (finding a relevant market that was not "pressed upon the District Court" by either party).

**Defendants' Authority:**  Adapted ABA Model Instr. 3.A.6; *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228-29 (2d Cir. 2006); *Concord Assocs., L.P. v. Entertainment Properties Trust*, 817 F.3d 46, 53 (2d Cir. 2016) ("Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."); *Ticketmaster v. RMG Techs.*, 536 F. Supp. 2d 1191, 1197 (C.D. Cal. 2008).

**Defendants' Argument:**

Defendants' edits to this instruction (1) align it with the ABA model jury instruction on relevant geographic markets and (2) further tailor it to the only market for which the parties dispute geography: the alleged primary ticketing market involving fans.

**Post-Instruction No. 13**

## MONOPOLIZATION—MONOPOLY POWER

If you find that Plaintiffs have proven any proposed market by a preponderance of the evidence, then you should separately determine whether Defendants have monopoly power in each such market. Monopoly power is the power to control prices, restrict output, or exclude competition in a relevant antitrust market.

Plaintiffs can prove monopoly power "directly," through direct evidence, or "indirectly," through indirect evidence. Either type of evidence may be sufficient to prove monopoly power. I will now provide further instructions about how you may determine whether Plaintiffs have met their burden of proving monopoly power in a relevant market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.2; *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) ("Monopoly power … is the power to control prices or exclude competition") (quotation marks and citation omitted); *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) (defining monopoly power as the power to "exclude actual or potential competition from the field"); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 378 (1973).

**Plaintiffs' Position:** Plaintiffs' proposal generally tracks the ABA model instruction but with certain edits for clarity and accuracy. It also clarifies that either direct or indirect evidence may be sufficient for the jury to find monopoly power. In particular, Plaintiffs deleted the additional sentence proposed by Defendants defining monopoly power as the ability to "profitably raise prices substantially" because it confusingly highlights only one of the manifestations of monopoly power set forth in the preceding sentence: "the power to control prices, restrict output, or exclude competition." Plaintiffs also object to Defendants' additional sentences related to anticompetitive conduct, as later instructions separately instruct the jury on that distinct element of Plaintiffs' monopolization claims. Including discussion of anticompetitive conduct within the monopoly power instruction will only confuse the jury.

**Defendants' Authority:**  ABA Model Instr. 3.A.2.

**Defendants' Argument:**

Defendants object to Plaintiffs' modifications to the ABA model jury instruction on monopoly power in ways that transparently lessen Plaintiffs' burden.  For instance, Plaintiffs delete language making clear that "monopoly power, in and of itself, is not unlawful," and that "a firm has monopoly power if it can profitably raise prices substantially above the competitive level for a significant period of time." ABA Model Instr. 3.A.2.

**Post-Instruction No. 14**

## EXISTENCE OF MONOPOLY POWER—DIRECT PROOF

Plaintiffs can provide direct proof of monopoly power in a relevant market via direct evidence through any one of these alternative ways.

*Raising or Maintaining Prices Above Competitive Levels*

One way Plaintiffs may prove that Defendants have a monopoly in a relevant market is to show that Defendants can profitably maintain prices above a competitive level. Plaintiffs must prove that Defendants have the power to do so themselves—that is, without the assistance of, and despite competition from, any existing or potential competitors. Defendants can have monopoly power even if they do not charge prices above competitive levels, so long as they have the ability to maintain prices above competitive levels without losing so much business to other competitors that the price increase would become unprofitable and would have to be withdrawn.

- In Plaintiffs' proposed primary ticketing services markets, the prices in question are the fees retained by ticketers, such as Ticketmaster, when providing primary ticketing services to major concert venues.

- In Plaintiffs' proposed amphitheaters market, the prices in question are the prices that Plaintiffs claim artists pay to rent large amphitheaters.

- In Plaintiffs' proposed concert booking services markets, the prices in question are the prices that venues pay for concert booking and promotion services.

- In Plaintiffs' proposed promotion services market, the prices in question are the prices that artists pay for promotion services.

To prove monopoly power in this way, Plaintiffs must prove that Defendants have the power to maintain prices above a competitive level for a significant period of time. If the Defendants attempted to maintain prices above competitive levels, but would lose so much business to other

competitors that the price increase would become unprofitable and would have to be withdrawn, then Defendants do not have monopoly power.

*Reducing or Maintaining Quality Below Competitive Levels*

Another way Plaintiffs may prove that Defendants have monopoly power is to show that Defendants have the ability to reduce or maintain the quality of products or services below competitive levels for a significant period of time. This is similar to the point I just described regarding price. If Defendants had the ability—even if unused—to reduce quality below competitive levels without losing so much business to other competitors that the quality reduction would become unprofitable and would have to be withdrawn, then Defendants have monopoly power.

*Power to Exclude Competition*

Alternatively, Plaintiffs may prove that Defendants have monopoly power by proving that Defendants have the ability to exclude or block competition. If you find that Defendants had the power to inhibit growth or expansion by existing competitors in a market or to prevent new competition from entering that market, then Defendants have monopoly power. This power to exclude may be shown by evidence of Defendants blocking competitors' ability to compete or of Defendants reducing or restricting the share of the market held by competitors.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 3.A.8; *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("the material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") (quotation marks and citation omitted); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market." (citation omitted)); *See United States v. Google LLC*, 747 F. Supp. 3d 1, 118 (D.D.C. 2024) ("Just as the power to raise price when it is desired to do so is proof of monopoly power, so too is the ability to degrade product quality without concern of losing consumers . . . ." (cleaned up)); *Cf. MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 182 (2d Cir. 2016) ("[A] plaintiff may offer direct evidence of harm to competition by proving higher prices, reduced output, or lower quality in the market as a whole."

**Plaintiffs' Position:** Plaintiffs propose an expanded and clarified version of the ABA model instruction on direct proof of monopoly power. In particular, Plaintiffs have proposed additional language to clarify that the ability to charge prices above competitive levels is sufficient, even if a monopolist chooses not to exercise such power. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274 (2d Cir.1979) ("[T]he fact that the power has not been used to extract improper benefits provides no succor to the monopolist."); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 n.2 (6th Cir. 2002) ("[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so.") Plaintiffs propose an additional short section on reducing or maintaining quality below competitive levels because Plaintiffs anticipate both sides will put on evidence of product quality in addition to price. It is well-recognized that a reduction in quality below competitive levels is the functional equivalent of a price-increase to customers. *Cf. In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 375 (S.D.N.Y. 2022) ("Harm to competition may be inferred through facts such as 'reduced output, increased prices and decreased quality' in the relevant market."). Plaintiffs also object to Defendants' proposed additions to the "power to exclude competition" section as they refer back to the ability to maintain supracompetitive prices, which is a distinct indicator of monopoly power already addressed earlier in the instruction, without providing any explanation of the concept of excluding or blocking competition. Referencing back to the ability to maintain higher prices in this section is likely to confuse jurors. Finally, Plaintiffs object to Defendants' proposed instructions related to profit margins. Ultimately, as acknowledged in Defendants' proposed instruction, profit margins are not dispositive in either direction as to the existence or absence of monopoly power, and therefore, these instructions are both irrelevant and likely to confuse jurors. Additionally, the proposed instructions are the inverse of the applicable law. In *Alcoa*, the Second Circuit explained that although high margins might be evidence of monopoly power, lower profit margins are not proof of its absence simply because a monopolist has not yet used its pricing power "extortionately." *United States v. Alcoa*, 148 F.2d 416, 427 (2d Cir. 1945)

**Defendants' Authority:**  Adapted ABA Model Instr. 3.A.8.

**Defendants' Argument:**

Defendants object to Plaintiffs' modifications to the ABA model jury instruction on direct proof of monopoly power in ways that transparently lessen Plaintiffs' burden.  For instance, Plaintiffs' omit that they must prove each Defendant has the ability to "*raise* or maintain" prices above competitive levels, as well as the final two paragraphs proposed by Defendants from the model instruction.  ABA Model Instr. 3.A.8 (emphasis added).  Defendants also object to Plaintiffs' addition of language regarding quality, which does not appear in the ABA model jury instruction.  *See id.*

**Post-Instruction No. 15**

## EXISTENCE OF MONOPOLY POWER—INDIRECT PROOF

Now, I will instruct you on indirect proof.

Indirect evidence is evidence regarding the structure of the relevant market which may permit you to draw an inference that Defendants have the power to control price, restrict output, or exclude competition in the relevant market. Structural factors you may consider include market share, market share trends, barriers to entry, actual examples of entry and exit by other companies, and the number and size of competitors, each of which I will now explain in more detail.

*Market Share*

One factor that you should consider is Defendants' share of the relevant market. While market share is not the equivalent of monopoly power, it is relevant to your determination of whether Plaintiffs have proven monopoly power. A defendant must have a significant share of the market in order to possess monopoly power, but it need not be the only company operating within the market. The higher the company's share, the higher the likelihood that a company has monopoly power. A market share of 70% or greater is usually strong evidence of the existence of monopoly power. A market share below 50% is often not, on its own, strong evidence of monopoly power. But even if a company has a market share below 50%, the company can still have monopoly power depending on the nature of the market, including the size and competitiveness of other market participants and their ability to expand output or constrain Defendants' prices or quality. There is no bright-line rule. You should consider Defendants' market share in conjunction with other characteristics of the market—including the factors I will discuss next—to determine whether Defendants have the ability to control prices, restrict output, or exclude competition.

*Market Share Trends*

The history of Defendants' market share is something you may consider. An increasing or stable market share may strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while a decreasing share might show that a company does not have monopoly power.

*Barriers to Entry*

You may also consider whether there are barriers to entry or expansion in or into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way, or to sell more of a product that they already sell in the relevant market. Barriers to entry might include, but are not limited to, the large financial and time investment required to build amphitheaters or other live entertainment venues, the large financial investment required to develop ticketing or other technologies, the need to satisfy governmental regulations, the lack of opportunities to bid for ticketing contracts due to the existence of long-term exclusive contracts or other factors, venues' reticence to switch ticketers due to switching costs and business risk, the need to enter into multiple markets simultaneously, or the need to achieve the necessary scale to credibly offer and market a range of live entertainment services to artists, venues, and fans across the relevant market or markets. Other barriers to entry might include relationships with artists or venues, data on fans' prior ticketing purchases and preferences, specialized marketing practices, the reputation of the companies already participating in the market, and any other factor making entry difficult.

Evidence of low or no entry barriers may be evidence that Defendants do not have monopoly power, regardless of Defendants' market share, because new competitors could enter easily if Defendants attempted to raise prices or reduce quality for a substantial period of time. By contrast, evidence of barriers to entry along with high market share may support an inference that Defendants

have monopoly power.

*Entry and Exit by Other Companies*

The history of entry and exit in the relevant market may be helpful to consider. Entry of new significant competitors or significant expansion of existing competitors may be evidence that Defendants lack monopoly power. On the other hand, departures from the market, or the failure of firms to enter the market or expand successfully, may support an inference that Defendants have monopoly power.

*Number and Size of Competitors*

You may consider whether Defendants' competitors are capable of effectively competing. In other words, you should consider whether the financial strength, market shares, and number of competitors act as a substantial check on Defendants' ability to price and adjust the quality of their services. If Defendants' competitors are strong or have large or increasing market shares this may be evidence that Defendants lack monopoly power. On the other hand, if you determine that Defendants' competitors are weak or have small, stable, or declining market shares, this may support an inference that Defendants have monopoly power.

You may find that Defendants have monopoly power based on direct evidence, indirect evidence, or both. If you find that Defendants have monopoly power in any relevant market, then you must consider the remaining element of that monopolization claim. If you find that Defendants do not have monopoly power in a relevant market, then you must find for Defendants and against Plaintiffs on that monopolization claim as to that particular relevant market.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.7; *New York v. Actavis, PLC*, No. 14 CIV. 7473, 2014 WL 7015198, at *37 (S.D.N.Y. Dec. 11, 2014), *aff'd sub nom. New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) ("depending on other market factors, courts in the Second Circuit have permitted findings of market power with shares less than 50%," such as "finding [a] market share less than 30% would not foreclose the possibility of proving monopoly power"); *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir.1981) ("[T]he

higher a market share, the stronger is the inference of monopoly power."); *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 364 (S.D.N.Y. 2022) ("In this Circuit, there is no bright-line rule.").

**Plaintiffs' Position:** Plaintiffs' proposed instruction moves the first paragraph of the model instruction to the direct proof section for clarity, since that section appears first in the proposed instructions. Plaintiffs' proposal then lists the types of evidence the jury may consider as indirect evidence, adds additional clarifications to each section, and clarifies the language. In the market share section, Plaintiffs provide market share percentages to aid the jury in comparing market shares presented in this case to those that have been found to be sufficient indirect evidence of monopoly power. In *Tops Markets Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998), the Second Circuit noted that while "market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power." The Second Circuit has also clarified that a market share below 50% may rarely be evidence of monopoly power, but a share between 50% and 70% can occasionally show monopoly power, while a share above 70% is usually strong evidence of monopoly power. *See Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981). In addition, Plaintiffs added additional details to the barriers to entry section to aid in the jury's understanding of the concept.

**Defendants' Authority:** Adapted ABA Model Instr. 3.A.7.

**Defendants' Argument:**

Defendants object to Plaintiffs' modifications to the ABA model jury instruction on indirect proof of monopoly power in ways that transparently lessen Plaintiffs' burden. For instance, Plaintiffs omit language making clear that regardless whether they use direct or indirect evidence, the evidence must "establish[] that defendant has the power to control prices and exclude competition," and that a market share below 50% is "ordinarily not sufficient to support a conclusion that defendant has monopoly power." ABA Model Instr. 3.A.7. Defendants also object to Plaintiffs' additions to the market share inquiry. These additions are misleading as they fail to mention that even where a defendant's market share is above 70%, there must still be other evidence of monopoly power. *See United States v. Microsoft*, 253 F.3d 34, 54 (D.C. Cir. 2001) ("agree[ing]" that "even a predominant market share [of 95%] does not by itself indicate monopoly power"). They are also misleading because they suggest that other indirect evidence is relevant only where market share is low. Finally, Defendants object to Plaintiffs' lengthy recitation of various aspects of their case as "barriers to entry." Such recitation of Plaintiffs' allegations as part of the Court's instructions on the law improperly seeks to give the jury the misimpression that the Court agrees with Plaintiffs' allegations. Defendants' edits to this instruction align it with the ABA model jury instruction.

82

**Post-Instruction No. 16**

### MONOPOLIZATION: MAINTAINING MONOPOLY POWER THROUGH ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT

If you find that Plaintiffs have met their burden of proving Defendants possessed monopoly power in a relevant market, then you must turn to the next element. Plaintiffs must prove by a preponderance of the evidence that Defendants maintained monopoly power through anticompetitive or exclusionary conduct or acts.

Anticompetitive or exclusionary acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the relevant market. Put another way, exclusionary conduct causes harm to competition by limiting the opportunities of competitors, and it either does not further competition on the merits or does so in an unnecessarily restrictive way. For example, foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges in an area where it otherwise faces competition can all constitute exclusionary conduct.

Harm to competition is different from harm to a single competitor or group of competitors. For example, the maintenance of monopoly power by supplying better or cheaper products or services, or possessing superior business skills, is not unlawful because the goal of the antitrust laws is to protect competition itself rather than any particular competitor's right to succeed. This is sometimes referred to as "competition on the merits." Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws. It is also not unlawful if monopoly power is maintained because of luck.

In determining whether Defendants' conduct was anticompetitive or exclusionary, you should assess whether the conduct was consistent with competition on the merits, including whether the conduct provides benefits to consumers.

Plaintiffs are not required to prove every one of their specific allegations of exclusionary behavior, and Plaintiffs do not have to prove that Defendants' monopoly was maintained solely by exclusionary conduct. Rather Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market. You must weigh the evidence as a whole and consider all of the alleged exclusionary conduct, including the interrelated effects of the different conduct in aggregate, not in isolation, to reach your determination as to whether Defendants' conduct was reasonably capable of contributing significantly to maintaining their monopoly. Accordingly, you should not wipe the slate clean after scrutinizing any individual facet of Defendants' conduct but rather examine Defendants' conduct—and its effect—as a whole.

If you find, for any of Plaintiffs' claims, that Plaintiffs have proven by a preponderance of the evidence that Defendants maintained monopoly power through anticompetitive or exclusionary acts, then you must find for Plaintiffs on that claim. If you find that Plaintiffs did not prove this element by a preponderance of the evidence, then you must find for Defendants and against Plaintiffs on that claim.

Next, I will describe some types of anticompetitive conduct that may be at issue here based on Plaintiffs' allegations, but it is up to you to decide what conduct by Defendants was proven by Plaintiffs and whether that conduct harmed the competitive process.

**Plaintiffs' Authority**: ABA Model Instr. 3.A.9; *US Airways, Inc., for Am. Airlines, Inc. as Successor & Real Party in Int. v. Sabre Holdings Corp.*, Final Jury Instructions, 1:11cv2725, ECF No. 1207-8 at *18 (S.D.N.Y. May 19, 2022); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024); *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith*, 334 U.S. 100, 107 (1948); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452-53 (7th Cir. 2020); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive

way.'"); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83))).

**Plaintiffs' Position:** Plaintiffs' proposed instruction begins with the ABA model and adds to it additional explanation of what constitutes anticompetitive or exclusionary conduct based on a number of key Section 2 cases. In particular, Plaintiffs' proposal includes an additional sentence instructing the jury that it may consider whether the "conduct causes harm to competition by limiting the opportunities of competitors, and either does not further competition on the merits or does so in an unnecessarily restrictive way," drawing from language in *Aspen Skiing* and other cited cases. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) ("The question whether Ski Co.'s conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on Highlands. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been 'attempting to exclude rivals on some basis other than efficiency,' it is fair to characterize its behavior as predatory."); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019) ("A monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'").

Additionally, Plaintiffs proposed the subsequent sentence to explain to jurors some of the particular forms of conduct that the Supreme Court has previously held to be anticompetitive: "foreclosing potential competitors from obtaining access to a key input, using monopoly power to destroy threatened competition, or using a strategic position to acquire exclusive privileges in an area where it otherwise has competitors can all constitute exclusionary conduct." *See Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *United States v. Griffith*, 334 U.S. 100, 107 (1948)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 353 (4th Cir. 2024); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 222 (S.D.N.Y. 2014) ("Specifically, § 2 proscribes the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." (cleaned up) (quoting *Eastman Kodak*, 504 U.S. at 482-83)).
Plaintiffs' proposed instruction also provides guidance to jurors on how to evaluate the connection between the anticompetitive conduct alleged by Plaintiffs and the maintenance of any monopoly power by Defendants to avoid jurors incorrectly applying a "but-for" causation standard. Specifically, relying upon *United States v. Microsoft Corp.*, Plaintiffs propose jurors be told that "Plaintiffs may meet their burden by proving, by a preponderance of the evidence, that the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." 253 F.3d 34, 79 (2001).

Given the wide range of interrelated anticompetitive conduct alleged by Plaintiffs, much of which applies to multiple claims, Plaintiffs also believe it is important the jury be instructed to consider the evidence as a whole, including its interrelated nature, consistent with the Supreme Court's guidance in *Continental Ore* and the Fourth Circuit's recent opinion in *Duke Energy*. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole; and in a case like the one before us, the duty of the jury was to look at the

whole picture and not merely at the individual figures in it." (cleaned up)); *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024), cert. denied sub nom. *Duke Energy Carolinas v. NTE Carolinas II, LLC*, 2026 WL 79821 (U.S. Jan. 12, 2026) ("Just as the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole, so too must a firm's exclusionary efforts be considered in their totality." (citation and quotation omitted)).

Defendants' proposed instruction, by contrast, misstates the law by narrowly defining anticompetitive conduct, failing to provide the jury with examples of such conduct, and imposing additional hurdles for Plaintiffs to clear that are unsupported by the case law. For example, Defendants' proposed language can be incorrectly interpreted to be exhaustive: "[h]arm to competition can include evidence of increased prices, decreased production levels, and reduced quality." However, courts have made clear that "harm to the competitive process" is itself sufficient harm to competition to render conduct anticompetitive. *See Viamedia, Inc. v. Comcast Corp*., 951 F.3d 429, 453 (7th Cir. 2020) ("The fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'"); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (plaintiffs "must allege and prove harm, not just to a single competitor, but to the competitive process, i.e., to competition itself"). Defendants' proposed instruction appears to require near complete foreclosure of competition by an act for it to be anticompetitive ("conduct that has made it very difficult or impossible for competitors to compete"), but Defendants identify no authority for such a high bar. As explained above, the correct test set forth in *Microsoft* requires Plaintiffs to show the conduct merely "was reasonably capable of contributing significantly to Defendants' continued monopoly power in any relevant market." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (2001).

Defendants' proposal incorrectly instructs the jury that anticompetitive conduct "must represent something more than the conduct of business that is part of the normal competitive process or commercial success." But "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003); *United States v. Google LLC*, 803 F. Supp. 3d 18, 142 (D.D.C. 2025) ("[C]onduct that is otherwise lawful when committed by a non-monopolist can be deemed anticompetitive when performed by a dominant firm.").

Defendants' proposal also vaguely and confusingly injects the concept of a "legitimate business purpose" and implies without further explanation that any conduct undertaken for a "business purpose" such as increased profits or market share is necessarily not anticompetitive. But that is not the law. As the Seventh Circuit explained in *Viamedia*, "a short-term profit sacrifice is neither necessary nor sufficient for conduct to be exclusionary." *Viamedia*, 951 F.3d at 462; *see also Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) ("The fact that profit maximization is a goal of the make or buy policy provides support for an argument that the policy is a legitimate practice, but does not shield the policy from judicial scrutiny. A monopolist cannot escape liability for conduct that is otherwise actionable simply because that conduct also provides short-term profits."); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 431 (2d Cir. 1945) ("[The monopolist] insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face

every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to maneuvers not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent."); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075-76 (10th Cir. 2013) ("[S]urely a monopolist can find ways to harm competition while still making money.").

To avoid confusion, any discussion of business purposes should be included in the subsequent instruction on procompetitive justifications. That instruction also properly clarifies that it is Defendants' burden to come forward with any non-pretextual procompetitive justifications for the alleged conduct, rather than any generic "business purpose." *See Kodak*, 504 U.S. at 483, 485 (defendants' proffered business reasons must be "valid," "sufficient," "legitimate," and "competitive"); *Aspen Skiing*, 472 U.S. at 608-10; *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212-14, 1218–20 (9th Cir. 1997). Defendants further misstate the law by suggesting that jurors "may not find that a company willfully acquired or maintained monopoly power through anticompetitive means if it has acquired or maintained that power through the exercise of superior foresight and skill, such as providing quality products or services." But this misstates the holding of *Grinnell* by creating a false dichotomy. *Grinnell* held that the maintenance of a monopoly "as a consequence of a superior product, business acumen, or historic accident" did not itself violate the Sherman Act, but the Court did not hold that a company with a superior product or business acumen that *also* engaged in anticompetitive conduct cannot be found liable under Section 2. Defendants' proposed instruction incorrectly suggests this to be the case.

**Defendants' Authority:**  Adapted ABA Model Instr. 3.A.9, 1.C.3, 1.C.4.

**Defendants' Argument:**

*First*, Defendants object to Plaintiffs' elimination of "willful acquisition," which is included in the ABA model jury instruction on anticompetitive conduct as well as in the caselaw.  ABA Model Instr. 3.A.9; *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

*Second*, Defendants object to Plaintiffs' modifications to the model instruction in ways that transparently lessen Plaintiffs' burden.  For instance, Plaintiffs omit language regarding examples of harm to competition, a monopolist's ability to compete aggressively and charge monopoly prices without violating the law, and the difference between anticompetitive conduct and legitimate business conduct.

*Third*, Defendants object to Plaintiffs' insertion of language that they must prove only that "the exclusionary conduct was reasonably capable of contributing significantly to Defendants' continued monopoly power."  That is not the law for any Plaintiff.  Indeed, no Plaintiff even argued as much during summary judgment briefing.  ECF No. 724 at 23 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 777 at 26-36 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment).  Even if that standard might potentially apply "when a regulator is seeking only injunctive relief," *United States v. Google LLC*, 747 F. Supp. 3d 1, 152-53 (D.D.C. 2024), it has no place here where the United States has chosen to try its claims together with State Plaintiffs that are seeking monetary relief as well.  To the extent that the United

87

States thinks a different causation standard applies to its claims, Defendants object to that view and to inclusion of that standard in this instruction without explanation that the standard certainly does not apply to Plaintiff States' claims.  Moreover, if the same jury would need to be instructed on different causation standards for different Plaintiffs, Defendants would face severe prejudice.  In that circumstance, the Court would need to bifurcate and stay the United States' claims while the Plaintiff States' claims alone were tried to the jury under a single causation standard.

Defendants' proposal aligns this instruction with the ABA model jury instruction.  It also combines subsequent instructions regarding procompetitive justifications and balancing competitive effects to reduce the length of the jury instructions and indicate to the jury that the latter analyses are all part of the anticompetitive conduct analysis.

**Post-Instruction No. 16P**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXAMPLES

Now I will provide additional detail on some of the anticompetitive and exclusionary conduct Plaintiffs have alleged Defendants engaged in. You should consider all of the evidence as a whole to decide whether any conduct by Defendants was anticompetitive or exclusionary.

*Content Conditioning and Long-Term Exclusivity*

Plaintiffs have alleged Defendants maintained monopoly power in the primary ticketing markets by engaging in conduct that led venues to believe that they would lose valuable Live Nation shows if they used primary ticketers other than Ticketmaster. Plaintiffs contend that Defendants did so through statements by employees and agents of Live Nation, including but not limited to statements that conditioned, or threatened to condition, a venue's access to Live Nation shows on the venue's use of Ticketmaster. Plaintiffs also allege Live Nation retaliated against venues that use rival ticketers. Plaintiffs also allege that Defendants have engaged in other conduct to maintain exclusive or restrictive ticketing agreements with venues, including engaging in early renewals and insisting on long-term contracts. You should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in the alleged conduct. If you find Defendants engaged in the alleged conduct, you should then consider what effect this conduct had on competition. You should consider whether this alleged conduct harmed competition for primary ticketing services by impairing the opportunities of rivals instead of competing on the merits or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Use of Large Amphitheaters to Exclude Rival Promoters*

Plaintiffs also have alleged that Defendants conditioned artists' use of large amphitheaters owned, operated or controlled by Defendants on artists also purchasing promotion services from Defendants. You should first consider whether Plaintiffs have proven by a preponderance of the

evidence that Defendants engaged in such conduct. If you find Defendants engaged in such conduct, you should consider whether the alleged conduct harmed competition for promotion services by impairing the opportunities of rivals, instead of competing on the merits, or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Acquisitions*

Plaintiffs have alleged Defendants acquired control over rival promotion and ticketing companies, venues, and festivals, thereby reducing competition in certain markets. Acquisitions can come in many forms, including the purchase of a company or venue or entering into contracts or other agreements that provide Defendants effective or practical control over a company or venue, even if they do not own that company or venue. As with the other alleged conduct, you should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. Put another way, you should consider whether the alleged acquisitions harmed competition for promotion services, primary ticketing services, or the use of venues by impairing the opportunities of rivals, instead of competing on the merits, or by impairing rivals' ability to compete in an unnecessarily restrictive way.

*Exclusive Booking Agreements*

Plaintiffs have alleged Defendants entered into exclusive or restrictive booking agreements with venues, thereby reducing competition for promotion services and the use of large amphitheaters. As with the other alleged conduct, you should first consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct. You should consider whether any arrangements and agreements had the practical effect of providing Defendants control over concert bookings at venues.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. For example, you should consider whether this conduct had the effect of preventing or excluding competition for promotion services or the use of large amphitheaters not by furthering competition on the merits but by impairing the opportunities of rivals or engaging in the conduct in an unnecessarily restrictive way.

The previous examples are not exhaustive of the types of anticompetitive conduct because anticompetitive conduct comes in many forms. You should consider the evidence as a whole in deciding whether any of Defendants' conduct was anticompetitive.

**Plaintiffs' Authority**: *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (anticompetitive conduct can take many forms because "the means of illicit exclusion, like the means of legitimate competition, are myriad") (quoting *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)); *Viamedia, Inc. v. Comcast Corp.,* 951 F.3d 429, 453 (7th Cir. 2020) ("Conduct that can harm competition may fit into more than one of these court-devised categories" and thus "[t]he fact that the categories of conduct here are conceptually related and may overlap should not cause confusion if we stay focused on the underlying inquiry: the conduct 'must harm the competitive process and thereby harm consumers.'") (quoting *Microsoft*, 253 F.3d at 58); Areeda & Hovenkamp, *Antitrust Law*,  ¶ 777a (Although "the standard for a §2 violation is significantly stricter in its power assessment [than for a § 1 claim], it is broader and less categorical in its definition of proscribed conduct."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia, J., dissenting) ("Our § 2 monopolization doctrines are similarly directed to discrete situations in which a defendant's possession of substantial market power, combined with his exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power. Where a defendant maintains his substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive— can take on exclusionary connotations when practiced by a monopolist." (cleaned up)).

**Plaintiffs' Position**: Plaintiffs have proposed this instruction in order to provide clarity for the jury on the types of alleged anticompetitive conduct it may consider when evaluating the evidence in this case, utilizing the earlier general instruction on anticompetitive conduct. Plaintiffs have drafted the instructions in a neutral manner that does not presume the evidence has proven any of the alleged conduct and without indicating what ultimate outcome the jury should reach as to whether any particular conduct was or was not anticompetitive.

**Defendants' Argument:**  Defendants object to Plaintiffs' three instructions reciting their allegations of anticompetitive conduct in their entirety.  Further recitation of Plaintiffs' allegations beyond that included in the summary of the parties' contentions above has no place in the Court's official instructions on the law.  Such recitation risks prejudice because it might give the jury the misimpression that Plaintiffs' allegations are part of the law, or that the Court (which determines the

law) agrees with them.  If the Court allows these instructions, Defendants reserve the right to propose alternative instructions that state Defendants' position against Plaintiffs' allegations.

**Post-Instruction No. 16P2**

### ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—OVG AGREEMENTS

Plaintiffs have alleged Defendants entered into various agreements with Oak View Group that reduced or restricted competition in one or more markets, either by leading to Oak View Group or Live Nation not competing in certain markets or by distorting the competitive process within those markets. First, you should consider whether Plaintiffs have proven by a preponderance of the evidence that Defendants engaged in such conduct.

If you find that Defendants engaged in such conduct, you should then consider what effect this conduct—taken as a whole—had on competition. You should consider whether this conduct had the effect of harming or impeding competition for promotion services, primary ticketing services, or the use of venues, not by furthering competition on the merits but by impairing the opportunities of rivals, or by engaging in the conduct in an unnecessarily restrictive way.

**Plaintiffs' Position:** As with the prior instruction, Plaintiffs have proposed this instruction in order to provide clarity for the jury on the types of alleged anticompetitive conduct and how to utilize the earlier general instruction on anticompetitive conduct. Plaintiffs have drafted the instruction in a neutral manner that does not presume the evidence in this case has proven any of the alleged conduct and without indicating whether the jury should ultimately find any particular conduct to be anticompetitive. Omitting this instruction would leave the jury with only the somewhat abstract legal standards for evaluating conduct without explanation of how to apply those standards to the specific facts of this case.

**Defendants' Argument:** Defendants object to Plaintiffs' three instructions reciting their allegations of anticompetitive conduct in their entirety. Further recitation of Plaintiffs' allegations beyond that included in the summary of the parties' contentions above has no place in the Court's official instructions on the law. Such recitation risks prejudice because it might give the jury the misimpression that Plaintiffs' allegations are part of the law, or that the Court (which determines the law) agrees with them. If the Court allows these instructions, Defendants reserve the right to propose alternative instructions that state Defendants' position against Plaintiffs' allegations.

**Post-Instruction No. 17**

## ANTICOMPETITIVE OR EXCLUSIONARY CONDUCT—EXCLUSIVE DEALING - SHERMAN ACT SECTION 2

Plaintiffs have alleged that Defendants entered into long-term, exclusive primary ticketing contracts with major concert venues that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. This is a category of conduct known as "exclusive dealing," and there are special standards that apply only to exclusive dealing conduct, which I will explain to you now. You should not apply these standards when considering other forms of alleged anticompetitive conduct.

I will now explain to you what an exclusive agreement is.

Exclusive agreements require a buyer of a product or service to obtain that product or service exclusively—or nearly exclusively—from one supplier for a period of time. There are several forms of exclusive dealing arrangements. The arrangement may take the form of an agreement, arrangement, or practice forbidding the buyer from purchasing the product or service from the supplier's competitors, a requirements contract committing the buyer to purchase all of its requirements of specific products or services from the supplier, or a pricing policy that creates a substantial disincentive to purchase from competitors. Some practices may operate as partial exclusive dealing contracts. Others may operate as de facto exclusive dealing contracts by limiting the practical ability of the buyer to obtain the specific products or services from other suppliers.

To establish that an exclusive dealing, or partial exclusive dealing, arrangement amounts to exclusionary conduct under Section 2 of the Sherman Act, Plaintiffs must establish by a preponderance of the evidence that the Defendants entered into one or more exclusive agreements between the buyers (major concert venues) and the supplier (Defendants).

If you find that such an agreement existed, you must then determine whether the agreement or agreements had a substantial adverse effect on competition for primary ticketing services to major concert venues. Plaintiffs may prove the agreement had a substantial adverse effect on competition through direct evidence, circumstantial evidence, or both. When evaluating whether the agreement adversely affected competition there is no set formula and you may assess some or all of the following factors: (i) the extent of Defendants' market power; (ii) whether the agreements foreclose a substantial share of the market for primary ticketing services; the test is not total foreclosure, but rather whether the exclusive dealing barred a substantial number of competitors or severely restricted the market's ambit; (iii) the duration of the contract: a contract of shorter duration is less likely to harm competition than one of longer duration; (iv) the ability of venues to terminate the contract, and (v) whether competitors use similar contracts.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.D.5, 1.C.2., 2.E.8; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025).

**Plaintiffs' Position**: Plaintiffs have proposed an instruction that closely tracks the three relevant ABA model instructions for exclusive dealing, combining two of them for purposes of streamlining. Plaintiffs' only substantive alterations consist of (i) clarifying that exclusive deals may be "nearly exclusive," consistent with other parts of the model instruction and case law, and (ii) providing the jury with guidance on sufficient foreclosure rates and other relevant factors for assessing competitive effects, based on *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-612, (S.D.N.Y. 2025) (citing *ZF Meritor*, 696 F.3d at 271-72).

Defendants' proposal by contrast is not based on an established model and misstates the relevant law. First, it incorrectly suggests to jurors that the particular exclusive contracts at issue *here* are "presumptively procompetitive and lawful" based on caselaw describing exclusive contracts more generally across the economy. Whether the particular exclusive contracts at issue here are anticompetitive/procompetitive or lawful/unlawful depends on the particular facts and circumstances, as analyzed using the *ZF Meritor* factors that appear nowhere in Defendants' proposed instruction. Additionally, Defendants' proposed instruction misstates the law on coercion and is likely to confuse the jury. Defendants' proposal suggests the jury must find that customers "would have preferred to enter into a non-exclusive contract," but the relevant question, as with tying, is whether, but for Defendants' conduct, customers *might* have preferred a non-exclusive contract. *See supra* Plaintiffs' Position at Post-Instruction No. 7; *see also United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 611 (S.D.N.Y. 2025) (identifying "evidence that the dominant firm engaged in coercive behavior" as only one of seven factors courts consider in assessing foreclosure). Additionally, Defendants' broad assertion that "it is not anticompetitive for a seller to agree to sell

on an exclusive basis, even if that seller has monopoly power," finds no support in the cases cited, as the key question under Section 2 is whether Defendants' exclusive contracts foreclosed competition, here in furtherance of maintaining their ticketing monopolies.

**Defendants' Authority:** *In re Mylan N.V. Sec. Litig.*, 666 F. Supp. 3d 266, 291 (S.D.N.Y. 2023) ("With respect to exclusive dealing agreements, the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively procompetitive and lawful."); *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) ("[E]xclusive distributorship arrangements are presumptively legal."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Interface Grp., Inc. v. Massachusetts Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987) ("When there is no plausible connection between exclusive dealing and antitrust harm, courts have not hesitated to hold that dealing lawful."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is thrown out the window when record evidence suggests coercion by the monopolist.").

**Defendants' Argument:**

Exclusive contracting is the core conduct that Plaintiffs challenge in their Section 1 claim and most of their Section 2 claims. Given its central role in this case, the jury should be instructed on the law of exclusive contracts. This instruction explains that exclusive contracts themselves are not unlawful, and they do not constitute anticompetitive or exclusionary conduct unless the seller coercively imposed them on customers. As multiple courts have recognized, this element of coercion is required with respect to exclusive contracts. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022). Without an instruction of this nature, the jury may erroneously believe that the mere fact of entering into exclusive contracts is anticompetitive.

Defendants object to Plaintiffs' three instructions reciting their allegations of anticompetitive conduct in their entirety. Further recitation of Plaintiffs' allegations beyond that included in the summary of the parties' contentions above has no place in the Court's official instructions on the law. Such recitation risks prejudice because it might give the jury the misimpression that Plaintiffs' allegations are part of the law, or that the Court (which determines the law) agrees with them. If the Court allows these instructions, Defendants reserve the right to propose alternative instructions that state Defendants' position against Plaintiffs' allegations.

**Post-Instruction No. 17P**

## PROCOMPETITIVE BENEFITS

If you find that Defendants engaged in anticompetitive conduct, then you may consider non-pretextual, procompetitive justifications for this conduct offered by Defendants.

A justification is pretextual if it was not the true reason for Defendants' conduct.

A justification is procompetitive if it promotes efficiency or quality or allows a company to offer a better product or service. For example, if Defendants' conduct is part of what supports the quality or functionality of the specific service of Defendants at issue, then that conduct may be procompetitive.

If you find that Defendants offered non-pretextual, procompetitive justifications for particular conduct, you must then determine whether Plaintiffs have proven by a preponderance of the evidence that the conduct was not reasonably necessary to achieve the benefits. In other words, if Plaintiffs have proven that the same benefits claimed by Defendants could have been achieved by other, reasonably available alternative means that would have created less harm to competition, then Defendants cannot use those claimed benefits to justify the conduct.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.3; *US Airways, Inc. v. Sabre Holdings Corp.*, Final Jury Instructions at 19, 27, 1:11cv2725, ECF No. 1207-8 (S.D.N.Y. May 19, 2022); *Fed. Trade Comm'n v. Shkreli,* 581 F. Supp. 3d 579, 627 (S.D.N.Y. 2022) (a "monopolist may proffer nonpretextual procompetitive justifications for its conduct") (citation omitted); *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2162 (2021) (explaining that the defendant failed to show a "procompetitive benefit" because it "failed to establish that the challenged compensation rules have any direct connection to consumer demand" (cleaned up)); *Microsoft*, 253 F.3d at 72 (rejecting justification of "keeping developers focused upon Windows" as "competitively neutral"); *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) ("If the defendants [provide a procompetitive justification for a challenged restraint], the government must prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.").

**Plaintiffs' Position**: Although Defendants subsume a similar instruction as a small part of their proposed instruction 19, Plaintiffs' position is that this explanation of how the jury should evaluate procompetitive justifications warrants emphasis as its own instruction, just like in the ABA Model.

**Post-Instruction No. 17P2**

## BALANCING THE COMPETITIVE EFFECTS

If you find that the challenged conduct was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm outweighs the competitive benefits, then the challenged conduct is exclusionary. If the competitive harm does not outweigh the competitive benefits, then the challenged conduct is not exclusionary. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Plaintiffs bear the burden of proving by a preponderance of the evidence that the anticompetitive effect of the conduct outweighs any qualifying pro-competitive benefits.

This concludes the instructions on Plaintiffs' monopolization claims. Once you've completed your deliberations following these monopolization instructions, you should mark on the jury form, for each market identified, whether or not Defendants unlawfully monopolized that market.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.4; *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) ("If the defendants [provide a procompetitive justification for a challenged restraint], the government must prove either that the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition.").

**Plaintiffs' Position**: Although Defendants subsume a similar instruction as a small part of their proposed instruction 19, Plaintiffs' position is that this explanation of how the jury should evaluate procompetitive justifications warrants emphasis as its own instruction, just like in the ABA Model.

**Post-Instruction No. 18**

## EXCLUSIVE DEALING—SHERMAN ACT SECTION 1

Plaintiffs claim that Defendants have engaged in unlawful exclusive dealing also in violation of Section 1 of the Sherman Act by entering into long-term, exclusive primary ticketing contracts with major concert venues that generally require the venue to use Ticketmaster as the exclusive primary ticketer for all events or for all concerts. I have already instructed you on the special standards you are to consider when evaluating exclusive dealing conduct under Plaintiffs' Section 2 monopolization claim. I will now instruct you on how to evaluate Plaintiffs' separate Section 1 exclusive dealing claim. Again, you should not apply these standards when considering other forms of alleged anticompetitive conduct.

To establish that an exclusive dealing, or partial exclusive dealing, arrangement violates Section 1 of the Sherman Act, Plaintiffs must establish each of the following elements by a preponderance of the evidence:

(1)     There is an agreement between the buyers (major concert venues) and the supplier (Defendants) that substantially forecloses the major concert venues from buying primary ticketing services from competing suppliers.

(2)     The agreement was an unreasonable restraint of trade that had a substantial adverse effect on competition for primary ticketing services. Plaintiffs may prove the agreement unreasonably restrained trade through direct evidence, circumstantial evidence, or both. When evaluating whether the agreement adversely affected competition, there is no set formula and you may assess some or all of the following factors: (i) whether the Defendants possess market power; (ii) whether the agreements foreclose a substantial share of the market for primary ticketing services to major concert venues—for your guidance, foreclosing roughly 40% of a relevant market can be considered a substantial share under Section 1 of the Sherman

Act; (iii) the duration of the contract: a contract of shorter duration is less likely to harm competition than one of longer duration; (iv) the ability of venues to terminate the contract, and (v) whether competitors use similar contracts.

(3)    Defendants had substantial market power in the market for primary ticketing services. Market power has been defined as an ability to profitably raise prices for a sustained period of time above those prices that would be charged in a competitive market, or to exclude competition, or to force a purchaser to do something it would not do in a competitive market. Market power is understood to be less power over the market compared to monopoly power. A firm can have market power if it does not have monopoly power, but a firm that has monopoly power in a relevant market necessarily also has market power in that market. Even a firm with around 30% market share can have market power. A firm that has market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not on its own market power. An important factor in determining whether Defendants possess market power is their market share, that is, Defendants' percentage of the services sold in the relevant market by all competitors. Other factors that you may consider in determining whether Defendants have, or had, market power include whether Defendants are capable of raising or maintaining prices above competitive levels or reducing quality; or whether there are barriers to entering the market; or whether Defendants can exclude or have excluded competition or prevented competitors or potential competitors from entering the relevant market.

If Defendants do not possess a substantial market share, it is less likely that they possess market power and unlikely that the challenged restraint has resulted or will result in a substantial harmful effect on competition in the market. However, if Defendants do possess a substantial market share it

is more likely that they possess market power and the challenged restraint has resulted or will result in a substantial effect on competition.

To violate Section 1 of the Sherman Act, the exclusive dealing agreement also must have occurred in or affected interstate commerce. Because the parties have agreed to this last element, you will not need to decide it.

If you find that the evidence is insufficient to prove any one of these elements, then you must find for Defendants and against Plaintiffs on Plaintiffs' Section 1 exclusive dealing claim. If you find that the evidence is sufficient to prove all of these elements, then you must find for Plaintiffs and against Defendants on Plaintiffs' Section 1 exclusive dealing claim.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 1.C.2, 2.D.5; *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609, 611-12, (S.D.N.Y. 2025) (setting forth exclusive dealing framework under Section 1 of the Sherman Act); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001) (ruling that MasterCard had "market power in the general purpose card network services market" where Mastercard had a "26%" market share), *modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), and *aff'd*, 344 F.3d 229 (2d Cir. 2003); *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001) (Section 1 generally requires a roughly "40% standard drawn from the caselaw," while a Section 2 violation may "foreclose less than the roughly 40% or 50% share usually required in order to establish a [Section] 1 violation").

**Plaintiffs' Position:** As with the exclusive dealing instruction under Section 2, Plaintiffs' proposed instruction hews closely to the cited model instructions and the language from *United States v. Visa*. 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025). For the reasons stated in Plaintiffs' opposition to Defendants' motion for summary judgment, Defendants' proposed instruction, which differs from the model and caselaw cited, is incorrect. *See* ECF No. 784.

**Defendants' Authority:**  Adapted ABA Model Instr. 1.C.2, 2.D.5, 2.D.6, *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 116 (S.D.N.Y. 2015) ("In order to adequately plead foreclosure in a relevant market, a plaintiff first must properly define the relevant market."); *id.* at 117 ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012) ("Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present."); *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015, 1031 n.11 (8th Cir. 2020) (same); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 77-78 (3d Cir. 2010) ("coercion is a fundamental consideration" where customers have "freely entered into exclusive contracts with the respective suppliers"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005); *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 996 (10th Cir. 2022) ("We can [] generally presume exclusive deals are procompetitive. But this assumption is

thrown out the window when record evidence suggests coercion by the monopolist."); *CoStar Grp., Inc. v. Comm. Real Estate Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025) ("[A] § 1 exclusive dealing claim requires a substantial foreclosure of competition."); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, (D.C. Cir. 2023) (requiring "substantial market foreclosure"); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB), 2024 WL 1014159, at *26 (E.D.N.Y. Mar. 8, 2024) ("Moreover, it is settled law that, under the rule of reason, a plaintiff bears the burden of showing 'an actual adverse effect' on competition through increased prices, decreased output, or that the challenged conduct 'otherwise stifled competition.'"); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts); *Paddock Publ'ns v. Chi. Tribune*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common."); *Ticketmaster v. Tickets.com*, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired.").

**Defendants' Argument:**

Defendants' edits to this instruction primarily accomplish four things.  *First*, they clarify that this claim is asserted only against Ticketmaster, not Live Nation.  ECF No. 257 at 87-88 (Am. Compl.).  Indeed, only Ticketmaster is a party to its primary ticketing contracts with venues, and Plaintiffs have not alleged any veil-piercing or like theory that would permit this claim against Live Nation.  *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both").

*Second*, Defendants' edits make clear that Plaintiffs must prove their Section 1 exclusive dealing claim for each challenged primary ticketing contract separately.  As Defendants explained in their summary judgment briefing, exclusive dealing challenges under Section 1 cannot aggregate contracts, unlike under Section 2.  ECF No. 724 at 32 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); *Dickson v. Microsoft Corporation*, 309 F.3d 193, 203-05 (4th Cir. 2002) (declining to consider licensing agreements between Microsoft and various OEMs in the aggregate and analyzing each agreement "individually" instead); *Howard Hess Dental*

*Laboratories v. Dentsply International*, 602 F.3d 239, 255-56 (3d Cir. 2010) (requiring plaintiffs to show that "every single agreement" between a manufacturer and its dealers had anticompetitive effect); *Gibson v. Cendyn Group*, 148 F.4th 1069, 1087 (9th Cir. 2025) (finding that "a grouping of individual agreements could not be 'aggregated' for the purposes of determining whether together they acted as an unreasonable restraint of trade," and requiring that the agreements "have a 'discrete effect' on competition"); *Panini America v. Fanatics*, 2025 WL 753954, at *9 (S.D.N.Y. Mar. 10, 2025) (refusing to "consider the effects of [] six exclusive deals together" and considering the effect of each separately instead).

*Third*, Defendants' edits to the market power element align it with the ABA model jury instruction on market power. *See* ABA Model Instr. 1.C.2. Defendants object to Plaintiffs' comparison of market power to monopoly power. This comparison, and in particular Plaintiffs' provision of a market share percentage at which market power may be found, is prejudicial as it may cause the jury to ignore the market power analysis and find the market power element satisfied based only on Ticketmaster's market share.

*Fourth*, Defendants have added elements on market definition, coercion, substantial foreclosure, and anticompetitive effects because it is well-established that each of those inquiries must be satisfied in a Section 1 exclusive dealing claim. *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under . . . §§ 1 or 2 of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired."); *supra* Post-Instruction No. 17 (Anticompetitive or Exclusionary Conduct – Exclusive Dealing – Sherman Act Section 2); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"); *United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 609 (S.D.N.Y. 2025) ("[A]n exclusive dealing arrangement must 'foreclose competition in such a substantial share of the relevant market so as to adversely affect competition.'"). Defendants' explanation of the substantial foreclosure element tracks the relevant ABA model jury instruction. *See* ABA Model Instr. 2.D.6. As does Defendants' explanation that the jury should consider whether venues wanted to enter into exclusive primary ticketing contracts, and whether Ticketmaster's competitors has an opportunity to compete for those contracts. *Id.*; *see Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) ("It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."); *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83-84 (3d Cir. 2010) (plaintiff was not denied the ability to compete merely because it did not receive an invitation to bid where it was "well aware of what [was] going on in the marketplace" and knew how to compete for exclusive contracts).

**Post-Instruction No. 19**

### UNLAWFUL TYING

Plaintiffs also claim that Defendants engaged in an unlawful tying arrangement in violation of Section 1 of the Sherman Act. Again, this is separate and apart from Plaintiffs' claims of monopolization and is subject to different rules for you to consider, which I will explain now.

A tying arrangement is one in which the seller will sell one product or service (referred to as the tying product) only on the condition that buyers also purchase a different product or service (referred to as the tied product) from the seller, or at least agrees not to purchase the tied product or service from any other seller. In this case, Plaintiffs claim that the tying product is the use of large amphitheaters by artists, and the tied product is promotion services to artists performing in major concert venues. Plaintiffs claim that Defendants require artists to use Defendants' promotion services in order for those artists to be able to perform at large amphitheaters owned, operated, or controlled by Defendants.

To prevail on their tying claim, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

1.    The use of large amphitheaters by artists and promotion services to artists performing in major concert venues are separate and distinct products.

2.    Defendants conditioned artists' use of large amphitheaters on artists also purchasing Defendants' promotion services.

3.    Defendants have sufficient market power in the use of large amphitheaters by artists to enable Defendants to restrain competition in promotion services to artists performing in major concert venues. I have previously instructed you on the meaning of market power in connection with the exclusive dealing claim. The same rules apply with determining the existence of market

power here. You may find that Defendants have market power with respect to the use of large amphitheaters by artists if, by reason of some advantage, Defendants have the power to raise their prices, reduce quality, or restrict output for the use of large amphitheaters by artists without losing an appreciable amount of business or otherwise to force artists who purchase the use of large amphitheaters to do something that they would not do in a more competitive market.

4.    The alleged tying arrangement caused anticompetitive effects in the market for promotion services to artists performing in major concert venues by forcing artists into buying promotion services that they may have preferred to buy elsewhere on different terms. When such forcing is present, competition on the merits in the market for promotion services to artists is restrained.

5.    The alleged tying arrangement involved a not insubstantial volume of commerce in promotion services to artists performing in major concert venues.

If you find that the evidence is sufficient to prove all five of these elements, then you must find for Plaintiffs and against Defendants on Plaintiffs' tying claim. If you find that the evidence is insufficient to prove any one of these elements, then you must find for Defendants and against Plaintiffs on Plaintiffs' tying claim. I will now provide additional detail on these elements.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.1 and 2.E.3; *In re Google Play Store Antitrust Litigation*, No. 3:20-cv-05761-JD, Final Jury Instructions for *Epic* Trial, ECF No. 592 at 41 (N.D. Cal. Dec. 6, 2023); *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989); *E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992); *N. Pacific R. Co. v. United States*, 356 U.S. 1, 7 (1958); *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

**Plaintiffs' Position**: Plaintiffs combined ABA Model Instructions 2.E.1 (Unlawful Tying Arrangement) and 2.E.3 (Elements – Per Se Unlawful Tying) for brevity and clarity. Plaintiffs' proposal conforms closely to the ABA model for both instructions. In paragraph one, Plaintiffs add the sentence with the language "separate and apart" to make it clear to the jurors that they are now considering a new claim. In paragraph two, Plaintiffs provide an illustrative example for the jurors, by specifying the type of conduct being alleged. In paragraph three, Plaintiffs list all five elements that are required to prove a tying claim in the Second Circuit: "first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product;

third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a 'not insubstantial' amount of commerce in the 'tied' market." *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1516-17 (2d Cir. 1989); *accord E & L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 31 (2d Cir. 2006)

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.1, 2.E.3; *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (noting "the 'fundamental principle of antitrust law that an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual'"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").

**Defendants' Argument:**

Defendants' edits to this instruction primarily accomplish three things. *First*, Defendants' addition of the first element and its accompanying instruction asks the jury—assuming the Court has not ruled for Defendants on this issue at summary judgment—to resolve whether promoters or artists rent amphitheaters from Live Nation. Resolution of this issue is required because "an illegal tying arrangement requires that at least two products and/or services be purchased by *the same individual*." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 71 (2d Cir. 1996) (emphasis added). If promoters are the purchasers, then there is no illegal tying arrangement involving artists, as Plaintiffs' contend. Moreover, if promoters are the purchasers, then it is not unlawful for Live Nation to refuse to deal with those competitors. *See infra* Post-Instruction No. 23 (No Duty to Deal); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'").

*Second*, Defendants' edits to the second element make clear a point that might otherwise be missed by the jury: it must have found two relevant antitrust markets (the amphitheaters market and the promotion services market) in order to proceed with the tying analysis. Plaintiffs have conceded this requirement. Transcript of Hearing on Defendants' Motion for Summary Judgment at 20:13-21:22.

*Third*, Defendants' edits to the fourth element eliminate redundant explanation of market power.

**Post-Instruction No. 20**

## UNLAWFUL TYING—PRESENCE OF TWO PRODUCTS

To determine whether the use of large amphitheaters by artists and promotion services to artists performing in major concert venues are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. If enough artists would want to purchase the use of large amphitheaters and promotion services to perform in major concert venues separately to induce venues and promoters generally to provide each service separately, then each service is a separate service. On the other hand, if there is very little demand for artists to buy one of the services by itself, that is, without the other service as part of a single purchase, then the use of large amphitheaters by artists and promotion services to artists performing in major concert venues are not two separate products for the purposes of the tying claim, even if they are sometimes sold separately.

Services may be separate services even if one of them is useless without the other. The relevant issue is whether there is sufficient demand from customers to induce sellers to provide them separately, even if the customer needs to obtain both products from one or more suppliers.

**Authority**: Adapted ABA Model Instr. 2.E.5; *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995 (9th Cir. 2023).

**Plaintiffs' Position**: Plaintiffs' proposed instruction largely follows the ABA model with minor modifications to match the facts of the case (i.e. what are the alleged tying and tied products). Consistent with the second paragraph of the model instruction, Plaintiffs' proposed minor adjustments to the model to make clear the relevant question is whether there is separate customer demand for the two products at issue, not whether customers would buy one product but not the other at all. Plaintiffs object to Defendants' proposed deletion of the phrase "as part of a single purchase" for this reason. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 995-96 (9th Cir. 2023). Plaintiffs also object to Defendants' renaming of Plaintiffs' proposed relevant markets in a manner that is confusing and misleading to the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.5.

**Defendants' Argument:**

Defendants object to Plaintiffs' insertion of "as part of a single purchase," which does not appear in the ABA model jury instruction and is unsupported by any authority.

**Post-Instruction No. 21**

## UNLAWFUL TYING—PROOF OF CONDITIONING

You may find that a tying arrangement exists between the use of large amphitheaters by artists and promotion services to artists performing in major concert venues if Defendants refused to allow artists to use large amphitheaters Defendants controlled unless artists also agreed to buy Defendants' promotion services.

You may also find that a tie exists if Defendants effectively coerced artists into buying Defendants' promotion services for performances in major concert venues. To prove coercion, Plaintiffs must prove by a preponderance of the evidence that Defendants exploited their control over the use of large amphitheaters to force the artists into the purchase of promotion services, which the artists either did not want at all, or might have preferred to purchase from a different promoter on different terms, and that any appearance of choice was illusory. Mere sales pressure or persuasion is not coercion. You may find that Defendants have effectively tied these products if the only viable economic option for artists is to purchase the use of Defendants' large amphitheaters and Defendants' promotion services together. Coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price, because the key issue for this element is the lack of choice.

However, there is no coercion if the use of large amphitheaters by artists and promotion services to artists performing in major concert venues are offered separately for sale and separate purchase is economically feasible. There is no requirement that Plaintiffs demonstrate coercion on an individual basis or that individual artists were coerced. An unremitting policy of a tie, if accompanied by sufficient market power in the use of large amphitheaters to appreciably restrain competition in the market for promotion services to artists constitutes the requisite coercion.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.7; *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976); *Park v. Thomson Corp.*, 2007 WL 119461, at *4 (S.D.N.Y. Jan. 11, 2007).

**Plaintiffs' Position:** Plaintiffs' proposal conforms largely to the ABA model instruction, adding clarifying language to provide examples of the type of conduct Plaintiffs would need to prove to meet their burden. In the final paragraph, Plaintiffs add two sentences on the standard in the Second Circuit, recognized in *Hill v. A-T-O, Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1976), that Plaintiffs can prove coercion by showing evidence of an unremitting policy of a tie, if accompanied by sufficient market power in the tying product (use of large amphitheaters) to appreciably restrain competition in the market for the tied product (artist promotion services). Plaintiffs also object to Defendants' renaming of Plaintiffs' proposed relevant markets in a manner that is confusing and misleading to the jury.

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.7; *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 257 F.3d 256, 270 (2d Cir. 2001) ("An invalid tying arrangement conditions the purchase of one product to the purchase of a second product that the buyer either does not want or would have preferred to purchase elsewhere."); *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 70 (2d Cir. 1996) ("To prove a tying claim, a plaintiff must have "evidence of actual coercion by the seller that forced the buyer to accept the tied product."); *Unijax, Inc. v. Champion Int'l, Inc.*, 683 F.2d 678, 686 (2d Cir. 1982).

**Defendants' Argument:**

Defendants object to Plaintiffs' additions to this instruction that do not appear in the ABA model jury instruction on proof of conditioning.  In particular, Defendants object to Plaintiffs' statement that "coercion can be shown even if the artist thinks that the promoter did a good job or charged a fair price."  And Defendants object to Plaintiffs' language regarding "[a]n unremitting policy of a tie." Defendants' edits align this instruction with the ABA model jury instruction and make clear that a tying arrangement is illegal only if the buyer was forced into purchasing "a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

Post-Instruction No. 22

## UNLAWFUL TYING—INVOLVEMENT OF A NOT INSUBSTANTIAL VOLUME OF INTERSTATE COMMERCE WITH RESPECT TO THE TIED PRODUCT

The last element is whether the alleged tying arrangement involved a not insubstantial amount of interstate commerce in promotion services to artists performing in major concert venues.

For commerce to be considered interstate, it must as a matter of practical economics have a nexus to commerce that affects or touches more than one state.

In determining whether the tying arrangement involved a not insubstantial amount of interstate commerce, you should consider the total dollar amount of Defendants' sales of promotion services in interstate commerce involved in the tying arrangement.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Plaintiffs' Position:** Plaintiffs proposed instruction generally follows the ABA model with an additional sentence explaining what constitutes interstate commerce, drawing from the cited cases. Plaintiffs' have also revised the model language to more closely mirror the "not insubstantial" phrasing used by the Supreme Court in *Fortner Enterprises* and *Northern Pacific Railway Co*. Plaintiffs object to Defendants renaming of Plaintiffs' proposed markets as confusing, prejudicial, and misleading to the jury. Plaintiffs also object to Defendants' addition of the phrase "achieved by," which is vague and likely confusing. The relevant question is the amount of commerce "involved" in or "affected" by the alleged tying arrangement. *See Fortner Enterprises, Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 6 (1958) (tying agreements are unreasonable "whenever a party has sufficient economic power with respect to the tying product to

appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Authority**: Adapted ABA Model Instr. 2.E.9; *Summit Health. Ltd. v. Pinhas*, 500 U.S. 322, 328 (1991) (affirming appellate court's description of interstate commerce requirement as requiring no more than a nexus to commerce that affects more than one state, even if "any actual impact on interstate commerce would be 'indirect' and 'fortuitous'"); *Fortner Enterprises, Inc. v. U.S. Steel Corp*., 394 U.S. 495, 501-02 (1969) ("requirement that a 'not insubstantial' amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie"; rather, "normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie"); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16 (1984); *Eastman Kodak Co. v. Image Technical Services, Inc*., 504 U.S. 451 (1992); *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6-7 (1958) (requiring only that "a 'not insubstantial' amount interstate commerce is affected").

**Defendants' Argument:**

Defendants' edits align this instruction with the relevant ABA model jury instruction and omit the phrase "as a matter of practical economics," which has no clear meaning and may be confusing to the jury.

**Post-Instruction No. 23**

**UNLAWFUL TYING—NO DUTY TO DEAL [PLAINTIFFS' PROPOSED ALTERNATIVE VERSION]**

In assessing Plaintiffs' tying claim, you may consider that as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing. This means that businesses have no general duty to deal with their competitors. However, that right is not absolute. For example, that right does not mean that companies can interfere with customer choice and harm the competitive process, such as through exclusive dealing and tying. Additionally, such a right does not apply where a company conditions a customer's access to one service on the customer not partnering with the company's rival for another service, where a company discontinues a profitable prior course of dealing with its rivals, and where a company denies customers access to an important input when the customer seeks to compete with the company or partner with the company's rivals.

**Plaintiffs' Authority:** *United States v. Colgate*, 250 U.S. 300, 307 (1919) ("*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (emphasis added)); *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-03, 610-11 (1985); *Viamedia Inc. v. Comcast Corp.*, 951 F.3d 429, 454-55, 480 (7th Cir. 2020); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (distinguishing refusals to deal from conduct that "limit[s] the abilities of third parties to deal with rivals (exclusive dealing)" and "requir[ing] third parties to purchase a bundle of goods rather than just the ones they really want (tying)"); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992) ("Assuming, *arguendo,* that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not."); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) ("We have never extended a refusal-to-deal-with-rivals analysis outside that situation . . . Indeed, as the United States points out, a refusal-to-deal framework applies to narrow situations often remedied by monopolists sharing their technology with rivals."); *United States v. Google LLC*, 778 F. Supp. 3d 797, 867 (E.D. Va. 2025) ("Although such tying, like other anticompetitive and restrictive conditions on customers, can be conceptualized as a 'conditional refusal[ ] to deal,' that does not mean it should be assessed as a 'simple refusal to deal' with rivals, which was the alleged harm in *Trinko*.").

**Plaintiffs' Position:** Plaintiffs do not believe a separate instruction on duty to deal is necessary for Plaintiffs' tying claim. Plaintiffs have not alleged a claim based on Defendants' unilateral refusal to

deal with a competitor, and a "tying claim does not fail as a matter of law simply because it was implemented by refusing to deal with an intermediary." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 472 (7th Cir. 2020). More generally, it is well-settled that the refusal-to-deal doctrine does not apply to tying conduct, and Defendants have cited no case to the contrary. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (distinguishing refusals to deal from conduct that "limit[s] the abilities of third parties to deal with rivals (exclusive dealing)" and "require[s] third parties to purchase a bundle of goods rather than just the ones they really want (tying)"); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 463 n.8 (1992) ("Assuming, arguendo, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not."); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1173 (10th Cir. 2023) ("We have never extended a refusal-to-deal-with-rivals analysis outside that situation . . . Indeed, as the United States points out, a refusal-to-deal framework applies to narrow situations often remedied by monopolists sharing their technology with rivals."); *United States v. Google LLC*, 778 F. Supp. 3d 797, 867 (E.D. Va. 2025) ("Although such tying, like other anticompetitive and restrictive conditions on customers, can be conceptualized as a 'conditional refusal[ ] to deal,' that does not mean it should be assessed as a 'simple refusal to deal' with rivals, which was the alleged harm in Trinko."). Notably, none of the authorities cited by Defendants involved a Section 1 tying claim, even though Defendants have proposed this instruction be used by the jury "[i]n assessing Plaintiffs' tying claim."

However, to the extent the Court is inclined to provide a "duty to deal" instruction, Plaintiffs have proposed revisions to fix Defendants' absolute statements that are inconsistent with the law or subject to fact-specific and context-specific nuances. For example, if the Court instructs the jury as Defendants propose that "as a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing," it should also explain the circumstances in which this "general rule," does not hold, such as here where Plaintiffs allege Defendants' conduct is designed to "maintain a monopoly." *United States v. Colgate*, 250 U.S. 300, 307 (1919) ("*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (emphasis added)). The Court should likewise instruct the jury on other examples where courts have found this "general rule" does not apply, such as where a defendant conditioned customer's access to one service on the customer not partnering with a rival for another service, *see Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951), discontinuing a profitable prior course of dealing, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-03, 610-11 (1985) and *Viamedia Inc. v. Comcast Corp.*, 951 F.3d 429, 454-55, 485 (7th Cir. 2020), and denying customer access to an important input where customers seek to partner with the defendants' rivals, *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377 (1973). Defendants claim their absolute language stems from *Trinko* and *Linkline;* yet those cases stated the opposite, observing that there *are* circumstances in which a refusal to deal leads to liability. *Verizon Commc'n, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 408 (2004) ("Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate Section 2"); *Pac. Bell Tel. Co. v. Linkline Commc's*, 555 U.S. 438, 448 (2009) ("There are also limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability.").

Defendants' proposed instruction also misstates Plaintiffs tying claim by asserting "Live Nation has no obligation to rent its amphitheaters to rival promoters." As the Court is aware, Plaintiffs' claim

stems from Live Nation's refusal to rent its amphitheaters to artists without the artist agreeing to retain and pay for Live Nation's promotion services. For the same reason, the second paragraph of the proposed instruction is a red herring that is likely to distract and confuse the jury because it focuses on rival promoters rather than artist customers of amphitheater rentals and promotion services.

**Defendants' Authority:** *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'"); *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 929 (4th Cir. 1990) ("In general, a seller has the right to choose with whom it wishes to deal.").

**Defendants' Argument:**

It is well-established that, absent circumstances Plaintiffs do not and could not allege here, businesses have no duty to deal with their competitors. *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 447 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"). It is important to inform the jury of this principle because a key disputed issue with respect to the tying claim is whether this claim merely challenges Live Nation's refusal to rent its amphitheaters to its rivals, which is not unlawful. ECF No. 724 at 33-36 (Memorandum of Law in Support of Defendants' Motion for Summary Judgment); ECF No. 777 at 37-41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 604-05 (1985) (jury instructed that "refusal to deal … 'does not violate Section 2 if valid business reasons exist for that refusal'").

Defendants object to Plaintiffs' proposed alternative. To start, it is not the law and seriously confuses distinct issues. Refusal to deal concerns a company's refusal to do business with or otherwise assist its competitors. It has nothing to do with exclusive dealing and tying, which concern a company's interactions with its customers. A company could engage in lawful exclusive dealing while also lawfully refusing to deal with its competitors, yet Plaintiffs' instruction misleadingly suggests that a company engaging in exclusive dealing somehow cannot avail itself of the benefits of the refusal-to-deal doctrine. That is not the law, and none of Plaintiffs' authorities remotely supports it. Moreover, Plaintiffs' laundry list of exceptions to the refusal-to-deal doctrine is flatly contravened by *Trinko*'s statement that there are only a "few existing exceptions from the proposition that there is no duty to aid competitors." 540 U.S. at 411. The oft-recognized "limited exception" is *Aspen Skiing*, which is "at or near the outer boundary of § 2 liability." *Id.* at 409.

Plaintiffs' list of exceptions involving all sorts of conduct beyond that fitting *Aspen Skiing* would blow a hole through that limited exception and should be rejected.

**Post-Instruction No. 24**

## STATE LAW CLAIMS

In addition to the claims the United States and the Plaintiff States have brought under the Sherman Act, some Plaintiff States have brought claims under their own state laws. I will proceed to instruct you on those state law claims now.

**Authority**: ECF No. 257 (Am. Compl.).

**Post-Instruction No. 25**

## CONGRUENT STATE CLAIMS

Plaintiffs claim that Defendants' conduct harmed competition nationwide, including in each of the Plaintiff States. Thirty Plaintiff States have state laws that are congruent with the Sherman Act. That means that these State laws require the same proof as a violation of Section 1 or 2 of the Sherman Act.

For these thirty Plaintiff States, if you find that Plaintiffs have proven every element of a Sherman Act claim and Defendants' conduct harmed competition in the state, then you must also find that the Plaintiff State has proven a violation of its State law.

- the Arizona Uniform State Antitrust Act, A.R.S. § 44-1401 *et seq.*;

- the Arkansas Unfair Practices Act, Ark. Code Ann. § 4-75-201 *et seq.*;

- the Colorado Antitrust Act of 2023, Colo. Rev. Stat. 6-4-101, *et seq.*;

- the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-24 *et seq.*;

- the District of Columbia Antitrust Act, D.C. Code § 28-4501 *et seq.*;

- the Florida Antitrust Act, Fla. Stat. § 542.15 *et seq.*;

- the Indiana Antitrust Act, Ind. Code §§ 24-1-2-1 and 24-1-2-2;

- the Iowa Competition Law, Iowa Code §§ 553.2 and 553.5;

- the Louisiana Unfair Trade Practices Act, LSA-R.S. 51:1401 *et seq.*;

- the Maryland Antitrust Act, MD Commercial Law Code Ann. § 11-201 *et seq.*;

- the Michigan Antitrust Reform Act, MCL 445.771 *et seq.*;

- the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49–325D.66;

- the Mississippi Antitrust Act, Miss. Code Ann. § 75-21-1 *et seq.*;

- the Nebraska Unlawful Restraint of Trade Act, Neb. Rev. Stat. § 59-801 *et seq.*;

- the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1603;

117

- the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1604;

- the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A.010 *et seq.*;

- the New Hampshire Revised Statutes Annotated § 356 *et seq.*;

- the New Jersey Antitrust Act, N.J.S.A. § 56:9-1 *et seq.*;

- the New Mexico Antitrust Act, N.M. Stat. Ann. §§ 57-1-1 and 57-1-2;

- the North Carolina Unfair or Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.*;

- the Valentine Act, Ohio Rev. Code Chapter 1331;

- the Rhode Island Antitrust Law, R.I. Gen. L. §§ 6-36-4 and 6-36-5;

- the Texas Business and Commerce Code § 15.01 *et seq.*;

- the Utah Antitrust Act, Utah Code §76-16-510;

- the Virginia Antitrust Act, Va. Code § 59.1-9.1 *et seq.*;

- the Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86.030 and 19.86.040;

- the West Virginia Antitrust Act, W. Va. Code § 47-18-1 *et seq.*; and

- Wisconsin Statutes Chapter 133.

**Plaintiffs' Authority**: *In re Elec. Books Antitrust Litig.,* No 11 MD 2293 DLC, 12 Civ. 3394 (DLC) (S.D.N.Y 2011); *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006-07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Bi-Rite Oil Co. v. Ind. Farm Bureau Coop. Ass'n*, 720 F. Supp. 1363, 1378 (S.D. Ind. 1989), *aff'd*, 908 F.2d 200 (7th Cir. 1990) ("Indiana antitrust law . . . was substantially patterned after the federal Sherman Antitrust Act and references to decisional law under the Sherman Act may be made in construing Indiana antitrust provisions . . . ."); *Goldfinch Lab'y, P.C. v. Iowa Pathology Assocs., P.C.,* No. 4:24-CV-00168-RGE-HCA, 2024 WL 5205936, at *7 (S.D. Iowa Dec. 13, 2024); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.,* 493 So. 2d

1149 (La. 1986), *superseded in part by statute,* La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co*., 474 F. Supp. 1053, 1071 (D. Md. 1979)(state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss*., 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("courts treat federal and Mississippi state antitrust claims as "analytically identical"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *See Shire US, Inc. v. Allergan, Inc.*, 375 F. Supp. 3d 538, 546 (D.N.J. 2019) (the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes) (quoting *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 n.11 (3d Cir. 2016)); *see also State v. Lawn King,* 417 A.2d 1025, 1032 (N.J. 1980) (finding that consonance between the federal and state enactments is required); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); *Northwest Medical Laboratories, Inc. v. Blue Cross and Blue Shield of Oregon, Inc.,* 775 P.2d 863, 868 (Or. App. 1989), *aff'd*, 310 Or. 72 (1990) (Oregon Antitrust Law should be interpreted consistently with federal antitrust law); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed"); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes."); *Kessel v Mon. County Gen. Hosp. Co.*, 648 S.E.2d 366, 374 (W.Va. 2007); *Olstad v. Microsoft Corp.*, 2005 WI 121, ¶ 42 ("The pivotal language in the first two sections [of the Wisconsin antitrust act and Sherman Act] is nearly identical. This has led courts and commentators to refer to that first incarnation of Wisconsin's antitrust act as the 'Little Sherman Act.'"); *Pulp Wood Co. v. Green Bay Paper & Fiber Co.*, 157 Wis. 604, 625, 147 N.W. 1058 (1914)

119

(Wisconsin antitrust law is a "copy of the federal statute" that "should receive the same interpretation that [is] placed on the federal act, from which it was taken".).

**Plaintiffs' Position:** The parties largely agree on the instructions regarding state laws that are congruent with the Plaintiffs' federal law claims, but several aspects of Defendants' proposed instructions are inaccurate.

First, as discussed above, for purposes of the claims at issue, Defendants should be considered together for purposes of liability. *See* Preliminary Instruction No. 1.

Second, Plaintiffs have alleged national markets for all claims at issue that may require proof of a relevant market, and Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that each Plaintiff is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether Defendants' conduct "harmed competition nationwide, including in each Plaintiff State."

Third, Defendants have removed six states from the instruction without an adequate basis. For four states—Arizona, Iowa, New Jersey, and Wisconsin—Defendants' objection appears to rest on a belief that these States are not empowered to bring *parens patriae* actions. Defendants' objection is misplaced for two reasons. As an initial matter, even if these states did not have *parens patriae* standing to bring damages claims, that does not preclude those states from seeking a jury to determine liability, given their claims for civil penalties. But more importantly, Defendants are incorrect; each state does in fact have standing to bring *parens patriae* claims. *See* A.R.S. § 21-102(F) (State of Arizona has the right to a jury in a civil action seeking, among other relief, civil penalties); *United States v. Apple, Inc.,* No. 24-CV-04055, 2025 WL 1829127, at *16–17 (D.N.J. June 30, 2025) (New Jersey has standing to bring *parens patriae* actions)*; In re Generic Pharmaceuticals Pricing Antitrust Litigation,* 605 F.Supp.3d 672, 679-80 (E.D. Pa 2022) (Iowa and New Jersey have standing to bring *parens patriae* actions); Wis. Stat. § 165.25(1m) (Wisconsin DOJ shall prosecute "any cause or matter … in which the state or the people of this state may be interested"); *State v. City of Oak Creek*, 232 Wis. 2d 612, 628 (2000) (Wisconsin Attorney General may bring a specific action where authorized by law).

With respect to Arkansas, Defendants appear to take the position that Arkansas may not pursue claims that are congruent to Section 1 of the Sherman Act because Arkansas voluntarily dismissed those claims in the *In re Elec. Books Antitrust Litigation*. The fact that Arkansas previously dismissed certain claims in an unrelated litigation has no bearing on whether it may maintain them here, and its state law claims are congruent with the federal claims. *See* Ark. Code Ann. §§ 4-75-301, 4-75-302.

Finally, for Indiana, Defendants proposed instructions are superfluous for this phase of the trial and are likely to lead to juror confusion. Indiana is pursuing federal claims along with its state claims under the Indiana Antitrust Act, and its claim for damages under 15 U.S.C. § 15c are subject to the federal statute of limitations. To the extent Indiana's other claims for relief (*e.g.*, injunctive relief and penalties) are impacted an amendment to the Indiana Antitrust Act, those issues can be resolved during the second phase of the trial. Presenting the jury with additional dates is likely to cause unnecessary confusion and will not bear on the issues before them (liability and damages).

**Defendants' Authority**: *People ex rel. Woodward v. Colo. Springs Bd. of Realtors*, 692 P.2d 1055, 1061 (Colo. 1984); *Shea v. First Fed. Sav. & Loan Ass'n*, 439 A.2d 997, 1006–07 (Connecticut General Statutes sections 35-26 and 25-27 are substantively the same as Sections 1 and 2 of the Sherman Act); *District of Columbia v. Amazon.com, Inc.*, 320 A.3d 1073, 1079 (D.C. 2024) ("The two provisions of the D.C. Antitrust Act at issue here, D.C. Code § 28-4502 and § 28-4503, mirror sections 1 and 2 of the federal Sherman Antitrust Act, 15 U.S.C. § 1 and 15 U.S.C. § 2. In language that is opportune given the dearth of antitrust decisions in this court, the D.C. statute itself—in a provision labeled "Uniformity"—explicitly gives us the green light to rely upon federal courts' interpretations of the Sherman Act when interpreting the D.C. Antitrust Act."); Fla. Stat. §§ 542.16, 542.32 (In interpreting Florida Antitrust Act, "great weight [should] be given to the interpretations of the federal courts relating to comparable federal antitrust statutes); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So. 2d 1149 (La. 1986), *superseded in part by statute*, La R.S. 51:122(B); *Neugebauer v. A. S. Abell Co.*, 474 F. Supp. 1053, 1071 (D. Md. 1979) (state law claims for exclusive dealing, tying, monopolization and others treated like federal claims under Sherman Act because Maryland Antitrust Act, Md. Code Ann., Comm. Law, Sec. 11-204(a)-(b) "were 'carefully and purposefully patterned after their counterparts in the federal law,'") (*citing* General Revisor's Note to the Maryland Antitrust Act); *Little Caesar Enterprises, Inc. v. Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995) ("Michigan antitrust law is identical to federal law and follows the federal precedents."); *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) (citing *Minn. Twins P'ship v. State*, 592 N.W.2d 847, 851 (Minn.1999)) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law."); *Walker v. U-Haul Co. of Miss*., 734 F.2d 1068, 1070 n.5 (5th Cir.), on reh'g, 747 F.2d 1011 (5th Cir. 1984) ("Courts treat federal and Mississippi state antitrust claims as 'analytically identical'"); *Salem Grain Company, Inc. v. Consolidated Grain and Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017) ("The NCPA is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust law, including the FTCA…Further, the act was intended to be an antitrust measure to protect Nebraska consumers from monopolies and price-fixing conspiracies."); *Furniture Royal, Inc. v. Schnadig Int'l Corp.*, No. 2:18-CV-318, 2018 WL 6574779, at *4 (D. Nev. Dec. 13, 2018) (analysis under Nevada Unfair Trade Practices Act "is the same as the Sherman Act"); *Kenneth E. Curran, Inc. v. Auclair Transp.,* 128 N.H. 743, 748-49 (1986); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F2d 589, 593 (1st. Cir. 1993); *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 18, 148 N.M. 713, 242 P.3d 280 ("It is therefore the duty of the courts to ensure that New Mexico antitrust law does not deviate from federal interpretations of antitrust law."); *Rose v. Vulcan Materials*, 282 N.C. 643, 655 (1973); *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980); *Johnson v. Microsoft Corp.*, 106 Ohio St. 3d 278, 284 (2005); R.R. Gen. Laws § 6-36-2(b) ("[t]his chapter shall be construed in harmony with judicial interpretations of comparable federal antitrust statutes insofar as practicable, except where provisions of this chapter are expressly contrary to applicable federal provisions as construed."); Tex. Bus. & Comm. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state [and] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose."); Utah Code. § 76-16-502(2) ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); *Boeing Co. v. Sierracin Corp.,* 108 Wn.2d 38, 54, 738 P.2d 665, 677 (1987) (citing RCW 19.86.920); W.Va. Code § 47-18-16 (West Virginia Antitrust laws "shall be construed liberally and in harmony with ruling judicial interpretations of

comparable federal antitrust statutes."); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); Iowa Code §§ 553.1 *et seq.* (no provision for *parens patriae* actions); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute."); Utah Code § 76-16-510.

**Defendants' Argument:**

*First*, Defendants propose this instruction subject to resolution of their pending motion in limine to preclude all Plaintiffs from introducing evidence or argument concerning alleged exclusionary conduct that occurred before May 23, 2020.  ECF No. 1019 at 12-15 (Memorandum of Law in Support of Defendants' Motions in Limine).  As set forth in that motion, the applicable statutes of limitations materially limits the evidence Plaintiff States can use to try to establish Defendants' liability and collect damages.  *Id.*  Although the Court, not the jury, would determine whether any Plaintiff State is entitled to any penalty, statutes of limitations also apply to Plaintiff States' penalties claims, some of which are even less than four years.  *See, e.g.*, S.C. Code § 39-5-150 ("No action may be brought under this article more than three years after discovery of the unlawful conduct which is the subject of the suit."); D.C. Code § 12-301 (one year statute of limitations for statutory penalty actions).  Accordingly, if the Court does not grant Defendants' pending motion in limine to exclude evidence prior to May 23, 2020, then the jury will need to be instructed that Plaintiff States cannot prove liability or damages based on alleged anticompetitive conduct that occurred prior to May 23, 2020.  Defendants reserve all rights to propose alternative and/or additional instructions to address that issue if needed.

*Second*, Defendants object to Plaintiffs' inclusion of Arizona, Arkansas, Indiana, Iowa, New Jersey, and Wisconsin in this instruction.

Arizona, Iowa, New Jersey, and Wisconsin lack parens patriae authority to bring their state-law claims.  *See California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1165 (N.D. Cal. 2007) ("[N]othing in Arizona's antitrust statute grants the Attorney General *parens patriae* authority."); Iowa Code §§ 553.1 *et seq.* (no provision for *parens patriae* actions); N.J. Stat. Ann. §§ 56:9-1 *et seq.* (no provision for *parens patriae* actions); Wis. Stat. Ann. §§ 133.01 *et seq.* (no provision for *parens patriae* actions); *State v. City of Oak Creek*, 232 Wis. 2d 612, 627 (2000) ("The attorney general is devoid of the inherent power to initiate and prosecute litigation intended to protect or promote the interests of the state or its citizens and cannot act for the state as *parens patriae*."); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) ("[T]here is no express grant of *parens patriae* authority to sue for damages on behalf of consumers in Wisconsin's antitrust statute.").  Plaintiffs have provided no authority to the contrary.

As for Arkansas, Defendants have not been able to locate cases interpreting the Arkansas Unfair

Practices Act consistently with the Sherman Act, or any statutory provision harmonizing the two statutes. In at least one case, Arkansas voluntarily dismissed its claims under the Arkansas Unfair Practices Act "as not congruent with Section 1 of the Sherman Act." *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014); Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claims under Arkansas Unfair Trade Practices Act). Defendants have thus provided a separate instruction for the Arkansas Unfair Practices Act, interpreting that statute as consistent with only Section 2 of the Sherman Act. Plaintiffs have provided no authority to the contrary.

Finally, the antitrust statute of Indiana did not authorize parens patriae actions until July 1, 2023. Ind. Code § 24-1-2-5.1 (granting parens patriae authority as of July 1, 2023). And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 1207566, at *7 (D. Conn. Apr. 25, 2025) ("Indiana conceded that this amendment is not retroactive."). Accordingly, Defendants have provided a separate instruction for Indiana, making clear that it can only recover for each Defendant's conduct that harmed Indiana residents and competition in Indiana occurring after the date on which Indiana authorized parens patriae actions.

**Post-Instruction No. 26**

## CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

The State of California alleges that Defendants have violated California's Unfair Competition Law, which prohibits corporations from engaging in unfair competition through unlawful or unfair business acts or practices.

For the State of California to prevail on its claim under the Unfair Competition Law, you must find that the State of California has proven each of the following elements by a preponderance of the evidence:

1.    Defendants engaged in a business act or practice;

2.    The act or practice is either unlawful or unfair.

The Unfair Competition Law imposes strict liability. It is not necessary for the State of California to show that Defendants intended to injure anyone.

You must find that the Defendants have violated the Unfair Competition Law if you find that Plaintiffs have satisfied the two elements above and find that Plaintiffs have proven by a preponderance of the evidence any one of the following: (1) the act or practice occurred within California; (2) the act or practice emanated from California; or (3) individuals in California were harmed by the act or practice

To determine whether acts or practices emanate from California, you may consider the location of the firm's headquarters, executives, or other employees involved in the conduct; where the relevant materials were created; where the relevant policies at issue were developed or executed; and where the firm conducts business.

*Unlawful*

To establish a violation of the unlawful prong of the California Unfair Competition Law, the State of California must prove by a preponderance of the evidence that Defendants have violated any

other law, and that the act or practice that violates that other law occurred within California or emanated from California or harmed individuals in California. Therefore, if you find for Plaintiffs on any other claim and that any associated act or practice occurred within California or emanated from California or harmed individuals in California, you must find that Defendants have violated the unlawful prong of California's Unfair Competition Law.

*Unfair*

 To establish a violation of the unfair prong of the California Unfair Competition Law, the State of California must prove by a preponderance of evidence that Defendants have:

1. engaged in conduct that threatens an incipient violation of the antitrust laws or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition; or

2. engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct.

 These tests are not mutually exclusive and you may find that Plaintiffs have proven a violation of (1) or (2) or both (1) and (2).

 A business act or practice may be unfair even if not prohibited by some other law such as the Sherman Act. Plaintiffs do *not* need to define any relevant market as described in my prior instructions regarding the Sherman Act (Preliminary Instructions Nos. 10 and 11 and Post-Instructions Nos. 11 and 16 through 27 are not applicable) or perform any market definition exercise to prove a violation of the unfair prong (Post-Instructions Nos. 13 through 15 are not applicable). Plaintiffs do *not* need to establish any antitrust injury to prove a violation of the unfair prong (Post-Instruction Nos. 37 and 38 are not applicable).

 In order to find a violation of the unfair prong of the Unfair Competition Law, you must also find that the act or practice that satisfies either test of that prong occurred of that prong within

California or emanated from California or harmed individuals in California.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651-652 (2020); *Fernandez v. CoreLogic Credco, LLC*, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022); *Ehret v. Uber Techs., Inc*., 68 F. Supp. 3d 1121, 1131-32 (N.D. Cal. 2014) (finding that a plaintiff had plausibly alleged a "sufficient nexus" and that allegedly unlawful misrepresentations "emanated from California" where the plaintiff alleged misrepresentations were developed in California, contained on a website and application maintained in California, and that billing went through servers located in California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598-99 (S.D. Cal. 2008); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech*, 20 Cal. 4th at 186-87); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (quoting *Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Id.* at 1002 (rejecting the defendant's argument that the UCL "mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because the defendant did "not cite to any California authority for this proposition" and that "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition.'" (quoting *Pohl v. Anderson*, 13 Cal. App. 2d 241, 242 (1936))); *In re Google Play Store Antitrust Litig.*, 147 F.4th 917, 933 n.3 (9th Cir. 2025) ("The UCL forbids not only 'unlawful' but 'unfair' conduct, thus allowing for liability even when there is a failure to prove an antitrust claim, as we held in *Epic Games, Inc. v. Apple Inc* . . . [t]he UCL claim survives independent of any antitrust liability").

**Plaintiffs' Position:** Plaintiffs have proposed an instruction that correctly describes the only two elements of California's Unfair Competition Law ("UCL") at issue here: (1) Defendants engaged in a business act or practice and (2) the act or practice is either unlawful or unfair. Cal. Bus. & Prof. Code § 17200 *et seq*.; *see Epic Games v. Apple*, 67 F.4th 946, 1000 (9th Cir. 2023) ("*Epic*"). The UCL is a strict liability statute. *See Hewlett v. Squaw Valley Ski Corp*., 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997) ("The [UCL] statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone.").

Plaintiffs' proposed instruction lists examples of the factors from caselaw that can be considered when evaluating whether conduct emanated from California for the purposes of out-of-state liability. *See People v. Ashford Univ., LLC,* 100 Cal. App. 5th 485, 518 (2024). Defendants' proposed instruction is unsupported by the cases they cite. In those cases, one factor was not enough to show that conduct emanated from California, but they do not stand for the proposition that one factor is always insufficient. *Sullivan v. Oracle,* which was specifically limited to the "circumstances of [that] case" as stipulated by the parties, declined to apply the UCL to nonresidents when the stipulated facts "identif[ed] only a single instance of relevant conduct occurring in California" that

was not "unlawful in the abstract." 51 Cal. 4th 1191, 1208 (2011). The court in *Aghaji v. Bank of America* noted that the plaintiffs failed to even "disclose what information they have that leads them to believe that the alleged violations occurred in . . . California facilities" and failed to allege a violation "in California as to any Plaintiff." 247 Cal. App. 4th 1110, 1119-20 (2016). *Norwest Mortgage v. Superior Court* is distinguishable because in that case the harm to "nonresident members of the nationwide class" was "caused by conduct occurring outside of California's borders by actors headquartered and operating outside of California." 72 Cal. App. 4th 214, 228 (1999).

In addition, Plaintiffs' proposed instruction correctly states that the UCL applies where "individuals in California" were harmed. Defendant's proposed instruction, which requires harm to "California residents[,]" is inappropriate because the UCL applies to both residents and "nonresidents of California." *Ashford*, 100 Cal. App. 5th at 519, 524 (2024).

Finally, as many of the jury instructions refer to relevant markets and other antitrust concepts, it is appropriate and necessary to instruct the jury that the UCL does not require any market definition or showing of antitrust injury. *Epic*, 67 F.4th at 1001-02 (rejecting defendant's argument that "the UCL mandates trial courts to define a relevant market and then conduct the balancing test within that market (similar to the Rule of Reason)" because defendant "does not cite any California authority for this proposition" and "such a rule runs contrary to California courts' repeated instruction that '[n]o inflexible rule can be laid down as to what conduct will constitute unfair competition'" (citation omitted)).

**Defendants' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 519-20 (2024) (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego"); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 1000 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 681 (2024) ("As the UCL's three-prong structure makes clear, a business practice may be 'unfair,' and therefore illegal under the UCL, 'even if not specifically proscribed by some other law.'" (*citing Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999))); *Id.* ("First, to support 'any finding of unfairness to *competitors*,' a court uses the 'tethering' test, which asks whether the defendant's conduct 'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999))); *Id.* ("Second, to support a finding of unfairness to consumers, a court uses the balancing test, which 'weigh[s] the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" (*quoting Progressive W. Ins. Co. v. Super. Ct.*, 135 Cal. App. 4th 263, 285 (2005) (citation omitted))); *Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *id.* at 1119-20 (finding insufficient that defendant had "processing facilities and personnel in California" and that is "where the misapplied payments were received or that is from where the improper charges or

improper crediting of payments occurred"); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct . . . occurred in states other than California (Category III members)" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision . . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states.").

**Defendants' Argument:**  *First*, in order to simplify this instruction, Defendants propose a three-element structure rather than a two-element structure.  As Defendants understand it, California does not dispute that in addition to proving that each Defendant engaged in a business act or practice that was either unlawful or unfair, the State must prove a territorial nexus between that act or practice and California.  Listing the territorial nexus requirement with the other two requirements makes this instruction easier to understand for the jury and ensures that Defendants will not be prejudiced in the event that the jury overlooks the territorial nexus requirement because it is not listed as an element.

*Second*, Defendants object to California's language suggesting that "individuals in California [] harmed by the act or practice," without more, are covered by the Unfair Competition Law (UCL).  The caselaw distinguishes between California residents and non-residents, not between individuals within and outside California. *See Aghaji v. Bank of America, N.A.*, 247 Cal. App. 4th 1110, 1119 (Cal. Ct. App. 2016) ("[P]laintiffs who are not California residents must also allege facts to show that the alleged violations occurred within California, because California's unfair competition law does not apply extraterritorially."); *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. App. 1999) ("non-California residents for whom [defendant's] conduct . . . occurred in states other than California" could "not assert UCL claims"); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1209 (Cal. 2011) ("that [defendant's] decision . . . was made in California does not, standing alone, justify applying the UCL to the nonresident plaintiffs' FLSA claims for overtime worked in other states").  California's proposed instruction is misleading and prejudicial to Defendants because it suggests that the UCL covers anyone who happened to be injured in California at some point, even if that person is a resident of a different State.

Importantly, if that interpretation of the UCL were right (it is not), then it is possible that Plaintiff States might obtain double recoveries in this lawsuit.  In other words, California could recover for a Texas resident who was injured in California at some point, and Texas could also recover for that Texas resident.  That prospect severely prejudices Defendants and violates the basic damages principle that "only a single recovery is allowed" for one injury.  *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994).

*Third*, Defendants object to California's recitation of things it need not prove (intent to injure, market definition, antitrust injury).  Defendants' proposed instruction—like all other instructions in this document—straightforwardly lists what Plaintiffs must prove to prevail.  Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.

**Post-Instruction No. 27**

## FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.204)

The State of Florida alleges that Defendants' anticompetitive conduct violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), which broadly prohibits persons from engaging in unfair methods of competition in the conduct of any trade or commerce.

To establish a violation of the FDUTPA based on anticompetitive conduct, Florida must prove by a preponderance of the evidence that Defendants engaged in an unfair method of competition. Even if the method of competition does not rise to the level of an antitrust violation, you may find it violates the FDUTPA if you find such method of competition was otherwise unfair.

*Unfair Methods of Competition*

An act is an "unfair method of competition" if the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business skills, or truthful marketing and advertising practices. Conduct goes beyond competition on the merits if it is coercive, exploitative, collusive, abusive, deceptive, predatory, or exclusionary and tends to negatively affect competitive conditions.

Violations of antitrust laws constitute "unfair methods of competition" under the FDUTPA. Therefore, if you find that the State of Florida proves by a preponderance of the evidence that Defendants violated the Sherman Act, you may find that such conduct by Defendants also violated the FDUTPA.

**Plaintiffs' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See*

129

*United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see F.T.C. v. Sperry & Hutchinson*, 405 U.S. 233, 243-44 (1972) (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. F.T.C.*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *F.T.C. v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. F.T.C.*, 729 F.2d 128, 140 (2d Cir. 1984) (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd*, 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law."); *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws . . . but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted).

**Plaintiffs' Position:** Defendants' jury instructions regarding the Florida Unfair and Deceptive Trade Practices Act remain inaccurate with regard to geographical restrictions. First, Florida's DTPA applies to extraterritorial conduct and contains no geographical restrictions. *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So. 2d 582, 586 (Fla. 2000) (application of Florida's DTPA to a foreign manufacturer—with no offices or direct sales in Florida—did not violate due process); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2014 WL 2905131, at *3-4 (N.D. Cal. June 26, 2014) (rejecting due process challenge despite Defendants' lack of direct sales and conspiratorial conduct in Florida and finding that Florida's DTPA, "by its own terms," applies to acts occurring outside Florida); *In re Auto. Parts Antitrust Litig.*, 2015 WL 1849138, at *3 (E.D. Mich. Apr. 22, 2015) (rejecting due process challenge to Florida's indirect-purchaser DTPA claims given "the purchase of many, many vehicles in Florida" downstream of the conspiracy); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 538 (E.D. Pa. 2010) (plain language of FDUTPA does not require that injuries take place within the state).

FDUPTA prohibits four different categories of conduct: (1) Unfair methods of competition; (2) unconscionable acts or practices; (3) unfair acts or practices; and (4) deceptive acts or practices. Fla. Stat. § 501.204(1). Each of these categories of conduct supports a claim under FDUPTA and is analyzed differently. The authority cited by Defendants (*Team Servs., Inc. v. Securitas Elec. Sec., Inc.; Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs; Zarfati v. Artsana USA, Inc.*) for the geographical limitation all center around unfair or deceptive trade practices, not unfair methods of competition. Defendants also cite to language defining "unfair" under the unfair trade practices prong (*Porsche Cars North America, Inc. v. Diamond*). Plaintiffs have already provided authorities relating to the unfair methods of competition prong, which includes the following: "); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 228-29 (1968)

(finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. Fed. Trade Comm'n (Ethyl)*, 729 F.2d 128, 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted).

**Defendants' Authority**: Fla. Stat. § 501.204 (in construing prohibited conduct under FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1)"); Fla. Stat. § 501.203(3)(b)-(c) (violations of FDUTPA may be based on, inter alia, "[t]he standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts" or "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices"); Federal Trade Commission, Comm'n File No. P221202, Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act (Nov. 10, 2022) at 8-9; *See U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *see Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers); *Atlantic Refining Co. v. Fed. Trade Comm'n*, 381 U.S. 357, 369 (1965) (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices"); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 228-29 (1968) (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition"); *E.I. du Pont de Nemours v. Fed. Trade Comm'n (Ethyl)*, 729 F.2d 128, 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary"); *Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 104 (Fla. 1st DCA 1996) ("[T]he acts proscribed by subsection 501.204(1) include antitrust violations."); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 235 F. Supp. 2d 1269, 1286 (M.D. Fla. 2002), *aff'd,* 364 F.3d 1288 (11th Cir. 2004) ("FDUTPA is to be construed consistently with antitrust law.");  *see also F.T.C. v. Indiana Fedn. of Dentists*, 476 U.S. 447, 454 (1986) ("unfairness" under the FTCA encompasses "practices that violate the Sherman Act and the other antitrust laws . . . but also practices that the [FTC] determines are against public policy for other reasons"); *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 609 (1953) (tying arrangement that violates § 1 of the Sherman Act "transgresses s 5 of the [FTCA], since minimally that section registers violations of the Clayton and Sherman Acts"); *Crawford v. Am. Title Ins. Co.*, 518 F.2d 217, 218-19 (5th Cir. 1975) ("[I]t has been uniformly held that 'a violation of the Sherman Act is an 'unfair method of competition' under the [FTCA].'") (citations omitted); *Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida."); *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000) ("As we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation."); *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025) (plaintiffs stated a FDUTPA claim by alleging that "deceptive acts and unfair

131

practices were at a minimum aimed at consumers in Florida"); Federal Trade Commission Act Amendments of 1994, codified as amended at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA.").

**Defendants' Argument:**

Defendants' proposed instruction requires that any unfair method of competition have been based in or directed toward Florida.  This requirement is well-established in Florida law:  FDUTPA seeks to prohibit unfair practices that "transpire[] within the territorial boundaries" of Florida. *Millennium Comm'ns & Fulfillment, Inc. v. Office of Attorney General, Dep't of Legal Affairs*, 761 So. 2d 1256, 1262 (Fla. Ct. App. 2000); *see also Team Servs., Inc. v. Securitas Elec. Sec., Inc.*, No. 1:21-CV-21026-KMM, 2021 WL 9350987, at *5 (S.D. Fla. Aug. 9, 2021), *aff'd*, No. 22-12840, 2023 WL 6890660 (11th Cir. Oct. 19, 2023) ("FDUTPA applies only to action that occurred within the state of Florida."). Courts have interpreted FDUTPA to encompass acts occurring within Florida as well as acts "aimed at consumers" in the State.  *Zarfati v. Artsana USA, Inc.*, No. 1:24-cv-21372-KMM, 2025 WL 373081, at *12 (S.D. Fla. Jan. 15, 2025).  A territorial nexus requirement must be included to reflect the proper scope of FDUTPA.

Defendants' proposed instruction also includes the requirement that an unfair act or practice must cause or be likely to cause a substantial injury.  FDUTPA embraces the Federal Trade Commission's (FTC) interpretations of Section 5(a)(1) of the Federal Trade Commission Act (FTCA).  Fla. Stat. § 501.204(2); *Porsche Cars North America, Inc. v. Diamond*, 140 So. 3d 1090, 1097-98 (Fla. Ct. App. 2014) ("Following the clear and unambiguous directive of sections 501.203(3)(b), 501.204(2), and 501.202(3), Florida Statutes, we hold 1980 Policy Statement's definition of unfair trade practice should be used when interpreting FDUTPA.").  The FTC's 1980 Policy Statements restrict authority under the FTCA to only those unfair acts that are "likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  Federal Trade Commission Act Amendments of 1994, codified at 15 U.S.C. § 45(n) (1994) (codifying FTC Policy Statement on Unfairness (Dec. 17, 1980)), *appended to Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984).  That restriction of authority must be reflected here as well.

Defendants object to language in the second paragraph indicating that an unfair method of competition or an antitrust violation can violate FDUTPA.  This language is redundant as the next two paragraphs sufficiently explain those two ways of violating FDUTPA.  Repetition of this point adds unnecessary length and risks confusing the jury and prejudicing Defendants.  Moreover, Plaintiffs' allegations in this case have rested on antitrust violations, and Plaintiffs have not provided any theories or facts—let alone Florida-specific theories or facts—to support non-antitrust consumer protection violations.

**Post-Instruction No. 28**

## ILLINOIS ANTITRUST ACT
### (740 ILCS 10/1 *et seq.*)

The State of Illinois has brought claims under the Illinois Antitrust Act, 740 ILCS 10/1 *et seq*. Illinois' claims under the Illinois Antitrust Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Illinois Antitrust Act involving the restraint of competition by contract, agreement, combination, or conspiracy, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, and Illinois proves by a preponderance of the evidence that Defendants engaged in unlawful conduct that harmed competition nationwide, including in Illinois, then you must find for the State of Illinois and against Defendants on those same claims under the Illinois Antitrust Act. If you find for Defendants on Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing and unlawful tying, you must find for the Defendants under those same claims under the Illinois Antitrust Act.

For claims under the Illinois Antitrust Act involving the monopolization of the markets for amphitheaters, for venue booking and artists promotion services using anticompetitive exclusionary practices, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must also prove that the Defendants unreasonably restrained trade or commerce by establishing or maintaining a monopoly by contract, combination, or conspiracy with one or more other persons. If you find for Plaintiffs and against Defendants on Plaintiffs' claims of monopolization of markets for amphitheaters, for venue booking services and artists promotion services by using anticompetitive exclusionary practices under Section 2 of the Sherman Act, and Illinois proves by a preponderance of the evidence that Defendants unreasonably restrained trade or

commerce by contract, combination, or conspiracy with one or more other persons, and that Defendants engaged in unlawful conduct that harmed competition nationwide, including in Illinois, then you must also find for the State of Illinois on those claims under the Illinois Antitrust Act and against the Defendants. If you find for Defendants on Plaintiffs' claims of monopolization of the markets for amphitheaters, for venue booking services and artists promotion services by using anticompetitive exclusionary practices under Section 2 of the Sherman Act, or Illinois fails to prove the existence of a contract, combination, or conspiracy in connection with that claim, then you must find for Defendants for those claims under the Illinois Antitrust Act.

For the claim under the Illinois Antitrust Act involving the monopolization of primary concert ticketing, primary ticketing and fan ticketing, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of Illinois must prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in these relevant markets. If you find for Plaintiffs and against Defendants under Plaintiffs' claim of monopolization of primary concert ticketing, primary ticketing, and fan ticketing, and Illinois proves by a preponderance of evidence that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in these relevant markets, and Defendants engaged in unlawful conduct that harmed competition nationwide, including in Illinois, then you must also find for the State of Illinois on those same claims under the Illinois Antitrust Act and against Defendants. If you find for Defendants on Plaintiffs' claims under Section 2 of the Sherman Act related to the monopolization of primary concert ticketing, primary ticketing and fan ticketing, or that the State of Illinois fails to prove that Defendants acted with the purpose of excluding competition or controlling, fixing, or maintaining prices in these relevant markets, then you must find for the relevant Defendants for that claim under the Illinois Antitrust Act.

**Plaintiffs' Authority:** 740 ILCS 10/3(2); 740 ILCS 10/3(3); 740 ILCS 10/11; *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).

 **Plaintiffs' Position:** The parties disputes regarding the Illinois's claims under the Illinois Antitrust Act ("IAA") in part mirror those discussed above. First, for the reasons stated regarding Post-Instruction No. 25, Defendants actions should be evaluated collectively. Second, as discussed above, Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that Illinois is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether the evidence presented by Plaintiffs is sufficient to show that Defendants' conduct harmed competition in Illinois.

The parties agree that Illinois' claims under the IAA and Section 1 of the Sherman Act are congruent because the wording of the IAA is identical or similar to that of the Sherman Act. 740 ILCS 10/11; *Int'l Star Registry v. RGIFT Ltd.*, 2024 WL 3594644, \*3 (N.D. Ill. July 31, 2024). With respect to Illinois's claims under Sections 3(2) and 3(3) of the IAA, those claims are largely congruent with Section 2 of the Sherman Act. Where additional proof elements are required, Illinois has added appropriate language in its proposed jury instructions consistent with Illinois' claims and the wording of Sections 3(2) and 3(3) of the IAA. *See* 740 ILCS 10/3(2); 740 ILCS 10/3(3); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).

**Defendants' Authority:** *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994) ("[T]he Illinois Act requires more proof than section 2 of the Sherman Act for a court to find that a defendant violated section 3(3) of the Illinois Act, in that not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market.").

**Defendants' Argument:**

For monopolization claims under the Illinois Antitrust Act, "not only must the plaintiff prove that defendant established, maintained, used, or attempted to acquire monopoly power over any substantial part of trade or commerce but, in addition, plaintiff must prove that defendant did so for the purpose of excluding competition or controlling, fixing, or maintaining prices in that trade or market." *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 251 Ill. App. 3d 17, 24 (1993), *aff'd*, 162 Ill. 2d 99 (1994).  Defendants' proposed instruction has added this additional element for monopolization claims under the Illinois Antitrust Act.

**Post-Instruction No. 29**

## KANSAS RESTRAINT OF TRADE ACT
### (Kan. Stat. Ann. § 50-101 *et seq.*)

The State of Kansas has brought claims under the Kansas Restraint of Trade Act, Kan. Stat. Ann. § 50-101 *et seq.* Kansas's claims under the Kansas Restraint of Trade Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Kansas involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and Kansas proves by a preponderance of the evidence that Defendants engaged in unlawful conduct that harmed competition nationwide, including in Kansas, then you must also find for the State of Kansas and against Defendants on those same claims under the Kansas Restraint of Trade Act. If you find for Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for Defendants under those same claims under the Kansas Restraint of Trade Act.

For claims under the Kansas Restraint of Trade Act involving monopolization, the elements of proof for claims under this statute are the same as under Section 2 of the Sherman Act, except the State of Kansas must also prove the existence of concerted or joint action with another party. If you find for Plaintiffs and against one or more Defendants on Plaintiffs' monopolization claims under Section 2 of the Sherman Act, and Kansas proves by a preponderance of the evidence that one or more Defendants acted jointly or in concert with another party, and that one or more Defendants' conduct harmed competition in Kansas, then you must also find for the State of Kansas on those same claims under the Kansas Restraint of Trade Act and against the relevant Defendants. If you find

for one or more Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or that the

State of Kansas failed to prove that one or more Defendants acted jointly or in concert with another

party, then you must find for the relevant Defendants under those claims under the Kansas Restraint

of Trade Act.

**Plaintiffs' Authority:** Kan. Stat. Ann. §§ 50-102, 112, 163(b).

**Plaintiffs' Position:** Defendants appear to take the position that Kansas is not able to pursue state law claims analogous to Section 1 of the Sherman Act, based on a prior dismissal of its state law claims in the *In re Elec. Books Antitrust Litigation*. As discussed above (*see* Post-Instruction No. 25), the voluntary dismissal of a claim in prior litigation has no bearing on Kansas's ability to bring those claims here. And under Kansas's harmonization statute, the Kansas Restraint of Trade Act and Section 1 of the Sherman Act are congruent. *See* Kan. Stat. Ann. § 50-163(b).

**Defendants' Authority:** Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claim under Kansas Restraint of Trade Act); *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014) ("The States moved on May 28 to voluntarily dismiss all state law claims not congruent with Section 1 of the Sherman Act. The Court granted that motion on May 29."); *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas . . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[].").

**Defendants' Argument:** Defendants have not been able to locate cases interpreting the Kansas Restraint of Trade Act consistently with the Sherman Act, or any statutory provision harmonizing the two statutes. In at least one case, Kansas voluntarily dismissed its claims under the Kansas Restraint of Trade Act "as not congruent with Section 1 of the Sherman Act." *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 DLC, 2014 WL 2535112, at *2 (S.D.N.Y. June 5, 2014); Memorandum Endorsing Plaintiff States' Motion to Voluntarily Dismiss Certain State Law Claims, *In re Elec. Books Antitrust Litig.*, No. 1:11-md-02293-DLC (S.D.N.Y, May 29, 2013), ECF No. 352 (voluntarily dismissing claims under Kansas Restraint of Trade Act). Defendants' proposed instruction thus interprets the Kansas Restraint of Trade Act as consistent with only Section 2 of the Sherman Act. Plaintiffs have provided no authority to the contrary. Moreover, the Kansas Restraint of Trade Act requires concerted action for monopolization claims, unlike Section 2 of the Sherman Act. *In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 394 (D.N.J. 2018) ("[T]he case law as well as the plain language of the Kansas . . . antitrust statute[] require concerted action between two parties. As such, allegations relating to [plaintiff]'s unilateral conduct fails to state a claim under the[] statute[]."). Defendants' proposed instruction includes this requirement.

137

**Post-Instruction No. 30**

## NEBRASKA CONSUMER PROTECTION ACT
### (Neb. Rev. Stat. § 59-1602)

The State of Nebraska alleges Defendants' conduct violates the Nebraska Consumer Protection Act. Neb. Rev. Stat. § 59-1601 *et. seq.*

The State of Nebraska may prove that Defendants violated the Nebraska Consumer Protection Act by proving by a preponderance of the evidence that Defendants violated the Sherman Act, and that the Defendants' conduct directly or indirectly affected the people of the State of Nebraska. If you find for Plaintiffs against one or more Defendants under Plaintiffs' Sherman Act claims, and the State of Nebraska proves by a preponderance of the evidence that Defendants' conduct affected the people of the State of Nebraska, directly or indirectly, you must also find for the State of Nebraska against those Defendants under the Nebraska Consumer Protection Act.

If you find for Defendants under Plaintiffs' Sherman Act claims, you may still find for the State of Nebraska under the Nebraska Consumer Protection Act if the State proves by a preponderance of the evidence for each Defendant that:

1.      The Defendant's conduct is a method of competition;

2.      The Defendant's method of competition was unfair;

3.      The method of competition was in the conduct of trade or commerce; and

4.      The Defendant's conduct directly or indirectly affected the people of the State of Nebraska.

Trade and commerce shall mean the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska.

"Unfair" means either "(1) fell within some common-law, statutory, or other established concept of unfairness or (2) was immoral, unethical, oppressive, or unscrupulous."

**Plaintiffs' Authority**: Neb. Rev. Stat. § 59-829 (2025); Neb. Rev. Stat. 59-1601(2) (2025); *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.* 755 N.W.2d 583, 591 (Neb. 2008) (citing *Raad v. Wal-Mart Stores, Inc.*, 13 F.Supp.2d 1003, 1014 (D. Neb. 1998)); *Salem Grain Company Inc. v. Consolidated Grain and Barge, Co.*, 900 N.W.2d 909, 922 (Neb. 2017).

**Plaintiffs' Position:** Defendants' proposed jury instructions regarding the Nebraska Consumer Protection Act inserts as a four "element" a restatement of the third element of the claim—that the claim "affected the public interest." This is no more than a restatement of the third element—that Defendants' conduct "directly or indirectly affected the people of the State of Nebraska." Defendants' insertion is unnecessary and may lead to juror confusion and should be omitted.

**Defendants' Authority**: Neb. Rev. Stat. § 59-829 (2025); Neb. Rev. Stat. 59-1601(2) (2025); *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.* 755 N.W.2d 583, 591 (Neb. 2008) (citing *Raad v. Wal-Mart Stores, Inc.*, 13 F.Supp.2d 1003, 1014 (D. Neb. 1998)); *Salem Grain Company Inc. v. Consolidated Grain and Barge, Co.*, 900 N.W.2d 909, 922 (Neb. 2017); *Nelson v. Luterstone Surfacing Co.*, 258 Neb. 678, 678 (2000) ("To be actionable under the Consumer Protection Act, the unfair or deceptive act or practice must have an impact upon the public interest."); *Ordosgoitti v. Wener Enterprises, Inc.*, No. 8:20-CV-421, 2021 WL 826504, at *6 (Neb. Mar. 4, 2021) (granting defendant's motion to dismiss plaintiff's claim under § 59-1602 because "the CPA is not meant to apply to private contracts or 'unfair or deceptive act[s] or practice[s] that affect[] only [the] parties to [a] transaction.'"); *Dante v. Schwartz*, Civ. No. 20-01047, 2022 WL 1104996, at *10 (D.N.J. Apr. 13, 2022) ("Because Defendant allegedly targeted only [] employees with deceptive statements, the Court finds that Plaintiffs have not adequately pled that Defendant's behavior impacted the public interest so as to be actionable under the NCPA.").

**Defendants' Argument:**  Nebraska law is clear that "[t]o be actionable under the Consumer Protection Act, the unfair or deceptive act or practice must have an impact upon the public interest." *Nelson v. Luterstone Surfacing Co.*, 258 Neb. 678, 678 (2000).  Defendants thus have added this language to make clear that conduct affecting only a limited number of people is not actionable under this statute.

139

**Post-Instruction No. 31**

**DONNELLY ACT**
**(New York General Business Law §§ 340 *et seq.*)**

The State of New York has brought claims under the Donnelly Act, New York General Business Law §§ 340 *et seq.* New York's claims under the Donnelly Act are based on the same conduct as its claims under the Sherman Act.

For claims under the Donnelly Act involving the restraint of competition by contracts, agreements, arrangements, or combinations, the elements of proof are the same as under Section 1 of the Sherman Act. If you find for Plaintiffs and against Defendants on Plaintiffs' claims under Section 1 of the Sherman Act regarding unlawful exclusive dealing or unlawful tying, and New York proves by a preponderance of the evidence that Defendants engaged in unlawful conduct that harmed competition nationwide, including in New York, then you must also find for the State of New York and against Defendants on those same claims under the Donnelly Act. If you find for Defendants under Plaintiffs' claims under Section 1 of the Sherman Act for unlawful exclusive dealing or unlawful tying, you must find for Defendants under those same claims under the Donnelly Act.

For claims under the Donnelly Act involving monopolization, the elements of proof are the same as under Section 2 of the Sherman Act, except the State of New York must also prove that the establishment or maintenance of the monopoly involved a contract, agreement, arrangement, or combination. If you find for Plaintiffs and against Defendants under Plaintiffs' monopolization claims under Section 2 of the Sherman Act, New York proves by a preponderance of the evidence that those monopolies were established or maintained through one or more contracts, agreements, arrangements, or combinations, and that Defendants engaged in unlawful conduct that harmed competition nationwide, including in New York,  then you must also find for the State of New York and against Defendants on those same claims under the Donnelly Act. If you find for Defendants on Plaintiffs' claims under Section 2 of the Sherman Act, or the State of New York fails to prove the existence of a

contract, agreement, arrangement, or combination in connection with that claim, then you must find

for Defendants under those claims under the Donnelly Act.

**Plaintiffs' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68-69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Plaintiffs' Position:** The parties' disputes regarding New York's claims under the Donnelly Act mirror those above. First, for the reasons stated regarding Post-Instruction No. 25, Defendants actions should be evaluated collectively. Second, as discussed above, Plaintiffs will collectively present evidence to prove that Defendants' conduct harmed competition nationwide. Defendants' proposal may suggest that New York is independently required to put on a separate case, which is not correct. To avoid juror confusion while ensuring an evaluation of State impact, the jury should be instructed to determine whether Defendants' conduct "harmed competition nationwide, including in New York."

**Defendants' Authority**: *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 68–69 (2d Cir. 2019); *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *43 (S.D.N.Y. Dec. 11, 2014); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012); *Saxe, Bacon & Bolan, P.C. v. Martindale-Hubbell, Inc.*, 710 F.2d 87, 90 (2d Cir. 1983) (citations omitted).

**Defendants' Argument:** Defendants' edits to this instruction make clear that New York must prove each Defendant's liability separately, as explained above. *See supra* Defendants' Argument on Preliminary Instruction No. 10 (Summary of Contentions).

**Post-Instruction No. 32**

## SOUTH CAROLINA
## UNFAIR TRADE PRACTICES ACT
### (S.C. Code Ann. § 39-5-10 et seq.)

The state of South Carolina alleges that Defendants' conduct violates the South Carolina Unfair Trade Practices Act (S.C. Code Ann. § 39-5-10 *et seq*.), SCUTPA provides that "[u]nfair methods of competition and unfair practices in the conduct of any trade or commerce are… unlawful."

For the State of South Carolina to prevail on this claim, you must find that:

1.   Defendants engaged in an act or practice in trade or commerce.

2.   The act or practice is unfair.

3.   The act or practice has an impact on the public interest.

The words "trade" and "commerce" include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and any trade or commerce directly or indirectly affecting the people of South Carolina. Although the Act defines "trade and commerce" to include the previously mentioned activities, "trade and commerce" may also mean other activities that were not mentioned.

The act or practice alleged must be unfair or deceptive. An act or practice is "unfair" when it is offensive to public policy or when it is immoral, unethical, or oppressive. Whether an act or practice is unfair or deceptive within the meaning of the Act depends upon the surrounding facts and the impact of the transaction on the marketplace.

Unfair acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition. While not the only means for showing potential repetition, potential for repetition may be shown by:

1.    showing the same kind of actions occurred in the past, thus making it likely they will

continue to occur absent deterrence; or

2.    showing the company's procedures create a potential for repetition of the unfair acts.

When the State of South Carolina brings a claim under the Act, there is no requirement for the

State to:

1.    demonstrate any actual impact, or to show any adverse impact, injury-in-fact, or

reliance.

2.    Establish a definition of "Market."

**Plaintiffs' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge - Civil*, 2009, §§ 34-1; 34-2, 34-3; *Chucks Feed & Seed Co. v. Ralston Purina Co.*, 810 F.2d 1289, 1292 (4th Cir. 1987); *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (the Act may be violated if there is a claim or representation that had the capacity or effect or tendency to deceive; plaintiff need not show intentional deception under South Carolina UTPA, but a plaintiff cannot prevail without showing at least a potential of deception); *Cheshire v. Coca-Cola Bottling Affiliated Inc.*, 758 F. Supp. 1098, 1101 (D.S.C. 1990); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms.*, Inc., 414 S.C. 33, 777 S.E.2d 176 (2015); *Singleton v. Stokes Motor, Inc.*, 358 S.C. 369, 595 S.E.2d 461 (2004); *Crary v. Djebelli*, 329 S.C. 385, 496 S.E.2d 21 (1998); *York v. Conway Ford, Inc.*, 325 S.C. 170, 173, 480 S.E.2d 726, 728 (1997)(alleged acts or practices have the potential for repetition where defendant remains in the same business and faced with opportunities to repeat the conduct); *Taylor v. Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996); *Daisy Outdoor Advertising Co. v. Abbott*, 322 S.C. 489, 493-94, 473 S.E.2d 47, 49-50 (1996)(evidence of a potential for repetition, generally speaking, establishes the required public impact); *Adams v. G.J. Creel and Sons, Inc.*, 320 S.C. 274, 465 S.E.2d 84 (1995); *Foggie v. CSX Transp., Inc.*, 313 S.C. 98, 431 S.E.2d 587 (1993); *Camp v. Springs Mortgage Corp.*, 310 S.C. 514, 426 S.E.2d 304 (1993); *Haley Nursery Co. v. Forrest*, 298 S.C. 520, 381 S.E.2d 906 (1989); *Inman v. Ken Hyatt Chrysler Plymouth, Inc.*, 294 S.C. 240, 363 S.E.2d 691 (1988); *Wright v. Craft*, 372 S.C. 1, 640 S.E.2d 486 (Ct. App. 2006); *Wogan v. Kunze*, 366 S.C. 583, 606, 623 S.E.2d 107, 120 (Ct. App. 2005); *Robertson v. First Union Nat'l Bank*, 350 S.C. 339, 565 S.E.2d 309 (Ct. App. 2002); *DeBondt v. Carlton Motorcars, Inc.*, 342 S.C. 254, 536 S.E.2d 399 (Ct. App. 2000); *Prestwick Golf Club, Inc. v. Prestwick Limited Partnership*, 331 S.C. 385, 503 S.E.2d 184 (Ct. App. 1998); *Perry v. Green*, 313 S.C. 250, 437 S.E.2d 150 (Ct. App. 1993); *Baker v. Chavis*, 306 S.C. 203, 410 S.E.2d 600 (Ct. App. 1991); *Dowd v. Imperial Chrysler-Plymouth, Inc.*, 298 S.C. 439, 381 S.E.2d 212 (Ct. App. 1989); *Potomac Leasing Co. v. Bone*, 294 S.C. 494, 366 S.E.2d 26 (Ct. App. 1988); *Barnes v. Jones Chevrolet Co.*, 292 S.C. 607, 358 S.E.2d 156 (Ct. App. 1987); *Key Co. v. Fameco Distrib., Inc.*, 292 S.C. 524, 357 S.E.2d 476 (Ct. App. 1987); *Noack Enters., Inc. v. Country Corner Interiors*, 290 S.C. 475, 351 S.E.2d 347 (Ct. App. 1986); *State ex-rel. Medlock v. Nest Egg Soc'y Today, Inc.*, 290 S.C. 124, 128-29, 348 S.E.2d 381, 384 (Ct. App. 1986); *State ex- rel. McLeod v. Brown*, 278 S.C. 281, 283-84, 294 S.E.2d 781, 782-83 (Ct. App. 1982); S.C. Code Ann. § 39-5-10(b) (1985); S.C. Code Ann. § 39-5- 20(a) (1985); S.C. Code Ann. § 39-5- 50(a) (1985); S.C. Code Ann. § 39-5- 110(a) (1985); S.C.

Code Ann. § 39-5-140 (1985); Federal Trade Commission, Comm'n File No. P221202, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission A*ct (Nov. 10, 2022).

**Plaintiffs' Position:** Defendants proposed jury instructions for the South Carolina Unfair Trade Practices Act strike certain language defining the meaning of "trade and commerce" under the Unfair Trade Practices Act, and language clarifying that South Carolina does not need to show "actual impact, or show any adverse impact, injury in fact, or reliance" or to establish a definition of "market" to show liability. Defendants provide no authority for their removal of this language, and it should be maintained.

**Defendants' Authority**: Roger L. Couch, *South Carolina Requests to Charge – Civil*, 2011; Ralph King Anderson, Jr., *South Carolina Requests to Charge – Civil*, 2009, §§ 34-1, 34-2, 34-3; ECF No. 257 ¶ 464 (Am. Compl.) ("Defendants' acts or practices alleged herein constitute "unfair methods of competition" under S.C. Code § 39-5-20.).

**Defendants' Argument:**

*First*, Defendants object to South Carolina's statement that "'trade and commerce' may also mean other activities" not enumerated in the statute.  The statutory definition sufficiently makes clear what "trade and commerce" means under SCUTPA. South Carolina's statement that it could also mean other things is confusing and inaccurate.

*Second*, Defendants object to inclusion of "deceptive" as no deceptive conduct has been alleged here.

*Third*, Defendants object to South Carolina's recitation of things it need not prove (actual impact and market definition).  Defendants' proposed instruction—like all other instructions in this document—straightforwardly lists what the State must prove to prevail.  Reciting elements that must not be proven adds unnecessary length and risks confusing the jury.  Moreover, South Carolina's statement that it need not prove actual impact directly contradicts element three of the statute—"impact on the public interest."  South Carolina's internally inconsistent proposed instruction is likely to confuse the jury and prejudice Defendants.  And in any event, South Carolina has brought this action in parens patriae and thus must show that a "substantial segment of the state's population was injured."  *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 280 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025).

Post-Instruction No. 33

## TENNESSEE TRADE PRACTICES ACT
## (TENN. CODE ANN. §§ 47-25-101 AND 102)

The State of Tennessee has brought claims under the Tennessee Trade Practices Act. The State of Tennessee is authorized to bring claims under this Act only for conduct that occurred after April 23, 2024. So conduct that occurred before April 23, 2024 cannot form a basis for liability under this statute. If the State of Tennessee fails to provide evidence of conduct that occurred and harmed competition in Tennessee after April 23, 2024, you must find for Defendants on this claim.

For conduct that occurred after April 23, 2024, if you find that the State of Tennessee has proven every element of a Sherman Act Section 1 or Section 2 claim against Defendants, and that Defendants' conduct harmed competition in Tennessee, then you may find that the State of Tennessee has also proven the elements of the Tennessee Trade Practices Act against Defendants with respect to that claim.

**Plaintiffs' Authority**: Tenn. Code Ann. § 47-25-106.

**Plaintiffs' Position:** For the reasons stated above in connection with Preliminary Instruction No. 1, Defendants' liability should be assessed collectively.

**Defendants' Authority:** Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23, 2024); *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1170-71 (N.D. Cal. 2007) (recognizing that Tennessee previously lacked *parens patriae* authority); *State ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, at *5 (Tenn. Ch. Sept. 25, 1980) (rejecting common-law parens patriae authority because such authority "must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established"); *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. As such, statutes are presumed to operate prospectively absent clear indication from the legislature that the law is intended to apply retrospectively. . . . Here, the legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively.").

**Defendants' Argument:** The Tennessee Trade Practices Act did not authorize parens patriae actions until April 23, 2024. Tenn. Code Ann. § 47-25-106 (granting parens patriae authority as of April 23,

2024).    And the statutory amendment authorizing such actions does not apply retroactively. *Connecticut v. Sandoz, Inc.*, No. 3:20-CV-00802(MPS), ECF No. 645 at 5-6 (D. Conn. Apr. 25, 2025) ("Tennessee's constitution prohibits retrospective laws, Tenn. Const. Art. 1, § 20. . . . Here, the legislature did not clearly provide that the amendment to the TTPA be retroactive; therefore, the amendment is presumed to operate prospectively."). Accordingly, Defendants' proposed instruction makes clear that Tennessee's recovery under the Tennessee Trade Practices Act is limited to each Defendant's conduct occurring after April 23, 2024 that harmed Tennessee residents and competition in Tennessee.

**Post-Instruction No. 33P**

### VERMONT CONSUMER PROTECTION ACT
### (9 V.S.A. § 2451 et seq.)

The State of Vermont alleges that Defendants' conduct violates the Vermont Consumer Protection Act (9 V.S.A § 2451 *et seq.*), which provides that "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce are…unlawful."

For the State of Vermont to prevail on this claim, you must find that:

1.      Defendants engaged in an act or practice in commerce; and

2.      The act or practice is unfair or deceptive.

An act or practice occurs "in commerce" when it takes place in the consumer marketplace in the context of a defendant's business, rather than in a private transaction; and (2) it has a potential harmful effect on consumers, constituting a breach of duty owed to consumers.

The act or practice alleged must be unfair or deceptive. An act or practice is "unfair" when it (1) offends public policy even if it hasn't been previously considered unlawful; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. Acts or practices are considered against public policy if they are in the realm of what is considered unfair as established by statutes, common law, or another established concept of unfairness.

An act is deceptive where (1) there is a representation, omission, or practice likely to mislead consumers; (2) the consumer interprets the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision. Deception is measured objectively and looks to whether the representation or omission had the capacity or tendency to deceive a reasonable person. Actual injury does not need to be shown.

When the State of Vermont brings a claim under the Vermont Consumer Protection Act, there is no requirement for the State to prove intent by the defendant to have acted deceptively or unfairly.

**Plaintiffs' Authority**: *Concepts NREC, LLC v. Qiu*, No. 5:20-CV-133, 2025 WL 2052132, at *26 (D. Vt. July 21, 2025); *Foti Fuels, Inc. v. Kurrle Corp.,* 2013 VT 111, ¶ 22, 195 Vt. 524, 536, 90 A.3d 885, 893 (2013); *Carter v. Gugliuzzi,* 168 Vt. 48, 56, 716 A.2d 17, 23 (1998); *Peabody v. P.J.'s Auto Village, Inc.,* 153 Vt. 55, 57, 569 A.2d 460, 462 (1989); *Winton v. Johnson & Dix Fuel Corp.,* 147 Vt. 236, 244, 515 A.2d 371, 376 (1986); *In re Bristol-Myers Co.,* 102 F.T.C. 21 (1983); *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385, 1388 (1979); *F.T.C. v. Sperry & Hutchinson Co.,* 405 U.S. 233, 241 (1972).

**Plaintiffs' Position:** Defendants propose striking the instruction on the Vermont Consumer Protect Act on the apparent argument that Vermont does not have standing to maintain *parens patriae* claims. As discussed above (*see* Post-Instruction No. 25), this is not a basis for striking a jury instruction.

**Defendants' Argument:**  Vermont lacks parens patriae authority to bring this claim.  *See* Vt. Stat. Ann. tit. 9 §§ 2451 *et seq.* (no provision for *parens patriae* actions).  Plaintiffs have provided no authority to the contrary.

**Post-Instruction No. 34**

## STATES DAMAGES CLAIMS AND CAUSATION

Twenty-four of the Plaintiff States—specifically, Arizona, Arkansas, Colorado, Connecticut, Florida, Illinois, Indiana, Iowa, Michigan, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, Washington, West Virginia, Wisconsin, and the District of Columbia—are seeking damages from Defendants on behalf of fans who purchased primary concert tickets for events at major concert venues in those States. I may refer to these 24 States as "Plaintiff States claiming damages."

If you find that the Plaintiffs have proved that Defendants have monopolized any of the markets for services for primary concert tickets at major concert venues in violation of Section 2 of the Sherman Act or those States' laws, or that Plaintiffs have proved Defendants have engaged in unlawful exclusive dealing in violation of Section 1 of the Sherman Act or those States' laws, then you must decide if any such violations caused injury to fans who attended concerts at major concert venues in the Plaintiff States claiming damages. If any Plaintiff State claiming damages fails to do so, then you cannot award damages to that Plaintiff State

If a Plaintiff State seeking damages proves Defendants caused injury to fans, then you must determine the amount of damages, if any, that each Plaintiff State claiming damages is entitled to recover.

I will now give you further instructions on how to determine whether to award damages.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases B-304.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants again inaccurately mischaracterize Plaintiffs' damages claims as relevant only to the fan ticketing market. As described above, Plaintiffs may also viably claim damages based on the venue-facing primary concert ticketing and primary ticketing markets, and based on their exclusive dealing claim, under *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009), and *Reazin v. BCBS of Kansas*, 899 F.2d 951 (10th Cir. 1990). *See* Preliminary Instruction No. 12.

Fourth, as described above, Defendants' assertion that "damages will be kept by those States and not returned to any State residents or 'fans'" is inaccurate. *See* Preliminary Instruction No. 10.

**Defendants' Authority:**  ECF No. 777 at 41 (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment); *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 848 (9th Cir. 2011) ("[A] statutory *parens patriae* action may well result in a settlement that does not include restitution to victims of the fraud, but only results in penalties paid to the public treasury."); *Broselow v. Fisher*, 319 F.3d 605, 608 (3d Cir. 2003) (individuals have no right to funds collected through *parens patriae* claims because such funds are not collected "under an assignment" from those individuals); *New York by Vacco v. Reebok Int'l*, 96 F.3d 44, 49 (2d Cir. 1996) (individuals are not entitled to distributions from the settlement of a *parens patriae* suit); N.Y. Exec. § 63(12) ("monies recovered or obtained under this subdivision" are subject to N.Y. State Fin. § 4(11), which requires that the funds "be deposited in the state treasury" and not disbursed "except pursuant to an appropriation"); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025) ("A state suing *in parens patriae* must establish '(1) [an] injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual plaintiffs to obtain complete relief.'"); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both"); ECF No. 483 at 4 n.1 (Opinion and Order); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained"); *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State").

**Defendants' Argument:**

Defendants' edits clarify that each Plaintiff State claiming damages can only seek damages (1) on an individual, not collective, basis; and (2) from Ticketmaster, not Live Nation, who is not a party to the exclusive ticketing contracts that allegedly harm "fans." *Orchestrate HR, Inc. v. Trombetta*, No. 3:13-CV-2110-KS, 2017 WL 273669, at *8 (N.D. Tex. Jan. 20, 2017) ("It is elementary that each plaintiff must prove its own damages."); *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a contract under the corporate name of [either a parent corporation or its subsidiary] is not treated as that of both").

Defendants' edits also make clear that a Plaintiff State claiming damages may recover only if it has proven (1) the monopolization claim with respect to the primary ticketing market involving "fans," and (2) injury to "fans" who reside in its State.  ECF No. 483 at 4 n.1 (Opinion and Order Denying Defendants' Motion to Dismiss) (recognizing that Plaintiff States claiming damages "only seek damages for injuries in the primary-ticketing market caused by conduct outlined in Count 1"); *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016) ("to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained"); *New York, by James v. Niagara-Wheatfield Cent. Sch. Dist.*, 119 F.4th 270, 279 (2d Cir. 2024), *cert. denied sub nom. Niagara-Wheatfield Cent. Sch. Dist. v. New York*, 146 S. Ct. 324 (2025) ("A state suing *in parens patriae* must establish . . . [an] injury to a sufficiently substantial segment of the state's population" and "a quasi-sovereign interest").

**Post-Instruction No. 35**

## INJURY AND CAUSATION

Each Plaintiff State claiming damages is entitled to recover damages on behalf of fans who purchased primary concert tickets to attend events at major concert venues in those States if they can establish these three elements of injury and causation:

1.    Fans residing in its State were in fact injured as a result of Defendants' alleged violations of the antitrust laws;

2.    Defendants' alleged unlawful conduct was a material cause of fans' injuries; and

3.    Those fans' injuries are of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each of the Plaintiff States claiming damages to establish that they are entitled to damages, they must prove that fans were injured as a result of Defendants' alleged monopolization of the market for services for primary concert tickets at major concert venues in violation of Section 2 of the Sherman Act, or for exclusive dealing in violation of Section 1 of the Sherman Act. Proving the fact of damage does not require each of the Plaintiff States claiming damages to prove the dollar value of fans' injuries. It requires only that the Plaintiff States claiming damages to prove that fans residing in that State were in fact injured by Defendants' alleged antitrust violations. If you find that the Plaintiff States claiming damages have proved that fans were in fact injured, you may then consider the amount of damages. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that fans were in fact injured.

Each of the Plaintiff States claiming damages must also offer evidence that establishes by a preponderance of the evidence that Defendants' alleged unlawful conduct was a material cause of injuries to fans in that State. This means that the Plaintiff States claiming damages must have proven

that some damage occurred to fans as a result of Defendants' alleged antitrust violation, and not some other cause. The Plaintiff States claiming damages are not required to prove that Defendants' alleged antitrust violations were the sole cause of fans' injuries; nor do they need to eliminate all other possible causes of injury. It is enough if each of the Plaintiff States claiming damages have proven that the alleged antitrust violation was a material cause of injury to fans residing in that State.

Finally, each of the Plaintiff States claiming damages must establish that fans' alleged injuries are the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If fans' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then fans' injuries are antitrust injuries. On the other hand, if fans' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then fans' injuries are not antitrust injuries and none of the Plaintiff States claiming damages may recover damages for those injuries under the antitrust laws.

When determining whether an antitrust injury occurred, you may consider whether Defendants monopolized the market for primary concert ticketing offered to fans at major concert venues in the United States or engaged in unlawful exclusive dealing in that market.

Even if you conclude that defendants did not monopolize that market or engage in unlawful exclusive dealing in that market, you should consider whether Defendants monopolized the markets for primary ticketing services to major concert venues or primary concert ticketing services to major concert venues, or engaged in unlawful exclusive dealing in those markets. If you conclude that Defendants did monopolize either of those markets or engaged in unlawful exclusive dealing in those markets, you may consider whether fans' purchases of primary concert tickets are inextricably intertwined with those markets. In reaching that determination, you should consider whether the alleged anticompetitive conduct by Defendants in either of those markets led to injuries to fans when

153

they purchased primary tickets for concerts at major concert venues, and whether those injuries were clearly foreseeable based on Defendants' conduct. You may also consider whether fan purchases of primary tickets at major concert venues were part of the economy endangered by Defendants' alleged anticompetitive conduct in those other markets. If you do find that fans' purchases of tickets are inextricably intertwined with the market for selling ticketing services to major concert venues, you also may conclude the Plaintiff States claiming damages have established an antitrust injury.

In summary, if each of the Plaintiff States claiming damages can establish that fans residing in that State were in fact injured by Defendants' conduct, that Defendants' conduct was a material cause of fans' injuries, and that fans' injuries were the type that the antitrust laws were intended to prevent, then each such Plaintiff State is entitled to recover damages for the injuries to fans residing in that State.

**Plaintiffs' Authority**: Adapted Final Jury Instructions at 52-53, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Jury Instructions in Civil Antitrust Cases A-300, A-303; ABA Model Instr. 6.A.1; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479-84 (1982); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009); *United States of Am. v. Live Nation Entm't, Inc.*, No. 1:24-cv-03973-AS (S.D.N.Y. Mar. 13, 2025) at 4-7.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.*, with further changes necessary to account for the Plaintiff States seeking damages' standing under *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009) and *Reazin v. BCBS of Kansas*, 899 F.2d 951 (10th Cir. 1990). Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury. *See also* Preliminary Instruction No. 12.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants again inaccurately mischaracterize Plaintiffs' damages claims as relevant only to the fan ticketing market and delete necessary instructions to account for standing under *McCready*.

**Defendants' Authority**: ABA Model Instr. 6.A.1; *U.S. Football League v. Nat'l Football League*, No. 84 CIVIL 7484PKL, 1986 WL 10620, at *34 (S.D.N.Y. July 31, 1986) ("I instruct you that each one of the plaintiffs must show the fact of its injury and the amount of its damage. Should you find that one of the plaintiffs was injured in fact and was damaged in its business or property, that does not necessarily mean that any other plaintiff was either injured or damaged."); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256, 265 (E.D.N.Y. 2004) ("The doctrine of parens patriae grants standing to a state to sue on behalf of its citizens."); 15 U.S.C. § 15c(a)(1) (parens patriae authority is "on behalf of natural persons residing in such State").

**Defendants' Argument:**

Defendants' edits to this instruction align it with the previous instruction and were undertaken for the same reasons.

Additionally, Plaintiff States' proposed instruction on antitrust injury is wrong as a matter of law. As set forth in Defendants' motion for summary judgment, "to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016). The fans that Plaintiff States seek to represent do not meet this requirement, nor are the fans' alleged injuries "inextricably intertwined" with alleged injuries in other purported markets. *In re DDAVP Direct Purchaser Antitrust Litigation* and *Blue Shield of Virginia v. McCready*—are distinguishable. In *DDAVP*, the defendants' exclusionary conduct focused directly on the *same product* (a drug) that the plaintiffs purchased. 585 F.3d 677, 683, 688 (2d Cir. 2009). And in *McCready*, the plaintiff alleged that she was a "consumer of *psychotherapeutic services* and that she had been injured by the defendants' conspiracy to restrain competition in the market *for such services*." *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983) (describing *McCready*, 457 U.S. 465, 484 (1982)) (emphasis added). In such circumstances, "the consumers' injury is 'clearly foreseeable,' 'inextricably intertwined' with the anticompetitive conduct, and 'flows from that which makes [the] defendants' acts unlawful.'" ECF No. 483 at 6 (Opinion and Order Denying Defendants' Motion to Dismiss) (citations omitted). But that is not this case: fans purchase a different product, in a different market, than the product in the venue-facing market where the alleged conduct occurs and, as a result, the alleged conduct and injury are not "inextricably intertwined."

Post-Instruction No. 36

## DAMAGES INSTRUCTIONS—GENERAL

If you find that Defendants violated the antitrust laws and that this violation caused injury to fans residing in any of the Plaintiff States, then you must determine the amount of damages, if any, those Plaintiff States are entitled to recover. The fact that I am giving you instructions concerning the issue of damages does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on Plaintiffs' claims for monopolization of the market for services for primary concert tickets at major concert venues in violation of Section 2 of the Sherman Act and the Plaintiff States claiming damages' laws, or for exclusive dealing in violation of Section 1 of the Sherman Act and the Plaintiffs States claiming damages' laws, you should not consider the issue of damages and you may disregard the damages instruction that I am about to give.

The law provides that each Plaintiff State claiming damages should be fairly compensated for all damages to fans residing in those States who attended live concert events at a major concert venue that were a direct result or likely consequence of the conduct that you have found to be unlawful.

Antitrust damages are only compensatory, meaning their purpose is to put injured fans as near as possible in the position in which they would have been had the alleged antitrust violation not occurred. The law does not permit you to award damages to punish a wrongdoer—what we sometimes refer to as punitive damages—or to deter particular conduct in the future. Furthermore, you are not permitted to award to any of the Plaintiff States an amount for attorneys' fees or the costs of maintaining this lawsuit.

**Plaintiffs' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1.

**Plaintiffs' Position:** Plaintiffs have adapted nonargumentative damages instructions based on the ABA Model Jury Instructions and those used in *Innovative Health LLC v. Biosense Webster, Inc.* Defendants' proposed modifications misstate the relevant claims at issue or otherwise pose a risk of confusing the jury. First, for the same reasons described with respect to prior instructions,

Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury. Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants. Third, Defendants again inaccurately mischaracterize Plaintiffs' damages claims as relevant only to the fan ticketing market. As described above, Plaintiffs may also viably claim damages based on the primary concert ticketing and primary ticketing markets, and based on their exclusive dealing claim, under *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009), and *Reazin v. BCBS of Kansas*, 899 F.2d 951 (10th Cir. 1990). *See* Preliminary Instruction No. 12.

**Defendants' Authority**: Final Jury Instructions at 54, *Innovative Health LLC v. Biosense Webster, Inc.*, Case No. 8:19-cv-1984 JVS (C.D. Cal. May 16, 2025); ABA Model Instr. 6.B.1; 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief . . . which is properly allocable to . . . any business entity.").

**Defendants' Argument:**

Defendants' edits to this instruction align it with the previous two instructions and were undertaken for the same reasons. Additionally, Defendants' edits make clear to the jury that Plaintiff States claiming damages can only recover damages for injuries to natural persons, not for injuries to businesses. 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief . . . which is properly allocable to . . . any business entity.").

**Post-Instruction No. 37**

## COMPENSATORY DAMAGES—OVERCHARGE

The Plaintiff States claiming damages contend that fans paid excessively high prices for primary tickets for live events at major concert venues because Defendants were charging ticketing fees that were inflated due to Defendants' antitrust violations; that is, higher prices than would have prevailed in a competitive market. If you find that the Plaintiffs have proven that Defendants violated the antitrust laws I previously described, and that the Plaintiff States claiming damages have satisfied the other elements for damages in my previous instructions, then the Plaintiff States claiming damages are entitled to recover, on behalf of fans, as damages, the amount of the overcharge. That amount is the difference between what fans paid for primary tickets during the damages period and the price you find that fans would have paid in a competitive market.

**Plaintiffs' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs have proposed a short nonargumentative instruction regarding the nature of overcharge damages. Defendants' proposed instruction complicates this instruction in a way that mischaracterizes Plaintiffs' claims and may otherwise be confusing for the jury.

First, for the same reasons described with respect to prior instructions, Defendants' alternative names for Plaintiffs' proposed markets risk confusing the jury.

Second, Defendants again mischaracterize Plaintiffs' claims (as relevant to this instruction) as only against Ticketmaster, rather than both Defendants.

Third, Defendants again inaccurately mischaracterize Plaintiffs' damages claims as relevant only to the fan ticketing market. As described above, Plaintiffs may also viably claim damages based on the primary concert ticketing and primary ticketing markets, and based on their exclusive dealing claim, under *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) and *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677 (2d Cir. 2009). *See* Preliminary Instruction No. 12.

Fourth, Defendants do not accurately describe the Plaintiff States' economic evidence about the basis of the overcharge to fans. While it is correct that the Plaintiff States' expert will testify that Defendants' increased ticketing fees are the cause of any injuries to fans, Defendants' instruction suggests that the only mechanism by which fans are injured is through a simple pass-through model in which venues are charged increase fees by Ticketmaster and those venues subsequently increase their fees to fans. As the Plaintiff States' expert will testify, because Ticketmaster sells tickets directly to fans, and the various components of a ticket depend on one another, Defendants'

characterization of causation here is not accurate. And regardless, given that causality with be a subject of dispute between experts at trial, attempting to characterize it in detail in a jury instruction is not appropriate.

Fifth, while Plaintiffs do not dispute they may recover only for natural persons, Defendants' have not provided any evidence that corporate entities are present in an material number in the data sets relied on by Plaintiffs to prove damages—as discussed in Plaintiff's opposition to Defendants' motion to preclude the testimony of Dr. Abrantes-Metz, Defendants have not examined transaction-level data at all. ECF No. 743 at 17–18. Plaintiffs are required only to provide the jury with a reasonable basis for estimating damages. *See id.* Defendants' proposed instruction may confuse the jury into believing a heightened standard is required based on no more than speculation.

**Defendants' Authority**: Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008); 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief . . . which is properly allocable to . . . any business entity.").

**Defendants' Argument:**

Defendants object to Plaintiffs' characterization of the alleged overcharge, which seeks to prejudice the jury by obfuscating the nature of the alleged overcharge and how it allegedly results. Defendants' edits seek to make clear that the alleged overcharge at issue (1) relates to *fees* added to the face value of tickets, not the face value of tickets themselves; and (2) results from *venues* increasing those fees, not Ticketmaster. Defendants' remaining edits align this instruction with the preceding damages instructions and were undertaken for the same reasons. Additionally, the jury should be instructed that it cannot award damages for injuries to businesses. 15 U.S.C. § 15c(a)(1) ("The court shall exclude from the amount of monetary relief awarded in [a parent patriae] action any amount of monetary relief . . . which is properly allocable to . . . any business entity.").

Post-Instruction No. 38

## TIME PERIOD FOR ANY DAMAGES: STATUTE OF LIMITATIONS

The statute of limitations for the antitrust laws does not permit Plaintiff States to recover damages for any injuries sustained by fans residing in their States in connection with any live events that took place before May 23, 2020.

**Plaintiffs' Authority:** Adapted ABA Model Instr. 7.A.1.

**Plaintiffs' Position:** The Plaintiff States do not dispute that their damages claims in this action are subject to a four-year statute of limitations. But Defendants' draft instructions argue that the Plaintiff States cannot based any claims for damages "on any contracts any Defendant may have entered into before May 23, 2020." For the reasons explained in more detail in the Plaintiffs' opposition to Defendants' motion to preclude the testimony of Dr. Abrantes-Metz, that principle is inapplicable here and contrary to law. ECF No. 743 at 14–16. The Plaintiff States are suing on behalf of fans who are not parties to these contracts and whose injury depends on sales of ticketing services, not the underlying contracts.

Defendants' further language about the purpose of a statute of limitations is unnecessary and risks confusing the jury as to the application of any statute of limitations to Plaintiffs' liability claims, which is not relevant here. A straightforward instruction about the limitations period will provide the jury the information they require.

**Defendants' Authority:** *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); 15 U.S.C. § 15b ("Any action to enforce any cause of action under [the Sherman Act] shall be forever barred unless commenced within four years after the cause of action accrued."); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."); *CSX Transp., Inc. v. Norfolk S. Ry. Co.*, 114 F.4th 280, 286 (2024) ("Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."); *id.* at 289 ("[M]ere silence or inaction from a defendant—even though the allegedly unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period. Instead, an affirmative act—like a promise to act in the future—is required."); *id.* ("an overt act … must be a new and independent act that is not merely a reaffirmation of a previous act" (quoting *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014)); *id.* at 292 ("[I]n … antitrust cases, [a] plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."); *CTS Corp. v. Waldburger*, 573 U.S. 1, 7 (2014) ("[A] statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.'"); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 320a (2025) ("Limitation serves the same functions in antitrust as elsewhere in the law: to put old liabilities to rest, to relieve courts and parties from 'stale' claims where the best evidence may no longer be available, and to create incentives for those who believe themselves wronged to investigate and bring their claims promptly, particularly when they are known or can be determined."); *Rotella v. Wood*, 528 U.S. 549, 555 (2000) (noting the

basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities"); *Gabelli v. SEC*, 568 U.S. 442, 448-49 (2013) ("Statutes of limitations are intended to 'promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.' They provide 'security and stability to human affairs.' We have deemed them 'vital to the welfare of society,' and concluded that 'even wrongdoers are entitled to assume that their sins may be forgotten.'"); *Seets v. Anne Arundel County*, 40 F. App'x 744, 750-51 (4th Cir. 2002) (instructing jury on statute of limitations).

**Defendants' Argument:**    Defendants object to Plaintiffs' watered down alternative statute of limitations instruction.  As an initial matter, Plaintiffs' instruction fails to explain what a statute of limitations is to the jury.  More importantly, as Defendants explained in a *Daubert* motion and in their pending motion in limine, the applicable statutes of limitations materially limit the evidence the Plaintiff States can use to try to establish Defendants' liability and collect damages.  ECF No. 1019 at 12-15 (Memorandum of Law in Support of Defendants' Motions in Limine); ECF No. 704 at 14-18 (Memorandum of Law in Support of Defendants' Motion to Exclude Dr. Rosa M. Abrantes-Metz); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("[T]he commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."). Although the Court, not the jury, would determine whether any Plaintiff State is entitled to any penalty, statutes of limitations also apply to Plaintiff States' penalties claims, some of which are even less than four years.  *See, e.g.*, S.C. Code § 39-5-150 ("No action may be brought under this article more than three years after discovery of the unlawful conduct which is the subject of the suit."); D.C. Code § 12-301 (one year statute of limitations for statutory penalty actions).  Plaintiffs' proposed instruction erroneously elides that the relevant Defendant's conduct and the relevant fans' injuries must come after May 23, 2020.

Plaintiff States' equitable claims are also subject to the doctrine of laches.  *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 40 (D.D.C. 2021) ("the doctrine of laches [] applies to parens patriae suits"); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 301 (D.C. Cir. 2023) (applying laches).  So the evidence Plaintiff States can rely on to try to prove liability for those claims also must post-date May 23, 2020.

161

**Post-Instruction No. 39**

## BASIS FOR CALCULATING DAMAGES

You are permitted to make just and reasonable estimates in calculating damages for each Plaintiff State that has proven it is entitled to recover damages. You are not required to calculate damages with mathematical certainty or precision. However, the amount of damages must have a reasonable basis in the evidence and must be based on reasonable, non-speculative assumptions and estimates. Damages may not be based on guesswork or speculation. Each of the Plaintiff States claiming damages must prove the reasonableness of each of the assumptions upon which the damages calculation is based.

If you find that any Plaintiff States claiming damages have provided a reasonable basis for determining damages, then you may award that State damages based on a just and reasonable estimate supported by the evidence.

If you find that any Plaintiff States failed to carry their burden of providing a reasonable basis for determining damages, then you may not award damages or you may award nominal damages, not to exceed one dollar to each State.

**Plaintiffs' Authority**: Adapted ABA Model Instr. 6.B.3.

**Plaintiffs' Position:** Plaintiffs have proposed an adapted version of the ABA Model Jury Instructions for this instruction. Defendants' proposed instruction unnecessarily repeats the requirement for individual determinations for each State that is already covered in the existing instruction.

**Defendants' Authority**: Adapted ABA Model Instr. 6.B.3.

**Defendants' Argument:**

Defendants' edits to this instruction align it with the preceding damages instructions and were undertaken for the same reasons.

**Post-Instruction No. 39P**

**CALCULATION OF MONETARY RECOVERY FOR VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200 ET SEQ.)**

If you find that Defendants have violated California's Unfair Competition Law, then you must determine the amount of monetary recovery, if any, that harmed consumers are entitled to recover. The fact that I am giving you instructions concerning the issue of the amount of monetary recovery under California's Unfair Competition Law does not mean that I believe any party should, or should not, prevail in this case. If you reach a verdict for Defendants on California's Unfair Competition Law, you may disregard the monetary recovery instructions that I am about to give.

The law provides that the State of California should receive the amount of the overcharge paid by fans who attended live concert events in the State of California. California contends that fans paid excessively high prices for primary tickets for concerts at major concert venues during the damages period of 2020 through 2024 because Defendants were charging prices that were inflated due to Defendants' unlawful or unfair conduct. If you find that the State of California has proven that Defendants violated California's Unfair Competition Law then the harmed consumers are entitled to recover the amount of the overcharge. That amount is the difference between what fans paid for primary tickets in California during the damages period and the price you find that fans would have paid in the absence of the unfair or unlawful conduct.

In addition, if you found that the unlawful or unfair act or practice that either or both Defendants engaged in emanated from California and harmed consumers who attended live concert events outside of California, you should separately determine the amount of overcharge for those consumers.

In calculating the overcharge amount, you must use a reasonable basis of computation. Your calculation of the overcharge amount may be an approximation. Your computation must be

supported by evidence. If you find that the State of California has failed to carry its burden of

providing a reasonable basis for determining the amount of the overcharge, then you may not award

monetary recovery *or you may award nominal monetary recovery, not to exceed one dollar*.

**Plaintiffs' Authority**: *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 506-07, 518-21 (2024) (citing *Abbott Laboratories v. Superior Court*, 9 Cal. 5th 642, 651–652 (2020)); *Ashford*, 100 Cal. App. 5th at 518-19 (the trial court properly determined that defendants' conduct emanated from California and had cited "evidence that defendants were headquartered in San Diego, and Ashford's former presidents, admissions counselors, and the majority of admissions employees worked in San Diego" and that, as an example, the UCL "could constitutionally be applied to the claims of nonresident class members" where the defendant was a California corporation with its principal place of business in California and the "brochures at issue were prepared in and distributed from California" (citation omitted); *Fernandez v. CoreLogic Credco*, LLC, 593 F. Supp. 3d 974, 992 (S.D. Cal. 2022) (refusing to dismiss UCL claim and finding it plausible that unlawful conduct emanated from California in lawsuit brought by Maryland resident
against a firm that had its principal place of business in California, management level employees in California, and that the policies and procedures at issue in this case were developed, designed, and implemented in California); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("Restitution under the UCL . . . must be of a measurable amount to restore to the plaintiff what has been acquired by the violation of the statute[], and that measurable amount must be supported by evidence" and "[i]n calculating damages, here restitution, California law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation" and that "the fact that the amount of damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery" (citing *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698 (2006), *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 938-39 (9th Cir. 1999) (internal quotation marks omitted)). Jury Instructions at 15-16, *Morelock Enterprises, Inc. v. Weyerhaeuser Co.*, 3:04-cv-00583-PA (D. Ore. Apr. 25, 2008).

**Plaintiffs' Position:** Plaintiffs' request for the jury to be instructed on its request for monetary restitution under California's Unfair Competition law is both legally proper and in the interest of judicial efficiency. As stated in Plaintiffs' Joint Memorandum of Law in Support of Plaintiffs' Motion to Bifurcate Trial, the State of California believes that judicial efficiency is served by its request for monetary restitution being tried to the same jury as the liability claims. *See* ECF No. 528 at 7 n.3. The State of California's request for monetary restitution is based on the same evidence and testimony that will support the damages claims of the other states. Plaintiffs' monetary relief expert, Dr. Rosa Abrantes-Metz, calculates the amount of monetary restitution California seeks in the same manner as those of the damages states and presenting the same testimony in another phase of the trial would be inefficient and unnecessary. Further, the Federal Rules permit a jury to sit in an advisory capacity on equitable claims such as the State of California's monetary relief claim where, as here, judicial efficiency would be best served by a single jury considering the claim with others in the case. Fed. R. Evid. 39(c); 9 Wright & Miller, Federal Practice and Procedure: Civil 3d § 2335; *Starr Int'l Co. v. Am. Int'l Grp., Inc.*, 623 F. Supp. 2d 497, 502 (S.D.N.Y. 2009) ("Courts may empanel an advisory jury in order to maximize efficiency and convenience.").

**Defendants' Argument:**  California has sought only equitable relief and civil penalties in this case. ECF No. 257 at 95 (Am. Compl.) (seeking "[i]njunctive, restitution and other equitable relief under the UCL" and "[c]ivil penalties").  Indeed, "[a] UCL action is equitable in nature; damages cannot be recovered."  *Cruz v. PacifiCare Health Systems, Inc.*, 30 Cal. 4th 303, 317 (Cal. 2003).  Although the UCL provides for monetary recovery in the form of restitution, that too is viewed as an equitable remedy "[i]n the UCL context."  *Id.*  This Court has already decided that equitable remedies and civil penalties will be determined at a later phase, after the jury trial on liability and damages. Defendants object to California's attempt to relitigate that ruling and have its equitable remedies tried to the jury.

**Post-Instruction No. 40**

**FINAL INSTRUCTIONS**

You are about to go into the jury room and begin your deliberations. If during those deliberations you want to see any of the exhibits, you may request that they be brought into the jury room. If you want any of the testimony read back to you, you may also request that. Please remember that it is not always easy to locate what you might want to read or hear, so be as specific as you possibly can in requesting exhibits or portions of the testimony.

Your requests for exhibits or testimony—in fact, any communication with the Court—should be made to me in writing, signed by your foreperson, and given to one of the marshals. In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

*Duty to Deliberate/Unanimous Verdict*

You will now retire to decide the case.  It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement. Each of you must decide the case for yourselves, but you should do so only after a consideration of the case with your fellow jurors, and you should not hesitate to change an opinion when convinced that it is erroneous. Your verdict must be unanimous, but you are not bound to surrender your honest convictions concerning the effect or weight of the evidence for the mere purpose of returning a verdict or solely because of the opinion of other jurors. Discuss and weigh your respective opinions dispassionately, without regard to sympathy, without regard to prejudice or favor for either party, and adopt that conclusion which in your good conscience appears to be in accordance with the truth.

Again, each of you must make your own decision about the proper outcome of this case based on your consideration of the evidence and your discussions with your fellow jurors. No juror should surrender their conscientious beliefs solely for the purpose of returning a unanimous verdict.

*Selection of Foreperson*

When you retire, you should elect one member of the jury as your foreperson. That person will preside over the deliberations and speak for you here in open court.

Verdict forms have been prepared for your convenience. You will take these forms to the jury room and, when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form that sets forth the verdict upon which you unanimously agree. You will then return with your verdict to the courtroom. I will read the verdict form to you now.

*Return of Verdict*

After you have reached a verdict, your foreperson will fill in the form that has been given to you, each of you will sign it with the date and advise the marshal outside your door that you are ready to return to the courtroom.

I will stress that each of you should be in agreement with the verdict which is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

*Juror Oath*

In determining the facts, you are reminded that you took an oath to render judgment impartially and fairly, without prejudice and without fear, solely upon the evidence in the case and the applicable law. I know that you will do this and reach a just and true verdict.

167